# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| OSAMA ABU IRSHAID, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 1:17cv402 |
| | ) | |
| UNITED STATES CITIZENSHIP & | ) | |
| IMMIGRATION SERVICES, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 7(F) (1), defendants, through their undersigned counsel, hereby respectfully submit the instant memorandum of law in support of their motion for summary judgment in the above-captioned action.

## INTRODUCTION

Citizenship is the most significant benefit that our nation has to bestow.  And to this end, Congress has enumerated a number of requirements for naturalization, and clearly provided that an alien bears the burden to demonstrate their eligibility for this treasured privilege.  One of those eligibility requirements requires an alien to demonstrate not only that the United States has previously accorded them permanent resident status, but also that their adjustment of status was substantively correct and in full accordance with the governing law.  The Fourth Circuit has now, in a binding decision bearing much in common with the instant action, held that an alien who makes a misrepresentation on their adjustment of status application – regardless of whether the alien intended to deceive immigration authorities – is barred from obtaining naturalization if the

correct response to the relevant question could have influenced the adjustment decision or prevented immigration authorities from further questioning about the alien's eligibility.

That is exactly the case here. In 2000, in pursuit of permanent residence status, plaintiff Osama Abu Irshaid informed immigration authorities in Chicago that he was not (and had not been) a "member" of or "affiliated" with any organization. What plaintiff would later reveal, however, is that he had previously "helped" a group known as the Islamic Association for Palestine ("IAP") with "some of its events," including speaking to those assembled. At the time that plaintiff's adjustment application was pending, a federal district court in Chicago was considering whether there were sufficient connections between IAP and the designated terrorist group Hamas to hold IAP civilly-liable for the murder of an American teenager in a terrorist attack in Israel. That court subsequently answered that question in the affirmative, identifying evidence that tied IAP to Hamas, and entering judgment against IAP in the amount of $156 million. The plaintiffs in that civil action have filed a new action against the plaintiff in the instant action, based on allegations that plaintiff currently leads the IAP's alter ego, in an attempt to render plaintiff himself liable for that $156 million judgment.

As USCIS correctly concluded during the underlying administrative proceedings, plaintiff's failure to identify his connections to IAP in his adjustment application precluded further inquiry about both IAP generally and plaintiff's connections to the same, and was information that could have had a "natural tendency" to influence federal immigration authorities in their deliberations. Plaintiff is therefore ineligible for naturalization, and this Court should enter summary judgment in favor of defendants.

## STATUTORY & REGULATORY BACKGROUND

As several courts have noted, Congress has promulgated a "complex statutory scheme to effect naturalization and deportation."  United States v. Maimaje, 930 F. Supp. 1331, 1332 (D. Minn. 1996).  At the threshold, it is thus appropriate to provide an explanation of the statutory and regulatory provisions that govern an alien's eligibility to become a naturalized citizen of the United States, the process by which an individual applies for naturalization and United States Citizenship and Immigration Services ("USCIS") adjudicates such applications, and the standards by which an Article III court reviews an individual's eligibility for naturalization.

## I.    ELIGIBILITY FOR NATURALIZATION

Federal statute provides that "[n]o person . . . shall be naturalized unless" they satisfy several requirements.  8 U.S.C. § 1427(a); see also United States v. Ginsberg, 243 U.S. 472, 475 (1917) ("No alien has the slightest right to naturalization unless all statutory requirements are complied with.").  In this regard, "the burden is on the alien applicant to show his eligibility for citizenship in every respect," INS v. Pangilinan, 486 U.S. 875, 886 (1988), and "any doubts regarding an applicant's eligibility for naturalization 'should be resolved in favor of the United States and against the claimant,'" Nesari v. Taylor, 806 F. Supp. 2d 848, 863 (E.D. Va. 2011) (quoting Berenyi v. INS, 385 U.S. 630, 637 (1967))).  The instant discussion will identify only those naturalization requirements that are pertinent to defendants' instant motion for summary judgment.

a.    A naturalization applicant must demonstrate that he has been *lawfully* admitted to the United States for permanent residence.  See id. §§ 1427(a)(1); 1429; see also 8 C.F.R. §§ 316.2(a)(2)-(3).  And of particular import, "[w]hether the applicant was *actually* admitted to the United States or had his . . . status adjusted to that of a permanent resident is not dispositive."

Nesari, 806 F. Supp. 2d at 865. Rather, in order to satisfy the requirement of lawful admittance to permanent residence, the applicant must establish that United States's prior decision was substantively correct; *i.e.*, that it was "'in substantive compliance with the immigration laws.'" Injeti v. USCIS, 737 F.3d 311, 316 (4th Cir. 2013) (quoting Shin v. Holder, 607 F.3d 1213, 1217 (9th Cir. 2010)).

In Injeti – which, as will be seen below, shares much in common with the instant action – the Fourth Circuit considered whether an alien's omission of information from an earlier-filed (and ultimately granted) adjustment application rendered that alien ineligible for naturalization because she had not been "lawfully admitted" to the United States for permanent residence. In responding to the question contained on the permanent residence application to list all "former husbands," the alien in Injeti wrote "none," when in actuality, she had previously been married. See id. at 313. Despite the fact that the former INS granted the alien's application for permanent residence status, the Fourth Circuit nevertheless held that this misrepresentation precluded her from demonstrating that she had been *lawfully* admitted to the United States for permanent residence, and as such, she was ineligible for naturalization. See id. at 316-19.

In so holding, the Fourth Circuit rejected two of the alien's arguments that bear on the naturalization application at issue in the instant action. *First*, the Fourth Circuit rejected the alien's position that her misrepresentation was irrelevant to the naturalization analysis because it was not a *willful* or *intentional* misrepresentation (*i.e.*, it was simply a mistake). See id. at 317-18 ("Nor was it necessary for the district court to determine whether Injeti's misrepresentation was fraudulent or intentional."). *Second*, the Fourth Circuit rejected the alien's position that the misrepresentation was not material to the INS's adjudication of her prior permanent resident application because an accurate answer would not *necessarily* have required or led the INS to

deny the application.  See id. at 316-17.  To the contrary, the Fourth Circuit held in order for a

misrepresentation in a prior permanent resident application to be "material," and thus disqualify

an alien from naturalization, it need only have "'a natural tendency to *influence* the decision[] of

[immigration officials],'" or "tend[] to *shut off a line of inquiry* which is relevant to the alien's

eligibility."  Id. (quoting Kungys v. United States, 485 U.S. 759, 772 (1988) (emphasis added);

Matter of Kai Hing Hui, 15 I. & N. Dec. 288, 289 (BIA 1975) (emphasis added)).[1]

b.      It is also necessary to explain how one seeks to adjust status to that of permanent

resident, and the standards by which USCIS adjudicates applications for this type of adjustment.

Permanent resident adjustments are generally governed by 8 U.S.C. § 1255, which provides, in

pertinent part, as follows:

> The status of an alien who was inspected and admitted or paroled into the United States .
> . . may be adjusted by the Attorney General, *in his discretion and under such regulations*
> *as he may prescribe*, to that of an alien lawfully admitted for permanent residence if (1)
> the alien makes an application for such adjustment, (2) the alien is eligible to receive an
> immigrant visa and *is admissible to the United States for permanent residence*, and (3) an
> immigrant visa is immediately available to him at the time his application is filed.

8 U.S.C. § 1255(a) (emphasis added).  From this statutory provision, two significant parts of the

adjustment criteria are derived.  *First*, the alien seeking adjustment of status must be admissible

to the United States.  The federal immigration code identifies several groups of aliens who are

deemed inadmissible to the United States, includes those who have committed certain criminal

offenses, id. § 1182(a)(2), those who carry certain communicable diseases, id. § 1182(a)(1),

those who have been previously removed from the United States, id. § 1182(a)(9), and those who

have "engaged in a terrorist activity" or "endorse[] or espouse[] terrorist activity or persuade[]

---

[1]The Injeti panel concluded that it was not necessary to decide whether there was any
actual substantive difference between these two formulations of the materiality framework,
because the alien's misrepresentation (however innocent) was material under either formulation.
See Injeti, 737 F.3d at 317.

others to endorse or espouse terrorist activity or support a terrorist organization," <u>id.</u> §§

1182(a)(3)(B)(i)(I); (VII).  *Second*, even if an alien is admissible to the United States (*i.e.*, he

does not fall within these statutory categories of inadmissibility), whether to adjust the alien's

status to that of permanent residence remains a *discretionary* decision on the part of USCIS.

See, e.g., <u>Safadi v. Howard</u>, 466 F. Supp. 2d 696, 698 (E.D. Va. 2006).[2]

## II.   ADMINISTRATIVE REVIEW

In order to seek naturalization, an alien must first file a form application (N-400) with

USCIS.  <u>See</u> 8 U.S.C. § 1445(a); <u>see also</u> 8 C.F.R. § 316.4(a).  USCIS then proceeds to conduct

an examination of the alien's application, and *a fortiori*, whether the applicant meets the above-

referenced qualifications for naturalization.  <u>See</u> 8 U.S.C. § 1446(b).  After the conclusion of the

examination, USCIS "shall make a determination as to whether the application should be granted

or denied, with the reasons therefor."  8 U.S.C. § 1446(d) (emphasis added); <u>see also</u> 8 C.F.R. §§

335.3(a); 336.1.

If USCIS's initial "determination" is to deny an application for naturalization, the

applicant may request – within thirty (30) days of the determination – a hearing with the agency

on his application.  <u>See</u> 8 U.S.C. § 1447(a); <u>see also</u> 8 C.F.R. §§ 316.14(b)(2); 336.2(a).  This

hearing, which serves as an administrative appeal of USCIS's initial determination, must be

conducted independently of the earlier examination and determination.  The USCIS hearing

officer ultimately issues a new decision that either "affirm[s] the findings and determination of

the original examining officer or re-determine[s] the original decision in whole or in part."

8 C.F.R. § 336.2(b).

---

[2]For this reason, courts are precluded from exercising judicial review over the Executive
Branch's discretionary decision to deny an alien's application for permanent resident status.  <u>See,
e.g.</u>, <u>Gonzalez-Gonzalez v. Gonzales</u>, 219 Fed. Appx. 327, 328 (4th Cir. 2007) (per curiam).

**III.    JUDICIAL REVIEW**

The statute similarly provides for Article III judicial review of naturalization applications. As pertinent here, if, after the applicant's administrative appeal has concluded, USCIS affirms its initial determination to deny a naturalization application, the applicant may seek judicial review of that denial in an appropriate district court. See 8 U.S.C. § 1421(c). In these circumstances, the district court engages in *de novo* review of USCIS's denial, and is not limited to the administrative record – including the metes and bounds of USCIS's written decision. See Chan v. Gantner, 464 F.3d 289, 291 (2d Cir. 2006); see also Hassan v. Johnson, 93 F. Supp. 3d 457, 461-62 (E.D. Va. 2015). As a result, although USCIS and the applicant are entitled to introduce new evidence in support of, or in opposition to, the agency's decision, see Hamdan v. Chertoff, 626 F. Supp. 2d 1119, 1139 (D.N.M. 2007), if there are no material facts genuinely in dispute, as with any other civil action, a court may enter summary judgment in favor of a particular party, see Chan, 464 F.3d at 290-91.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.    Plaintiff Osama Abu Irshaid was born in Egypt, and is a citizen and national of Jordan. Defendant's Exhibit ("DEX") A; Complaint (Dkt. No. 1), ¶7.

2.    Federal immigration officials first admitted plaintiff to the United States as a non-immigrant[3] on September 10, 1996 – at the age of twenty-three (23) – on what is colloquially

---

[3]Pursuant to the federal immigration code, the difference between an immigrant and *non-immigrant* is the intent of the individual at the time that they are admitted to the United States – *i.e.*, whether or not they intend to remain in the United States permanently. See, e.g., 8 U.S.C. § 1101(a)(15)(B) (defining a non-immigrant as "an alien . . . having a residence in a foreign country which he has no intention of abandoning and who is visiting the United States for business or temporarily for pleasure").

known as an "I" visa, because plaintiff represented himself as an international journalist.[4]  DEX A.

## I.    PLAINTIFF'S APPLICATION FOR PERMANENT RESIDENT STATUS

3.    On August 9, 1999, plaintiff married Ahlam Mahmoud Isa in Prospect Heights, Illinois (a Chicago suburb).  Isa, on May 30, 2000, filed with the former Immigration and Naturalization Service ("INS") a Petition for Alien Relative (Form I-130), listing plaintiff as the beneficiary.[5]  The INS would later approve Isa's petition on August 29, 2001.  DEX A; C.

4.    Simultaneously with Isa's petition, on May 30, 2000, plaintiff (with the assistance of a Dallas-based attorney) filed with INS an application to adjust his status to that of permanent resident (Form I-485).[6]  DEX A.

a.    The adjustment of status application required plaintiff to provide substantive answers to a number of questions, and to sign the application.  Pursuant to federal regulation, by affixing one's signature to the application, an applicant "certifies under penalty of

_____

[4]One who "is a bona fide representative of foreign press, radio, film or other information media[] who seeks to enter the United States solely to engage in such vocation" may enter the United States on a visa as a temporary non-immigrant.  See 8 U.S.C. § 1101(a)(15)(I); 22 C.F.R. § 41.52(a).

[5]In order for an alien to immigrate to the United States – i.e., come to the United States with the intent to stay permanently, see 8 U.S.C. § 1101(a)(15)(A) – he or she must be the recipient of an immigrant visa, see generally 8 U.S.C. §§ 1151-54.  There are a number of ways to obtain an immigrant visa, but many are subject to numerical limitations; that is, there is a maximum number of immigrant visas that can be issued in any given year.  See id. §§ 1152-53. One means by which an alien can obtain an immigrant visa – and one that is not numerically-capped – is through a United States citizen parent, child, or spouse.  See id. § 1151(2)(A)(i).  In order to obtain an immigrant visa through a United States citizen-spouse, an alien's citizen-spouse files a petition with USCIS, asking the agency, in granting the petition, to classify the alien as an immediate relative, thereby making the alien eligible for an immigrant visa.  See id. § 1154(a).

[6]Those who have obtained permanent resident status in the United States are colloquially known as "green card" holders.  See, e.g., Krasilych v. Holder, 583 F.3d 962, 963 (7th Cir. 2009) (per curiam).

perjury that the benefit request, and all evidence submitted with it, whether at the time of filing or thereafter, is true and correct." But in order to ensure that applicants understand their obligation of candor, the application itself provided a reminder to plaintiff directly above the signature line itself: "I certify under penalty of perjury under the laws of the United States of America that this application, the evidence submitted with it, is all true and correct." Id.; 8 C.F.R. § 103.2(a)(2).

b. One of the questions within the permanent resident application required plaintiff to do the following:

> List your present and past membership in or affiliation with every political organization, association, fund, foundation, party, club, society, or similar group in the United States or in any other place since your 16th birthday. Include any foreign military service in this part. If none, write "none." Include the name of organization, location, dates of membership from and to, and the nature of the organization. If additional space is needed, use separate paper.

Plaintiff answered "none," and affixed his own signature to the application. DEX A.

5. On August 29, 2001, plaintiff attended an interview on his permanent resident application at the INS's Chicago office. At that time, plaintiff was placed under oath, and confirmed the accuracy of each of the written responses that he provided in his application – including his response of "none" to the above-referenced question. DEX A; C.

6. During future administrative proceedings related to his application to become a naturalized citizen of the United States, however, plaintiff disclosed to United States Citizenship and Immigration Services ("USCIS") that he was, in fact, involved in a "certain association, fund, foundation, party, club society, or similar group" before and at the time of his prior permanent resident application – the Islamic Association for Palestine ("IAP"). In particular, plaintiff explained to USCIS officials that he had become involved in IAP in approximately late

1997 or 1998, when he began helping the Chicago chapter of IAP with some of its events. DEX B; K, at 1:32; 1:50.[7]

A.   THE ISLAMIC ASSOCIATION FOR PALESTINE ("IAP")

7.   As related in federal court opinions, the IAP was established in Illinois in 1981, before being incorporated in Texas in 1993, with the stated goal to serve as a "not-for-profit organization [] dedicated to disseminating information on and promoting discussion of the Israeli-Palestinian conflict." But more than one court has found that IAP's operations went far further than this innocuous mission. Boim v. Quranic Literacy Institute, 127 F. Supp. 2d 1002, 1007 (N.D. Ill. 2001); United States v. El-Mezain, 664 F.3d 467, 485-86 (5th Cir. 2011).

8.   To understand IAP's putative alternative purpose, it is first necessary to identify another group – *Hamas*.

a.   The Fifth Circuit has recognized that Hamas, which is also known as the "Islamic Resistance Movement," is an organization that espouses an "overall goal to destroy Israel," "advocates violent jihad as the only solution for the conflict between Palestinians and Israelis," and "considers it the duty of all Muslims to participate in this objective either through direct action or through financial support." El-Mezain, 664 F.3d at 485-86.

b.   On January 25, 1995, pursuant to his authority under the International Emergency Economic Powers Act and the National Emergencies Act, the President of the United States designated Hamas as a "terrorist organization" with which United States citizens were

---

[7]Defendants' Exhibit ("DEX") K is the video recording of plaintiff's June 17, 2015 interview with USCIS officials on his naturalization application, and the particular citations serve to identify the approximate time of the interview for the proposition at issue. A copy of this video has been mailed to plaintiff's counsel, and has been delivered to chambers with its courtesy copy of the instant memorandum. Pursuant to this Court's practice, defendants have filed a *pro forma* motion to have the Court direct the Clerk's Office to place the DVD in the record of this civil action.

prohibited from transacting any form of business. And on October 8, 1997, the Secretary of State similarly designated Hamas as a "foreign terrorist organization" for purposes of the Immigration and Nationality Act. Exec. Order 12,947 (Jan. 25, 1995); Designation of Foreign Terrorist Organizations, 62 Fed. Reg. 52,650, 52,650 (Oct. 8, 1997).

   c.  Hamas's putative operations in the United States have spawned a significant amount of criminal and civil litigation. That litigation has uncovered evidence on which courts have relied regarding Hamas's United States operations. El-Mezain, 664 F.3d at 485-86

   9.  The Fifth Circuit has stated that evidence in a separate criminal action revealed that Hamas – through another group known as the "Muslim Brotherhood" – directed others to "establish so-called 'Palestinian Committees' to support Hamas from abroad." The United States-based "Palestinian Committee" "created other organizations in the United States to support Hamas." Those organizations included the Holy Land Foundation ("HLF"), the United Association for Studies and Research ("UASR"), and *IAP*. El-Mezain, 664 F.3d at 486; 527.

   a.  The Holy Land Foundation allegedly served "as a fundraising arm for the Palestinian Committee." On December 4, 2011, the United States Department of the Treasury's Office of Foreign Asset Control designated HLF as both a "specially designated terrorist" and as a "specially designated global terrorist," and thus blocked its assets under the International Emergency Economic Powers Act – designations that were upheld by federal courts in the District of Columbia. In addition, in 2008, a jury sitting in the Northern District of Texas convicted HLF on several charges related to its involvement in a conspiracy to provide material support to a foreign terrorist organization (namely, Hamas). Id. at 485; Holy Land Found. v. Ashcroft, 219 F. Supp. 2d 57 (D.D.C. 2002), aff'd, 333 F.3d 156 (D.C. Cir. 2003).

b.     Courts have recognized that there is evidence to support the conclusion that **IAP** was established to "distribute[] information on behalf of Hamas," as a part of IAP's role as a "media entity."  HLF, 219 F. Supp. 2d at 70 n.17; El-Mezain, 664 F.3d at 486.

**B.     *BOIM v. QURANIC LITERARY INSTITUTE***

10.     On May 12, 2000, Stanley and Joyce Boim filed a civil action – styled as *Boim v. Quranic Literary Institute, et al.*, No. 00-C-2905 – in the United States District Court for the Northern District of Illinois, Eastern Division (*i.e.*, Chicago).  The Boims were the parents of David Boim, a United States citizen who was murdered in 1996 at the age of seventeen as a part of a Hamas terrorist attack at a bus stop in Israel.  The Boims named several individuals and entities as defendants, including HLF, USAR, *and IAP*.  The complaint generally alleged that these individuals and entities – because they raised and laundered money for Hamas in the United States – were civilly liable for David Boim's murder pursuant to the Antiterrorism Act, see 18 U.S.C. § 2300, *et seq.*  DEX G.

11.     The filing of the Boim civil action received press attention in major newspapers in Chicago and other cities in the United States.  DEX H.

12.     On January 10, 2001, the District Court in the Boim action issued an opinion denying IAP's motion to dismiss, concluding that the Boims could proceed on their theory of aiding and abetting liability under the Antiterrorism Act – a ruling affirmed by the Seventh Circuit on interlocutory appeal.  See Boim v. Quranic Literary Inst., 127 F. Supp. 2d 1002, 1018 (N.D. Ill. 2001), aff'd, 291 F.3d 1000 (7th Cir. 2002).

13.     On November 10, 2004, the District Court entered summary judgment against IAP, and in favor of the Boims.  In its written opinion, the District Court detailed what it considered to be extensive evidence demonstrating the significant connections between IAP and

Hamas, and concluded that there was "strong evidence that IAP was supporting Hamas." In particular, the District Court explained that the evidence revealed, *inter alia*, the following regarding IAP's activities:

- That "IAP . . . published and distributed an abundance of pro-Hamas documents," "including an August 30, 2001 editorial written by Khalid Amyreh that advocated martyrdom operations, meeting death with death, and killing Jews."

- That IAP "published articles and editorials characterizing suicide bombers and those who carried out bombing operations against Israeli targets as 'martyrs' and as 'freedom fighters.'"

- That "IAP held annual conferences or conventions, invited pro-Hamas speakers to present at those conferences or conventions, and paid for their travel expenses," and that one such conference "featured a veiled Hamas terrorist."

The Seventh Circuit, sitting *en banc*, affirmed the District Court's entry of summary judgment against IAP. Boim v. Quranic Literacy Inst., 340 F. Supp. 2d 885, 908-13 (N.D. Ill. 2004), aff'd sub nom, Boim v. Holy Land Found., 549 F.3d 685 (7th Cir. 2008) (en banc).

14.     In December 2004, the District Court entered judgment against, *inter alia*, IAP (and in favor of the Boims) in the amount of $156 million. The Boims maintain that in the thirteen year period between the entry of this judgment and May 2017, they have only been able to collect slightly less than $4 million from the defendants. And of particular import, the Boims have maintained that IAP appeared to go out of business and cease existence as an entity as a result of its financial inability to pay the judgment. Boim, 549 F.3d at 688; Boim v. Quranic Literacy Inst., 2017 WL 2179457, at *1 n.1 (N.D. Ill. May 18, 2017); DEX I-J.

15.     But the Boims now maintain that IAP did not cease its existence; rather, it continued to exist, but under an alter ego led by, *inter alia*, Osama Abu Irshaid – the *plaintiff* in the instant action. Based on these allegations, the Boims have filed a new civil action in the

United States District Court for the Northern District of Illinois against, *inter alia*, plaintiff,[8] in which they seek to hold plaintiff liable for the $156 million judgment.[9]  DEX I-J.

## II.   PLAINTIFF'S APPLICATION FOR NATURALIZATION

16.   Plaintiff filed with USCIS an application to become a naturalized citizen of the United States.  That application (Form N-400) asked plaintiff a similar question to one contained on his application for permanent resident status:  whether he had ever "been a member of or associated with any organization, association, fund, foundation, party, club, society, or similar group in the United States or in any other place?"  And this time, plaintiff answered in the affirmative; as pertinent here, plaintiff identified "Islamic Association for Palestine [IAP]: Member, 7/02-1/04" and "United Association for Studies and Research [USAR], 1/00-12/03." DEX B.

17.   During a subsequent interview with USCIS officials on his naturalization application, plaintiff elaborated upon this response.

Q:   When were you involved with the Islamic Association for Palestine?

A:   When I met them . . . I would guess it was sometime in late 1997, or early 1998.  I used to help with some of their events especially in the Chicago Chapter maybe in 1998. . . . I used to help, I used to attend their events, maybe I helped with Chicago Chapter at the time.

Plaintiff also explained that at this time he "spoke at these [IAP] activities."  DEX K, at 1:32-33; 1:50-51.

---

[8]Simultaneously, the Boims sought to extend the original $156 million judgment to plaintiff within the auspices of the original civil action, and to that end, filed a "Citation to Discover Assets" to satisfy the judgment against plaintiff.  DEX I.

[9]In candor, plaintiff here has moved to dismiss this new civil action on jurisdictional grounds.  That motion remains currently pending before the Northern District of Illinois, and is scheduled to be heard on August 11, 2017.

18.     On August 10, 2015, USCIS issued its initial decision on plaintiff's naturalization decision, which detailed its conclusion that plaintiff was ineligible for naturalization because he had not been "lawfully admitted for permanent residence" in 2002.  DEX C.

a.      First, USCIS detailed the various statements that plaintiff had made – in both his written benefit applications to INS/USCIS and in oral interviews with INS/USCIS officials through the years – regarding his various connections to certain organizations, including both IAP and USAR.  Id. at 2-4; see also supra ¶¶4(b)-6, 16-17.

b.      Second, USCIS concluded that plaintiff's involvement with IAP and USAR prior to and at the time of the filing of his permanent resident application (in 2000) required plaintiff to list both organizations on that application, or – at the very least – to have identified them in his subsequent oral interview with INS officials.  Accordingly, USCIS concluded that plaintiff's permanent resident application contained a misrepresentation.  DEX C, at 4.

c.      Third, USCIS concluded that plaintiff's misrepresentation was "material" to INS's adjudication of that permanent resident application.  Drawing from the Fourth Circuit's decision in Injeti, USCIS concluded that plaintiff's failure to list IAP and USAR in his application "cut off a material line of questioning not only to assess [his] admissibility but to establish whether or not [he] warranted a favorable grant of discretion."  This was so, USCIS reasoned, because at the time that INS was considering plaintiff's permanent residence application, both IAP and USAR were named in federal court papers in Chicago – in the Boim civil action – as groups "alleged to have provided material support to Hamas," which "would have impacted the [] INS' analysis regarding [plaintiff's] eligibility for adjustment of status . . . under the statutory inadmissibility grounds and as a matter of discretion."  Put simply, had

plaintiff disclosed his involvement with IAP and UASR, INS "would have been able to question [plaintiff] about the extent of [his] affiliation with each organization." Id. at 4-5.

19.     On or about September 11, 2015, plaintiff – through counsel – filed a written application with USCIS (Form N-336) seeking an administrative hearing on the agency's initial decision on his application for naturalization.  That form contained the following explanation for why plaintiff was seeking a hearing on USCIS's naturalization denial:  "Applicant was credible. Even if he considered himself affiliated, he had no reason to deny his affiliations.  USCIS findings are faulty.  Also, consider this a motion to reopen and/or reconsider."  DEX D.

        a.     Some months later, plaintiff filed a brief in support of his request for a hearing, in which he maintained that he "had no reason to hide his 'involvement' with any organization."  This was so, plaintiff reasoned, because, inter alia, the Boim civil action – despite its entry of judgment against the organization – was nothing more that "a civil suit engineered by Jewish-American groups opposed to Palestinian rights and activism in America [that] would not and can not be grounds for denying an applicant adjustment of status."  Plaintiff also argued that USCIS should ignore the Fourth Circuit's decision in Injeti in favor of a contrary decision issued by a federal district court in the District of Columbia.  DEX E.

        b.     USCIS also held an oral hearing on plaintiff's request on March 17, 2016. DEX F.

20.     In a decision issued on December 2, 2016, USCIS issued its final decision on plaintiff's application for naturalization, which affirmed its initial denial.  Id.

        a.     USCIS began its decision by recapitulating the statements that plaintiff had made – both in written prior benefit applications and in oral interviews on those applications

– to INS and USCIS regarding his involvement with both IAP and UASR.  USCIS also summarized its initial decision to deny plaintiff's naturalization application.  Id. at 2-5.

b.     USCIS then identified the factual and legal arguments that plaintiff presented in his request for review of the agency's initial naturalization decision.  With particular reference to IAP, USCIS explained that during the hearing on his request, plaintiff confirmed – again under oath – that he "helped" with some of IAP's events in late 1997 or 1998 (*i.e.*, before he filed his permanent resident application with INS in 2000) and that he was "employed by IAP in 2000" in the capacity of "chapter coordinator," through which he "recruited new members on behalf of the organization."  Id. at 5-6.

c.     USCIS then explained the reasoning behind its decision to affirm the agency's initial denial of his naturalization application.  Id. at 6-8.

i.     *First*, USCIS concluded that plaintiff's explanation that he was "not a member of or affiliated with UASR prior to [his] grant of adjustment of status" was plausible, and thus, USCIS reversed its initial decision concerning UASR.  Id. at 6.

ii.     *Second*, USCIS reaffirmed its previous finding that plaintiff misrepresented his connection to IAP within the context of his application for permanent residence.  Given the "broad definition" of the term "affiliated," USCIS concluded, plaintiff was, "if not a member of, at least affiliated with IAP" before INS granted him permanent resident status in 2002.  In this regard, USCIS again pointed to plaintiff's testimony that he helped with IAP with some of its events in Chicago in 1997 and 1998, and that he may have assisted with fundraising efforts.  Finally, USCIS rejected plaintiff's position that the existence of the Boim civil action did not render his failure to identify his connections with IAP "material" to his permanent residence application, concluding that plaintiff "cut off a line of questioning relevant

to [his] statutory eligibility for adjustment of status as well as whether you merited a favorable exercise of discretion." Id. at 6-8.

## ARGUMENT

## I.    GENERAL STANDARDS

Pursuant to Federal Rule 56, a motion for summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  Where the non-moving party will bear the burden of proof, the moving party's obligation is satisfied upon a showing that there is a lack of evidence to carry the non-moving party's burden on an essential element of that party's cause of action.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

The non-moving party must then go beyond the pleadings and mere allegations and establish the existence of specific fact disputes that would necessitate a trial.  See id. at 323.  As the Supreme Court has held, the non-movant cannot successfully survive summary judgment by establishing "[t]he mere existence of a scintilla of evidence in support" of his position; to the contrary, he must proffer "evidence on which the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).  Most importantly, as the rule itself provides, in order to survive summary judgment, any factual dispute plaintiff identifies must be material – i.e., must make a difference to the outcome of the underlying claims.  See id. at 248; Metric/Kvaener Fayetteville v. Fed. Ins. Co., 403 F.3d 188, 197 (4th Cir. 2005).

## II.    PLAINTIFF IS NOT ELIGIBLE FOR NATURALIZATION BECAUSE HE WAS NOT "LAWFULLY ADMITTED" FOR PERMANENT RESIDENCE

As stated earlier, in this Court, plaintiff bears the significant burden of demonstrating that he is eligible for naturalization.  See Pangilinan, 486 U.S. at 886.  And here, plaintiff cannot

meet this weighty burden because he cannot establish that "he has been lawfully admitted to the United States for permanent residence." 8 U.S.C. § 1429.

To be sure, in 2002, the former INS adjusted plaintiff's status to that of permanent resident. DEX A. But in order to establish that he was "*lawfully* admitted to the United States for permanent residence," id. (emphasis added), plaintiff must do substantially more than simply demonstrate that, as a technical matter, he was granted permanent resident status. Rather, as the Fourth Circuit has held, in adopting BIA precedent on the subject:

> The [BIA] has explained that the term "lawfully" "denotes compliance with substantive legal requirements, not mere procedural regularity." According to the BIA, an alien who has obtained LPR status by fraud – or who is *otherwise* not entitled to it – has not been lawfully admitted. In other words, even in cases where there is no indication of fraud, an alien has not been "lawfully admitted" if her admission, at the time it was granted, was "not in substantive compliance with the immigration laws."

Injeti v. USCIS, 737 F.3d 311, 315 (4ᵗʰ Cir. 2013) (quoting In re Koloamatangi, 23 I. & N. Dec. 548, 550 (BIA 2003); Shin v. Holder, 607 F.3d 1213, 1217 (9ᵗʰ Cir. 2010)). Put more simply, "an alien has not been 'lawfully admitted' when she was 'not legally entitled' to LPR status for *any* reason" – including, *inter alia*, that all information contained in the alien's application was not "true and correct," or that the alien was actually inadmissible to the United States at the time of adjustment. Id. at 317-18 (quoting Gallimore v. Atty. Gen., 619 F.3d 216, 224 (3d Cir. 2010)).

And here, USCIS concluded that plaintiff's application for permanent resident status was not completely "true and correct," and thus contained a misrepresentation – *i.e.*, his failure to list IAP as an "organization" of which he was a member or with which he was affiliated. This misrepresentation, USCIS further concluded, was material to INS's previous adjudication of plaintiff's permanent resident application. The instant memorandum will address each conclusion in turn.

## A.    PLAINTIFF OMITTED HIS SUBSTANTIVE CONNECTIONS WITH IAP FROM HIS ADJUSTMENT APPLICATION

It will be recalled that the permanent resident application contained the following question:

> List your present and past membership in or affiliation with every political organization, association, fund, foundation, party, club, society, or similar group in the United States or in any other place since your 16th birthday.  Include any foreign military service in this part.  If none, write "none."  Include the name of organization, location, dates of membership from and to, and the nature of the organization.  If additional space is needed, use separate paper.

Plaintiff answered "none," and affixed his own signature to the application.  DEX A.  And at his subsequent oral interview on the application, plaintiff confirmed – under oath – the veracity of this response.  Id.  USCIS correctly concluded – based on plaintiff's own sworn statements alone – that plaintiff's response of "none" was a misrepresentation because of his then-concurrent "affiliation" with IAP.

At the outset, during administrative proceedings before USCIS, plaintiff ostensibly maintained that his response did not constitute a misrepresentation because he was not technically a "member or associate" of IAP at the time that his permanent resident application remained pending.  DEX F, at 5.  But the relevant question presented to plaintiff on that application was far broader than plaintiff's position suggests – i.e., it required to plaintiff to list all organizations that he was (or previously had) "membership in *or* affiliation with."  DEX A (emphasis added).  Given the question's use of the disjunctive "or," there can be little doubt that the mere fact that plaintiff was not a "member" of IAP at the time (assuming the veracity of plaintiff's statement) did not relieve plaintiff of his obligation to list IAP on his application.[10]

---

[10]It bears reiterating here that the Fourth Circuit's binding authority provides that it is irrelevant that plaintiff's failure to list IAP may have been nothing more than an accidental mistake or oversight (i.e., without intent to deceive INS).  See Injeti, 737 F.3d at 317-18.

Cf. Reiter v. Sonotone Corp., 442 U.S. 330, 339 (1979) ("Canons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings . . . .").

And there can be little doubt that plaintiff was at least "affiliated" with IAP during the pendency of his permanent resident application. During administrative proceedings before USCIS, plaintiff ostensibly painted his connection to IAP as but an onlooker or passerby – merely "checking out" the organization from afar. DEX E, at 2. But plaintiff's own sworn statements belie this contention. Plaintiff himself testified before USCIS officials that he became involved with IAP in late 1997 or 1998, and then he "used to *help with some of their events* especially in the Chicago Chapter, maybe in 1998," and that he spoke at some of these events. DEX K (emphasis added).[11] It is hard to envision how an individual who goes to the effort of actively helping an organization stage a number of its events is not – at the very least – "affiliated" with that organization, and the mere fact that plaintiff provided this assistance outside of a formal leadership role does not remove him from this status. As at least one court has recognized as a general matter, the term "affiliate" is a "broad, inclusive word[]." J. Rogers Flannery & Co. v. Comm'r, 42 F.2d 11, 12 (3d Cir. 1930); see also Black's Law Dictionary (10th ed. 2014) (defining "affiliation" as "the connection or involvement that someone or something has with a[n] . . . organization").

In short, plaintiff's own admissions about his involvement with IAP at and before the time of his permanent resident application place him well within the broad ambit of the term "affiliation." And as such, USCIS correctly concluded that plaintiff's response of "none" on that application – and concomitant failure to list IAP – serves as a misrepresentation that might serve to disqualify him from becoming a naturalized citizen of the United States.

---

[11]Plaintiff similarly testified that he needed to approximate these dates "because that is when [he] moved to Chicago." DEX K, at 1:32.

**B.** **PLAINTIFF'S MISREPRESENTATION "CUT OFF A LINE OF INQUIRY" REGARDING A SUBJECT THAT HAD A "NATURAL TENDENCY" TO INFLUENCE INS'S ADJUDICATION OF HIS PERMANENT RESIDENT APPLICATION**

Having addressed whether plaintiff's failure to list "IAP" on his adjustment application served as a misrepresentation, the next question is whether that misrepresentation was "material" to INS's adjudication of plaintiff's permanent resident application. And it will be recalled that in order for a misrepresentation to be "material," it need not be one that – if disclosed accurately – would have *required* INS to deny the application. Far to the contrary, a misrepresentation is "material" for instant purposes if it is one that could have "'a natural tendency to *influence* the decision[] of [immigration officials],'" or "tend[] to *shut off a line of inquiry* which is relevant to the alien's eligibility." Injeti, 737 F.3d at 316-17 (quoting Kungys v. United States, 485 U.S. 759, 772 (1988) (emphasis added); Matter of Kai Hing Hui, 15 I. & N. Dec. 288, 289 (BIA 1975) (emphasis added)). Plaintiff's failure to list IAP on his adjustment application, especially given the Boim civil action at the time of the INS Chicago field office's consideration of that application (a civil action with which plaintiff is now *personally* associated as a putative defendant), meets either of these standards.

1. First, plaintiff's connections with IAP would have been pertinent to – *i.e.*, it could have a "natural tendency to influence" – INS's determination of plaintiff's admissibility under the federal immigration code. It is well-settled that an alien must be admissible to the United States in order to adjust his status to that of permanent resident. See id. at 318 (holding that "the statute governing adjustment of status makes admissibility a prerequisite for receiving a grant of LPR status" (citing 8 U.S.C. § 1255(a))). And the relevant statute clearly provides that, *inter alia*, an alien who, "endorses or espouses terrorist activity or persuades others to endorse or espouse

terrorist activity or support a terrorist organization" is inadmissible to the United States. 8

U.S.C. §§ 1182(a)(3)(B)(i)(VII).

In the instant circumstances, had plaintiff disclosed his affiliation with IAP, INS could

have inquired further about not only the *bona fides* of IAP and its activities generally, but also

about plaintiff's particular connections with IAP. See Injeti, 737 F.3d at 317 (discussing what

USCIS would have discovered had they been notified of a fact that would have led them to

"inquire[] deeper into the matter"). With respect to plaintiff specifically, one presumes that

plaintiff would have provided the same information to INS that he provided to USCIS in sworn

testimony here (*i.e.*, that he assisted IAP with some of its Chicago events). With respect to IAP

generally, INS might well have discovered the same evidence concerning IAP's activities in

support of Hamas – including the *hosting of events* that unequivocally espoused support for

Hamas's terrorist activities – that was revealed through the Boim civil action. On this score, the

Boim civil action revealed evidence of the following with respect to IAP:

- That "IAP . . . published and distributed an abundance of pro-Hamas documents," "including an August 30, 2001 editorial written by Khalid Amyreh that advocated martyrdom operations, meeting death with death, and killing Jews."

- That IAP "published articles and editorials characterizing suicide bombers and those who carried out bombing operations against Israeli targets as 'martyrs' and as 'freedom fighters.'"

- That "IAP held annual conferences or conventions, invited pro-Hamas speakers to present at those conferences or conventions, and paid for their travel expenses," and that one such conference "featured a veiled Hamas terrorist."

Boim, 340 F. Supp. 2d at 908-13. There simply can be no doubt that these activities, as both the

Fifth and Seventh Circuits have held (albeit in different contexts), served to support Hamas,

which was (and currently remains) a designated "terrorist group" for purposes of the immigration

code. And those who participated in these activities would be inadmissible to the United States.

Plaintiff's failure to list his affiliation with IAP thus precluded INS from the ability to inquire whether the "events" with which plaintiff assisted IAP during the relevant timeframe were those that espoused support for Hamas's violent terroristic activities, something that could have a "natural tendency" to influence USCIS's decision concerning plaintiff's admissibility to the United States.

Nor is the Boim civil action a single random lawsuit. At the outset, the several decisions issued by the federal courts in Boim lay waste to plaintiff's contention that the action was nothing more than "a civil suit engineered by Jewish-American groups opposed to Palestinian rights and activism in America [that] would not and can not be grounds for denying an applicant adjustment of status." DEX E. The amount of evidence linking IAP – and its conferences, other events, and publications – to the heinous conduct of Hamas in the Middle East relayed through that civil action was overwhelming and gut-wrenching. Nor was the Boim litigation conducted under a shroud of secrecy; there was local and national press coverage of the Boims' claims. DEX H. And perhaps most importantly, *plaintiff himself* is now *directly* involved in the Boim action as the Boims have named him as an individual defendant in a new action that seeks to render plaintiff responsible for the entirety of the $156 million judgment because of his activities with the alleged successor entity to IAP. DEX I-J.

To be sure, it is certainly *possible* that had plaintiff listed his affiliation with IAP in his permanent resident application, he would have remained eligible for – and ultimately received – an adjustment of status from INS. But, as the Fourth Circuit has held, that is not the correct standard. Because had plaintiff listed IAP on his application, that could have led INS to inquire further into information that would have had a "natural tendency" to influence INS's

admissibility determination, plaintiff was not "lawfully admitted for permanent residence," and he is not eligible for naturalization.

2.      For similar reasons, there can be little doubt that the troubling nature of IAP's activities could have impacted the second part of any adjudication of a permanent resident application – whether the applicant warrants an exercise of the United States's discretion for such a significant immigration benefit.  As stated above, whether to grant an alien permanent resident status is a decision that Congress has ultimately left to the discretion of the Executive Branch (now through USCIS).  If any information could have a "natural tendency" to influence the exercise of that discretion, it would be plaintiff's connection to an organization such as IAP, which upon "deeper inquiry," could have been revealed to have connections to a designated terrorist organization.

*          *          *

In the end, plaintiff failed to list in his previous permanent resident application that he had at least some affiliation with IAP – a group that was found to be a United States-based fundraising and media arm of Hamas, in a case with which plaintiff is now a putative individual defendant.  Because that information, and that which INS would have uncovered through deeper inquiry, could have had a "natural tendency" to influence whether plaintiff would be afforded permanent resident status, plaintiff is ineligible for naturalization.

///

///

## **CONCLUSION**

For the foregoing reasons, this Court should enter summary judgment in favor of

defendants.

Respectfully submitted,

DANA J. BOENTE
UNITED STATES ATTORNEY

By:  _____/s/_____
DENNIS C. BARGHAAN, JR.
Assistant U.S. Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Telephone: (703) 299-3891
Fax:        (703) 299-3983
Email:  dennis.barghaan@usdoj.gov

DATE: June 26, 2017                    ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing ("NEF") to the following:

Ashraf Nubani
AWN Point Law, PLLC
2677 Prosperity Avenue, Suite 320
Fairfax, Virginia  22031
Email:  awn@awnpointlaw.com

Date: June 26, 2017                             _____/s/_____
                                                DENNIS C. BARGHAAN, JR.
                                                Assistant U.S. Attorney
                                                2100 Jamieson Avenue
                                                Alexandria, Virginia 22314
                                                Telephone: (703) 299-3891
                                                Fax:        (703) 299-3983
                                                Email:  dennis.barghaan@usdoj.gov

                                                ATTORNEYS FOR DEFENDANTS