# EXHIBIT

# A

Immigration and Naturalization Service

of Lawful Permanent Residence

| | |
|---|---|
| Place | *CHI* |
| File No. | *A 77 658 396* |

**Status as a lawful permanent resident of the United States is accorded:**

*681 Castle*
*Des Plaines, IL 60016*

| | | | |
|---|---|---|---|
| Name In Care Of Street Address Apt. No. City, State, Zip | OSAMA ABU-SHAID *Abu-Irshaid* 5537 N. SAWYER *7010 W. 99th St* *2E* CHICAGO IL 60625 *Chicago Ridge, IL 60415* | Sex ☒ Male ☐ Female | Date of Birth (Month/Day/Year) |
| | | City of Birth *CAIRO* | Country of Birth *EGYPT* |
| | | Country of Nationality *EGYPT* | Country of Last Residence *EGYPT* |

| Marital Status | 1 ☐ Single 2 ☒ Married 3 ☒ Widowed 4 ☐ Divorced 5 ☐ Separated | Occupation | N/I Class at time of Adj. *IB6* *00S* | Year Adm. to U.S. or Year of Change to Present NI Class (whichever most recent) *96* |
|---|---|---|---|---|
| Priority Date (Month/Day/Year) | | Preference (if any) | Country to Which Chargeable *(if any)* *EGYPT* | |

| Section 212 (a)(14) Labor Certification | 1 ☐ Applicable-Submitted 3 ☒ Not Applicable | Mother's First Name *NUSAIBAH* | Father's First Name *MAHMOUD* |
|---|---|---|---|

| Last NIV Issued at (U.S. Consulate Post) *AMMAN* | Date of Issuance of Last NIV *04 Sep 96* | Number of Last NIV *10019184* | Classification of Last NIV *I* |
|---|---|---|---|

Under the following provision of law
☐ Public Law 95-412
☐ Public Law 96-212
☐ Private Law No.
of the ___ Congress ___ Session

☐ Sec. 209 (a) of the I & N Act
☐ Sec. 209 (b) of the I & N Act
☐ Sec. 244 ( ) ( ) of the I & N Act
☒ Sec. 245 of the I & N Act

☐ Sec. 249 of the I & N Act
☐ Sec. 1 of the Act of 11/2/66
☐ Sec. 13 of the Act of 9/11/57
☐ Sec. 214 (d) of the I & N Act

☐ Other law (Specify)

As of *2* *13* *02* at *CHI*
   (Month)   (Day)   (Year)

PORT OF ENTRY FOR PERMANENT RESIDENCE

Class of admission (Insert Symbol) *IR6*

REMARKS *DC 8/27/01*

RECOMMENDED BY (Immigration Officer)     (Date) *2-02*

APPROVED
INS DISTRICT DIRECTOR

DATE OF ACTION
DD   FEB 13 2002

District Recommended by:
CHI 2237

**FOR USE BY VISA CONTROL OFFICE**

Date _____

Foreign State    *EGYPT* _____

Preference Category _____

Number _____

Month of Issuance _____

Signed _____
     (Visa Office, Dept. of State)

CC: Page 2 Master Index copy sent on   *08/27/2001*
CC: Page 3 ADIT and Statistical report copy sent on _____

Form I - 181 (Rev. 3-1-83)N

**1. FILE COPY**

047

*L76*

U.S. Department of Justice
Immigration and Naturalization Service

Application to Register Permanent Residence or Adjust Status

OMB No. 1115-0053

## START HERE - Please Type or Print

### Part 1. Information about you.

| | | |
|---|---|---|
| Family Name ABU-IRSHAID | Given Name Osama | Middle Initial M. |

Address - C/O
Ahlam Isa

| Street Number and Name 5537 N. Sawyer Ave. | Apt. # n/a |
|---|---|

City
Chicago

| State IL | Zip Code 60625 |
|---|---|

| Date of Birth (month/day/year) ████ | Country of Birth Egypt |
|---|---|

| Social Security # ████ | A # (if any) none ATT6553916 |
|---|---|

| Date of Last Arrival (month/day/year) 9/10/1996 | I-94 # 603-12781005 |
|---|---|

| Current INS Status   I (Journalist) | Expires on (month/day/year) D/S |
|---|---|

### FOR INS USE ONLY

| Returned | Receipt |
|---|---|
| 4051 001 007   05/30/98   3:59   I-485 | |
| Resubmitted | |
| Reloc Sent 4051 001 007   05/30/00   3:14   G-058   25 00 | |
| Reloc Rec'd | |
| | |
| Applicant Interviewed | |

Section of Law
☐ Sec. 209(b), INA
☐ Sec. 13, Act of 9/11/57
☒ Sec. 245, INA
☐ Sec. 249, INA
☐ Sec. 1 Act of 11/2/66
☐ Sec. 2 Act of 11/2/66
☐ Other _____

Country Chargeable

Eligibility Under Sec. 245
☒ Approved Visa Petition
☐ Dependent of Principal Alien
☐ Special Immigrant
☐ Other _____

Preference

Action Block

APPROVED
DISTRICT DIRECTOR
MAR 1 3 2001
examined by: ___

### Part 2. Application Type.   *(Check one)*

I am applying for adjustment to permanent resident status because

a. ☒ an immigrant petition giving me an immediately available immigrant visa number has been approved (attach a copy of the approval notice), or a relative, special immigrant juvenile, or special immigrant military visa petition filed with this application will give me an immediately available visa number if approved.

b. ☐ My spouse or parent applied for adjustment of status or was granted lawful permanent residence in an immigrant visa category which allows derivative status for spouses and children.

c. ☐ I entered as a K-1 fiance(e) of a U.S. citizen whom I married within 90 days of entry, or I am the K-2 child of such a fiance(e) (attach a copy of the fiance(e) petition approval notice and the marriage certificate).

d. ☐ I was granted asylum or derivative asylum status as the spouse or child of a person granted asylum and am eligible for adjustment.

e. ☐ I am a native or citizen of Cuba admitted or paroled into the U.S. after January 1, 1959, and thereafter have been physically present in the U.S. for at least 1 year.

f. ☐ I am the husband, wife, or minor unmarried child of a Cuban described in (e) and am residing with that person, and was admitted or paroled into the U.S. after January 1, 1959, and thereafter have been physically present in the U.S. for at least 1 year.

g. ☐ I have continuously resided in the U.S. since before January 1, 1972.

h. ☐ Other-explain_____

I am already a permanent resident and am applying to have the date I was granted permanent residence adjusted to the date I originally arrived in the U.S. as a nonimmigrant or parolee, or as of May 2, 1964, whichever is later, and:   *(Check one)*

i. ☐ I am a native or citizen of Cuba and meet the description in (e), above.

j. ☐ I am the husband, wife or minor unmarried child of a Cuban, and meet the description in (f), above.

To be Completed by
Attorney or Representative, if any
☐ Fill in box if G-28 is attached to represent the applicant

VOLAG# _____

ATTY State License # 24004520/TX

Form I-485 (09-09-92)N          *Continued on back.*

L74

## Part 3. Processing Information

**A.** City/Town/Village of Birth    Cairo

Current occupation    n/a

Your mother's first name    Nusaibah

Your father's first name    Mahmoud

Give your name exactly how it appears on your Arrival/Departure Record (Form I-94)

Abu-Irshaid, Osama Mahmoud

Place of last entry into the U.S. (City/State)

New York, New York

In what status did you last enter? (Visitor, Student, exchange alien, crewman, temporary worker, without inspection, etc.)

International Journalist

Were you inspected by a U.S. Immigration Officer?   ☒ Yes ☐ No

Nonimmigrant Visa Number    1996248812012

Consulate where Visa was issued   Amman, Jordan

Date Visa was issued (month/day/year)    9/04/1996

Sex: ☒ Male ☐ Female

Marital Status: ☒ Married ☐ Single ☐ Divorced ☐ Widowed

Have you ever before applied for permanent resident status in the U.S.? ☒ No ☐ Yes (give date and place of filing and final disposition):

**B.** List your present husband/wife, all of your sons and daughters (if you have none, write "none". If additional space is needed, use separate paper.)

| Family Name | Given Name | Middle Initial | Date of Birth (month/day/year) |
|---|---|---|---|
| Isa | Ahlam | M. | ▮ |
| Country of Birth: U.S.A. | Relationship: Wife | A # n/a | Applying with you? ☐ Yes ☒ No |
| ▮ | ▮ | | ▮ |
| Country of Birth: ▮ | Relationship: ▮ | A # | Applying with you? ☐ Yes ☐ No |
| | | | |
| Country of Birth: | Relationship: | A # | Applying with you? ☐ Yes ☐ No |
| | | | |
| Country of Birth: | Relationship: | A # | Applying with you? ☐ Yes ☐ No |
| | | | |
| Country of Birth: | Relationship: | A # | Applying with you? ☐ Yes ☐ No |

**C.** List your present and past membership in or affiliation with every political organization, association, fund, foundation, party, club, society, or similar group in the United States or in any other place since your 16th birthday. Include any foreign military service in this part. If none, write "none". Include the name of organization, location, dates of membership from and to, and the nature of the organization. If additional space is needed, use separate paper.

---

Form I-485 (Rev. 09-09-92)N      Continued On Next Page

L72

## Part 3. Processing Information  *(Continued)*

Please answer the following questions. (If your answer is "Yes" on any one of these questions, explain on a separate piece of paper. Answering "Yes" does not necessarily mean that you are not entitled to register for permanent residence or adjust status).

1.  Have you ever, in or outside the U.S.:
    a.  knowingly committed any crime of moral turpitude or a drug-related offense for which you have not been arrested?
    b.  been arrested, cited, charged, indicted, fined, or imprisoned for breaking or violating any law or ordinance, excluding traffic violations?
    c.  been the beneficiary of a pardon, amnesty, rehabilitation decree, other act of clemency or similar action?
    d.  exercised diplomatic immunity to avoid prosecution for a criminal offense in the U.S.?                                      ☐ Yes  ☒ No

2.  Have you received public assistance in the U.S. from any source, including the U.S. government or any state, county, city, or municipality (other than emergency medical treatment), or are you likely to receive public assistance in the future?           ☐ Yes  ☒ No

3.  Have you ever:
    a.  within the past 10 years been a prostitute or procured anyone for prostitution, or intend to engage in such activities in the future?
    b.  engaged in any unlawful commercialized vice, including, but not limited to, illegal gambling?
    c.  knowingly encouraged, induced, assisted, abetted or aided any alien to try to enter the U.S. illegally?
    d.  illicitly trafficked in any controlled substance, or knowingly assisted, abetted or colluded in the illicit trafficking of any controlled substance?                                                                                                      ☐ Yes  ☒ No

4.  Have you ever engaged in, conspired to engage in, or do you intend to engage in, or have you ever solicited membership or funds for, or have you through any means ever assisted or provided any type of material support to, any person or organization that has ever engaged or conspired to engage, in sabotage, kidnapping, political assassination, hijacking, or any other form of terrorist activity?                                                                                                               ☐ Yes  ☒ No

5.  Do you intend to engage in the U.S. in:
    a.  espionage?
    b.  any activity a purpose of which is opposition to, or the control or overthrow of, the Government of the United States, by force, violence or other unlawful means?
    c.  any activity to violate or evade any law prohibiting the export from the United States of goods, technology or sensitive information?                                                                                                                   ☐ Yes  ☒ No

6.  Have you ever been a member of, or in any way affiliated with, the Communist Party or any other totalitarian party?            ☐ Yes  ☒ No

7.  Did you, during the period March 23, 1933 to May 8, 1945, in association with either the Nazi Government of Germany or any organization or government associated or allied with the Nazi Government of Germany, ever order, incite, assist or otherwise participate in the persecution of any person because of race, religion, national origin or political opinion?                      ☐ Yes  ☒ No

8.  Have you ever engaged in genocide, or otherwise ordered, incited, assisted or otherwise participated in the killing of any person because of race, religion, nationality, ethnic origin, or political opinion?                                                  ☐ Yes  ☒ No

9.  Have you ever been deported from the U.S., or removed from the U.S. at government expense, excluded within the past year, or are you now in exclusion or deportation proceedings?                                                                              ☐ Yes  ☒ No

10. Are you under a final order of civil penalty for violating section 274C of the Immigration Act for use of fraudulent documents, or have you, by fraud or willful misrepresentation of a material fact, ever sought to procure, or procured, a visa, other documentation, entry into the U.S., or any other immigration benefit?                                                            ☐ Yes  ☒ No

11. Have you ever left the U.S. to avoid being drafted into the U.S. Armed Forces?                                                  ☐ Yes  ☒ No

12. Have you ever been a J nonimmigrant exchange visitor who was subject to the 2 year foreign residence requirement and not yet complied with that requirement or obtained a waiver?                                                                             ☐ Yes  ☒ No

13. Are you now withholding custody of a U.S. Citizen child outside the U.S. from a person granted custody of the child?           ☐ Yes  ☒ No

14. Do you plan to practice polygamy in the U.S.?                                                                                  ☐ Yes  ☒ No

---

Form I-485 Rev. 09-09-92)N                          *Continued on back*

L 71

**Part 4. Signature.** *(Read the information on penalties in the instructions before completing this section. You must file this application while in the United States.)*

I certify under penalty of perjury under the laws of the United States of America that this application, the evidence submitted with it, is all true and correct. I authorize the release of any information from my records which the Immigration and Naturalization Service needs to determine eligibility for the benefit I am seeking.

| Signature | Print Your Name | Date | Daytime Phone Number |
|---|---|---|---|
| | Osama Mahmoud Abu-Irshaid | | |

**Please Note:** *If you do not completely fill out this form, or fail to submit required documents listed in the instructions, you may not be found eligible for the requested document and this application may be denied.*

**Part 5.   Signature of person preparing form if other than above.     *(Sign Below)***

I declare that I prepared this application at the request of the above person and it is based on all information of which I have knowledge.

| Signature | Print Your Name | Date | Daytime Phone Number |
|---|---|---|---|
| | H. Abdelhadi | | 214-951-9777 |

Firm Name
and Address

Law Offices of
Jaber, Hadi, & O'Brien
P.O. Box 560323
Dallas, TX 75356-0323

Form I-485 Rev. 09-09-92)N

L70

U.S. Department of Justice
Immigration and Naturalization Service

**BIOGRAPHIC INFORMATION**

OMB No. 1115-0066
Approval expires 4-30-85

| (Family name) | (First name) | (Middle name) | ☒MALE ☐FEMALE | BIRTHDATE (Mo.-Day-Yr.) | NATIONALITY | FILE NUMBER |
|---|---|---|---|---|---|---|
| ABU-IRSHAID | Osama | Mahmoud | | ▓▓▓▓ | Jordanian | A- none |

| ALL OTHER NAMES USED (Including names by previous marriages) | | CITY AND COUNTRY OF BIRTH | | SOCIAL SECURITY NO. (If any) |
|---|---|---|---|---|
| none | | Cairo | Egypt | ▓▓▓▓ |

| | FAMILY NAME | FIRST NAME | DATE, CITY AND COUNTRY OF BIRTH (If known) | CITY AND COUNTRY OF RESIDENCE |
|---|---|---|---|---|
| FATHER | Abu-Irshaid | Mahmoud | ▓▓▓ Birsan,Israel | Irbid, Jordan |
| MOTHER (Maiden name) Khdair | | Nusaibah | Irbid,Jordan | Irbid, Jordan |

| HUSBAND(If none, so state) OR WIFE | FAMILY NAME (For wife, give maiden name) | FIRST NAME | BIRTHDATE | CITY & COUNTRY OF BIRTH | DATE OF MARRIAGE | PLACE OF MARRIAGE |
|---|---|---|---|---|---|---|
| Isa | | Ahlam | 5/22/1979 | Dallas, TX U.S.A. | 8/09/1999 | Prospect Heights, L |

FORMER HUSBANDS OR WIVES (If none, so state)

| FAMILY NAME (For wife, give maiden name) | FIRST NAME | BIRTHDATE | DATE & PLACE OF MARRIAGE | DATE AND PLACE OF TERMINATION OF MARRIAGE |
|---|---|---|---|---|
| none | | | | |

APPLICANT'S RESIDENCE LAST FIVE YEARS, LIST PRESENT ADDRESS FIRST

| STREET AND NUMBER | CITY | PROVINCE OR STATE | COUNTRY | FROM MONTH | FROM YEAR | TO MONTH | TO YEAR |
|---|---|---|---|---|---|---|---|
| 5537 N. Sawyer Ave. | Chicago | IL | U.S.A. | January | 1997 | PRESENT TIME | |
| 1103 North 31st Street | Seattle, | WA | U.S.A. | Sept. | 1996 | January | 1997 |
| PO Box 1927 | Irbid | | Jordan | August | 1995 | Sept. | 1996 |
| 14 Place Pu Masoc | Wajda | | Morocco | October | 1991 | August | 1995 |
| | | | | | | | |
| | | | | | | | |

APPLICANT'S LAST ADDRESS OUTSIDE THE UNITED STATES OF MORE THAN ONE YEAR

| STREET AND NUMBER | CITY | PROVINCE OR STATE | COUNTRY | FROM MONTH | FROM YEAR | TO MONTH | TO YEAR |
|---|---|---|---|---|---|---|---|
| 14 Place Pu Masoc | Wajda | | Morocco | October | 1991 | August | 1995 |

APPLICANT'S EMPLOYMENT LAST FIVE YEARS. (IF NONE, SO STATE.) LIST PRESENT EMPLOYMENT FIRST

| FULL NAME AND ADDRESS OF EMPLOYER | OCCUPATION (SPECIFY) | FROM MONTH | FROM YEAR | TO MONTH | TO YEAR |
|---|---|---|---|---|---|
| n/a | n/a | | | PRESENT TIME | |
| | | | | | |
| | | | | | |
| | | | | | |
| Show below last occupation abroad if not shown above. (Include all information requested above.) | | | | | |
| Assabeel Magazine      Tarek PO Box 108  Amman, Jordan | Journalist | Jan. | 1996 | Sept. | 1996 |

| THIS FORM IS SUBMITTED IN CONNECTION WITH APPLICATION FOR: | SIGNATURE OF APPLICANT | DATE |
|---|---|---|
| ☐ NATURALIZATION   ☐ OTHER (SPECIFY): ☒ STATUS AS PERMANENT RESIDENT | *Osama abu Irshaid* | |
| Are all copies legible?  ☒ Yes | If your native alphabet is other than roman letters, write your name in your native alphabet here: | |

PENALTIES: SEVERE PENALTIES ARE PROVIDED BY LAW FOR KNOWINGLY AND WILLFULLY FALSIFYING OR CONCEALING A MATERIAL FACT.

**APPLICANT:**  BE SURE TO PUT YOUR NAME AND ALIEN REGISTRATION NUMBER IN THE BOX OUTLINED BY HEAVY BORDER BELOW.

| COMPLETE THIS BOX (Family Name) | (Given name) | (Middle name) | (Alien registration number) |
|---|---|---|---|
| ABU-IRSHAID | Osama | Mahmoud | none |

Form G-325  (Rev. 10-1-82) Y

(1) Ident.

L69

U.S. Department of Justice
Immigration and Naturalization Service

**FORM G-325A**
**BIOGRAPHIC INFORMATION**

OMB No. 1115-0066

| (Family name) ISA | (First name) Ahlam | (Middle name) Mahmoud | ☐ MALE  ☒ FEMALE | BIRTHDATE (Mo.-Day-Yr.) ▮▮▮ | NATIONALITY American | FILE NUMBER A- n/a |
|---|---|---|---|---|---|---|

| ALL OTHER NAMES USED (Including names by previous marriages) none | CITY AND COUNTRY OF BIRTH Dallas, Texas U.S.A. | SOCIAL SECURITY NO. (If any) ▮▮▮ |
|---|---|---|

| | FAMILY NAME | FIRST NAME | DATE, CITY AND COUNTRY OF BIRTH (If known) | CITY AND COUNTRY OF RESIDENCE |
|---|---|---|---|---|
| FATHER | Isa | Mahmoud | ▮▮▮ Silwad/Jordan | Dallas, TX   U.S.A. |
| MOTHER (Maiden name) Abdelhadi | | Siham | Silwad/Jordan | Dallas, TX   U.S.A. |

| HUSBAND (If none, so state) OR WIFE | FAMILY NAME (For wife, give maiden name) | FIRST NAME | BIRTHDATE | CITY & COUNTRY OF BIRTH | DATE OF MARRIAGE | PLACE OF MARRIAGE |
|---|---|---|---|---|---|---|
| | Abu-Irshaid | Osama | 10/30/1973 | Cairo Egypt | 8/09/1999 | Prospect Heights, IL |

| FORMER HUSBANDS OR WIVES (If none, so state) | | | | |
|---|---|---|---|---|
| FAMILY NAME  (For wife, give maiden name) | FIRST NAME | BIRTHDATE | DATE & PLACE OF MARRIAGE | DATE AND PLACE OF TERMINATION OF MARRIAGE |
| n/a | | | | |

APPLICANT'S RESIDENCE LAST FIVE YEARS. LIST PRESENT ADDRESS FIRST

| STREET AND NUMBER | CITY | PROVINCE OR STATE | COUNTRY | FROM MONTH | FROM YEAR | TO MONTH | TO YEAR |
|---|---|---|---|---|---|---|---|
| 5537 N. Sawyer Ave. | Chicago | Illinois | U.S.A. | July | 1999 | PRESENT TIME | |
| 7318 Elderberry Ln. | Dallas | Texas | U.S.A. | August | 1993 | July | 1999 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

APPLICANT'S LAST ADDRESS OUTSIDE THE UNITED STATES OF MORE THAN ONE YEAR

| STREET AND NUMBER | CITY | PROVINCE OR STATE | COUNTRY | FROM MONTH | FROM YEAR | TO MONTH | TO YEAR |
|---|---|---|---|---|---|---|---|
| n/a | | | | | | | |

APPLICANT'S EMPLOYMENT LAST FIVE YEARS. (IF NONE, SO STATE.) LIST PRESENT EMPLOYMENT FIRST

| FULL NAME AND ADDRESS OF EMPLOYER | OCCUPATION (SPECIFY) | FROM MONTH | FROM YEAR | TO MONTH | TO YEAR |
|---|---|---|---|---|---|
| Dr. Duane B. Tinkler  Grand Prarie, TX | Receptionist | August | 1996 | August | 1997 |
| | | | | | |
| | | | | | |
| | | | | | |
| *Show below last occupation abroad if not shown above. (Include all information requested above.)* | | | | | |
| none | | | | | |

| THIS FORM IS SUBMITTED IN CONNECTION WITH APPLICATION FOR: | SIGNATURE OF APPLICANT | DATE |
|---|---|---|
| ☐ NATURALIZATION    ☐ STATUS AS PERMANENT RESIDENT  ☒ OTHER (SPECIFY)  Petitioner I-130 Application | *Ahlam Isa* | |

If your native alphabet is other than roman letters, write your name in your native alphabet here:

Are all copies legible?   ☒  Yes

PENALTIES: SEVERE PENALTIES ARE PROVIDED BY LAW FOR KNOWINGLY AND WILLFULLY FALSIFYING OR CONCEALING A MATERIAL FACT.

# APPLICANT:  BE SURE TO PUT YOUR NAME AND ALIEN REGISTRATION NUMBER IN THE BOX OUTLINED BY HEAVY BORDER BELOW.

| COMPLETE THIS BOX (Family Name) ISA | (Given name) Ahlam | (Middle name) Mahmoud | (Alien registration number) n/a |
|---|---|---|---|

Form G-325 A (Rev. 10-1-82)          (1) Ident.

L 68

U.S. Department of Justice
Immigration and Naturalization Service

**Affidavit of Support under Section 213A of the Act**

OMB #1115-0214

**START HERE - Please Type or Print**

## Part 1.  Information on Sponsor (You)

| | | |
|---|---|---|
| Last Name<br>Qutub | First Name<br>Musa | Middle Name<br>Yacub |
| Mailing Address *(Street Number and Name)*<br>██████████ | | Apt/Suite Number<br>n/a |
| | | State or Province<br>Illinois |
| Country<br>USA | | Zip/Postal Code ████  Telephone Number |

| | | FOR AGENCY USE ONLY | |
|---|---|---|---|
| Place of Residence if different from above *(Street Number and Name)*<br>n/a | Apt/Suite Number | This Affidavit | Receipt |
| City | State or Province | [✓] Meets | |
| Country | Zip/Postal Code  Telephone Number | [ ] Does not<br>meet | |
| Date of Birth *(Month, Day, Year)*<br>████ | Place of Birth *(City, State, Country)*<br>Jerusalem, Jordan | Are you a U.S. Citizen?<br>☒ Yes ☐ No | Requirements of<br>Section 213A |
| Social Security Number<br>████ | A-Number *(If any)*<br>n/a | | |

Officer's Signature

Location

3/29/01
Date

## Part 2.  Basis for Filing Affidavit of Support

I am filing this affidavit of support because   *(check one)*:

a.  ☐  I filed/am filing the alien relative petition.

b.  ☐  I filed/am filing an alien worker petition on behalf of the intending immigrant, who is related to me as my _____
*(relationship)*

c.  ☐  I have ownership interest of at least 5% of _____
*(name of entity which filed visa petition)*
which filed an alien worker petition on behalf of the intending immigrant, who is related to me as my _____
*(relationship)*

d.  ☒  I am a joint sponsor willing to accept the legal obligations with any other sponsor(s).

## Part 3.  Information on the Immigrant(s) You Are Sponsoring

| | | |
|---|---|---|
| Last Name<br>ABU-IRSHAID | First Name<br>Osama | Middle Name<br>Mahmoud |
| Date of Birth *(Month, Day, Year)*<br>████ | Sex:<br>☒ Male  ☐ Female | Social Security Number *(If any)*<br>████ |
| Country of Citizenship<br>Jordan | A-Number *(If any)*<br>none | |
| Current Address *(Street Number and Name)*<br>5537 N. Sawyer Ave. | Apt/Suite Number<br>n/a | City<br>Chicago |
| State/Province<br>IL | Country<br>U.S.A. | Zip/Postal Code<br>60625  Telephone Number ████ |

List any spouse and/or children immigrating with the immigrant named above in this Part: *(Use additional sheet of paper if necessary.)*

| Name | Relationship to Sponsored Immigrant | | | Date of Birth | | | A-Number<br>*(If any)* | Social Security Number<br>*(If any)* |
|---|---|---|---|---|---|---|---|---|
| | Spouse | Son | Daughter | Mo. | Day | Yr. | | |
| none | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

Form I-864 (1/21/98)Y

L64

## Part 4.  Eligibility to Sponsor

To be a sponsor you must be U.S. citizen or national or lawful permanent resident. If you are not the petitioning relative, you must provide proof of status. To prove status, U.S. citizens or nationals must attach a copy of a document proving status, such as a U.S. passport, birth certificate, or certificate of naturalization, and lawful permanent residents must attach a copy of both sides of their Alien Registration Card (Form I-551).

The determination of your eligibility to sponsor an immigrant will be based on an evaluation of your demonstrated ability to maintain an annual income at or above 125 percent of the Federal poverty line (100 percent if you are a petitioner sponsoring your spouse or child and you are on active duty in the U.S. Armed Forces). The assessment of your ability to maintain an adequate income will include your current employment, household size, and household income as shown on the Federal income tax returns for the 3 most recent tax years. Assets that are readily converted to cash and that can be made available for the support of sponsored immigrants if necessary, including any such assets of the immigrant(s) you are sponsoring, may also be considered.

The greatest weight in determining eligibility will be placed on current employment and household income. If a petitioner is unable to demonstrate ability to meet the stated income and asset requirements, a joint sponsor who *can* meet the income and asset requirements is needed. Failure to provide adequate evidence of income and/or assets or an affidavit of support completed by a joint sponsor will result in denial of the immigrant's application for an immigrant visa or adjustment to permanent resident status.

### A.  Sponsor's Employment

I am:   1.  ☒  Employed by ___Northeastern Illinois University___   *(Provide evidence of employment)*
Annual salary $75,000__ *or* hourly wage $_____ *(for* ____ *hours per week)*

   2.  ☐  Self employed _____   *(Name of business)*
Nature of employment or business _____

   3.  ☐  Unemployed or retired since _____

### B.  Use of Benefits

Have you or anyone related to you by birth, marriage, or adoption living in your household or listed as a dependent on your most recent income tax return received any type of means-tested public benefit in the past 3 years?
☐  Yes   ☒  No *(If yes, provide details, including programs and dates, on a separate sheet of paper)*

### C.  Sponsor's Household Size

| | **Number** |
|---|---|
| 1.  Number of persons (related to you by birth, marriage, or adoption) living in your residence, including yourself.  *(Do NOT include persons being sponsored in this affidavit.)* | 8 |
| 2.  Number of immigrants being sponsored in this affidavit   *(Include all persons in Part 3.)* | 1 |
| 3.  Number of immigrants **NOT** living in your household whom you are still obligated to support under a previously signed affidavit of support using Form I-864. | 0 |
| 4.  Number of persons who are otherwise dependent on you, as claimed in your tax return for the most recent tax year. | 0 |
| 5.  Total household size.   *(Add lines 1 through 4.)*   **Total** | 9 |

List persons below who are included in lines 1 or 3 for whom you previously have submitted INS Form I-864, *if your support obligation has not terminated. (If additional space is needed, use additional paper)*

| Name | A-Number | Date Affidavit of Support Signed | Relationship |
|---|---|---|---|
| n/a | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Form I-864 (1/21/98)Y **Page 2**

L63

**Part 4.   Eligibility to Sponsor**          *(Continued)*

### D.  Sponsor's Annual Household Income

Enter total unadjusted income from your Federal income tax return for the most recent tax year below. If you last filed a joint income tax return but are using only your *own* income to qualify, list total earnings from your W-2 Forms, or, *if* necessary to reach the required income for your household size, include income from other sources listed on your tax return. If your *individual* income does not meet the income requirement for your household size, you may also list total income for anyone related to you by birth, marriage, or adoption currently living with you in your residence if they have lived in your residence for the previous 6 months, or any person shown as a dependent on your Federal income tax return for the most recent tax year, even if not living in the household. For their income to be considered, household members or dependents must be willing to make their income available for support of the sponsored immigrant(s) and to complete and sign Form I-864A, Contract Between Sponsor and Household Member. A sponsored immigrant/household member only need complete Form I-864A if his or her income will be used to determine your ability to support a spouse and/or children immigrating with him or her.

*You must attach evidence of current employment and copies of income tax returns as filed with the IRS for the most recent 3 tax years for yourself and all persons whose income is listed below. See "Required Evidence" in Instructions.* Income from all 3 years will be considered in determining your ability to support the immigrant(s) you are sponsoring.

- ☐  I filed a single/separate tax return for the most recent tax year.
- ☒  I filed a joint return for the most recent tax year which includes only my own income.
- ☐  I filed a joint return for the most recent tax year which includes income for my spouse and myself.
    - ☐  I am submitting documentation of my individual income (Form W-2 and 1099).
    - ☐  I am qualifying using my spouse's income; my spouse is submitting a Form I-864A.

| | 1998 |
|---|---|
| **Indicate most recent tax year** | *(tax year)* |
| Sponsor's individual income | $ 54,196.00 |
| *or* | |
| Sponsor and spouse's combined income *(If joint tax return filed; spouse must submit Form I-864A.)* | $ |
| Income of other qualifying persons. *(List names; include spouse if applicable. Each person must complete Form I-864A.)* | |
| _____ | $ |
| _____ | $ |
| _____ | $ |
| **Total Household Income** | $ 54,196.00 |

Explain on separate sheet of paper if you or any of the above listed individuals are submitting Federal income tax returns for fewer than 3 years, or if other explanation of income, employment, or evidence is necessary.

### E.  Determination of Eligibility Based on Income

1.  ☒  I am subject to the 125 percent of poverty line requirement for sponsors.
    ☐  I am subject to the 100 percent of poverty line requirement for sponsors on active duty in the U.S. Armed Forces sponsoring their spouse or child.
2.  Sponsor's total household size, from Part 4.C., line 5 ___9___ .
3.  Minimum income requirement from the Poverty Guidelines chart for the year of ___1998___ is $ ___38,062.00___
    for this household size.                                                    *(year)*

**If you are currently employed  and your household income for your household size is equal to or greater than the applicable poverty line requirement (from line E.3.), you do not need to list assets (Part 4.F. and 5) or have a joint sponsor (Part 6)**   unless you are requested to do so by a Consular or Immigration Officer.  You may skip to Part 7, Use of the Affidavit of Support to Overcome Public Charge Ground of Admissibility.   **Otherwise, you should continue with Part 4.F.**

∠62

**Part 4. Eligibility to Sponsor** *(Continued)*

### F. Sponsor's Assets and Liabilities

Your assets and those of your qualifying household members and dependents may be used to demonstrate ability to maintain an income at or above 125 percent (or 100 percent, if applicable) of the poverty line *if* they are available for the support of the sponsored immigrant(s) and can readily be converted into cash within 1 year. The household member, other than the immigrant(s) you are sponsoring, must complete and sign Form I-864A, Contract Between Sponsor and Household Member. List the cash value of each asset *after* any debts or liens are subtracted. Supporting evidence must be attached to establish location, ownership, date of acquisition, and value of each asset listed, including any liens and liabilities related to each asset listed. See "Evidence of Assets" in Instructions.

| Type of Asset | Cash Value of Assets *(Subtract any debts)* |
|---|---|
| Saving deposits | $ See attached tax returns |
| Stocks, bonds, certificates of deposit | $ |
| Life insurance cash value | $ |
| Real estate | $ |
| Other *(specify)* | $ |
| **Total Cash Value of Assets** | $ |

### Part 5. Immigrant's Assets and Offsetting Liabilities

The sponsored immigrant's assets may also be used in support of your ability to maintain income at or above 125 percent of the poverty line *if* the assets are or will be available in the United States for the support of the sponsored immigrant(s) and can readily be converted into cash within 1 year.

The sponsored immigrant should provide information on his or her assets in a format similar to part 4.F. above. Supporting evidence must be attached to establish location, ownership, and value of each asset listed, including any liens and liabilities for each asset listed. See "Evidence of Assets" in Instructions.

### Part 6. Joint Sponsors

If household income and assets do not meet the appropriate poverty line for your household size, a joint sponsor is required. There may be more than one joint sponsor, but each joint sponsor must individually meet the 125 percent of poverty line requirement based on his or her household income and/or assets, including any assets of the sponsored immigrant. By submitting a separate Affidavit of Support under Section 213A of the Act (Form I-864), a joint sponsor accepts joint responsibility with the petitioner for the sponsored immigrant(s) until they become U.S. citizens, can be credited with 40 quarters of work, leave the United States permanently, or die.

### Part 7. Use of the Affidavit of Support to Overcome Public Charge Ground of Inadmissibility

Section 212(a)(4)(C) of the Immigration and Nationality Act provides that an alien seeking permanent residence as an immediate relative (including an orphan), as a family-sponsored immigrant, or as an alien who will accompany or follow to join another alien is considered to be likely to become a public charge and is inadmissible to the United States unless a sponsor submits a legally enforceable affidavit of support on behalf of the alien. Section 212(a)(4)(D) imposes the same requirement on employment-based immigrant, and those aliens who accompany or follow to join the employment-based immigrant, if the employment-based immigrant will be employed by a relative, or by a firm in which a relative owns a significant interest. Separate affidavits of support are required for family members at the time they immigrate if they are not included on this affidavit of support or do not apply for an immigrant visa or adjustment of status within 6 months of the date this affidavit of support is originally signed. The sponsor must provide the sponsored immigrant(s) whatever support is necessary to maintain them at an income that is at least 125 percent of the Federal poverty guidelines.

*I submit this affidavit of support in consideration of the sponsored immigrant(s) not being found inadmissible to the United States under section 212(a)(4)(C) (or 212(a)(4)(D) for an employment-based immigrant) and to enable the sponsored immigrant(s) to overcome this ground of inadmissibility. I agree to provide the sponsored immigrant(s) whatever support is necessary to maintain the sponsored immigrant(s) at an income that is at least 125 percent of the Federal poverty guidelines. I understand that my obligation will continue until my death or the sponsored immigrant(s) have become U.S. citizens, can be credited with 40 quarters of work, depart the United States permanently, or die.*

L61

**Part 7.  Use of the Af..avit of Support to Overcome Public C...rge Grounds**     *(Continued)*

**Notice of Change of Address.**

Sponsors are required to provide written notice of any change of address within 30 days of the change in address until the sponsored immigrant(s) have become U.S. citizens, can be credited with 40 quarters of work, depart the United States permanently, or die.  To comply with this requirement, the sponsor must complete INS Form I-865.  Failure to give this notice may subject the sponsor to the civil penalty established under section 213A(d)(2) which ranges from $250 to $2,000, unless the failure to report occurred with the knowledge that the sponsored immigrant(s) had received means-tested public benefits, in which case the penalty ranges from $2,000 to $5,000.

> *If my address changes for any reason before my obligations under this affidavit of support terminate, I will complete and file INS Form I-865, Sponsor's Notice of Change of Address, Within 30 days of the change of address. I understand that failure to give this notice may subject me to civil penalties.*

**Means-tested Public Benefit Prohibitions and Exceptions.**

Under section 403(a) of Public Law 104-193 (Welfare Reform Act), aliens lawfully admitted for permanent residence in the United States, with certain exceptions, are ineligible for most Federally-funded means-tested public benefits during their first 5 years in the United States.  This provision does not apply to public benefits specified in section 403(c) of the Welfare Reform Act or to State public benefits, including emergency Medicaid; short-term, non-cash emergency relief; services provided under the National School Lunch and Child Nutrition Acts; immunizations and testing and treatment for communicable diseases; student assistance under the Higher Education Act and the Public Health Service Act; certain forms of foster-care or adoption assistance under the Social Security Act; Head Start programs; means-tested programs under the Elementary and Secondary Education Act; and Job Training Partnership Act programs.

**Consideration of Sponsor's Income in Determining Eligibility for Benefits.**

If a permanent resident alien is no longer statutorily barred from a Federally-funded means-tested public benefit program and applies for such a benefit, the income and resources of the sponsor and the sponsor's spouse will be considered (or deemed) to be the income and resources of the sponsored immigrant in determining the immigrant's eligibility for Federal means-tested public benefits.  Any State or local government may also choose to consider (or deem) the income and resources of the sponsor and the sponsor's spouse to be the income and resources of the immigrant for the purposes of determining eligibility for their means-tested public benefits.  The attribution of the income and resources of the sponsor and the sponsor's spouse to the immigrant will continue until the immigrant becomes a U.S. citizen or has worked or can be credited with 40 qualifying quarters of work, provided that the immigrant or the worker crediting the quarters to the immigrant has not received any Federal means-tested public benefit during any creditable quarter for any period after December 31, 1996.

> *I understand that, under section 213A of the Immigration and Nationality Act (the Act), as amended, this affidavit of support constitutes a contract between me and the U.S. Government. This contract is designed to protect the United States Government, and State and local government agencies or private entities that provide means-tested public benefits, from having to pay benefits to or on behalf of the sponsored immigrant(s), for as long as I am obligated to support them under this affidavit of support. I understand that the sponsored immigrants, or any Federal, State, local, or private entity that pays any means-tested benefit to or on behalf of the sponsored immigrant(s), are entitled to sue me if I fail to meet my obligations under this affidavit of support, as defined by section 213A and INS regulations.*

**Civil Action to Enforce.**

If the immigrant on whose behalf this affidavit of support is executed receives any Federal, State, or local means-tested public benefit before this obligation terminates, the Federal, State, or local agency or private entity may request reimbursement from the sponsor who signed this affidavit.  If the sponsor fails to honor the request for reimbursement, the agency may sue the sponsor in any U.S. District Court or any State court with jurisdiction of civil actions for breach of contract. INS will provide names, addresses, and Social Security account numbers of sponsors to benefit-providing agencies for this purpose. Sponsors may also be liable for paying the costs of collection, including legal fees.

$L60$

**Part 7.  Use of the Affidavit of Support to Overcome Public Charge Grounds** *(Continued)*

*I acknowledge that section 213A(a)(1)(B) of the Act grants the sponsored immigrant(s) and any Federal, State, local, or private agency that pays any means-tested public benefit to or on behalf of the sponsored immigrant(s) standing to sue me for failing to meet my obligations under this affidavit of support. I agree to submit to the personal jurisdiction of any court of the United States or of any State, territory, or possession of the United States if the court has subject matter jurisdiction of a civil lawsuit to enforce this affidavit of support. I agree that no lawsuit to enforce this affidavit of support shall be barred by any statute of limitations that might otherwise apply, so long as the plaintiff initiates the civil lawsuit no later than ten (10) years after the date on which a sponsored immigrant last received any means-tested public benefits.*

### Collection of Judgment.

*I acknowledge that a plaintiff may seek specific performance of my support obligation. Furthermore, any money judgment against me based on this affidavit of support may be collected through the use of a judgment lien under 28 U.S.C. 3201, a writ of execution under 28 U.S.C. 3203, a judicial installment payment order under 28 U.S.C. 3204, garnishment under 28 U.S.C. 3205, or through the use of any corresponding remedy under State law. I may also be held liable for costs of collection, including attorney fees.*

### Concluding Provisions.

I, _____Musa Yacub Qutub_____, *certify under penalty of perjury under the laws of the United States that:*

    (a) *I know the contents of this affidavit of support signed by me;*
    (b) *All the statements in this affidavit of support are true and correct;*
    (c) *I make this affidavit of support for the consideration stated in Part 7, freely, and without any mental reservation or purpose of evasion;*
    (d) *Income tax returns submitted in support of this affidavit are true copies of the returns filed with the Internal Revenue Service; and*
    (e) *Any other evidence submitted is true and correct.*

_____          _March 12, 2000_____
*(Sponsor's Signature)*                              *(Date)*

Subscribed and sworn to *(or affirmed)* before me this

_12th_ day of _March_ , _2000_
      *(Month)*        *(Year)*

at _Dallas County_____ ,

My commission expires on _4-12-02_____

_____
*(Signature of Notary Public or Officer Administering Oath)*

__Notary Public_____
*(Title)*

TERESA R. ACORD
MY COMMISSION EXPIRES
April 12, 2002

---

**Part 8.  If someone other than the sponsor prepared this affidavit of support, that person must complete the following:**

I certify under penalty of perjury under the laws of the United States that I prepared this affidavit of support at the sponsor's request, and that this affidavit of support is based on all information of which I have knowledge.

| Signature | Print Your Name | Date | Daytime Telephone Number |
|---|---|---|---|
| | Husein A. Abdelhadi | | 214-951-9777 |

Firm Name and Address

Law Offices of
Jaber, Hadi, & O'Brien
P.O. Box 560323
Dallas, TX  75356-0323

Form I-864 (1/21/98)Y Page 6

L59

U.S. Department of Justice
Immigration and Naturalization Serv(

OMB #1115-0214

**Contract** [ /een Sponsor and Household Member

| Sponsor's Name *(Last, First, Middle)* | | | Social Security Number | A-Number *(If any)* |
|---|---|---|---|---|
| Qutub | Musa | Yacub | ▓▓▓▓▓ | n/a |

### General Filing Instructions:

Form I-864A, Contact Between Sponsor and Household Member, is an attachment to Form I-864, Affidavit of Support Under Section 213A of the Immigration and Nationality Act (the Act). The sponsor enters the information above, completes Part 2 of this form, and signs in Part 5. The household member completes Parts 1 and 3 of this form and signs in Part 6. A household member who is also the sponsored immigrant completes Parts 1 and 4 (Instead of Part 3) of this form and signs in Part 6. The Privacy Act Notice and information on penalties for misrepresentation or fraud are included on the instructions to Form I-864.

The signatures on the I-864A must be notarized by a notary public or signed before an Immigration or Consular Officer. A separate form must be used for each household member whose income and/or assets are being used to qualify. This blank form may be photocopied for that purpose. A sponsored immigrant who qualifies as a household member is only required to complete this form if he or she has one or more family members immigrating with him or her and is making his or her *income* available for their support. Sponsored immigrants who are using their. *assets* to qualify are not required to complete this form. This completed form is submitted with Form I-864 by the sponsored immigrant with an application for an immigrant visa or adjustment of status.

### Purpose:

This contract is intended to benefit the sponsored immigrant(s) and any agency of the Federal Government, any agency of a State or local government, or any private entity to which the sponsor has an obligation under the affidavit of support to reimburse for benefits granted to the sponsored immigrant, and these parties will have the right to enforce this contract in any court with appropriate jurisdiction. This contract must be completed and signed by the sponsor and any household member, including the sponsor's spouse, whose income is included as household income by a person sponsoring one or more immigrants under Section 213A of Act. The contract must also be completed if a sponsor is relying on the assets of a household member who is not the sponsored immigrant to meet the income requirements. If the sponsored immigrant is a household member immigrating with a spouse or children, and is using his or her income to assist the sponsor in meeting the income requirement, he or she must complete and sign this contract as a "sponsored immigrant/household member."

By signing this form, a household member, who is not a sponsored immigrant, agrees to make his or her income and/or assets available to the sponsor to help support the immigrant(s) for whom the sponsor has filed an affidavit of support and to be responsible, along with the sponsor, to pay any debt incurred by the sponsor under the affidavit of support. A sponsored immigrant/household member who signs this contract agrees to make his or her income available to the sponsor to help support any spouse or children immigrating with him or her and to be responsible, along with the sponsor, to pay any debt incurred by the sponsor under the affidavit of support. The obligations of the household member and the sponsored immigrant/household member under this contract terminate when the obligations of the sponsor under the affidavit of support terminate. For additional information see section 213A of the Act, part 213a of title 8 of the Code of Federal Regulations, and Form I-864, Affidavit of Support Under Section 213A of the Act.

### Definitions:

1) An "affidavit of support" refers to INS Form I-864, Affidavit of Support Under Section 213A of the Act, which is completed and filed by the sponsor;

2) A "sponsor" is a person, either the petitioning relative, the relative with a significant ownership interest in the petitioning entity, or another person accepting joint and several liability with the sponsor, who completes and files the Affidavit of Support under Section 213A of the Act on behalf of a sponsored immigrant;

3) A "household member" is any person (a) sharing a residence with the sponsor for at least the last 6 months who is related to the sponsor by birth, marriage, or adoption, *or* (b) whom the sponsor has lawfully claimed as a dependent on the sponsor's most recent Federal income tax return even if that person does not live at the same residence as the sponsor, *and* whose income and/or assets will be used to demonstrate the sponsor's ability to maintain the sponsored immigrant(s) at an annual income at the level specified in section 213A(f)(1)(E) or 213A(f)(3) of the Act;

4) A "sponsored immigrant" is a person listed on this form on whose behalf an affidavit of support will be completed and filed; and

5) A "sponsored immigrant/household member" is a sponsored immigrant who is also a household member.

L-58

## Part 1. Information on Sponsor's Household Member or Sponsored Immigrant/Household Member

| Last Name Abu-Irshaid | | First Name Osama | | Middle Name Mahmoud |
|---|---|---|---|---|
| Date of Birth *(Month, Day, Year)* | | Social Security Number *(Mandatory for non-citizens; voluntary for U.S. citizens)* | | A-Number *(If any)* none |

| Address *(Street Number and Name)* | Apt Number | City | State/Province | ZIP/Postal Code |
|---|---|---|---|---|
| 5537 N. Sawyer Ave. | | Chicago, | Illinois | 60625 |

| Telephone Number | Relationship to Sponsor: Nephew | |
|---|---|---|
| | I am: ☐ The sponsor's household member. *(Complete Part 3.)*<br>☒ The sponsored immigrant/household member. *(Complete Part 4.)* | Length of residence with sponsor<br>( n/a years, months) |

## Part 2. Sponsor's Promise

I, THE SPONSOR, <u>Musa Yacub Qutub</u> , in consideration of the household member's promise to support the
*(Print name of sponsor)*

sponsored immigrant(s) and to be jointly and severally liable for any obligations I incur under the affidavit of support,
promise to complete and file an affidavit of support on behalf of the following ___1___ sponsored immigrant(s):

*(Indicate number)*

| Name of Sponsored Immigrant *(First, Middle, Last)* | Date of Birth *(Month, Day, Year)* | Social Security Number *(If any)* | A-Number *(If any)* |
|---|---|---|---|
| Osama Mahmoud Abu-Irshaid | | | none |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

## Part 3. Household Member's Promise

I, THE HOUSEHOLD MEMBER, _____ , in consideration of the sponsor's
*(Print name of household member)*

promise to complete and file the affidavit of support on behalf of the sponsored immigrant(s):

1) Promise to provide any and all financial support necessary to assist the sponsor in maintaining the sponsored immigrant(s) at or above the minimum income provided for in section 213A(a)(1)(A) of the Act (not less than 125 percent of the Federal poverty line) during the period in which the affidavit of support is enforceable;

2) Agree to be jointly and severally liable for payment of any and all obligations owed by the sponsor under the affidavit of support to the sponsored immigrant(s), to any agency of the Federal Government, to any agency of a State or local government, or to any private entity;

3) Agree to submit to the personal jurisdiction of any court of the United States or of any State, territory, or possession of the United States if the court has subject matter jurisdiction of a civil lawsuit to enforce this contract or the affidavit of support; and

4) Certify under penalty of perjury under the laws of the United States that all the information provided on this form is true and correct to the best of my knowledge and belief and that the income tax returns I submitted in support of the sponsor's affidavit are true copies of the returns filed with the Internal Revenue Service.

Form I-864A (1/21/98)Y Page 2

$L57$

---

**Part 4.  Sponsored Immigrant/Household Member's Promise**

I, THE SPONSORED IMMIGRANT/HOUSEHOLD MEMBER,   Osama Mahmoud Abu-Irshaid
                                                                                        *(Print name of sponsored immigrant)*

in consideration of the sponsor's promise to complete  and  file  the  affidavit of support on behalf of the sponsored immigrant(s) accompanying me:

1)  Promise · to  provide  any  and  all financial support necessary to assist the sponsor in maintaining any sponsored immigrant(s) immigrating  with me at or above the minimum income provided for in section 213A(a)(1)(A) of the Act (not less than  125 percent  of the  Federal poverty line)  during the period in which the affidavit of support is enforceable;

2)  Agree to be jointly and  severally liable  for payment of any and all obligations owed by the sponsor under the affidavit  of  support  to  any  sponsored  immigrant(s) immigrating  with me, to any  agency of the Federal Government, to any agency of a State or local government, or to any private entity;

3)  Agree to submit to  the  personal  jurisdiction  of  any  court  of  the  United States or of any State, territory, or possession of the United States if the court has subject matter jurisdiction of a civil lawsuit to enforce this contract or the affidavit of support; and

4)  Certify under penalty of perjury under the laws of the United States  that all the information provided on this form is  true and correct  to  the  best of my knowledge and belief and that the income tax returns I submitted in support of the sponsor's affidavit of support are true copies of the returns filed with the Internal Revenue Service.

---

**Part 5.  Sponsor's Signature**

*Sponsor's Signature*                                              Date: March 12, 2000

Subscribed and sworn to  *(or affirmed)* before me this  12th  day of  March  ,  2000
                                                                                  *(Month)*           *(Year)*

at  Dallas County                                               My commission expires on  4-12-02 .

Teresa Acord                                                    Notary Public
*Signature of Notary Public or Officer Administering Oath*                                    *Title*

> TERESA R. ACORD
> MY COMMISSION EXPIRES
> April 12, 2002

---

**Part 6.  Household Member's or Sponsored Immigrant/Household Member's Signature**

*Household Member's or Sponsored Immigrant/Household Member's Signature*     Date: March 12, 2000

Subscribe and sworn to  *(or affirmed)* before me this _____  day of _____  ,  _____
                                                                                       *(Month)*           *(Year)*

at _____ .  My commission expires on _____ .

_____
*Signature of Notary Public or Officer Administering Oath*                                    *Title*

---

Form I-864A (1/21/98)Y **Page 3**

L56

# EXHIBIT

# B

OMB No. 1615-0052; Expires 11/3

# N-400 Applicatio
## for Naturalizatic

Department of Homeland Sec
U.S. Citizenship and Immigration Services

Print clearly or type your answers using CAPITAL letters. Failure to print clearly may delay your application. Use black ink.

## Part 1.  Your Name. *(The Person Applying for Naturalization)*

Write your USCIS "A"- number here:
A 077658396

**A.** Your current legal name.

Family Name *(Last Name)*
ABU IRSHAID

| Given Name *(First Name)* | Full Middle Name *(If applicable)* |
|---|---|
| OSAMA | MAHMOUD |

**B.** Your name **exactly** as it appears on your Permanent Resident Card.

Family Name *(Last Name)*
ABU IRSHAID

| Given Name *(First Name)* | Full Middle Name *(If applicable)* |
|---|---|
| OSAMA | |

**C.** If you have ever used other names, provide them below.

| Family Name *(Last Name)* | Given Name *(First Name)* | Middle Name |
|---|---|---|
| | | |
| | | |

**D.** Name change *(optional)*

Please read the Instructions before you decide whether to change your name.

**1.** Would you like to legally change your name?  ☐ Yes  ☒ No

**2.** If "Yes," print the new name you would like to use. Do not use initials or abbreviations when writing your new name.

Family Name *(Last Name)*

| Given Name *(First Name)* | Full Middle Name |
|---|---|
| | |

### For USCIS Use Only

Bar Code | Date Stamp

Remarks

Action Block

## Part 2. Information About Your Eligibility.   *(Check Only One)*

I am at least 18 years old AND

**A.** ☐ I have been a Lawful Permanent Resident of the United States for at least five years.

**B.** ☒ I have been a Lawful Permanent Resident of the United States for at least three years, **and** I have been married to and living with the same U.S. citizen for the last three years, **and** my spouse has been a U.S. citizen for the last three years.

**C.** ☐ I am applying on the basis of qualifying military service.

**D.** ☐ Other *(Please explain)*

f

Form N-400 (Rev. 12/16/05)

L3 15



Osama
Abu Irshaid
A 77658396

L3/4

**Part 3. Information About You.**

Your USCIS "A"- number here:
077658396

**A.** U.S. Social Security Number ②  **B.** Date of Birth *(mm/dd/yyyy)* ③  **C.** Date You Became a Permanent Resident *(mm/dd/yyyy)*

02/13/2002

**D.** Country of Birth
EGYPT

**E.** Country of Nationality   *Palestinian Refugees.* ④
JORDAN

**F.** Are either of your parents U.S. citizens? *(if yes, see Instructions)*  ☐ Yes  ☒ No

**G.** What is your current marital status?  ☐ Single, Never Married  ☒ Married  ☐ Divorced  ☐ Widowed

☐ Marriage Annulled or Other *(Explain)*

**H.** Are you requesting a waiver of the English and/or U.S. History and Government requirements based on a disability or impairment and attaching a Form N-648 with your application?  ☐ Yes  ☒ No

**I.** Are you requesting an accommodation to the naturalization process because of a disability or impairment? *(See Instructions for some examples of accommodations.)*  ☐ Yes  ☒ No

If you answered "Yes," check the box below that applies:

☐ I am deaf or hearing impaired and need a sign language interpreter who uses the following language: _____

☐ I use a wheelchair.

☐ I am blind or sight impaired.

☐ I will need another type of accommodation. Please explain: _____

**Part 4. Addresses and Telephone Numbers.**

**A.** Home Address - Street Number and Name *(Do not write a P. O. Box in this space)*   Apartment Number

4714 COMMONS DRIVE   202

| City | County | State | ZIP Code | Country |
|---|---|---|---|---|
| | | | | USA |

**B.** Care of   Mailing Address - Street Number and Name *(If different from home address)*   Apartment Number

ABDELHADI & ASSOCIATES, P.C.   PO BOX 192268

| City | State | ZIP Code | Country |
|---|---|---|---|
| DALLAS | TX | 75219 | USA |

**C.** Daytime Phone Number *(If any)*   Evening Phone Number *(If any)*   E-mail Address *(If any)*

abuirshaid@aol.com

L43

**Part 5. Information for Criminal Records Search.** | W__ your USCIS "A" number here: A 077658396

NOTE: The categories below are those required by the FBI. See Instructions for more information.

**A.** Gender

[X] Male    [ ] Female

**B.** Height   6' 0   ⑨

5 Feet 11 Inches

**C.** Weight

250 Pounds

**D.** Are you Hispanic or Latino?    [ ] Yes    [X] No

**E.** Race *(Select one or more.)*

[X] White    [ ] Asian    [ ] Black or African American    [ ] American Indian or Alaskan Native    [ ] Native Hawaiian or Other Pacific Islander

**F.** Hair color

[X] Black    [ ] Brown    [ ] Blonde    [ ] Gray    [ ] White    [ ] Red    [ ] Sandy    [ ] Bald (No Hair)

**G.** Eye color

[ ] Brown    [ ] Blue    [ ] Green    [X] Hazel    [ ] Gray    [ ] Black    [ ] Pink    [ ] Maroon    [ ] Other

**Part 6. Information About Your Residence and Employment.**

**A.** Where have you lived during the last five years? Begin with where you live now and then list every place you lived for the last five years. If you need more space, use a separate sheet(s) of paper.

| Street Number and Name, Apartment Number, City, State, Zip Code and Country | Dates *(mm/dd/yyyy)* | |
|---|---|---|
| | From | To |
| Current Home Address - Same as Part 4.A | 10/2003 | Present |
| 4327 RAVENSWORTH RD. #314, ANNANDALE, VA, USA 22003 | 10/2003 ~~2001~~ | 09/2003 |
| 7019 W. 99TH ST. #2E, CHICAGO RIDGE, IL, USA 60415 | 09/2000 | 09/2001 |
| ████████████████████████ | 12/2009 | present |

**B.** Where have you worked (or, if you were a student, what schools did you attend) during the last five years? Include military service. Begin with your current or latest employer and then list every place you have worked or studied for the last five years. If you need more space, use a separate sheet of paper.

| Employer or School Name | Employer or School Address *(Street, City and State)* | Dates *(mm/dd/yyyy)* | | Your Occupation |
|---|---|---|---|---|
| | | From | To | |
| DAR CONSULTING, INC. | PO Box 47 Annandale 22003 home. ~~4714 COMMONS DR. #202, ANNANDALE, VA, USA 22003~~ | 01/2005 | PRESENT | EDITOR/CONSULTANT |
| KINDHEARTS | 3450 W. CENTRAL AVE, TOLEDO, OH, USA | 08/2004 | 02/2006 | PR REP/FUNDRAISING |
| KINDER USA | PO BOX 224846, DALLAS, TX, USA | 11/2003 | 11/2004 | CONTRACTOR/ FUNDRAISING |
| ALZAYTOUNA | 10661 S. ROBERTS RD. #202, PALOS HILLS, IL, USA | 01/2004 | 11/2004 | CONTRACTOR/ EDITOR |
| AMERICAN MUSLIM SOCIETY | 10661 S. ROBERTS RD. #202, PALOS HILLS, IL, USA | 06/2000 | 01/2004 | OUTREACH COORDINATOR/ EDITOR |

Self Contracted

Form N-400 (Rev. 12/16/05)Y Page 3

L312



AWW Pawlow, PLLC
2650 Park Tower Dr.
Suite 801
Vienna, VA 22180

O-3a

2480
Delivery Point
2480
OFF LUTOSTANSKI
Processed By:
12/23/2014 10:45:26 AM

DEC 23 2014

Off. Lutostanski
US CIS
Washington Field Office
2675 Prosperity Ave
Fairfax, VA 20598-2400

CERTIFIED MAIL

7014 1200 0002 2515 0181

∠311

**Part 7. Time Outside the ...ted S ...es.**
*(Including Trips to Canada, Mexico and the Caribbean Islands)*

your USCIS "A"- number here:
A 077658396

**A.** How many total days did you spend outside of the United States during the past five years?   | 51 | days

**B.** How many trips of 24 hours or more have you taken outside of the United States during the past five years?   | 5 | trips

**C.** List below all the trips of 24 hours or more that you have taken outside of the United States since becoming a Lawful Permanent Resident. Begin with your most recent trip. If you need more space, use a separate sheet(s) of paper.

| Date You Left the United States (mm/dd/yyyy) | Date You Returned to the United States (mm/dd/yyyy) | Did Trip Last Six Months or More? | Countries to Which You Traveled | Total Days Out of the United States |
|---|---|---|---|---|
| 03/24/2006 | 04/04/2006 | ☐ Yes ☒ No | QATAR, JORDAN | 11 |
| 03/13/2006 | 03/17/2006 | ☐ Yes ☒ No | UK | 4 |
| 03/01/2005 | 03/17/2005 | ☐ Yes ☒ No | UK, JORDAN | 16 |
| 01/16/2005 | 01/26/2005 | ☐ Yes ☒ No | SAUDI ARABIA | 10 |
| 11/28/2002 | 12/08/2002 | ☐ Yes ☒ No | SAUDI ARABIA | 10 |
| | | ☐ Yes ☐ No | see sup. (14) | |
| | | ☐ Yes ☐ No | | |
| | | ☐ Yes ☐ No | | |
| | | ☐ Yes ☐ No | | |
| | | ☐ Yes ☐ No | | |

**Part 8. Information About Your Marital History.**

**A.** How many times have you been married (including annulled marriages)?   | 1 |   If you have **never** been married, go to Part 9.

**B.** If you are now married, give the following information about your spouse:

**1.** Spouse's Family Name *(Last Name)*
ISA

Given Name *(First Name)*
AHLAM

Full Middle Name *(If applicable)*
MAHMOUD

**2.** Date of Birth *(mm/dd/yyyy)*
▮▮▮▮▮▮

**3.** Date of Marriage *(mm/dd/yyyy)*
08/09/1999

**4.** Spouse's U.S. Social Security #
▮▮▮▮▮▮

**5.** Home Address - Street Number and Name
4714 COMMONS DRIVE ▮▮▮▮▮▮

Apartment Number
▮▮

City
▮▮▮▮▮▮

State
▮▮

Zip Code
▮▮▮▮

L 309

**Part 8.  Information About your Marital History. (Continued)**

your USCIS "A"- number here:
A 077658396

**C.** Is your spouse a U.S. citizen?  [X] Yes   [ ] No

**D.** If your spouse is a U.S. citizen, give the following information:

1. When did your spouse become a U.S. citizen?   [X] At Birth   [ ] Other

If "Other," give the following information:

2. Date your spouse became a U.S. citizen

3. Place your spouse became a U.S. citizen *(Please see Instructions)*

City and State

**E.** If your spouse is not a U.S. citizen, give the following information :

1. Spouse's Country of Citizenship

2. Spouse's USCIS "A"- Number *(If applicable)*
A

3. Spouse's Immigration Status

[ ] Lawful Permanent Resident   [ ] Other

**F.** If you were married before, provide the following information about your prior spouse. If you have more than one previous marriage, use a separate sheet(s) of paper to provide the information requested in Questions 1-5 below.

1. Prior Spouse's Family Name *(Last Name)*

Given Name *(First Name)*

Full Middle Name *(If applicable)*

2. Prior Spouse's Immigration Status

[ ] U.S. Citizen
[ ] Lawful Permanent Resident
[ ] Other

3. Date of Marriage *(mm/dd/yyyy)*

4. Date Marriage Ended *(mm/dd/yyyy)*

5. How Marriage Ended

[ ] Divorce   [ ] Spouse Died   [ ] Other

**G.** How many times has your current spouse been married (including annulled marriages)?  1

If your spouse has ever been married before, give the following information about **your spouse's** prior marriage.
If your spouse has more than one previous marriage, use a separate sheet(s) of paper to provide the information requested in Questions 1 - 5 below.

1. Prior Spouse's Family Name *(Last Name)*

Given Name *(First Name)*

Full Middle Name *(If applicable)*

2. Prior Spouse's Immigration Status

[ ] U.S. Citizen
[ ] Lawful Permanent Resident
[ ] Other

3. Date of Marriage *(mm/dd/yyyy)*

4. Date Marriage Ended *(mm/dd/yyyy)*

5. How Marriage Ended

[ ] Divorce   [ ] Spouse Died   [ ] Other

308

| Part 9: Information Abo~~ur~~ ~~Ch~~ildren. | | | | ~~We~~ your USCIS "A"- number here: A 077658396 |

A. How many sons and daughters have you had? For more information on which sons and daughters you should include and how to complete this section, see the Instructions.

2 3 (16)

B. Provide the following information about all of your sons and daughters. If you need more space, use a separate sheet(s) of paper.

| Full Name of Son or Daughter | Date of Birth (mm/dd/yyyy) | USCIS "A"- number (if child has one) | Country of Birth | Current Address (Street, City, State and Country) |
|---|---|---|---|---|
| D█████ A█████ | ████████ | A N/A | USA | WITH ME |
| R█████ A█████ | ████████ | A N/A | USA | WITH ME |
| L█████ A█████ | ████████ | A N/A | USA | with me |
| | | A | | |
| | | A | No other Children (18) | |
| | | A | | |
| | | A | | |
| | | A | | |

| Part 10. Additional Questions. | |

Please answer Questions 1 through 14. If you answer "Yes" to any of these questions, include a written explanation with this form. Your written explanation should (1) explain why your answer was "Yes" and (2) provide any additional information that helps to explain your answer.

A. General Questions.

1. Have you ever claimed to be a U.S. citizen (in writing or any other way)? ☐ Yes  ☒ No

2. Have you ever registered to vote in any Federal, state or local election in the United States? ☐ Yes  ☒ No

3. Have you ever voted in any Federal, state or local election in the United States? ☐ Yes  ☒ No

4. Since becoming a Lawful Permanent Resident, have you ever failed to file a required Federal, state or local tax return? Extension filed for 2014. (17)  ☐ Yes  ☒ No

5. Do you owe any Federal, state or local taxes that are overdue? ☐ Yes  ☒ No

6. Do you have any title of nobility in any foreign country? ☐ Yes  ☒ No

7. Have you ever been declared legally incompetent or been confined to a mental institution within the last five years? ☐ Yes  ☒ No

Form N-400 (Rev. 12/16/05)Y Page 6

L307

| Part 10.  Additional Ques... ... (Co...nued) | ... your USCIS "A"- number here: |
|---|---|
| | A 077658396 |

**B.  Affiliations.**

**8. a.** Have you **ever** been a member of or associated with any organization, association, fund, foundation, party, club, society or similar group in the United States or in any other place?    ☒ Yes   ☐ No

**b.** If you answered "Yes," list the name of each group below. If you need more space, attach the names of the other group(s) on a separate sheet(s) of paper.

| Name of Group | Name of Group |
|---|---|
| 1. ISLAMIC ASSOCIATION FOR PALESTINE *Deputy of board or Director* MEMBER, 7/02-1/04 | 6. *Director of education program* |
| 2. MUSLIM AMERICAN SOCIETY *June 2009 - Feb. 2010* MEMBER, 10/03-1/05 | 7. American Muslims for Palestine |
| 3. FREE DR. ASHQAR COMMITTEE 9/03-8/04 | 8. Washington Association of Arab Journalalist |
| 4. DAR AL HIJRAH ISLAMIC CENTER *This is church* 12/03-PRESENT - 2006 | 9. US Council of Muslim Organization. |
| 5. UNITED ASSOCIATION FOR STUDIES & RESEARCH, 1/00-12/03 *not member in 2000. Come for TV Interviews as Researcher* | |

**9.** Have you **ever** been a member of or in any way associated *(either directly or indirectly)* with:

   **a.** The Communist Party?    ☐ Yes   ☒ No

   **b.** Any other totalitarian party?    ☐ Yes   ☒ No

   **c.** A terrorist organization?    ☐ Yes   ☒ No

**10.** Have you **ever** advocated *(either directly or indirectly)* the overthrow of any government by force or violence?    ☐ Yes   ☒ No

**11.** Have you **ever** persecuted *(either directly or indirectly)* any person because of race, religion, national origin, membership in a particular social group or political opinion?    ☐ Yes   ☒ No

**12.** Between March 23, 1933 and May 8, 1945, did you work for or associate in any way *(either directly or indirectly)* with:

   **a.** The Nazi government of Germany?    ☐ Yes   ☒ No

   **b.** Any government in any area (1) occupied by, (2) allied with, or (3) established with the help of the Nazi government of Germany?    ☐ Yes   ☒ No

   **c.** Any German, Nazi, or S.S. military unit, paramilitary unit, self-defense unit, vigilante unit, citizen unit, police unit, government agency or office, extermination camp, concentration camp, prisoner of war camp, prison, labor camp or transit camp?    ☐ Yes   ☒ No

**C.  Continuous Residence.**

Since becoming a Lawful Permanent Resident of the United States:

**13.** Have you **ever** called yourself a "nonresident" on a Federal, state or local tax return?    ☐ Yes   ☒ No

**14.** Have you **ever** failed to file a Federal, state or local tax return because you considered yourself to be a "nonresident"?    ☐ Yes   ☒ No

L306

| Part 10. Additional Quest (Co ued) | your USCIS "A"- number here: |
| --- | --- |
| | 077658396 |

## D. Good Moral Character.

For the purposes of this application, you must answer "Yes" to the following questions, if applicable, even if your records were sealed or otherwise cleared or if anyone, including a judge, law enforcement officer or attorney, told you that you no longer have a record.

15. Have you **ever** committed a crime or offense for which you were **not** arrested? ☐ Yes ☒ No

16. Have you **ever** been arrested, cited or detained by any law enforcement officer (including former INS and military officers) for any reason? *only in secondary inspection.* ☐ Yes ☒ No

17. Have you **ever** been charged with committing any crime or offense? *Nothing else.* *only tickets* ☐ Yes ☒ No

18. Have you **ever** been convicted of a crime or offense? ☐ Yes ☒ No

19. Have you **ever** been placed in an alternative sentencing or a rehabilitative program (for example: diversion, deferred prosecution, withheld adjudication, deferred adjudication)? ☐ Yes ☒ No

20. Have you **ever** received a suspended sentence, been placed on probation or been paroled? ☐ Yes ☒ No

21. Have you **ever** been in jail or prison? ☐ Yes ☒ No

If you answered "Yes" to any of Questions 15 through 21, complete the following table. If you need more space, use a separate sheet (s) of paper to give the same information.

| Why were you arrested, cited, detained or charged? | Date arrested, cited, detained or charged? *(mm/dd/yyyy)* | Where were you arrested, cited, detained or charged? *(City, State, Country)* | Outcome or disposition of the arrest, citation, detention or charge *(No charges filed, charges dismissed, jail, probation, etc.)* |
| --- | --- | --- | --- |
| traffic tickets Speeding/parking went to court in Chicago accident in Chicago and I had broken tail light | last one most between 300 & 400 or citation that | Chicago | dismissed was dismissed. |

Answer Questions 22 through 33. If you answer "Yes" to any of these questions, attach (1) your written explanation why your answer was "Yes" and (2) any additional information or documentation that helps explain your answer.

22. Have you **ever**:

a. Been a habitual drunkard? ☐ Yes ☒ No

b. Been a prostitute, or procured anyone for prostitution? ☐ Yes ☒ No

c. Sold or smuggled controlled substances, illegal drugs or narcotics? ☐ Yes ☒ No

d. Been married to more than one person at the same time? ☐ Yes ☒ No

e. Helped anyone enter or try to enter the United States illegally? ☐ Yes ☒ No

f. Gambled illegally or received income from illegal gambling? ☐ Yes ☒ No

g. Failed to support your dependents or to pay alimony? ☐ Yes ☒ No

23. Have you **ever** given false or misleading information to any U.S. government official while applying for any immigration benefit or to prevent deportation, exclusion or removal? ☐ Yes ☒ No

24. Have you **ever** lied to any U.S. government official to gain entry or admission into the United States? ☐ Yes ☒ No

L 305

| Part 10. Additional Questions. (Continued) | your USCIS "A"- number here: |
|---|---|
| | A 077658396 |

**E.  Removal, Exclusion and Deportation Proceedings.**

25. Are removal, exclusion, rescission or deportation proceedings pending against you? ☐ Yes ☒ No

26. Have you **ever** been removed, excluded or deported from the United States? ☐ Yes ☒ No

27. Have you **ever** been ordered to be removed, excluded or deported from the United States? ☐ Yes ☒ No

28. Have you **ever** applied for any kind of relief from removal, exclusion or deportation? ☐ Yes ☒ No

**F.  Military Service.**

29. Have you **ever** served in the U.S. Armed Forces? ☐ Yes ☒ No

30. Have you **ever** left the United States to avoid being drafted into the U.S. Armed Forces? ☐ Yes ☒ No

31. Have you **ever** applied for any kind of exemption from military service in the U.S. Armed Forces? ☐ Yes ☒ No

32. Have you **ever** deserted from the U.S. Armed Forces? ☐ Yes ☒ No

**G.  Selective Service Registration.**

33. Are you a male who lived in the United States at any time between your 18th and 26th birthdays in any status except as a lawful nonimmigrant? ☐ Yes ☒ No

If you answered "NO," go on to question 34.

If you answered "YES," provide the information below.

If you answered "YES," but you did not register with the Selective Service System and are still under 26 years of age, you must register before you apply for naturalization, so that you can complete the information below:

Date Registered (mm/dd/yyyy) [          ]        Selective Service Number [          ]

If you answered "YES," but you did not register with the Selective Service and you are now 26 years old or older, attach a statement explaining why you did not register.

**H.  Oath Requirements.** *(See Part 14 for the Text of the Oath)*

Answer Questions 34 through 39.  If you answer "No" to any of these questions, attach (1) your written explanation why the answer was "No" and (2) any additional information or documentation that helps to explain your answer.

34. Do you support the Constitution and form of government of the United States? ☒ Yes ☐ No

35. Do you understand the full Oath of Allegiance to the United States? ☒ Yes ☐ No

36. Are you willing to take the full Oath of Allegiance to the United States? ☒ Yes ☐ No

37. If the law requires it, are you willing to bear arms on behalf of the United States? ☒ Yes ☐ No

38. If the law requires it, are you willing to perform noncombatant services in the U.S. Armed Forces? ☒ Yes ☐ No

39. If the law requires it, are you willing to perform work of national importance under civilian direction? ☒ Yes ☐ No

L 309

# Travel Updates

|    | Date left U.S. | Date Returned U.S. | Countries Visited | Days |
|----|----------------|--------------------|-------------------|------|
| 1. | 2-8-16         | 2-23-16            | Qatar, Jordan     | 15   |
| 2. | 12-3-15        | 12-9-15            | Qatar             | 6    |
| 3. | 11-11-15       | 11-19-15           | Qatar, Turkey     | 8    |
| 4. | 7-28-15        | 9-6-15             | Jordan            | 40   |

Attachment 14.

L303

Waqf Properties, LLC
January 7, 2016
Registered agent / Chief executive officer

AMP.

**From:** USCIS-CaseStatus <USCIS-CaseStatus@dhs.gov>
**To:** abuirshaid <abuirshaid@aol.com>
**Subject:** Address Change Request Confirmation
**Date:** Tue, Feb 2, 2016 9:13 am

Address change request successfully submitted:
Updated Address To:
Osama Abu Irshaid
8145 Ridge Creek Way

Springfield, VA 22153
AR-11: COA03316000242

Address chang

L 30J

**Part 11. Your Signature**

Write your INS "A"- number here:

A _ _ 077658396 _ _ _ _ _ _

I certify, under penalty of perjury under the laws of the United States of America, that this application, and the evidence submitted with it, are all true and correct. I authorize the release of any information which INS needs to determine my eligibility for naturalization.

Your Signature

Date *(Month/Day/Year)*

06/20/2006

**Part 12. Signature of Person Who Prepared This Application for You     (if applicable)**

I declare under penalty of perjury that I prepared this application at the request of the above person. The answers provided are based on information of which I have personal knowledge and/or were provided to me by the above named person in response to the *exact questions* contained on this form.

Preparer's Printed Name

Iman A. Abdelhadi

Preparer's Signature

Date *(Month/Day/Year)*

Preparer's Firm or Organization Name *(If applicable)*

Abdelhadi & Associates, P.C.

Preparer's Daytime Phone Number

214 219 8803

Preparer's Address - Street Number and Name

PO Box 192268

City

Dallas

State

TX

ZIP Code

75219

**Do Not Complete Part 13 and 14 Until an INS Officer Instructs You To Do So**

**Part 13. Signature at Interview**

I swear (affirm) and certify under penalty of perjury under the laws of the United States of America that I know that the contents of this application for naturalization subscribed by me, including corrections numbered 1 through ___23___ and the evidence submitted by me numbered pages 1 through ___13___, are true and correct to the best of my knowledge and belief.

Subscribed to and sworn to (affirmed) before me

**June Williams**

Officer's Printed Name or Stamp

OCT 03 2008

Date *(Month/Day/Year)*

Complete Signature of Applicant

Officer's Signature

**Part 14. Oath of Allegiance**

If your application is approved, you will be scheduled for a public oath ceremony at which time you will be required to take the following oath of allegiance immediately prior to becoming a naturalized citizen. By signing below, you acknowledge your willingness and ability to take this oath:

I hereby declare, on oath, that I absolutely and entirely renounce and abjure all allegiance and fidelity to any foreign prince, potentate, state, or sovereignty, of whom or which I have heretofore been a subject or citizen;

that I will support and defend the Constitution and laws of the United States of America against all enemies, foreign and domestic;
that I will bear true faith and allegiance to the same;
that I will bear arms on behalf of the United States when required by the law;
that I will perform noncombatant service in the Armed Forces of the United States when required by the law;
that I will perform work of national importance under civilian direction when required by the law; and
that I take this obligation freely, without any mental reservation or purpose of evasion; so help me God.

Printed Name of Applicant

Osama Mahmoud Abu Irshaid

Complete Signature of Applicant

Form N-400 (Rev. 07/23/02)N Page 10

L300

Abu Irshaid, Osama Mahmoud
File Number: 077658396
N-400

Part 6. Information about your employment (continued).

Former Employment:

Voice of America
330 Independence Ave. SW, Washington, DC, USA
From: 11 /01   To:  1/02
Occupation: Translator

sup)

L299

| Date left U.S. | Date Returned | Countries to which travelled | Total days out of U.S. | |
|---|---|---|---|---|
| 8-25-2014 | 8-29-2014 | Turkey | 5 | E |
| 6-12-2014 | 6-26-2014 | Qatar, Jordan | 15 | B/P F |
| 1-6-2014 | 1-23-2014 | Qatar, Jordan | 18 | B/P F |
| 12-5-2013 | 12-14-2013 | Qatar | 10 | B |
| 4-7-2013 | 5-2-2013 | Qatar, Jordan | 26 | B/P F |
| 3-19-2013 | 3-31-2013 | Morocco | 13 | B |
| 12-13-2012 | 12-18-2012 | Qatar | 6 | B |
| 9-12-2012 | 9-16-2012 | Turkey | 5 | B |
| 5-17-2012 | 6-20-2012 | Jordan | 34 | P/F |
| 7-4-2011 | 8-3-2011 | Turkey, Jordan, Saudi Arabia | 30 | P/F |
| 1-9-2011 | 1-13-2011 | U.K. | 5 | P |
| 12-8-2010 | 12-11-2010 | U.K. | 4 | P |

**Associations:**

| | |
|---|---|
| American Muslims for Palestine | 2010- present |
| The Washington Association of Arab Journalists | 2010- present |
| U.S. Council of Muslim Organizations | 2012- present |

Sup²

# EXHIBIT

# C



U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
*Washington Field Office*
2675 Prosperity Avenue
Fairfax, VA 20598

**U.S. Citizenship
and Immigration
Services**

Date:   AUG 1 0 2015

Osama Abu Irshaid
4902 Schuyler Drive
Annandale, VA 22003

A77 658 396
EAC*001664674

**DECISION**

Dear Osama Abu Irshaid:

Thank you for submitting Form N-400, Application for Naturalization, to U.S. Citizenship and Immigration Services (USCIS) under section 319 of the Immigration and Nationality Act (INA).

After a thorough review of the information provided in your application for naturalization, the documents supporting your application, and your testimony during your naturalization interview, USCIS has determined that you are not eligible for naturalization. Accordingly, USCIS must deny your application for naturalization.

Generally, to qualify for naturalization under INA 319, an applicant must:

- Be married to a U.S. citizen who has been a U.S. citizen during the 3 years immediately before filing Form N-400; or

- Have become a lawful permanent resident by being married to or by being the child of a U.S. citizen who battered or subjected him/her to extreme cruelty and this U.S. citizen has been a U.S. citizen during the 3 years immediately before filing Form N-400;

- Have been living in marital union with the citizen spouse during the 3 years immediately before filing Form N-400; except if he/she has been battered or subjected to extreme cruelty by his/her U.S. citizen spouse or parent;

- Be lawfully admitted for permanent residence;

- Be a lawful permanent resident for at least 3 years at the time of filing Form N-400;

- Have resided continuously in the United States as a lawful permanent resident for at least 3 years before filing Form N-400;

- Be physically present in the United States for at least 1½ years at the time of filing Form N-400;

- Have resided continuously in the United States from the date of filing Form N-400 up to the time of administration of the Oath of Allegiance;

- Demonstrate good moral character for at least 3 years prior to the Form N-400 filing date, and during the period leading to administration of the Oath of Allegiance;

*L416*

- Have resided for at least 3 months in the State or USCIS District where residency is claimed before filing Form N-400;

- Demonstrate a basic knowledge of U.S. history and government;

- Demonstrate the ability to read, write, and speak words in ordinary usage in the English language; and

- Establish an attachment to the principles of the U.S. Constitution and be disposed to the good order and happiness of the United States.

### Statement of Facts and Analysis Including Ground(s) for Denial

On February 13, 2002, you obtained permanent resident status through your spouse in immigrant classification IR6, spouse of a United States citizen. USCIS received your instant Form N-400 on June 30, 2006, and on October 3, 2008, March 19, 2010, and June 17, 2015, you appeared for interviews to determine your eligibility for naturalization.

During the interviews and review of your application with an Immigration Services Officer, you testified that the information on your Form N-400, along with any amendments made during the naturalization interviews, and the documents submitted by you were true and correct. During your interviews and review of your immigration record, USCIS determined that you have failed to meet your burden of proof in establishing that you were lawfully admitted for permanent residence.

Your alien registration file, A77 658 396, reflects that you entered the United States on or about September 10, 1996 through New York, New York as a non-immigrant journalist. On or about August 9, 1999 you married Ahlam Isa, a United States citizen, in Prospect Heights, Illinois. Ms. Isa filed a Petition for Alien Relative, Form I-130, on May 30, 2000 in which she sought to classify you as the spouse of a United States citizen in accordance with Section 201(b) of the INA. This visa petition was approved by the former Immigration and Naturalization Service (INS) on August 29, 2001.

On or about May 30, 2000, you concurrently submitted an Application to Register Permanent Residence or Adjust Status, Form I-485, with the former INS. You sought to adjust your status as the spouse of a United States citizen, pursuant to INA Section 245.

According to your Form I-485, you completed this application with the assistance of attorney H. Abdelhadi of the Law Offices of Jaber, Hadi, and O'Brien of Dallas, Texas. When you completed this application, you signed it under penalty of perjury indicating that the contents of the application and any additional evidence submitted with it were true and correct. While you did not date the Form I-485 application when you completed it, you did verify during your June 17, 2015 naturalization interview that the signature on the last page of the Form I-485, obtained at the time of your I-485 interview in Chicago, Illinois, was your signature.

Part 3, Section C of the Form I-485 you submitted and signed under penalty of perjury asks "List your present and past membership in or affiliation with every political organization, association, fund, foundation party, club, society, or similar group in the United States or in any other place since your 16[th] birthday. Include any foreign military service in this part. If none, write 'none'. Include the name of the organization, location, dates of membership from and to, and the nature of the organization. If additional space is needed, use separate paper." In response to this question, you wrote "none".

You were interviewed at the former INS office in Chicago, Illinois, the INS office holding jurisdiction over your place of residence, on August 29, 2001. During this interview, you confirmed under oath the representations you made on your Form I-485 were true and correct. Your Form I-485 was approved on

L 415

February 13, 2002 by the INS office in Chicago, Illinois, affording you the status of an alien lawfully admitted to the United States for permanent residence in immigrant visa classification IR6, spouse of a United States citizen.

On or about June 30, 2006, you filed the instant Form N-400. You signed this application on June 20, 2006 certifying under penalty of perjury that the contents of the application and any evidence submitted in support of it were true and correct. According to the last page of the instant application, you completed this application with the assistance of attorney Iman Abdelhadi of Abdelhadi & Associates of Dallas, Texas.

On page 7 of the Form N-400 you submitted, question 8a asked "Have you ever been a member of or associated with any organization, association, fund, foundation, party, club, society, or similar group in the United States or in any other place?" You answered "yes."

Question 8b of the Form N-400 you submitted asked "If you answered 'Yes,' list the name of each group below. If you need more space, attach the names of the other group(s) on a separate sheet(s) of paper." In typewriting, you provided the following information:

- Islamic Association for Palestine Member, 7/02 – 1/04;
- Muslim American Society Member, 10/03 – 1/05;
- Free Dr. Ashqar Committee, 9/03 – 8/04;
- Dar Al Hijrah Islamic Center, 12/03 – present; and
- United Association for Studies & Research, 1/00 – 12/03.

On October 3, 2008, March 19, 2010, and June 17, 2015, you were interviewed in connection with your naturalization application at the USCIS Washington Field Office. As part of these interviews, Immigration Services Officers reviewed the application with you while you were under oath and you confirmed that you were a member of or affiliated with these five organizations. Through your sworn testimony, this section was amended slightly at each of the interviews to update the dates of your membership or affiliation and to add additional memberships and/or affiliations. During these interviews, you indicated that your membership or affiliation with the Dar Al Hijrah Islamic Center ended in 2006, and that you were again a member of or affiliated with the Muslim American Society for a second time from June 2009 until February 2010. Lastly, you added that you were a member of or affiliated with the following three organizations:

- American Muslims for Palestine from 2010 to the present date;
- Washington Association of Arab Journalists from 2010 to the present date; and
- U.S. Counsel of Muslim Organizations from 2012 to the present date.

During your June 17, 2015 interview, you were asked when you became involved with the Islamic Association for Palestine (IAP). You testified while under oath during several occasions throughout the interview that you actually began your involvement with IAP in approximately late 1997 or 1998. You stated that you met the organization sometime in late 1997 or 1998 when you moved to the Chicago area. You went on to state that it was during this timeframe that you began to attend meetings at their Chicago chapter, you would attend their functions, you would solicit funds for the organization, you recruited members to join the organization, and you would assist with their functions. You later stated that you became a member of IAP sometime in 2000 when you began your employment; however, you again confirmed that you were involved with the organization prior to your employment.

When asked why you indicated on your Form N-400 that you became involved with IAP from July 2002 until January 2004, you indicated that this was when you became a board member with the organization. You indicated that because you were not a leader or an employee, you did not consider yourself to be a member. However, your testimony regarding this is inconsistent. When you first filed your N-400 application in 2006,

*L414*

you indicated that you became a member of IAP in July of 2002. You testified that this was correct during your first two naturalization interviews. Then you testified on June 17, 2015 that you became a member of IAP in 2000 when you became employed. While you had consistently disclosed your involvement with IAP during the naturalization process, it was not until your third interview that you disclosed that you actually began your involvement in the late 1990s.

In addition to your testimony regarding your involvement with IAP, on June 17, 2015 you testified that you were involved with the United Association for Studies and Research (UASR) from January 2000 until December 2003. You indicated that you performed research, wrote a paper or two for the organization, and you wrote some articles. You also, on at least one occasion, were interviewed by the media as a representative of UASR. You indicated that you do not consider yourself to be a member, an employee, or a leader of the organization; however, you would attend and possibly assist with conferences and symposiums held by UASR as well as attend meetings with members of the organization.

During your June 17, 2015 interview you were asked why you did not disclose your involvement with IAP or UASR on your Form I-485. You initially indicated it was because you were never involved with these organizations at the time you filed for adjustment of status. When you were confronted with the fact that you testified under oath that you did, in fact, meet the essential elements of being associated or affiliated with both organizations prior to your adjustment of status, namely that you attended meetings, participated in conferences held by the organizations, and assisted in setting up conferences and meetings held by the organizations, fund raising, and recruiting members, you testified that when you filed for adjustment of status, you did not understand the definition of membership. This explanation is not credible, however, as you also testified that you have researched how the government defines membership, affiliation, and association in relation to immigration benefit applications extensively in your career as a journalist and you acknowledged that the definition of membership and affiliation is quite broad. You testified that because of your research, you included the affiliations on your N-400 even though you personally do not believe that you are a member of the organizations.

The United States Court of Appeals for the Fourth Circuit held in *Injeti v. USCIS*, 737 F.3d 311 (4th Cir 2013) that while the statute governing adjustment of status makes admissibility a prerequisite for receiving any grant of lawful permanent resident status, *see* 8 U.S.C. § 1255, the ultimate determination as to whether an alien will receive that status is left to the Attorney General "in his discretion and *under such regulations as he may prescribe." Id.* at 318 (emphasis added). One such regulation, 8 C.F.R. § 103.2(a)(2), requires the applicant to certify that all information contained in the application "is true and correct." The court went on to hold that "[b]ecause Injeti's application contained a material misrepresentation, and thus was not 'true and correct,' it did not comply with § 103.2(a)(2)." *Id.* at 318. The court concluded, "It follows that Injeti did not satisfy the legal requirements for adjusting to LPR status under 8 U.S.C. § 1255, *regardless of whether the misrepresentation was willful* . . . " *Id.* (emphasis added). In a footnote, the court observed that 8 C.F.R. § 103.2(a)(2) should be interpreted as limited to those misrepresentations that are "material." *Id.* at 18 n.5. Thus, importantly, *Injeti* held that the misrepresentation did not have to be willful, and thus does not have to rise to the level to render someone inadmissible under INA § 212(a)(6)(C)(i), so long as it is material to the benefit being sought.

For the definition of materiality, the *Injeti* court looked to the Supreme Court's decision in *Kungys v. United States*, 485 U.S. 759 (1988) and the Board of Immigration Appeal's decision in *Matter of Kai Hing Hui*, 15 I.&N. Dec. 288 (BIA 1975). A misrepresentation is material if it "ha[s] a natural tendency to influence the decision of [immigration officials]," *Kungys*, 485 U.S. at 772, or if it "tends to shut off a line of inquiry which is relevant to the alien's eligibility and which might well have resulted in a proper determination that he be excluded," *Matter of Kai Hing Hui*, 15 I.&N. Dec. at 289. *Injeti*, 737 F.3d at 316-17.

USCIS finds that by not disclosing your involvement with IAP and UASR on your Form I-485, you cut off a

material line of questioning not only to assess your admissibility but to establish whether or not you warranted a favorable grant of discretion. USCIS finds that your failure to disclose your involvement with IAP and UASR was material to your eligibility for adjustment of status considering the fact that on May 12, 2000, *Boim v Quranic Literacy Institute, Et Al* was filed with the U.S. District Court in Chicago, Illinois. In this lawsuit, the parents of David Boim, a seventeen-year-old U.S. citizen murdered in Israel by Hamas, a foreign terrorist group, sued United States-based organizations and the alleged U.S.-based military leader of Hamas, alleging conspiracy to provide and provisions of material support to Hamas in violation of the Antiterrorism Act of 1990. Included as defendants were the Islamic Association for Palestine and the United Association for Studies and Research. In the complaint, UASR was alleged to serve as Hamas' political command center in the United States. The complaint also alleged that IAP directly or indirectly raised and laundered money for Hamas and financed Hamas' terrorist activities. On November 10, 2004, the U.S. District Court for the Northern District of Illinois granted the Boims' motion for partial summary judgment against IAP. *Boim v. Quranic Literacy Institute*, 340 F.Supp.2d 885 (N.D. Ill. Nov. 10, 2004). The Court also noted in its decision that it had previously granted summary judgment against UASR in a prior decision in the case. *Boim v. Quaranic Literacy Institute*, 340 F.Supp.2d at 891. You acknowledged during your interview on June 17, 2015 that you were aware of the *Boim* lawsuit.

The record therefore shows that prior to your filing Form I-485 on May 30, 2000, both the UASR and IAP were named in a document filed in Federal Court as organizations alleged to have provided material support to Hamas. This information would have impacted the former INS' analysis regarding your eligibility for adjustment of status under the statutory inadmissibility grounds and as a matter of discretion. If you had disclosed this information, the former INS would have known during your August 29, 2001 adjustment of status interview or prior to the approval of your Form I-485 on February 13, 2002, that you were involved with IAP and UASR, and would have been able to question you about the extent of your affiliation with each organization. As you failed to disclose your involvement with each organization, you cut off a material line of questioning directly related to determining your eligibility to adjust status, *i.e.*, whether you were admissible to the United States and whether you merited a favorable exercise of discretion. As a result, your Form I-485 contained a material misrepresentation and thus was "not true and correct" and also did not comply with 8 C.F.R. § 103.2(a)(2). Similar to *Injeti*, you therefore did not satisfy the legal requirements for adjustment of status under 8 U.S.C. § 1255.

If at the time an alien is accorded permanent resident status, he or she is not entitled to such status, the alien cannot be considered lawfully admitted for permanent residence. *See Matter of Koloamatangi*, 23 I&N Dec. 548 (BIA 2003). No applicant may be naturalized unless such applicant has been lawfully admitted to the United States for permanent residence in accordance with all applicable provisions of the Immigration and Nationality Act. *See Matter of Longstaff*, 716 F.2d 1439 (5th Cir. 1983); *see also Nesari v. Taylor*, 806 F.Supp.2d 848, 865 (E.D.Va. 2011) (*citing to Matter of Longstaff*, 716 F.2d. 1439, 1441 (5th Cir. 1983)); 8 U.S.C. § 1429.

Furthermore, "[a]dmission is not lawful if it is regular only in form. The term 'lawfully' denotes compliance with substantive legal requirements, not mere procedural regularity, as the definition provided by Congress plainly establishes: the term 'lawfully admitted for permanent residence' means the status having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed. [footnote omitted] Section 1429's added requirement 'in accordance with all applicable provisions of the Act' is not merely redundant, but emphatic and embracive." *Matter of Longstaff*, 716 F.2d at 1441.

To qualify for naturalization under INA § 319, you must demonstrate that you meet all the requirements for naturalization including the requirement of having been lawfully admitted for permanent residence. As you did not establish that you were legally entitled to the grant of your lawful permanent resident status that you received, you have not demonstrated that you have been lawfully admitted for permanent residence and, therefore are ineligible for naturalization. *See* INA § 318.

If you believe that you can overcome the grounds for this denial, you may submit a request for a hearing on Form N-336, Request for a Hearing on a Decision in Naturalization Proceedings, within 30 calendar days of service of this decision (33 days if this decision was mailed.) *See* 8 CFR §§ 336.2 and 103.8(b).  Without a properly filed Form N-336, this decision will become final.  *See* INA § 336.

To access Form N-336 or if you need additional information, please visit the USCIS website at www.uscis.gov or call our National Customer Service Center toll free at 1-800-375-5283.  You may also make an appointment to speak to a USCIS staff member in person at the USCIS office having jurisdiction over your current place of residence.  To schedule an appointment, go to www.uscis.gov and select INFOPASS.

Sincerely,

Kimberly J. Zanotti
Field Office Director
USCIS Washington Field Office

cc: Ashraf Nubani

**Attachment**
**(Applicable Law/Regulations)**

To better assist you, the sections of law referenced in your decision are provided below:

INA 319

(a)Any person whose spouse is a citizen of the United States...may be naturalized upon compliance with all the requirements of this title except the provisions of paragraph (1) of section 316(a) if such person immediately preceding the date of filing his application for naturalization has resided continuously, after being lawfully admitted for permanent residence, within the United States for at least three years, and during the three years immediately preceding the date of filing his application has been living in marital union with the citizen spouse...who has been a United States citizen during all of such period, and has been physically present in the United States for periods totaling at least half of that time and has resided within the State or the district of the Service in the United States in which the applicant filed his application for at least three months.

INA 318

Except as otherwise provided in this title, no person shall be naturalized unless he has been lawfully admitted to the United States for permanent residence in accordance with all applicable provisions of this Act. The burden of proof shall be upon such person to show that he entered the United States lawfully, and the time, place, and manner of such entry into the United States, but in presenting such proof he shall be entitled to the production of his immigrant visa, if any, or of other entry document, if any, and of any other documents and records, not considered by the Attorney General to be confidential, pertaining to such entry, in the custody of the Service. Notwithstanding the provisions of section 405(b), and except as provided in sections 328 and 329 no person shall be naturalized against whom there is outstanding a final finding of deportability pursuant to a warrant of arrest issued under the provisions of this or any other Act; and no application for naturalization shall be considered by the Attorney General if there is pending against the applicant a removal proceeding pursuant to a warrant of arrest issued under the provisions of this or any other Act: Provided, That the findings of the Attorney General in terminating removal proceedings or in canceling the removal of an alien pursuant to the provisions of this Act, shall not be deemed binding in any way upon the Attorney General with respect to the question of whether such person has established his eligibility for naturalization as required by this title.

INA 245

(a) The status of an alien who was inspected and admitted or paroled into the United States or the status of any other alien having an approved petition for classification as a VAWA self-petitioner may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if
(1) the alien makes an application for such adjustment,
(2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and
(3) an immigrant visa is immediately available to him at the time his application is filed.

8 CFR 103.2

(a) Filing
(2) Signature An applicant or petitioner must sign his or her benefit request. However, a parent or legal

L 410

guardian may sign for a person who is less than 14 years old. A legal guardian may sign for a mentally incompetent person. By signing the benefit request, the applicant or petitioner, or parent or guardian certifies under penalty of perjury that the benefit request, and all evidence submitted with it, either at the time of filing or thereafter, is true and correct. Unless otherwise specified in this chapter, an acceptable signature on a benefit request that is being filed with the BCIS is one that is either handwritten or, for applications or petitions filed electronically as permitted by the instructions to the form, in electronic format.

INA 336

(a) If, after an examination under section 335, an application for naturalization is denied, the applicant may request a hearing before an immigration officer.

(b) If there is a failure to make a determination under section 335 before the end of the 120-day period after the date on which the examination is conducted under such section, the applicant may apply to the United States district court for the district in which the applicant resides for a hearing on the matter. Such court has jurisdiction over the matter and may either determine the matter or remand the matter, with appropriate instructions, to the Service to determine the matter.

(c) The Attorney General shall have the right to appear before any immigration officer in any naturalization proceedings for the purpose of cross-examining the applicant and the witnesses produced in support of the application concerning any matter touching or in any way affecting the applicant's right to admission to citizenship, and shall have the right to call witnesses, including the applicant, produce evidence, and be heard in opposition to, or in favor of, the granting of any application in naturalization proceedings.

(d) The immigration officer shall, if the applicant requests it at the time of filing the request for the hearing, issue a subpoena for the witnesses named by such applicant to appear upon the day set for the hearing, but in case such witnesses cannot be produced upon the hearing other witnesses may be summoned upon notice to the Attorney General, in such manner and at such time as the Attorney General may by regulation prescribe. Such subpoenas may be enforced in the same manner as subpoenas under section 335(b) may be enforced.

(e) It shall be lawful at the time and as a part of the administration by a court of the oath of allegiance under section 337(a), for the court, in its discretion, upon the bona fide prayer of the applicant included in an appropriate petition to the court, to make a decree changing the name of said person, and the certificate of naturalization shall be issued in accordance therewith.

8 CFR 336.2

(a) The applicant, or his or her authorized representative, may request a hearing on the denial of the applicant's application for naturalization by filing a request with USCIS within thirty days after the applicant receives the notice of denial.

8 CFR 103.8

This section states authorized means of service by the Service on parties and on attorneys and other interested persons of notices, decisions, and other papers (except warrants and subpoenas)in administrative proceedings before Service officers as provided in this chapter.

(b) Effect of service by mail. Whenever a person has the right or is required to do some act within a prescribed period after the service of a notice upon him and the notice is served by mail, 3 days shall be added to the prescribed period. Service by mail is complete upon mailing.

L409

# EXHIBIT

# D

OMB No. 1615-0050; Expires 01/31/2016

Department of Homeland Security
U.S. Citizenship and Immigration Services

# Form N-336, Request for a Hearing on a Decision in Naturalization Proceedings
### (Under Section 336 of the INA)

Print or type all your answers fully and accurately in black ink. Write "N/A" if an item is not applicable. Write "None" if the answer is none. Failure to answer all of the questions may delay your Form N-336.

## Part 1. Information About You, the Naturalization Applicant

**Your A-Number:**
A 0 7 7 - 6 5 8 - 3 9 6

**1. Current Legal Name** *(do not provide a nickname)*

Family Name *(last name)*
ABU IRSHAID

Given Name *(first name)*
OSAMA

Middle Name *(if applicable)*
MAHMOUD

**2. Date of Birth** *(mm/dd/yyyy)*
█████████

**3. Home Address**

Street Number and Name *(do not provide a P.O. Box in this space unless it is your ONLY address.)*
█████████

| Apartment Number | City |
|---|---|
| | ████ |

| County | State |
|---|---|
| ████ | █ |

| ZIP Code | Province *(foreign address only)* |
|---|---|
| ███ | |

| Country *(foreign address only)* | Postal Code *(foreign address only)* |
|---|---|
| | |

**For USCIS Use Only**

| Bar Code | Date Stamp |
|---|---|
| | |

**Remarks**

☐ Re-Affirm N-400 Denial

☐ Re-Determine N-400 Denial

**4. Mailing Address**

C/O *(in care of name)*
SAME AS ABOVE

| Street Number and Name | | Apartment Number |
|---|---|---|
| | | |

| City | State | ZIP Code |
|---|---|---|
| | | |

| Province *(foreign address only)* | Country *(foreign address only)* | Postal Code *(foreign address only)* |
|---|---|---|
| | | |

**5. Daytime Phone Number** ████  **Work Phone Number** *(if any)* (    )  **Evening Phone Number** (    )

**Mobile Phone Number** *(if any)* ████

**6. E-Mail Address** *(if any)*
ABUIRSHAID@HOTMAIL.COM

Form N-336 (Rev. 01/07/13) N

L439

**Part 2. Information About Form N-400 (Application for Naturalization) Denial On Which You Are Requesting a Hearing**

A 0 7 7 - 6 5 8 - 3 9 6

1. Form N-400 Receipt Number

EAC-001664674

2. Date of Form N-400 Denial Notice *(mm/dd/yyyy)*

08/10/2015

3. USCIS Office That Issued Form N-400 Denial Notice

WASHINGTON

**Part 3. Reason You Are Requesting a Hearing**

Provide the reason(s) you are requesting a hearing on your denied Form N-400. If extra space is needed to provide an explanation, attach an additional sheet(s) of paper. You must write your A-Number, the date, the question number, and sign the top of each additional sheet(s).

**NOTE:** Refer to Form N-336 Instructions, Page 1, Document Submission, for documents to submit with your Form N-336.

```
Applicant was credible. Even if he considered himself affiliated, he had no reason to
deny his affiliations. USCIS findings are faulty. Also, consider this a motion to reopen
and/or reconsider.
```

Form N-336 (Rev. 01/07/13) N Page 2



L438

**Part 4. Accommodations for Individuals With Disabilities and/or Impairments**

A 0 7 7 - 6 5 8 - 3 9 6

Are you requesting an accommodation for the Form N-336 hearing because of a disability and/or impairment? *(see Part 4, Specific Form Instructions, in the Form N-336 instructions for some examples of accommodations)*  ☐ Yes  ☒ No

If you checked "Yes," check the box(es) below that apply:

☐ I am deaf or hearing impaired and need a sign language interpreter who uses the following language (e.g., American Sign Language (ASL)):

☐ I use a wheelchair.

☐ I am blind or sight-impaired.

☐ I will need another type of accommodation. Explain:

**Part 5. Your Signature** *(USCIS will reject your Form N-336 if it is not signed)*

I certify, under penalty of perjury under the laws of the United States, that this request, and the evidence submitted with it, is all true and correct. I authorize the release of any information that U.S. Citizenship and Immigration Services needs to determine eligibility for naturalization.

| Your Signature | Date *(mm/dd/yyyy)* |
|---|---|
|  | 9/9/2016 |

**Part 6. Signature of Person Who Prepared This Form N-336 For You** *(if applicable)*

I declare that I prepared Form N-336 at the request of the above person. The answers provided are based on information of which I have personal knowledge or were provided to me by the above-named person in response to the questions contained on this Form N-336.

| Preparer's Printed Name | Preparer's Signature | Date *(mm/dd/yyyy)* |
|---|---|---|
| ASHRAF W NUBANI |  | 9-10-16 |

| Preparer's Firm or Organization Name *(if applicable)* | Preparer's Daytime Phone Number |
|---|---|
| AWN POINT LAW PLLC | ( 703 ) 658-5151 |

Preparer's Address

Street Number and Name

2650 PARK TOWER DRIVE

| City | State | ZIP Code |
|---|---|---|
| VIENNA | VA | 22180 |

| Province *(foreign address only)* | Country *(foreign address only)* | Postal Code *(foreign address only)* |
|---|---|---|
|  |  |  |

| Preparer's E-Mail Address *(if any)* | Preparer's Fax Number |
|---|---|
| AWN@AWNPOINTLAW.COM | ( 703 ) 658-9200 |



L437

# EXHIBIT

# E

DEPARTMENT OF HOMELAND SECURITY
UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES
Washington Field Office

|  |  |
|---|---|
| N-336 APPEAL | ) |
|  | ) |
| Osama Abu Irshaid | ) |
|  | ) |
| A#: 077658396 | ) |
|  | ) |
|  | ) |

## BRIEF AND MEMORANDUM IN SUPPORT OF APPLICANT'S N-336 REQUEST FOR A HEARING ON A DECISION IN NATURALIZATION PROCEEDINGS UNDER SECTION 336 OF THE INA

Mr. Abu Irshaid hereby appeals his denial of citizenship dated August 10, 2015 (See Exhibit 1). In support of his appeal he submits the following brief, memorandum of law and statement.

The USCIS erred in denying Mr. Abu Irshaid citizenship.

### THE ISSUE

The issue presented is whether Mr. Abu Irshaid was lawfully admitted as a permanent resident and therefore eligible to be naturalized in a situation where his "involvement" in certain organizations was considered material to obtaining permanent residence.

### MR. ABU IRSHAID DID NOT PROVIDE FALSE STATEMENTS TO OBTAIN AN IMMIGRATION BENEFIT

At the time of filing his I-485 Adjustment of status application Mr. Abu Irshaid had no reason to hide his "involvement" with any organization. Both the Islamic Association for Palestine (IAP) and the United Association for Studies and Research (UASR) were lawful and duly established non for profit organizations in the US. The

MAILROOM
APR 14 2016

APR 14 2016 PM 3:13

*L 518*

question as asked whether he was a member or affiliated with any organization. At the time he did not consider knowing people or organizations through a mosque or community setting amounted to membership or affiliation. He was not a member or affiliated with any group or organization. Furthermore, had the then INS known that he had involvement in these two organizations a review of his application would have resulted in an approval. The existence of a civil suit engineered by Jewish-Americans groups opposed to Palestinian rights and activism in America would not and can not be grounds for denying an applicant adjustment of status. These two organizations were never criminally or administratively charged by the US government in any way. The USCIS impugns these organizations based on anti Muslim bias and political considerations.

### MR. ABU IRSHAID'S ALLEGED INVOLVEMENT IN CERATIN ORGANIZATIONS WAS NOT MATERIAL FOR ELIGIBILITY FOR ADJUSTMENT OF STATUS

Mr. Abu Irshaid was not a member of or affiliated with the Islamic Association for Palestine (IAP) at the time he filed his application for Adjustment of Status on or about May 30, 2000. He consistently stated under oath that he was not sure of the exact dates of his involvement. However, involvement does not amount to membership or even affiliation. In addition, he stated that he did not consider himself affiliated with the organization at the time he applied for and received his green card. He stated that he considered himself a member of the organization when he became a board member. Furthermore, he listed his employment with IAP on his N400 Application for Naturalization in 2006. The employment relationship started in June of 2000 which was after his application for adjustment of status.

2

*L517*

Mr. Abu Irshaid's "involvement" with the United Association for Studies and Research (UASR) began after he became a permanent resident. The dates given in his N400 Naturalization application were a misprint. Consistent with his statements at his interview his "involvement" with UASR began sometime after he obtained permanent residency. In fact he clearly stated that the only reason he put UASR as an association was out of caution. He was never a member and his "association" was based on attending some activities for UASR, such as conferences. And he once appeared as an analyst on TV and was given the title of fellow at the UASR. He also may have written a few articles for UASR. For these reasons he listed UASR as an association.

These activities may or may not amount to association. However even if they did it is our position that it was not material at the time when he applied for adjustment of status because the government never charged any of these organizations with wrong doing. The organizations were not charged with a crime. The organizations were not even shut down after September 2001 in an administrative process. The only reason they have been treated as "taboo" organizations is because they are associated with Palestinian activism.

In the USCIS denial it is claimed that because there was a civil law suit against these organizations somehow this made these organizations suspect. The Boim case was merely a tort case whereby the family of a youngster killed in an Israeli settlement on the West Bank was looking for compensation. Since they could not sue Hamas they decided to come up with an elaborate theory of liability whereby active Muslim Palestinian organizations here in the US would be accused of being fronts for Hamas. The IAP and UASR were not shut down by the government but a lack of funds.

3

L 516

Even today, 15 years after receiving permanent residency, if USCIS objectively looks at these Muslim organizations there is nothing in the record as it applies to Mr. Abu Irshaid that would deny him permanent residency much less citizenship.[1]

## ARGUMENT

To qualify for naturalization under the Immigration and Nationality Act ("INA"), an applicant must have "been lawfully admitted to the United States for permanent residence." 8 U.S.C.A. § 1427 & 1429 (West); Ampe v. Johnson, 2016 WL 247562, at *1 (D.D.C. Jan. 20, 2016). An alien is not lawfully admitted to the U.S. if she, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under §1182. 8 U.S.C. § 1182 (a)(6)(C)(i). To preclude an alien from naturalization under § 1182 (a)(6)(C)(i), the government must show three elements. Ampe, 2016 WL 247562, at *6. First, the applicant must have the necessary state of mind. Id. Section 1182(a)(6)(C)(i) does not render an alien inadmissible if she makes an innocent mistake on her LPR Form. Id. Second, the misrepresentation must be material. Id. Third, § 1182(a)(6)(C)(i) requires the government to show that any fraudulent or willful misrepresentation of a material fact was done for the purpose of "procuring ... a

---

[1] Numerous Muslim individuals who were associated with both IAP and UASR, as well as other Muslim organizations, were granted permanent residency and citizenship. USCIS granted these benefits coinciding with Mr. Abu Irshaid's filing of adjustment of status to the present. Therefore, it would be disingenuous of USCIS to claim that Mr. Abu Irshaid prevented the Service from pursuing a line of questioning. Even if he had been associated at the time he would have been eligible for adjustment of status as he is now eligible for citizenship.

L515

visa, other documentation, or admission into the United States or other benefit provided under the INA." Id. Therefore, it is not enough to show just that an alien intentionally misled USCIS officials and that her misstatements were material; the government must also show why she lied, and that reason must be that she was seeking to obtain an immigration benefit. Id.

Mr. Abu Irshaid had no reason to lie.  Kmowing and meeting people does not amount to affiliation.  Had the then INS had an opportunity to investigate Mr. Abu Irshaid's "affiliations" nothing in his record or the organizations he was alleged to have been ivolved with would have prevented him from obtaining permanent residency.

### *State of Mind*

The intent element of § 1182(a)(6)(C)(i) requires the government to show that alien's failure to disclose certain information constituted either "fraud" or "willful misrepresentation." Id. Fraud consists of false representations of a material fact made with knowledge of its falsity and with intent to deceive the other party." Id. A misrepresentation is only "willful" if it "involves conscious wrong or evil purpose ... or at least inexcusable carelessness," and is an even "stronger" requirement than "voluntary or intentional." Id. Therefore, a material misrepresentation, standing alone absent any scienter, does not constitute a valid intent under this section. Id. For example, a LPR's application was denied because USCIS alleged that the LPR failed to fully disclose her marital status with the government, and the government also asserted that case law indicates a finding of substantive irregularity for fraud or misrepresentation does not require a showing of intent to deceive by fraud or willfulness. Id. at *8. The court

5

L574

completely rejected this argument and concluded that the government's interpretation of law is simply "incorrect". Id. at 10.

Specifically, the court intensively analyzed a case that had been heavily relied on by the government: Injeti v. U.S. Citizenship & Immigration Servs., 737 F.3d 311, 312 (4th Cir. 2013). In Injeti, USCIS rejected a LPR's application for naturalization because the LPR failed to disclose her former marriage, and a death certificate filed by this LPR turned out to be a fake document. Id. at 313. USCIS in this case based its argument primarily on 8 U.S.C. § 1255, which provides the Attorney General authority to grant an LPR application "at his discretion and under such regulations as he may prescribe. Id. at 318. The 4th Circuit held for USCIS, and explained that one of the regulations the AG prescribed is 8 C.F.R. § 103.2(a)(2), which requires that "the applicant ... certifies under penalty of perjury that the benefit request, and all evidence submitted with it, either at the time of filing or thereafter, is true and correct." Id (quoting 8 C.F.R. § 103.2(a)(2)). Since the LPR violated § 103.2(a)(2), a regulation proscribed by the AG, the LPR was never lawfully admitted; thus her application for naturalization can be denied without finding of intent. Id. The court in the Ampe case (D.C. Circuit), however, completely disagreed with the 4th Circuit. D.C. Circuit stated that while it realized that Injeti is based on § 1255 rather than § 1182, the 4th Circuit's ruling is simply irrational and cannot be reconciled with legislature intent. Ampe, 2016 WL 247562, at *9-10. The D.C. Circuit held that the 4th Circuit's approach ignored a black-letter law, which is that perjury requires intent. Id. It also held that such approach would allow USCIS to deny any application with any innocent mistakes on it, which is a very extreme result. Id. Furthermore, the court noted that Congress explicitly chose to require the government to

6

L513

prove willfulness when seeking to deport an alien for misrepresenting facts in applying

for entry documents by passing § 1182(a)(6)(C)(i); thus the Court will not allow USCIS

to circumvent that statute and find an alien inadmissible absent a showing that she acted

fraudulently or willfully. Id.

In the instant case the USCIS barely alleges intent, rather it relies on *Injeti*. Mr. Abu

Irshaid was candid about his involvement and clearly stated that he was not precise with

dates. In addition, these subsequent interviews have to be considered in context. It took

USCIS over 9 long years and three interviews in 2008, 2010, and 2015 to adjudicate the

case. It is only after the pretext of the interview in 2015 that USCIS used these alleged

associations to deny Mr. Abu Irshaid's application for naturalization. USCIS had no basis

for denial. It was only after he threatened to sue that additional interviews in 2010 and

2015 were conducted. The USCIS used the 2015 interview as a basis for denial. This is

a clear indication that the USCIS had no basis to hold his application for this period of

time. Multiple interviews only serve to confuse the facts. However, the taped interviews

show consistency on the part of Mr. Abu Irshaid regarding his associations. Mr. Abu

Irshaid had no reason to lie about his associations. The negative information about the

organizations are products of anti Muslim bias.

### Materiality

Under the immigration laws, the test for materiality turns on whether the fact at issue

"has a natural tendency to influence, or was capable of influencing, the decisions of the

government agency. Id, at *10. A misrepresentation made in connection with an

application for visa or other documents, or with entry into the United States, is material if

either (1) the alien is excludable on the true facts, or (2) the misrepresentation tends to

7

L 512

shut off a line of inquiry which is relevant to the alien's eligibility and which might well have resulted in a proper determination that he be excluded. Id., citing Matter of S– and B–C–, 9 I. & N. Dec. 436, 447 (A.G.1961). Furthermore, a misrepresentation only satisfies the test if there is some reasonable possibility that the applicant would have been denied admissibility. Id. Whether an omission or affirmative misrepresentation is material is a question of law. Id. This legal determination, however, must be made in the context of a developed factual record. Id. For example, in Ampe, the court held that although it is clear that the alien's martial status is relevant to USCIS's adjudication and the omission or misrepresentation of such status may shut off a line of inquiry, more fact records are needed to be presented before the court renders a summary judgment in favor to USCIS. Id.

### *Necessary Purpose*

§ 1182(a)(6)(C)(i) requires not only the intent and materiality, but also requires the government to prove that the alien lied with the purpose to procure ... a visa, other documentation, or admission into the United States." § 1182(a)(6)(C)(i). This is a matter of fact. Kungys v. United States, 485 U.S. 759, 782 (1988). Although most of times it is quite obvious that the alien lied in her application to obtain immigration benefits, it does not mean that this is the only explanation and the court can just rule in favor to the government without a proper fact-finding. Ampe, 2016 WL 247562, at *12.

Here, it is clear that the government tries to bypass § 1182(a)(6)(C)(i), a statute that is right on the point, in order to avoid the "intent" requirement. The government took the approach of Injeti, and used § 1255 as its tool to deny Mr. Abu Irshaid's application.

8

*L511*

However, the DC Circuit in <u>Ampe v. Johnson</u> realized USCIS's approach to use §
1255 as a tool to bypass § 1182(a)(6)(C)(i), and it rejected and heavily criticized this
approach. The DC Circuit has found that such an approach is not consistent with other
laws, such as perjury laws; it is against common sense; and moreover, this approach is
designed to circumvent Congress's intent to put a burden on the government to prove
intent before it deports aliens. Thus, Mr. Abu Irshaid is in line with the framework of §
1182(a)(6)(C)(i).

## CONCLUSION

Mr. Abu Irshaid has been lawfully admitted as a permanent resident and is
eligible for naturalization. His application for citizenship should be approved and he
should be immediately scheduled for an oath ceremony.

Respectfully Submitted By

Ashraf W. Nubani, Esq.
AWN POINT LAW, PLLC
2677 Prosperity Ave., Ste. 320
Fairfax, VA 22031
Tel: (703) 658-5151
Fax: (703) 658-9200
awn@awnpointlaw.com
Counsel for Applicant

9

L510

# EXHIBIT

# F



U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
Washington Field Office
2675 Prosperity Avenue
Fairfax  VA 20598-2440

**U.S. Citizenship
and Immigration
Services**

Date:  DEC 0 2 2016

Osama Mahmoud Abu Irshaid                          A77658396
4902 Schuyler Drive
Annandale, VA 22003                                NBC*1590078124

**DECISION**

Dear Osama Abu Irshaid:

Thank you for submitting Form N-336, Request for a Hearing on a Decision in Naturalization Proceedings, to U.S. Citizenship and Immigration Services (USCIS) on September 11, 2015. After a thorough review of the record, USCIS affirms the decision to deny your Form N-400 for the following reasons.

**Statement of Facts and Analysis Including Grounds for Reaffirming Denial**

Your alien registration file, A77 658 396, reflects that you entered the United States on or about September 10, 1996 through New York, New York as a non-immigrant journalist. On or about August 9, 1999, you married Ahlam Isa, a United States citizen, in Prospect Heights, Illinois. Ms. Isa filed Form I-130, Petition for Alien Relative on May 30, 2000 seeking to classify you as the spouse of a United States citizen in accordance with Section 201(b) of the Immigration and Nationality Act (INA). This visa petition was approved by the former Immigration and Naturalization Service (INS) on August 29, 2001.

On or about May 30, 2000, you concurrently submitted Form I-485, Application to Register Permanent Residence or Adjust Status with the former INS. You sought to adjust your status to that of a lawful permanent resident pursuant to INA § 245(a), 8 U.S.C. § 1255(a).

According to your Form I-485, you completed this application with the assistance of attorney H. Abdelhadi of the Law Offices of Jaber, Hadi, and O'Brien of Dallas, Texas. When you completed this application, you signed it under penalty of perjury indicating that the contents of the application and any additional evidence submitted with it were true and correct. While you did not date the Form I-485 application when you completed it, you did verify during your June 17, 2015 naturalization interview that the signature on the last page of the Form I-485, obtained at the time of your adjustment interview in Chicago, Illinois, was your signature.

Part 3, Section C of the Form I-485 you submitted and signed under penalty of perjury asks "List your present and past membership in or affiliation with every political organization, association, fund, foundation party, club, society, or similar group in the United States or in any other place since your 16th birthday. Include any foreign military service in this part. If none, write 'none'. Include the name of

JAN 31 2017 AM10:07

JAN 3 1 2017                                                              1



the organization, location, dates of membership from and to, and the nature of the organization.   If additional space is needed, use separate paper." In response to this question, you wrote "none".

You were interviewed at the INS office in Chicago, Illinois, the INS office holding jurisdiction over your place of residence, on August 29, 2001.  During this interview, you confirmed under oath that the representations you made on your Form I-485 were true and correct.  Your Form I-485 was approved on February 13, 2002 by the INS office in Chicago, Illinois, affording you the status of an alien lawfully admitted to the United States for permanent residence in immigrant visa classification IR6, spouse of a United States citizen.

On or about June 30, 2006, you filed Form N-400, Application for Naturalization.  You signed this application on June 20, 2006 certifying under penalty of perjury that the contents of the application and any evidence submitted in support of it were true and correct.  According to the last page of your Form N-400, you completed your application with the assistance of attorney Iman Abdelhadi of Abdelhadi & Associates of Dallas, Texas.

On page 7 of the Form N-400 you submitted, question 8a asked "Have you ever been a member of or associated with any organization, association, fund, foundation, party, club, society, or similar group in the United States or in any other place?"  You answered "yes."

Question 8b of the Form N-400 you submitted asked "If you answered 'Yes,' list the name of each group below.  If you need more space, attach the names of the other group(s) on a separate sheet(s) of paper." In typewriting, you provided the following information:

- Islamic Association for Palestine Member, 7/02 – 1/04;
- Muslim American Society Member, 10/03 – 1/05;
- Free Dr. Ashqar Committee, 9/03 – 8/04;
- Dar Al Hijrah Islamic Center, 12/03 – present; and
- United Association for Studies & Research, 1/00 – 12/03.

On October 3, 2008, March 19, 2010, and June 17, 2015, you were interviewed in connection with your naturalization application at the USCIS Washington Field Office.  As part of these interviews, Immigration Services Officers reviewed the application with you while you were under oath and you confirmed that you were a member of or associated with these five organizations.  Through your sworn testimony, this section was amended at each interview to update the dates of your membership or association and to add additional memberships or associations.  During these interviews, you indicated that your membership or association with the Dar Al Hijrah Islamic Center ended in 2006, and that you were again a member of or associated with the Muslim American Society for a second time from June 2009 until February 2010.  Lastly, you brought an addendum to your June 17, 2015 interview indicating that you were a member of or associated with the following three organizations:

- American Muslims for Palestine from 2010 to the present date;
- Washington Association of Arab Journalists from 2010 to the present date; and
- U.S. Counsel of Muslim Organizations from 2012 to the present date.

During your June 17, 2015 interview, you were asked when you became involved with the Islamic Association for Palestine (IAP).  You testified while under oath during several occasions throughout the interview that you began your involvement with IAP in approximately late 1997 or 1998.  You stated that you met the organization sometime in late 1997 or 1998 when you moved to the Chicago area.  You went on to state that it was during this timeframe that you attended events at their Chicago chapter and you helped out with some of the chapter's events.  When asked whether you did any fundraising for the organization, you stated that you were not 100% sure but you didn't doubt it.  You later stated that you became a member of IAP sometime in 2000 when you began your employment; however, you confirmed that you were involved with the organization prior to your employment.

2

L455

When asked why you indicated on your Form N-400 that you were a member of or associated with IAP beginning in July 2002, you stated that this was maybe more about you becoming a board member of the organization. When asked to recall when you were a board member, you were unable to provide exact dates. USCIS noted that your testimony on this issue was inconsistent. When you first filed your Form N-400 in 2006, you indicated that you became a member of or associated with IAP in July of 2002. You testified that this was correct during your first two naturalization interviews. Then you testified on June 17, 2015, that you became a member of IAP in 2000 when you became employed with the organization. When asked why you listed "July 2002" as the start date for your membership in IAP on your Form N-400, you stated that this was maybe more about you becoming a board member. While you had consistently disclosed your involvement with IAP throughout the naturalization process, it was not until your third interview that you disclosed that you actually began your involvement in the late 1990s.

In addition to your testimony regarding your involvement with IAP, on June 17, 2015 you testified, consistent with your response on the Form N-400, that you were involved with the United Association for Studies and Research (UASR) from January 2000 until December 2003. You indicated that you performed research, wrote a paper or two for the organization, and you wrote some articles. You also, on at least one occasion, were interviewed by the media as a representative of UASR. You indicated that you did not consider yourself to be a member, an employee, or a leader of the organization; however, you would attend and possibly assist with conferences and symposiums held by UASR as well as attend meetings with members of the organization.

When asked during your June 17, 2015 interview why you did not disclose your affiliation with UASR on your Form I-485, you stated that it was because you were never involved with it. You stated that you were not in Virginia in 2000. When asked why you stated on your Form N-400 that you were a member of or associated with UASR beginning in January 2000, you indicated that that was when you appeared on a TV show with a caption that made it appear that you were a UASR researcher. You stated that you were not an associate of UASR, but that you put it on your Form N-400 because you believed that was how the U.S. defined affiliation.

Later during your June 17, 2015 interview, you were again asked why you did not disclose your involvement with IAP on your Form I-485, even though you testified that you helped out with and attended their meetings since the late 1990s. You stated that it was because you were not a member. You stated that you went into the office and sat in on some meetings but that you weren't a member. When you were informed that the Form I-485 and the Form N-400 included the terms "affiliated with" and "associated with" in addition to membership, you stated that you did not know that just attending a meeting or meeting with people that work for a certain organization would make you a member. You testified that you added the organizations because you were trying to be on the safe side and because things changed. You testified that after 9/11, your perspective on what it means to be a Palestinian Arab Muslim changed. You testified that, sometime after you received your green card, you researched how the government defines membership, affiliation, and association in relation to immigration benefit applications, and you acknowledged that the definitions of membership and affiliation are quite broad. You testified that because of your research, you included the organizations on your Form N-400 even though you personally do not believe that you are a member of the organizations.

### Form N-400 Decision

On August 10, 2015, USCIS denied your Form N-400 because it determined that you were not lawfully admitted for permanent residence, as required by INA § 318, 8 U.S.C. § 1429. Specifically, USCIS determined that your adjustment of status was not in compliance with INA § 245(a), 8 U.S.C. § 1255(a), which sets forth the statutory eligibility requirements for adjustment of status and provides that the ultimate determination as to whether an alien will receive that benefit is left to the Attorney General "in his discretion and *under such regulations as he may prescribe*." INA § 245(a), 8 U.S.C. § 1255(a) (emphasis added). In its decision, USCIS noted that 8 C.F.R. § 103.2(a)(2) requires an applicant for an

3

L 454

immigration benefit to certify that all information contained in the application "is true and correct," and it concluded that your failure to disclose your affiliations with IAP and UASR on your Form I-485 rendered your adjustment application in violation of 8 C.F.R. § 103.2(a)(2), such that your adjustment of status was not in compliance with INA § 245(a) and you were not lawfully admitted for permanent residence.

In its decision, USCIS cited to the decision of the United States Court of Appeals for the Fourth Circuit in *Injeti v. USCIS*, 737 F.3d 311 (4th Cir. 2013). In *Injeti*, the Fourth Circuit observed that while the statute governing adjustment of status makes admissibility a prerequisite for receiving a grant of adjustment of status, the ultimate determination as to whether an alien will receive that status is left to the Attorney General "in his discretion and *under such regulations as he may prescribe*." *Id.* at 318 (emphasis in original). "One such regulation, 8 C.F.R. § 103.2(a)(2), requires the applicant to certify that all information contained in the application 'is true and correct.'" *Id.* The court went on to hold that "[b]ecause Injeti's application contained a material misrepresentation, and thus was not 'true and correct,' it did not comply with § 103.2(a)(2)." *Id.* The court concluded: "It follows that Injeti did not satisfy the legal requirements for adjusting to LPR status under 8 U.S.C. § 1255, *regardless of whether the misrepresentation was willful . . .*" *Id.* (emphasis added). In a footnote, the Fourth Circuit observed that 8 C.F.R. § 103.2(a)(2) should be interpreted as limited to those misrepresentations that are "material." *Id.* at 18 n.5. Thus, *Injeti* held that as long as a misrepresentation on the Form I-485 is material to the applicant's adjustment of status, the misrepresentation need not be willful, and need not render the applicant inadmissible under INA § 212(a)(6)(C)(i), 8 U.S.C. § 1182(a)(6)(C)(i), in order for USCIS to determine that he or she was not lawfully admitted for permanent residence as required by INA § 318, 8 U.S.C. § 1429.

For the definition of materiality, the *Injeti* court looked to the decisions of the United States Supreme Court in *Kungys v. United States*, 485 U.S. 759 (1988) and the Board of Immigration Appeals in *Matter of Kai Hing Hui*, 15 I.&N. Dec. 288 (BIA 1975). A misrepresentation is material if it "ha[s] a natural tendency to influence the decision of [immigration officials]," *Kungys*, 485 U.S. at 772, or if it "tends to shut off a line of inquiry which is relevant to the alien's eligibility and which might well have resulted in a proper determination that he be excluded," *Matter of Kai Hing Hui*, 15 I.&N. Dec. at 289. *Injeti*, 737 F.3d at 316-17.

USCIS determined that by failing to disclose your involvement with IAP and UASR on your Form I-485 and during your adjustment interview, you cut off a line of questioning that was relevant not only to your admissibility, but also to whether or not you merited a favorable grant of discretion under INA § 245(a), 8 U.S.C. § 1255(a). USCIS found that your failure to disclose your involvement with IAP and UASR was material to your eligibility for adjustment of status in light of a lawsuit, *Boim, et al. v. Quranic Literacy Institute, et al.*, that was filed with the U.S. District Court in Chicago, Illinois on May 12, 2000. In this lawsuit, the parents of David Boim, a seventeen-year-old U.S. citizen murdered in Israel by Hamas, a foreign terrorist group, sued United States-based organizations and the alleged U.S.-based military leader of Hamas, alleging conspiracy to provide material support to Hamas in violation of the Antiterrorism Act of 1990. Included as defendants were the Islamic Association for Palestine (IAP) and the United Association for Studies and Research (UASR). In the complaint, UASR was alleged to have served as Hamas' political command center in the United States. The complaint also alleged that IAP fundraised and financed a network of front organizations that supported Hamas' terrorist activities. On November 10, 2004, the U.S. District Court for the Northern District of Illinois granted the Boims' motion for partial summary judgment against IAP. *Boim, et al. v. Quranic Literacy Institute, et al.*, 340 F.Supp.2d 885 (N.D. Ill. Nov. 10, 2004). The Court noted in its decision that it had previously granted the Boims' motion for default judgment against UASR for failing to comply with discovery. *Boim*, 340 F.Supp.2d at 891. You acknowledged during your interview on June 17, 2015, that you were aware of the *Boim* lawsuit.

Based on the record, USCIS determined that prior to your filing Form I-485 on May 30, 2000, both IAP and UASR were named in a document filed in federal court as organizations alleged to have provided

4

*L453*

material support to Hamas. USCIS determined that had you disclosed your involvement with IAP and UASR to the INS, this information would have impacted the INS' assessment of your statutory eligibility for adjustment of status as well as whether you merited a favorable exercise of discretion. Specifically, had you informed the INS that you were involved with UASR or IAP when you filed your Form I-485 on May 30, 2000, or during your adjustment interview at the Chicago office on August 29, 2001, the INS could have inquired into these organizations, questioned you about the extent of your involvement, and potentially reached a different decision on your application. USCIS determined that by failing to disclose your involvement with IAP and UASR, you cut off a line of questioning directly related to your statutory eligibility for adjustment of status, *i.e.*, whether you were admissible to the United States, as well as whether you merited a favorable exercise of discretion. As a result, your adjustment application contained a material misrepresentation, was not "true and correct," and did not comply with 8 C.F.R. § 103.2(a)(2). USCIS concluded that, as in *Injeti*, you did not satisfy the legal requirements for adjustment of status under INA § 245(a), 8 U.S.C. § 1255(a).

USCIS determined that because your adjustment of status was not in compliance with INA § 245(a), you were not lawfully admitted for permanent residence as required by INA § 318, 8 U.S.C. § 1429, citing to *Matter of Koloamatangi*, 23 I.&N. Dec. 548 (BIA 2003); *Matter of Longstaff*, 716 F.2d 1439 (5th Cir. 1983); and *Nesari v. Taylor*, 806 F.Supp.2d 848, 865 (E.D.Va. 2011). On August 10, 2015, USCIS denied your Form N-400.

### Form N-336 and Review Hearing

On September 11, 2015, you filed the instant Form N-336, in which you stated that you have overcome the grounds of the denial. On March 17, 2016, you appeared for a hearing to review the denial of your Form N-400. You testified during the review hearing that you "came to know IAP in late 1997 or early 1998." You testified that during that timeframe, you attended and you "helped with some of their events not as a member or associate but as you would help with any other cultural, social, political organization or event." You testified that the meetings with IAP were not "management, leadership or planning meetings" but social, so your involvement never amounted to a membership or association. You testified that the dates given were approximate because it happened more than 16 years ago.

While you testified that your relationship with IAP never amounted to a membership or association, you confirmed during the review hearing that you were employed by IAP in 2000. You testified that you were the chapter coordinator for IAP, and in that capacity, you recruited new members on behalf of the organization. You testified that before you assumed that position, you did not and were in no position to recruit members or solicit funds. You testified that you later became a board member, but you could not recall when you were a board member.

With regard to UASR, you testified that there was a typo on your Form N-400 indicating that you started your relationship with UASR in 2000. You testified that you listed UASR on your Form N-400 out of caution. You testified that in 2000, you were living in Chicago and UASR is based in Virginia. You testified that you relocated to Virginia around late October or early November 2001. You testified that before that, sometime in 1998, you published a study in a magazine, and that the magazine indicated that you were a "research fellow" with UASR but that you did not choose that title and that it was inaccurate. You testified that later, in October or November 2000, a scholar who used to run UASR, invited you to speak on a TV show as a journalist reporting on the uprisings in the Palestinian territories. You testified that when you spoke, the caption that appeared on the TV screen stated "Research Fellow at the UASR." You testified that you were not a research fellow with USAR, but that that is why you listed the UASR on your Form N-400. You testified that you never, and still do not, consider yourself to be an associate of UASR. You testified that you listed UASR on the Form N-400 "just to be on the safe side."

In a brief in support of your Form N-336, your counsel, Ashraf Nubani, stated that USCIS erred in denying your application for naturalization. Mr. Nubani asserted that you did not provide false statements on your adjustment application to obtain an immigration benefit. He contended that you were

5

L452

not a member of or affiliated with the IAP at the time of filing your Form I-485 on May 30, 2000. However, he confirmed that you began your employment with the IAP in June 2000.

With regard to UASR, your counsel indicated that your involvement with UASR began after you became a permanent resident. He stated that the dates given on your Form N-400 were a "misprint." Your counsel contended that you were never a member of UASR and that your association with the organization was only based on attending some activities, such as conferences, appearing on television as an analyst and writing a few articles on behalf of the organization.

Your counsel pointed to the fact that in its August 10, 2015 Form N-400 decision, USCIS did not allege that you intentionally or willfully omitted IAP or UASR on your Form I-485. Your counsel cited to *Ampe v. Johnson*, No. CV 14-717 (RDM), 2016 WL 247562 (D.D.C. Jan. 20, 2016), in which the U.S. District Court for the District of Columbia declined to follow the Fourth Circuit's reasoning in *Injeti* and held that a misstatement on the Form I-485 must be willfully made in order for it to render an applicant ineligible for naturalization, *id.* at *9-10. Your counsel argued that USCIS must follow the decision of the *Ampe* court, which declined to follow the Fourth Circuit's reasoning in *Injeti*.

Your counsel argued that even if you were a member of or affiliated with IAP or UASR when you applied for adjustment of status, the INS still would have approved your adjustment application. Your counsel based his contention on the fact that both IAP and UASR were lawfully and duly established nonprofit organizations in the United States. He asserted that your involvement with these two organizations was not material to the determination of your eligibility for adjustment of status. Your counsel stated that there were other similarly situated applicants who filed their applications coincidentally with yours, and who were granted permanent resident status, despite being members of the same organizations. Your counsel argued that materiality is a "legal determination" that "must be made in the context of a developed factual record," relying on the *Ampe* decision, where, as your counsel contends, "the court held that . . . more fact records are needed to be presented before the court renders a summary judgment in favor to USCIS." These arguments will be addressed below.

On August 5, 2016, USCIS issued a written notice requesting that you provide documentation regarding your employment with IAP and your W-2 forms for 1999, 2000 and 2001. USCIS requested that you submit the documentation by October 31, 2016. You formally declined to provide the information requested in a letter dated October 11, 2016.

### Form N-336 Findings

1. *UASR*

Based upon a review of the record including your testimony, USCIS finds plausible your testimony that you were not a member of or affiliated with UASR prior to your grant of adjustment of status, and that therefore you did not make a misrepresentation by omitting UASR on your Form I-485. USCIS also finds plausible your explanation that because you had been incorrectly linked with UASR in a magazine and on TV, you listed UASR on the Form N-400 "just to be on the safe side."

Therefore, USCIS is **not** reaffirming its decision to deny your Form N-400 on the ground that you misrepresented your involvement with UASR on your adjustment application.

2. *IAP*

USCIS is reaffirming its decision to deny your Form N-400 on the ground that you misrepresented your involvement with IAP on your adjustment application.

Part 3, Section C of the Form I-485 you submitted and signed under penalty of perjury asks "List your present and past membership in or affiliation with every political organization, association, fund,

6



foundation party, club, society, or similar group in the United States or in any other place since your 16th birthday."

Black's Law Dictionary (10th ed. 2014) defines "affiliation" as "the connection or involvement that someone or something has with a political, religious, etc. organization." In light of this broad definition, USCIS correctly determined that the evidence in your file, including your testimony, demonstrates that before you were granted lawful permanent resident status on February 13, 2002, you were, if not a member of, at least affiliated with IAP. Specifically, you testified on June 17, 2015, that beginning in late 1997 or 1998, you attended events at IAP's Chicago chapter, you helped out with some of the chapter's events, and you may have assisted with fundraising. On March 17, 2016, you testified that the meetings were not "management, leadership or planning meetings" but social. Regardless, it is clear that you were "connected" or "involved" with IAP, consistent with Black's Law Dictionary's definition of "affiliation," at least two years prior to filing your adjustment application. Therefore, your response of "none" when asked to list all memberships and affiliations on your Form I-485, and your testimony during your August 29, 2001 adjustment interview that your Form I-485 responses were true and correct constituted misrepresentations.

Your counsel argued that even if you were a member of or affiliated with IAP prior to your adjustment of status, USCIS erred in denying your Form N-400 because 1) USCIS did not establish that your omission of IAP on your Form I-485 was willfully made, and because 2) your involvement with IAP was not material to your adjustment of status. With regard to the willfulness argument, your counsel relied on *Ampe v. Johnson*, No. CV 14-717 (RDM), 2016 WL 247562 (D.D.C. Jan. 20, 2016). In *Ampe*, the U.S. District Court for the District of Columbia declined to follow the Fourth Circuit's reasoning in *Injeti* and held that a misstatement on the Form I-485 must be willfully made in order for it to render an applicant ineligible for naturalization. *Id.* at *9-10. Your counsel argued that USCIS must follow the decision of the *Ampe* court, which declined to follow the Fourth Circuit's reasoning in *Injeti*.

The *Injeti* decision, however, is binding authority in your case, while the *Ampe* decision is neither binding nor persuasive. Whereas the *Ampe* decision was issued by the U.S. District Court for the District of Columbia, the *Injeti* decision was issued by the U.S. Court of Appeals for the Fourth Circuit. INA § 310(c), 8 U.S.C. § 1421(c), gives jurisdiction over actions challenging USCIS denials of naturalization to the U.S. District Court and the U.S. Court of Appeals where the applicant resides. As you are a resident of Annandale, Virginia, located within the jurisdiction of the U.S. District Court for the Eastern District of Virginia and the U.S. Court of Appeals for the Fourth Circuit, the *Injeti* decision is binding authority on USCIS's determination of your eligibility for naturalization. It is the Fourth Circuit's statement of the law, and not that of a lower court in a foreign jurisdiction, that controls here.

Finally, USCIS correctly determined, based upon the allegations in the *Boim* lawsuit filed against IAP and UASR on May 12, 2000, and the subsequent decisions of the federal court, that by failing to disclose your affiliation with IAP on your Form I-485 and during your adjustment interview, you cut off a line of questioning relevant to your statutory eligibility for adjustment of status as well as whether you merited a favorable exercise of discretion. *Matter of Kai Hing Hui*, 15 I.&N. Dec. at 289.

In the Form N-336 brief, your counsel argued that materiality is a "legal determination" that "must be made in the context of a developed factual record," relying on the *Ampe* decision, where, as your counsel contends, "the court held that . . . more fact records are needed to be presented before the court renders a summary judgment in favor to USCIS."

But USCIS has provided you with adequate opportunity to submit "facts" in support of your naturalization application and your request for administrative review. You appeared for your N-336 review hearing on March 17, 2016, and on that date, you requested and were given an additional 30 days to submit a brief, which was later received by USCIS on April 14, 2016. On August 5, 2016, USCIS issued a written notice requesting that you provide documentation regarding your employment with IAP

L450

and your W-2 forms for 1999, 2000 and 2001. USCIS requested that you submit the documentation by October 31, 2016. You declined to provide the information requested in a letter dated October 11, 2016.

You have been afforded the opportunity to "develop" the "factual record" that your counsel insists is required in the instant administrative proceeding. USCIS notes further that, as an applicant for naturalization, you bear the burden of proving by a preponderance of the evidence that you meet all the requirements for naturalization, including that you were lawfully admitted for permanent residence. *See* 8 C.F.R. § 316.2(b); INA § 318, 8 U.S.C. § 1429. Not only have you failed to meet your burden of proof, but you have affirmatively rejected opportunities USCIS has provided to you throughout the instant proceeding to submit additional evidence. Indeed, as you are the party with the burden of proof, USCIS cannot be precluded from denying your Form N-400 on the basis that you have failed to provide sufficient "facts" in your favor.

As an applicant for naturalization, you alone bear the burden of establishing your eligibility for naturalization. *See* 8 C.F.R. § 316.2(b); *Nesari v. Taylor*, 806 F.Supp.2d 848, 862-65 (E.D.Va. 2011); *Berenyi v. District Director, Immigration & Naturalization Servs.*, 385 U.S. 630, 637 (1967). If at the time an alien is accorded permanent resident status, he or she is not entitled to such status, the alien cannot be considered lawfully admitted for permanent residence. *See Matter of Koloamatangi*, 23 I.&N. Dec. 548 (BIA 2003). No applicant may be naturalized unless such applicant has been lawfully admitted to the United States for permanent residence in accordance with all applicable provisions of the INA. INA § 318, 8 U.S.C. § 1429; *Matter of Longstaff*, 716 F.2d 1439 (5th Cir. 1983); *Nesari*, 806 F.Supp.2d at 865.

Furthermore, "[a]dmission is not lawful if it is regular only in form. The term 'lawfully' denotes compliance with substantive legal requirements, not mere procedural regularity, as the definition provided by Congress plainly establishes: the term 'lawfully admitted for permanent residence' means the status having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed. [footnote omitted] Section 1429's added requirement 'in accordance with all applicable provisions of the Act' is not merely redundant, but emphatic and embracive." *Matter of Longstaff*, 716 F.2d at 1441.

Thus, a naturalization applicant whose lawful permanent residence was obtained through means other than fraud, but who nonetheless was not entitled to it, has not been lawfully admitted. *See, e.g., Walker v. Holder*, 589 F.3d 12, 19 (1st Cir. 2009) (affirming a BIA finding that petitioner had not been lawfully admitted because he had acquired lawful permanent resident status "through the fraud or misrepresentation of third parties"); *Arellano-Garcia v. Gonzales*, 429 F.3d 1183, 1186-87 (8th Cir. 2005) (concluding that petitioner had not been lawfully admitted because his lawful permanent resident status "was obtained by a negligent mistake made by the government").

After a complete review of the information provided on your Form N-400, the documents submitted in support of your application and request for hearing, and the testimony you provided during your naturalization interviews and your N-336 review hearing, USCIS finds that you have not met your burden. Therefore, USCIS reaffirms the decision to deny your Form N-400.

This decision constitutes a final administrative denial of your naturalization application. You may request judicial review of this final determination by filing a petition for review in the United States District Court having jurisdiction over your place of residence. You must file a petition within 120 days of the date of this notice. See INA 310(c) and [Title 8, Code of Federal Regulations (8 CFR), section 336.9(b)].

If you need additional information, please visit the USCIS Web site at www.uscis.gov or call our National Customer Service Center toll-free at 1-800-375-5283. YOU may aslo make an appointment to speak to a USCIS staff member in person at the USCIS office having jurisdiction over your current place of residence. To schedule an appointment, go to www.uscis.gov and select INFOPASS.

*L449*

Sincerely,

Kimberly Zanotti
Field Office Director
Cc: Ashraf Nubani, Esq.

L448

**Attachment**
**(Applicable Law/Regulations)**

To better assist you, the sections of law referenced in your decision are referenced below:


INA 310

(c) Judicial Review. A person whose application for naturalization under this title is denied, after a hearing before an immigration officer under section 336(a), may seek review of such denial before the United States district court for the district in which such person resides in accordance with chapter 7 of title 5, United States Code. Such review shall be de novo, and the court shall make its own findings of fact and conclusions of law and shall, at the request of the petitioner, conduct a hearing de novo on the application.


8 CFR 336.9

(b) Filing a petition. Under these procedures an applicant must file a petition for review in the United States District Court having jurisdiction over his or her place of residence, in accordance with chapter 7 of title 5, United States Code, within a period of not more than 120 days after the USCIS final determination. The petition for review must be brought against USCIS, and service of the petition for review must be made upon DHS and upon the USCIS office where the hearing was held pursuant to 8 CFR 336.2.


INA 319

(a) Any person whose spouse is a citizen of the United States...may be naturalized upon compliance with all the requirements of this title except the provisions of paragraph (1) of section 316(a) if such person immediately preceding the date of filing his application for naturalization has resided continuously, after being lawfully admitted for permanent residence, within the United States for at least three years, and during the three years immediately preceding the date of filing his application has been living in marital union with the citizen spouse...who has been a United States citizen during all of such period, and has been physically present in the United States for periods totaling at least half of that time and has resided within the State or the district of the Service in the United States in which the applicant filed his application for at least three months.


INA 318

Except as otherwise provided in this title, no person shall be naturalized unless he has been lawfully admitted to the United States for permanent residence in accordance with all applicable provisions of this Act. The burden of proof shall be upon such person to show that he entered the United States lawfully, and the time, place, and manner of such entry into the United States, but in presenting such proof he shall be entitled to the production of his immigrant visa, if any, or of other entry document, if any, and of any other documents and records, not considered by the Attorney General to be confidential, pertaining to such entry, in the custody of the Service. Notwithstanding the provisions of section 405(b), and except as provided in sections 328 and 329 no person shall be naturalized against whom there is outstanding a final finding of deportability pursuant to a warrant of arrest issued under the provisions of this or any other Act; and no application for naturalization shall be considered by the Attorney General if there is pending against the applicant a removal proceeding pursuant to a warrant of arrest issued under the provisions of this or any other Act: Provided, That the findings of the Attorney General in terminating

10

L447

removal proceedings or in canceling the removal of an alien pursuant to the provisions of this Act, shall not be deemed binding in any way upon the Attorney General with respect to the question of whether such person has established his eligibility for naturalization as required by this title.

INA 245

(a) The status of an alien who was inspected and admitted or paroled into the United States or the status of any other alien having an approved petition for classification as a VAWA self-petitioner may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if
(1) the alien makes an application for such adjustment,
(2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and
(3) an immigrant visa is immediately available to him at the time his application is filed.

8 CFR 103.2

(a) Filing
(2) Signature An applicant or petitioner must sign his or her benefit request. However, a parent or legal guardian may sign for a person who is less than 14 years old. A legal guardian may sign for a mentally incompetent person. By signing the benefit request, the applicant or petitioner, or parent or guardian certifies under penalty of perjury that the benefit request, and all evidence submitted with it, either at the time of filing or thereafter, is true and correct. Unless otherwise specified in this chapter, an acceptable signature on a benefit request that is being filed with the BCIS is one that is either handwritten or, for applications or petitions filed electronically as permitted by the instructions to the form, in electronic format.

8 CFR 103.8

This section states authorized means of service by the Service on parties and on attorneys and other interested persons of notices, decisions, and other papers (except warrants and subpoenas)in administrative proceedings before Service officers as provided in this chapter.

(b) Effect of service by mail. Whenever a person has the right or is required to do some act within a prescribed period after the service of a notice upon him and the notice is served by mail, 3 days shall be added to the prescribed period. Service by mail is complete upon mailing.

L 446

# EXHIBIT

# G

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

STANLEY BOIM, Individually and )
as Administrator of the )
Estate of DAVID BOIM, deceased, and )
)
)
JOYCE BOIM, )
)
)
*Plaintiffs,* )
v. )
)
)
QURANIC LITERACY INSTITUTE )
9425 S. 68th Court )
Oak Lawn, IL 60453-2036 )
)
HOLY LAND FOUNDATION FOR RELIEF ) **COMPLAINT**
AND DEVELOPMENT )
9748 Roberts Road )
Palos Hills, IL 60463 )
)
ISLAMIC ASSOCIATION FOR PALESTINE, )
10661 S. Roberts Road #202 )
Palos Hills, IL 60465 )
)
AMERICAN MUSLIM SOCIETY )
(d/b/a ISLAMIC ASSOCIATION FOR )
PALESTINE IN CHICAGO) )
10661 S. Roberts Road #202 )
Palos Hills, IL 60465 )
)
AMERICAN MIDDLE EASTERN LEAGUE )
FOR PALESTINE )
P.O. Box 741805 )
Dallas, Texas 75374 )
)
UNITED ASSOCIATION FOR STUDIES AND )
RESEARCH )
77 W. Washington #505 )
Chicago, IL 60602 )
)
MOHAMMED ABDUL HAMID KHALIL SALAH )
(a/k/a ABU AHMED) )
9229 South Thomas Avenue )
Bridgeview, IL 60455 )
)



Civil No. _____



00C 2905

JUDGE KENNELLY

MAGISTRATE JUDGE

FILED
00 MAY 12 PM 1:27
CLERK
U.S. DISTRICT COURT

DOCKETED
MAY 15 2000

MOUSA MOHAMMED ABU MARZOOK          )
(a/k/a ABU OMAR MUSA),              )
                                   )
AMJAD HINAWI,                      )
Palestinian Authority             )
                                   )
ESTATE OF KHALIL TAWFIQ AL-SHARIF, )
                                   )
and JOHN DOES 1-99,               )
                                   )
                    *Defendants.*  )

## Introduction

1.    This action arises out of the murder by Hamas terrorists of seventeen-year-old David Boim, an American citizen who was the son of Stanley and Joyce Boim.  The plaintiffs bring this action under the federal Antiterrorism Act of 1990, against the Hamas-front organizations in the United States that solicited, financed, and provided material support for the attack and against the Hamas terrorist agents who carried them out.

2.    This action is related to a pending action in this Court brought by the United States seeking forfeiture of the funds of the Quranic Literacy Institute and Mohammed Salah, who are defendants in this action.  United States v. One 1997 E3J Ford Van, et al., No. 98C-3548 (verified complaint and affidavit of Special Agent Robert Wright attached hereto as Exhibit A). In that action the United States has seized funds raised to support the terrorist activity that gives rise to the present claim.  Plaintiffs in this case therefore seek special injunctive relief including an order setting aside, for the benefit of the plaintiffs in this case, the funds seized in the forfeiture action.

## PARTIES

3.     Plaintiff STANLEY BOIM is the father of the decedent, David Boim, and the administrator of his estate.  Mr. Boim is a U.S. national and was a legal resident of the State of New York at the time of his son's murder.  He was then, and is now, living in Jerusalem.

4.     Plaintiff JOYCE BOIM is the mother of David Boim. Mrs. Boim is a U.S. national and was a legal resident of New York at the time of David Boim's murder.  She was then, and is now, living in Jerusalem.

5.     Defendant QURANIC LITERACY INSTITUTE ("QLI") is a not-for-profit organization incorporated in the State of Illinois and whose offices are in Oak Lawn, Illinois.  QLI purports to translate and publish sacred Islamic texts, but, upon information and belief, QLI was and is also engaged in raising and laundering money for Hamas.  Defendant MOHAMMED ABDUL HAMID KHALIL SALAH was nominally employed by QLI as a computer analyst.  There are, however, no records of regular periodic payments to Salah, and QLI now denies having employed him at any time. The FBI has been investigating QLI since 1989 as part of a larger nationwide terrorist money-laundering probe.  In June 1997, FBI agents confiscated $1.4 million in cash and property from Salah.

4

6.     Defendant HOLY LAND FOUNDATION FOR RELIEF AND
DEVELOPMENT ("HLF") is a California corporation with a branch
office in Illinois and a certificate to conduct affairs within
Illinois.  HLF was originally incorporated in California in 1989
under the name "Occupied Land Fund." In 1991, a certificate of
amendment was filed to change its name to "Holy Land Foundation
for Relief and Development." HLF's American base of operations
is currently in Texas. HLF also operated an office in Jerusalem,
and the director of that office admitted HLF had provided funds
to Hamas.  In the United States, HLF is organized as a not-for-
profit charitable organization whose ostensible mission is to
fund and conduct a variety of humanitarian relief and
development efforts. Upon information and belief, however, HLF
also functions as a front organization for Hamas.  Upon
information and belief, HLF is actively involved in raising and
channeling funds to Hamas agents to finance terrorist activities
in Israel.

7.     Defendant ISLAMIC ASSOCIATION FOR PALESTINE ("IAP") is
a Texas corporation.  IAP was originally incorporated in
Illinois in 1981, but it was dissolved in 1991 for failure to
file an annual report.  IAP was also incorporated in California
in 1986, but its corporate status there was frozen in 1988 for
failure to pay a franchise tax.  IAP incorporated as a separate
entity in Texas in 1993. IAP is a not-for-profit organization

ostensibly dedicated to disseminating information on and promoting discussion of the Israeli-Palestinian conflict. Upon information and belief, these activities serve as a cover for IAP's function as a major fund-raiser and financier for the network of front organizations which support Hamas's terrorist activities.

8. Defendant AMERICAN MUSLIM SOCIETY ("AMS") is an Illinois corporation that is under the control of IAP. AMS incorporated in Illinois in 1993. In 1994 AMS applied for the name of "Islamic Association for Palestine in Chicago." AMS functions as the Chicago branch office of IAP. Upon information and belief, AMS has been an active participant in the network of front organizations that provide funds to Hamas terrorists.

9. Defendant AMERICAN MIDDLE EASTERN LEAGUE FOR PALESTINE ("AMELP") is a Texas corporation that operates in conjunction with IAP. Prior to its incorporation in 1990, AMELP operated as the Texas branch office of IAP. When AMELP incorporated separately in 1990, it applied for two names: the "IAP Information Office" and the "Islamic Association for Palestine in North America." AMELP thereafter remained under the control of IAP and now provides services and support to IAP in Texas. Upon information and belief, these activities include participation in IAP's fund-raising and channeling of money to Hamas operatives.

10. Defendant UNITED ASSOCIATION FOR STUDIES AND RESEARCH
("UASR") is an Illinois corporation incorporated in 1989. In
1992, UASR incorporated in Virginia where its headquarters are
now located. UASR conducts research on Mideastern and Islamic
topics. Upon information and belief, these activities serve as
a cover for UASR's function as the political command center of
Hamas in the United States.

11. Defendant MOHAMMED ABDUL HAMID KHALIL SALAH ("Salah"),
a/k/a Abu Ahmed is a naturalized U.S. citizen born in Jerusalem
and currently residing in the State of Illinois. Salah is the
admitted U.S.-based leader of the military branch of Hamas.
Salah has been prosecuted for channeling money to Hamas and
recruiting, organizing, and training terrorist operatives in
Israel. Salah was incarcerated in Israel from January 1993 to
November 1997, during which period he admitted channeling money
for Hamas operations. He returned to the United States after
his release. Salah is named on the list of Specifically
Designated Terrorists compiled by the U.S. Treasury Department's
Office of Foreign Assets Control, and he was recently the
subject of a major FBI investigation. Pursuant to that
investigation, the United States initiated its civil forfeiture
action.

12. Defendant MOUSA MOHAMMED ABU MARZOOK ("Marzook"),
a/k/a Abu Omar Musa, is a native of Gaza who resided in the

United States from 1973 to 1993. He received permanent resident alien status in 1990. Marzook served for many years as the admitted leader of the political wing of Hamas in the United States. Marzook traveled between the United States and the Middle East, appointed Hamas military commanders, and used his personal bank account to distribute funds to these Hamas operatives. From 1993 to 1995, Marzook resided principally in Jordan, which deported him in June 1995 for his involvement in Hamas. In July 1995, U.S. Customs Service and U.S. Immigration and Naturalization Service officials arrested Marzook at the request of the Israeli government, as he attempted to reenter the United States. In May 1996, a United States District Court ordered Marzook's extradition to Israel to stand trial for offenses connected to Hamas-sponsored terrorism, including murder, attempted murder, and conspiracy. The Israeli government thereafter dropped its request for extradition. Marzook was deported to Jordan in 1997. In 1999, he was deported from Jordan when Jordan's King Abdullah closed the Hamas Political Bureau headquarters in Amman and deported the leadership of the movement including Marzook. Upon information and belief, Marzook is currently living in the United Arab Emirates or Syria.

13. Defendant AMJAD HINAWI ("Hinawi") is a Hamas terrorist operating in Israel, the West Bank and Gaza. Hinawi is one of

two Hamas agents who carried out the attack on David Boim.   He
was convicted of participating in David Boim's murder by a
Palestinian Authority court and sentenced to ten years'
imprisonment on February 17, 1998.

   14.   Defendant KHALIL TAWFIQ AL-SHARIF ("Al-Sharif") was a
Hamas terrorist operating in Israel, the West Bank and Gaza.
Al-Sharif was one of the two Hamas agents who carried out the
fatal attack on David Boim.   Defendant Al-Sharif died on
September 4, 1997, as a Hamas suicide bomber who carried a bomb
that was exploded on Ben Yehuda Street in Jerusalem.   Five
civilians were killed in that attack, and 192 persons were
wounded.

## JURISDICTION AND VENUE

15.   This Court has subject matter jurisdiction over this action under 18 U.S.C. §§ 2333(a) and 2338, which authorize a private damages action in any appropriate District Court by a United States national who is injured "in his person, property or business by reason of an act of international terrorism." Subject-matter jurisdiction is also conferred by 28 U.S.C. §§ 1331 and 1332(a)(1)-(3).

16.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 18 U.S.C. § 2334(a).

17.   Defendants QLI, AMS and UASR are subject to the jurisdiction of this Court under 18 U.S.C. § 2334(a) and 735 Ill. Comp. Stat. 5/2-209(b)(3) because they are Illinois corporations.

18.   Defendant HLF is subject to the jurisdiction of this Court under 18 U.S.C. § 2334(a) and 735 Ill. Comp. Stat. 5/2-209(b)(4) because it has a branch office in Illinois and has obtained a certificate to conduct affairs in Illinois.

19.   Defendant IAP is subject to the jurisdiction of this Court pursuant to 225 Ill. Comp. Stat. 460/5(e) (solicitation for a charitable organization within Illinois); 735 Ill. Comp. Stat. 5/2-209(b)(4) (transaction of business within Illinois in the form of charitable solicitation); 735 Ill. Comp. Stat. 5/2-

209(a)(1) (cause of action arising from transaction of business within Illinois); and 735 Ill. Comp. Stat. 5/2-209(c) (jurisdiction in Illinois proper under federal and Illinois due process).

20. Defendant AMELP is subject to the jurisdiction of this Court pursuant to 735 Ill. Comp. Stat. 5/2-209(b)(4) (subsidiary wholly controlled by parent doing business within Illinois); 225 Ill. Comp. Stat. 460/5(e) (solicitation for a charity within Illinois); 735 Ill. Comp. Stat. 5/2-209(b)(4) (transaction of business within Illinois in the form of charitable solicitation); 735 Ill. Comp. Stat. 5/2-209(a)(1) (cause of action arising from transaction of business within Illinois); and 735 Ill. Comp. Stat. 5/2-209(c) (jurisdiction in Illinois proper under federal and Illinois due process).

21. Defendant Salah is subject to the jurisdiction of this Court under 18 U.S.C. § 2334(a) and 735 Ill. Comp. Stat. 5/2-209(b)(2) because he is domiciled and resident within Illinois.

22. Defendant Marzook is subject to the jurisdiction of this Court under 18 U.S.C. § 2334(a) (agent within Illinois), 735 Ill. Comp. Stat. 5/2-209(a)(1) (transaction of business within Illinois) and 5/2-209(c) (extension of jurisdiction comports with federal and state due process). Marzook was extensively involved in directing and supervising the conduct of business conducted in Illinois by Salah, the defendant-front

11

organizations, and donors to the organizations. Marzook also transferred funds into the bank accounts of the defendant front organizations.

23. Defendant Hinawi is subject to the jurisdiction of this Court under 18 U.S.C. § 2334(a).

24. Defendant Estate of Al-Sharif is subject to the jurisdiction of this Court under 18 U.S.C. § 2334(a).

## STATEMENT OF FACTS

### The Murder of David Boim

25. David Boim ("David") was born in Brooklyn, New York, on March 27, 1979, and was, at the time of his death, a citizen of both the United States and Israel. In 1996 David was studying at a yeshiva in Israel. On May 13, 1996, David was waiting with other students at a bus stop near Beit El in the West Bank when he was gunned down by shots fired from a passing car. His two attackers were Hamas terrorists who first opened fire on a civilian bus and injured two passengers on the bus. They then traveled a few hundred yards and fired on David and the other students at the bus stop. One student, Yair Greenbaum, was wounded in the chest. David was shot in the head and was pronounced dead within an hour. The terrorists then sped away from the scene and lost control of their car, which

crashed.  They then fled on foot towards Jalazun, in territory controlled by the Palestinian Authority.

26.  The two operatives who carried out the shooting were Amjad Hinawi and Khalil Tawfiq Al-Sharif.  Both were apprehended and temporarily imprisoned by the Palestinian Authority in early 1997.  Both Hinawi and Al-Sharif were known members of Hamas' military wing.  After his release, Al-Sharif joined two other Hamas suicide bombers in a suicide bombing on September 4, 1997 on Ben Yehuda Street in Jerusalem.  Five civilians were killed in that attack, and 192 persons were wounded.

27.  Defendant Hinawi confessed to participating in the shooting of David Boim.  He was tried in a court of the Palestinian Authority.  His confession was read in open court. He was convicted of participating in David Boim's murder.  On February 17, 1998, Hinawi was sentenced to ten years in prison at hard labor.

28.  In the same month, Hinawi was granted leave from prison for the Muslim holiday of Id Al-Fitr.  Hinawi did not return to prison at the end of his leave.  He was missing for several months.  According to public testimony from Martin Indyk, presently U.S. Ambassador to Israel, Hinawi is now back in a Palestinian Authority prison.  The Government of Israel requested Hinawi's transfer to Israeli authorities on September

22, 1997.  The Palestinian Authority has not responded to that request.

### Hamas and Its United States Presence

29.  Hamas is an extremist Palestinian militant organization that seeks to establish a fundamentalist Palestinian state.  Hamas is a "foreign terrorist organization" as defined in 8 U.S.C. § 1189.  President Clinton designated it a terrorist group threatening to disrupt the Middle East peace process by Executive Order 12947, signed on January 23, 1995 (and entered into the Federal Register on January 25, 1995).

30.  Hamas is organized into two branches, one political and one military.  The military branch receives orders and material support from the political branch.  Hamas' central purpose is to advance political objectives through acts of terrorism. Hamas seeks to undermine the Middle East peace process through violent attacks against civilians.  Its tactics include shootings and bombings to intimidate, maim and kill civilians.

31.  Hamas' organizational presence is global.  Terrorist operatives in Gaza and the West Bank receive their instructions, as well as the funds, weapons, and practical support they need to carry out their missions, from Hamas organizers throughout the world.  Upon information and belief, Hamas currently has

command and control centers in the United States, Britain, and several Western European countries. The leaders of these control centers coordinate fund-raising from sympathetic parties in these countries, they launder and channel money to Hamas operatives in the West Bank and Gaza, they arrange for the purchase of weapons and the recruitment and training of military personnel, and they work with local commanders in the West Bank and Gaza to plan terrorist attacks.

32.  Hamas' military wing depends on foreign contributions solicited by the overseas control centers.  Approximately one-third of Hamas' multi-million dollar annual budget comes from fund-raising activity in North America and Western Europe. Hamas' other sources of funding include local contributions and support from several Middle Eastern governments.

33.  Hamas' presence in the United States is significant but covert.  It conducts its affairs through a network of front organizations that ostensibly have religious and charitable purposes.  Upon information and belief, defendants QLI, UASR, HLF and IAP, and IAP's affiliates AMELP and AMS, are Hamas' main fronts in the United States. These organizations' purportedly humanitarian functions mask their core mission of raising and funneling money and other resources to Hamas operatives in support of their terrorist campaigns.

34.   Defendants Mohammed Salah and Mousa Mohammed Abu Marzook have coordinated Hamas' fund-raising and money-laundering operations in the United States.  As head of the political wing of Hamas operating from the United States, defendant Marzook issued instructions to Salah, the head of the military wing, for raising and channeling money to Hamas terrorists.  Marzook admitted in a Preliminary Statement appended to his Petition for Writ of Habeas Corpus filed on November 16, 1995, that he is the leader of the political wing of Hamas and that he has raised money for Hamas.  Evidence presented in Matter of Extradition of Marzook, 924 F. Supp 565 (S.D.N.Y. 1996), established that Marzook

(a) transferred funds to Salah, (b) recruited Salah to organize Hamas military fund-raising in the U.S., (c) knew that Hamas operatives were carrying out terrorist attacks in Israel, and (d) gave one of the organizers of these terrorist operations a book of blank signed checks to finance Hamas' operations. Statements made by Salah to Israeli authorities corroborated these conclusions.

35.   Defendant Salah's role in the fund-raising and money-channeling scheme was investigated and described in detail by FBI agents in United States v. One 1997 E35 Ford Van, the civil forfeiture action pending in this Court.  The FBI affidavit in that action declares that from 1988 until his arrest by Israeli

authorities in January 1993, defendant Salah (a) actively recruited Hamas terrorists, (b) arranged for and directly financed their training, (c) served, at defendant Marzook's request, as a financial conduit for Hamas operations directed from the U.S., (d) paid for plane tickets to transport trained terrorists from the U.S. to the Middle East, and (e) gave approximately $100,000 to another Hamas operative for the express purpose of procuring weapons.

## Interrelationships Among the Defendants

36. In the proceedings against defendant Marzook and Salah in this Court (United States v. One 1997 E35 Ford Van, 50 F. Supp. 2d 789 (N.D. Ill. 1999)), the United States alleged that the two defendants employed a number of charitable organizations in the United States to raise and launder money for Hamas. Salah told Israeli authorities that he received money from thirty-one charitable organizations that solicited contributions on behalf of Hamas, as well as from a network of mosques in Chicago. The identities of all Hamas front organizations are not known at this time, but upon information and belief, the named defendant organizations HLF, IAP, AMELP, and AMS are among them.

37. These front organizations are linked by interlocking directorates, and have ties to defendants Salah and Marzook.

Upon information and belief, the following links have been established to date:

38. IAP and AMELP: IAP and AMELP have the same telephone number and the same registered office listing in incorporation records. AMELP distributes IAP's publications and it serves as the tax-exempt conduit for IAP and as the means by which the IAP files IRS Form 990 (Return of Organization Exempt from Income Tax). AMELP's Form 990 lists a telephone number and mailing address for AMELP that is identical to IAP's telephone number and mailing address. Additionally, two past presidents of IAP, Yasser K. Salah Bushnaq and Omar Ahmad, are currently on the board of AMELP.

39. IAP and AMS: The previous president of IAP, Rafeeq Jaber, is the current president of AMS. AMS works closely with IAP in coordinating events and publications. The editor of IAP's publication Al-Zaituna-Chicago is a member of the board of AMS. IAP holds its convention in Illinois and uses AMS's phone number as the contact.

40. IAP and HLF: Ghassan Elashi, served as the incorporator for both IAP in California in 1986 and HLF in California in 1989. He also served as treasurer of HLF from 1988-1993. HLF's Secretary and Executive Director, Shukri Abu Baker, served as a member of IAP's advisory board. Kifah

Mustapha, HLF's registered agent in Illinois, organized the programming for IAP's 1999 Annual Conference.

41. <u>HLF and AMELP</u>: HLF's Director of Health, Ahmed Agha, is member of the board of AMELP.

42. <u>IAP and Marzook</u>: Marzook served as a member of IAP's advisory board and served as its chairman in 1988-90.

43. <u>UASR and Marzook</u>: Marzook served as an original Director of UASR and as its president in 1990-1991.

44. <u>AMELP, Marzook, and Salah</u>: Marzook shared a joint bank account with a member of the Board of Directors of AMELP, Ismael Elbarasse, whom Salah named in his statement to the Israeli authorities as a Hamas operative. During Marzook's extradition proceedings, evidence was presented that funds were transferred from this joint bank account to Salah while Salah was rebuilding Hamas units in the West Bank and Gaza. See <u>Marzook</u>, 924 F. Supp at 587, 592.

45. <u>QLI and Salah</u>: Salah says that he is employed as a computer analyst at QLI. QLI has been identified by the FBI as the vehicle through which Salah channeled hundreds of thousands of dollars to Hamas operatives outside the United States between 1991 and 1993.

## The Flow of Money from Defendants to Hamas Terrorists

46.  Money flows from American contributors to Hamas terrorist operatives in the West Bank and Gaza through a three-step process: First, the front organizations solicit contributions.  Second, the leaders arrange for the money to be laundered and wired overseas.  Third, Hamas operatives in the West Bank and Gaza use the money to finance terrorist activities.

47.  Fund-raising: The front organizations solicit contributions directly and through mosques in heavily Islamic areas in Illinois and Texas.  HLF also solicits donations over the internet.

48.  Channeling the Funds: It is illegal under the Antiterrorism Act of 1990 to provide financial support of any kind to recognized terrorist groups. Hence the money flows through a complicated series of transactions, changing hands several times and typically being commingled with funds from the front organizations' legitimate business and charitable dealings, before being transferred overseas.

49.  Defendant Marzook instructed Salah as to which units, operatives, and activities in the West Bank and Gaza were to receive the funds.  Marzook also acted, in some cases, as an originator of funds, transferring them to Salah to be laundered and sent overseas.

50.   Various means are used to launder money.   One method of generating income and laundering money is real-estate deals. Other money-laundering transactions involved direct transfers from Marzook's bank account to Salah's.   Money was also transferred via Swiss bank accounts.   Upon information and belief, the money transferred in this manner included funds raised by the defendant front organizations.   The organizations sometimes transferred funds directly into Salah's U.S. accounts without using any Swiss intermediary.   Salah sent money to Hamas operatives in the West Bank and Gaza through an unlicensed money-changer in Chicago.

51.   Upon information and belief, funds collected in the United States were sent to Hamas operatives for the purpose of financing terrorist activities.   Defendant Marzook signed blank checks and gave them to Hamas military commanders appointed by him, with instructions to use them to finance their operations. Defendant Marzook also opened local bank accounts in the Middle East to which Hamas operatives had access.   Salah delivered money to Hamas military operatives for the express purpose of procuring weapons.   The attached FBI affidavit describes travel by Salah to the West Bank in December 1992 at Marzook's request to carry out five Hamas missions.   Shortly before Salah's departure, according to the FBI affidavit, hundreds of thousands of dollars were transferred into Salah's account from an account

jointly held by Marzook and Ismael Elbarasse of AMELP. These funds were used for terrorist activities.

52. <u>Terrorist Activities</u>: Hamas operatives in the West Bank and Gaza used the money wired from the United States to buy weapons and carry out terrorist attacks, including the attack on David Boim. Funds were drawn from a pool of such funds by Hamas military organizers to finance training, weaponry, lodging, false documentation/identification, communications equipment, facilities, lethal substances, explosives, personnel, transportation, and other material support. Money from this pool also went to pay stipends to the families of Hamas terrorists "killed in action" in order to encourage others to volunteer for suicide missions. Upon information and belief, among the expenditures paid for by this pool of money were the vehicle, machine guns, and ammunition used to kill David Boim, and the training of Hinawi, Al-Sharif, and other Hamas operatives involved in this attack. The funds were also used to provide a stipend for Al-Sharif's family.

### PLAINTIFFS' CLAIM: VIOLATION OF 18 U.S.C. § 2333

53. Plaintiffs incorporate paragraphs 1 through 52 as if fully set forth herein.

54. Defendants are civilly liable to the plaintiffs under the Antiterrorism Act of 1990, as amended, 18 U.S.C. § 2333, for

the defendants' murder of David Boim in the course of terrorist activities outside the United States.  Defendants Hinawi and Al-Sharif actually committed the murder of David Boim.  They were, on information and belief, aided, abetted, and financed by the other defendants named herein.  The organizations named in this Complaint provided material support or resources to Hamas as defined in 18 U.S.C. §§ 2339A and 2339B.  Plaintiffs bring this action in their own right and on behalf of the Estate of David Boim and David's heirs-at-law, in accordance with 18 U.S.C. § 2333(a).

55.  Plaintiffs incurred damages as a result of defendants' conduct.  David Boim suffered extreme physical pain before his death.  His Estate suffered economic losses from funeral expenses and the loss of accretion to the Estate due to his death at age seventeen.  Plaintiffs Stanley Boim and Joyce Boim suffered extreme mental anguish and were deprived of the society of their son.  The plaintiffs are entitled to treble damages for their injuries under 18 U.S.C. § 2333(a).

## PRAYER FOR RELIEF

56.  WHEREFORE, plaintiffs Stanley and Joyce Boim and the Estate of David Boim pray that judgment be entered on their claims against the defendants, jointly and severally, for compensatory damages in the amount of ONE HUNDRED MILLION

DOLLARS ($100,000,000), and punitive damages in the amount of ONE HUNDRED MILLION DOLLARS ($100,000,000), plus costs and attorneys fees, and request the trebling of damages and such other relief as the Court may deem just and equitable.

## PRAYER FOR SPECIAL RELIEF

57. Plaintiffs also petition this Court to set aside ONE MILLION FOUR HUNDRED THOUSAND DOLLARS ($1,400,000) of the assets of defendants Salah and QLI that are presently in the registry of the Court. The FBI has determined that these assets have been raised and used to support the terrorist activities of Hamas that give rise to this civil suit under 18 U.S.C. § 2333. These assets are currently subject to civil forfeiture proceedings in this Court. The Court should segregate these assets pending the outcome of both the forfeiture proceedings and the present suit.

58.  Plaintiffs also pray that this Court enjoin the defendants to cease collecting funds for the support of Hamas.

NATHAN LEWIN
THOMAS B. CARR
ALYZA D. LEWIN
MILLER, CASSIDY, LARROCA & LEWIN, L.L.P.
2555 M Street, N.W.
Washington, D.C.  20037
(202) 293-6400

SHELLY B. KULWIN
KULWIN & ASSOCIATES
ARDC No. 03125344
161 North Clark
Suite 2500
Chicago, IL  60601
(312) 641-0300

ATTORNEYS FOR THE PLAINTIFFS

JURY TRIAL DEMANDED ON ALL CLAIMS.

NATHAN LEWIN

Date:  May 12, 2000

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RECEIVED

JUN 09 1998·

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA, )
)
                 Plaintiff, )
)
         v. )
)
ONE 1997 E35 FORD VAN, )
VIN 1FBJS31L3VHB70844, )
)
ALL FUNDS IN FIRST )
NATIONAL BANK OF CHICAGO )
ACCOUNT NO. 12310153, )
)
ALL FUNDS IN MIDLAND )
FEDERAL SAVINGS & LOAN )
ACCOUNT NO. 001093002113, )
)
ALL FUNDS IN FIRST NATIONAL )
BANK OF EVERGREEN PARK )
ACCOUNT NO. 1412446, )
)
ALL FUNDS IN STANDARD )
BANK & TRUST ACCOUNT )
NO. 5580349268, )
)
ALL FUNDS IN STANDARD BANK )
& TRUST ACCOUNT NO. 239328806,)
)
ALL FUNDS IN STANDARD BANK )
& TRUST SAFE DEPOSIT BOX )
NO. 207, )
)
ALL FUNDS IN STANDARD BANK )
& TRUST SAFE DEPOSIT BOX )
NO. 4019, )
)
ALL FUNDS IN FIRST )
NATIONAL BANK OF CHICAGO )
ACCOUNT NO. 8060700, )
)
ALL FUNDS IN LASALLE BANK, )
F.S.B. ACCOUNT NO. 022034532, )
)
REAL PROPERTY KNOWN AS )
9229 SOUTH THOMAS, )
BRIDGEVIEW, ILLINOIS, )
)
                 Defendants. )

No.                98 C 3548
Judge   JUDGE ANDERSEN

MAGISTRATE JUDGE BOBRICK

## VERIFIED COMPLAINT FOR FORFEITURE

The UNITED STATES OF AMERICA, by its attorney, SCOTT R. LASSAR, United States Attorney for the Northern District of Illinois, for its verified complaint against the above-named defendant properties, states as follows:

1.   This is a forfeiture action brought pursuant to 18 U.S.C. § 981 and this court has jurisdiction under 28 U.S.C. §§ 1345 and 1355.

2.   This complaint has been verified by the attached affidavit of Special Agent Robert Wright of the Federal Bureau of Investigation, which is fully incorporated herein.

3.   The defendant properties are presently located within and will remain in the Northern District of Illinois during the pendency of these proceedings.

4.   As set forth more fully in the attached affidavit, there is probable cause to believe that the defendant properties constitute funds or property traceable to funds transmitted or transferred from outside the United States to or through financial institutions within the United States with the intent that such funds be used in support of a conspiracy involving international terrorist activities, and domestic recruitment and training in support of such activities, which include but are not limited to acts of extortion, kidnaping and murder of and against the citizens and government of the State of Israel as part of an ongoing campaign to force the State and citizens of Israel to

2

cede physical and political control and dominion over the lands comprising the Israel and the occupied territories of the West Bank and the Gaza Strip, thus rendering the transmissions or. transfers violative of the money launder statute, 18 U.S.C. § 1956(a)(2), and rendering such funds or assets traceable to such funds forfeitable pursuant to 18 U.S.C. § 981.

5.    Additionally, certain of the illegally transferred funds or proceeds of such funds were used to engage in monetary transactions, including the purchase of the defendant vehicle and real property, the value of each being in excess of $10,000, in violation of 18 U.S.C. § 1957, and thereby rendering such property forfeitable pursuant 18 U.S.C. § 981.

WHEREFORE, the United States of America prays that:

a.    The defendant funds and properties named herein be proceeded against for forfeiture and condemnation; that a warrant of arrest in rem, and warrants of seizure and monition issue; and that due notice be given to all interested parties to appear and show cause as to why the forfeiture should not be decreed; and

b. This court adjudge and decree that the defendant funds and properties be forfeited to the United States of America and be disposed of according to law.

Respectfully submitted,

SCOTT R. LASSAR
United States Attorney

BY:

JOSEPH M. FERGUSON
Assistant United States Attorney
219 South Dearborn Street, Room 500
Chicago, Illinois 60604
(312) 353-5300

COUNTY OF COOK    )
                  )    SS
STATE OF ILLINOIS )

### AFFIDAVIT OF ROBERT WRIGHT

I, Robert Wright, being duly sworn, do hereby depose and state:

1. I am a Special Agent of the Federal Bureau of Investigation (FBI) assigned to the Chicago Division. I have been a Special Agent with the FBI since 1990. I am currently assigned to the Chicago Division Counter-Terrorism Task Force In this capacity, I have become familiar with techniques used by international terrorist organizations to surreptitiously move and launder money in and out of the United States, including through use of domestic financial institutions, in support of extortionate terrorist and paramilitary activities and operations in the United States and abroad, including the State of Israel and elsewhere.

2. The Chicago FBI Terrorist Task Force has been conducting an investigation into activity dating back to 1989 and continuing to the present involving the transfer or transmission of money from Europe and the Middle East to a network of individuals and organizations in the United States, including, in the Chicago area, Mohammad Salah, Azita Salah, and the Quranic Literacy Institute ("QLI"). There is probable cause to believe that some of these transfers or transmissions have been of money intended for use in support of domestic and international terrorist activities, thus rendering the transfers or transmissions violative of the money laundering statute, 18

U.S.C. § 1956(a)(2), and thereby rendering such money and assets traceable to such money forfeitable pursuant to 18 U.S.C. § 981. As set forth in greater detail below, the illegal transfers have supported specific terrorist activities involving the extortion, kidnaping and murder of the citizens and government of the State of Israel as part of an ongoing movement and campaign publicly pledged to the goal of forcing, through coercive and violent means, the State and citizens of Israel to cede, physical and political control and dominion over the lands comprising Israel and the occupied territories of the West Bank and the Gaza Strip.

3.     The specific items for which there is probable cause for seizure and forfeiture are as follows:

a.    With respect to QLI:

i.   All funds held in bank account number 12310153, at the First National Bank of Chicago, First National Plaza, Chicago, Illinois 60670, in the name of Quranic Literacy Institute, General Fund, P.O. Box 1467, Bridgeview, Illinois 60455.

ii.  All funds held in bank account number 0010930021133, at the Midland Federal Savings & Loan Association, 8929 South Harlem, Bridgeview, Illinois 60455, in the name of the Quranic Literacy Institute Building Fund.

iii. All funds held in bank account number 1412446, at the First National Bank of Evergreen Park, 9400 South Cicero Avenue, Oak Lawn, Illinois 60453 in the name of Quranic Literacy Institute.

iii. One 1997 E35 Ford Van, VIN: 1FBJS31L3VHB70844

b.    With respect to Mohammad Salah and Azita Salah:

i.   all funds held in bank accounts number 5580349268 and number 239328806, at the Standard Bank & Trust, 7800 West 95th Street, Hickory Hills, Illinois 60805, in the names of Mohammad and Azita Salah and Azita Salah TRF, (and their minor children Ahmad M or

2

Yusuf M or Salma Asmaa M Salah), P.O. Box 2616,
Bridgeview, Illinois 60455, respectively.

    ii.  all funds in safe deposit box number 207 (in
the name of Azita Salah), and safe deposit box number
4019 (in the name of Mohammad Salah), at the Standard
Bank & Trust, 7800 West 95th Street, Hickory Hills,
Illinois 60805,

    iii.  all funds held in bank account number
8060700, at the First National Bank of Chicago, First
National Plaza, Chicago, Illinois 60670, in the names
of Mohammad and Azita Salah.

    iv.  all funds held in bank account number
022034532, at the LaSalle Bank, F.S.B. (formerly known
as LaSalle Talman), 135 South LaSalle, Chicago,
Illinois 60674, in the names of Mohammad and Azita
Salah.

    v.  the property commonly referred to as 9229 S.
Thomas, Bridgeview, Illinois with the legal
description:
        Lot 5 in Mosque Foundation and Center
        Area, Subdivision of part of the
        Southeast quarter of Section 1, Township
        37 North, Range 12, East of the Third
        Principal Meridian, in Cook County,
        Illinois.
        PIN 23-01-404-012.

## MOHAMMED SALAH, OLI, AND THEIR RELATIONSHIP

4.  On January 25, 1993, Mohammad Salah, a naturalized

American citizen and Chicago area resident, was arrested in

Israel for his membership and participation in the HAMAS

terrorist organization ("HAMAS").[1]  In January of 1995, Salah pled

---

[1]HAMAS is an acronym of the Arabic term for "The Islamic
Resistance Movement"--Harakat al Muqawama al Islamiyya.  It is an
independent political organization founded in the Israeli
Occupied Territories in 1987 at the beginning of the Intifada,
the Palestinian-led campaign to resist Israeli political dominion
over the occupied territories. Organizationally, HAMAS is divided
into two operational branches or bureaus--a political branch and
a military branch.  The political branch has among its publicly
stated purposes the establishment of a Palestinian identity and
homeland.  To that end, the organization is involved in community

guilty in an Israeli military court to belonging to HAMAS and illegally channeling funds to the outlawed HAMAS organization, including funds transferred through one of the subject accounts he held jointly with his wife Azita, at LaSalle Talman Bank in Chicago. For his crimes, the Israelis sentenced Salah to five years imprisonment. Salah was released from an Israeli prison in November of 1997, at which time he was permitted to return to the United States.

5. On July 27, 1995, while Salah was incarcerated by Israeli authorities, the United States Treasury Department's Office of Foreign Assets Control added Mohammad Salah to the list of Specially Designated Terrorists, (published at 60 Fed. Reg. 44932, August 29, 1995), because of his facilitation of terrorist activities in the Middle East.

6. A review of bank records obtained by the FBI demonstrates that Salah previously has claimed to be an employee of the Quranic Literacy Institute ("QLI") of Oak Lawn, Illinois.

---

building activities in Israel and abroad. However, acting through its military branch, which receives instruction and support from its political branch, HAMAS also has been engaged in a more than decade-long campaign of subversive and violent activity--commonly denominated as terrorist activity--undertaken primarily in Israel, and supported in part by illegal activities in the United States including, among other things, money laundering in violation of 18 U.S.C. § 1956, including some that are the subject of this affidavit. These terrorist activities, for which HAMAS has repeatedly and publicly claimed credit, have as their broadly represented purpose the undermining the Israeli-Palestinian peace process, and, more generally, of forcing the State and citizens of Israel to cede physical and political control and dominion over the lands comprising Israel and the occupied territories, and replacing the Jewish political authority over these lands with an Islamic government.

QLI represents itself to be a not-for-profit research institute devoted to the translation and publication of sacred Islamic texts and to scholarly research devoted to such topics. QLI's principals include its President, Ahmad Zaki Hameed ("Zaki"), Corporate Secretary and Trustee Amer Haleem, and Treasurer Abraham Abusharif.

7. Bank records obtained by the FBI include an employment verification letter issued for Mohammad Salah by QLI to the Standard Bank & Trust Co of Evergreen Park, Illinois. The letter, printed on QLI organizational letterhead and signed by Amer Haleem, states that Salah began working for QLI as a computer analyst on January 1, 1991, at a salary of $36,000. The letter was provided to Standard Bank & Trust by QLI in support of Salah's securing of a mortgage loan in excess of $100,000 for his residence at 9229 S. Thomas, Bridgeview, Illinois. In making application for the loan, Salah claimed as his only employment the purported job with QLI.

8. Bank records further show that Salah also claimed an employment relationship with QLI when he opened his subject account with First National Bank of Chicago, (account number 8060700), in late July of 1991. The bank obtained an oral verification of Salah's employment with QLI from QLI treasurer Abraham Abusharif.

9. Other information obtained by the FBI indicates that Salah either was not employed by the QLI in the capacity claimed or that QLI is seeking to conceal and disguise the relationship

5

it has with Salah.  QLI initially responded to FBI and INS inquiries by refusing to discuss Salah's employment status.  FBI review of QLI business records did not reflect any type of regular periodic payments to Mohammad Salah, such as paychecks or tax withholding records, that would reflect the existence of the employment relationship claimed in the employment verification letter submitted to Standard Bank.  Additionally, speaking through its attorney Ralph Brown during a February 6, 1998, telephone conversation with FBI agents, QLI has expressly denied having employed Salah at any time.  Salah's wife, Azita Salah, in an interview with FBI agents, denied that her husband was employed by QLI and stated that he merely performed volunteer work for the organization.

10.  Tax records obtained in the course of the investigation indicate that Salah secured a mortgage from Standard Bank & Trust not only through misrepresenting his employment status and relationship with QLI, but also through tendering falsified tax returns for the 1988, 1989 and 1990 tax years which he represented to be copies of filed returns.  IRS tax information revealed that the Salahs in fact did not file tax returns for the 1988 tax year and that the tax returns they filed for the 1989 and 1990 tax years materially differed from the returns tendered to Standard Bank & Trust as part of the mortgage application process.

<u>SALAH'S AUGUST 1992 TRIP TO ISRAEL FOR HAMAS</u>

11.  Salah's statements to Israeli authorities after his

arrest in January 1993 suggests that Salah's claimed employment with QLI was likely a cover for his position as a high-level HAMAS military operative.

12.    While in Israeli custody after his arrest on January 25, 1993, Salah made a series of statements to Israeli authorities in which he admitted his activities in the United States and abroad as a HAMAS military operative prior to and during the period he was claiming to be a computer analyst for QLI.  According to Salah, his involvement with HAMAS began approximately in 1988 and continued through to the date of his arrest by Israeli authorities on January 25, 1993.  Salah further divulged that his activities for HAMAS, domestically and internationally, included recruiting and training new candidates for membership in HAMAS military cells in the Israeli Occupied Territories and to perform terrorist acts, primarily in the State of Israel. Salah told Israeli authorities that his recruitment activities included, among other things, conducting interviews and background checks, as well as identifying and sorting prospective candidates on the basis of expertise and skills relating to, among other things, knowledge of chemicals, explosives and the construction of terrorist devices that might be used in HAMAS military operations in Israel and elsewhere. His training activities for HAMAS, according to Salah, included mixing poisons, development of chemical weapons, and preparing remote control explosive devices.

13.    Salah also admitted having served as a financial

7

conduit for HAMAS operations. Relatedly, he admitted to directly financing domestic and international travel and terrorism training for new HAMAS members. Airline records obtained by the FBI show that Salah purchased airlines tickets for travel between the United States and sites in the Middle East for himself and other suspected HAMAS terrorists, including Alwan Shareef and Razick Saleh Abdel Razick, both of whom flew from the United States to Syria with tickets purchased by Salah in September of 1992. A review of the Salahs' bank records revealed that Salah paid for the airfare by executing a check, dated September 29, 1992, drawn from the subject LaSalle Bank account that Salah jointly held with his wife Azita. Additionally, Salah has acknowledged in statements to Israeli authorities that these trips were taken for the purpose of receiving training in preparation for HAMAS military and terrorist operations in Israel.

14. Bank and airline records obtained by the FBI and reviewed in conjunction with statements to Israeli authorities by Salah and other HAMAS operatives indicate that between June 18, 1991 and December 30, 1992, Mohammad Salah expended in excess of $100,000 in direct support of HAMAS military activities.

15. For example, Salah admitted to Israeli authorities that in September of 1992, he gave in excess of $48,000 to Salah Al-Arouri ("Al-Arouri"), an admitted HAMAS military operative and student at Hebron University in the Israeli-occupied West Bank. According to Salah, the money was to be used to purchase weaponry

8

to be used to carry out attacks against Israel.

16.  Salah's admission is corroborated by a number of independent sources, including statements of Salah Al-Arouri to Israeli authorities in early 1993.  Al-Arouri has related that he received approximately $96,000 from Salah during a face to face meeting at Hebron University late in the summer of 1992. According to Al-Arouri, Salah gave him the money specifically for the procurement of weapons and the financing of the activities of HAMAS military apparatus in Hebron.  Al-Arouri further related that  weapons were in fact purchased with the money provided by Salah.

17.  As recounted by Al-Arouri, Al-Arouri gave an individual named Musa Dudin approximately $45,000 of the money he received from Salah so that Dudin could purchase weapons in September of 1992.  Among the weapons Musa Dudin purchased were one short M-16 rifle; two Kalashnikovs, two Uzis, a number of 9 millimeter pistols, and  numerous magazines and hundreds of rounds of ammunition for the various weapons. Al-Arouri further related that the weapons purchased with the money from Salah were subsequently used in terrorist attacks, including a suicide attack resulting in the murder of an Israeli soldier in Hebron in October of 1992.  According to Al-Arouri, the attack was carried out with the short M-16 rifle purchased with the money he received from Salah.  Al-Arouri related that shortly after purchasing the rifle with the Salah money, he gave it to HAMAS operatives Bashir Hamada and Talal Salah, who used the weapon in

their October 1992 murder of an Israeli soldier. Al-Arouri further related that after the attack, he assisted Hamada and Talal Salah in evading Israeli authorities who had initiated a massive manhunt for the two HAMAS killers. According to subsequent published news reports based on Israeli military sources, the two men soon thereafter escaped to Egypt by sea in a rubber dinghy launched from the border town of Rafah in the occupied territory of Gaza.

18. In statements to Israeli authorities in January and April of 1993, Musa Dudin confirmed his role in the events revealed by Al-Arouri as summarized in the previous paragraph. Additionally, Musa Dudin admitted his involvement in the planning and execution of a HAMAS terrorist attack in Hebron on December 12, 1992, which resulted in the killing of Israeli soldier Yuval Tutanji. Musa Dudin stated that one of the weapons used in the ambush attack was a Kalashnikov rifle from the Hebron military squad. Al-Arouri indicated in his account of his dealings with Mohammad Salah that funds given to him by Salah were used to provide the Hebron squad with weapons, which included Kalashnikov rifles, clips and ammunition, and additional money to support their terrorist attacks.

19. Salah's transaction of HAMAS business with Al-Arouri is supported by Israeli border control records which, according to Israeli police, show that Salah entered Israel's Ben Gurion Airport from the United States on August 25, 1992, and departed from Israel Ben Gurion Airport on September 9, 1992.

10

20. Additionally, bank records from subject LaSalle Bank account number 02-203453-2, held in the names of Mohammed and Azita Salah (and one of the subject accounts against which seizure and forfeiture is sought), corroborate the statements of Salah and Al-Arouri regarding their dealings. Specifically, the bank records reveal that from August 12 through September 12, 1992, deposits in an amount exceeding $52,000 were received in Salah's LaSalle Talman account. Within that same period, on September 3, 1992, while in Israel, Salah withdrew $50,000 from his LaSalle Bank account by executing ten (10) $5000.00 checks made out to "Cash." The reverse side of each check indicates that it was cleared through the central branch of an Israeli bank in Tel Aviv on September 8, 1992, and debited against Salah's LaSalle Bank account in the United States the following day.

## QLI-RELATED SOURCES MADE LARGE STRUCTURED TRANSFERS OF MONEY DIRECTLY TO SALAH

21. A review of bank records further indicates that QLI and QLI-related entities or individuals likely were a source of funds for Salah's HAMAS-related expenditures between 1991 and his arrest in January of 1993 and beyond. They also suggest that the QLI-related transfers of funds to Salah were, in significant part, structured in an effort to conceal QLI as the source of the funds.

22. For example, bank records show that on each of October 29, 30 and 31, 1991, Salah received a $6,000 check, ($18,000 in total), executed by Ahmad Zaki Hameed, the President of QLI. The checks were not drawn on QLI bank accounts, but rather from

11

Zaki's personal bank account.

23. A review of bank records similarly revealed that on June 18, 1991, Salah received $40,500.00 in the form of five (5) cashier's checks, each in the amount of $8,100.00, drawn from an account held by the George Washington Savings and Loan Association of Oak Lawn, Illinois with the First National Bank of Evergreen Park, Illinois. Bank records show that the cashier's checks were obtained for and given to Salah by Linda Abusharif, the sister of QLI Treasurer Abraham Abusharif. Bank records further reflect that the five cashier's checks were counter-signed by Salah who deposited them into his LaSalle Bank account.

## QLI'S SCHEME TO GENERATE INCOME FOR HAMAS ACTIVITIES

24. Bank records further suggest that the planned source of the funds that were relayed to Salah by QLI related entities was, at least in part, the proceeds of a local land deal involving QLI and Golden Marble Corp. that was financed with funds transferred from a Swiss account of a Saudi Arabian entity into the United States.

25. In interviews with the FBI, Golden Marble President Dr. Tamer Al-Rafai ("Al-Rafai") has related that beginning in March of 1991, he met with QLI President Ahmad Zaki Hameed who represented himself to be a possible investor in a land development project Al-Rafai hoped to start. An outcome of the meetings was that Al-Rafai was instructed to bid on land for the project and, if the bid was accepted, QLI would arrange to finance the project.

26. Accordingly, in May of 1991, Al-Rafai made a bid of $820,000 for a large unimproved lot located at Route 53 and Hobson Road in Woodridge, Illinois. The bid was accepted, after which Zaki informed Al-Rafai that he had identified a source for the funds necessary to close the deal. Zaki further told Al-Rafai that QLI would handle all business matters regarding the investment and the investor, who Zaki indicated was from Saudi Arabia.

27. According to Al-Rafai, on July 19, 1991, Saudi Arabian businessman Yassin Kadi, acting pursuant to specific instructions from Zaki, wire transferred $820,000 to Golden Marble from a Swiss bank. Bank records corroborate the wire transfer. Shortly thereafter, on July 22, 1991, Golden Marble used these funds to purchase the Woodridge, Illinois property. Both the wire transfer from Kadi to Golden Marble and the land purchase were consummated without the prior execution of any kind of mortgage or loan note. Indeed, QLI was not signified as a party to, or otherwise referenced in the papers concerning, these transactions.

28. However, on July 18, 1991, prior to the closing on the purchase of the Woodridge property, Zaki, in his capacity as QLI's president, established a land trust (Trust No. 1206-0) at the Midland Federal Savings & Loan Association. The bank trust documents specify the Woodridge property as the only asset of the trust and designate QLI as the sole trust beneficiary. This specification was nominally false at the time it was made,

because the property had not been purchased yet, (and would not be until four days later). And when it was purchased, it was purchased by Golden Marble, not QLI. Moreover, the documents establishing the QLI/Midland Federal Bank trust, which have been reviewed by the FBI, do not recognize or otherwise reference Al-Rafai, Golden Marble, Yassin Kadi, or Kadi International as a party in interest, or otherwise connected to, the Woodridge property.

29. On July 23, 1991, the day after Golden Marble closed on the Woodridge property, QLI and Golden Marble executed a Lease and Sale Agreement. The agreement, which is signed by Ahmad Zaki for QLI and Tamer Al-Rafai for Golden Marble, states QLI to be the owner of the Woodridge property, and provides that Golden Marble would lease the property from July 22, 1991 through July 21, 1993 for $164,000. The agreement specified that the rent was to be paid in a lump sum of $150,000 on July 22, 1991, with the remaining $14,000 due three months later. The agreement further specified that Golden Marble was to purchase the property within two years--i.e. by July 1993--for a price of $970,000.

30. Bank records reflect that the day the lease and sale agreement was executed--July 23, 1991--Al-Rafai, on behalf of Golden Marble, executed three checks payable to QLI totaling $101,000. Each of the three drafts, which according to Al-Rafai were payments against the $150,000 rent due at the inception of the lease, were returned for insufficient funds after being deposited by QLI into its Oak Lawn National Bank account. Zaki

14

Hameed demanded immediate payment. However, QLI ultimately granted Al-Rafai forbearance on the payment until September 1991. On September 11, 1991, Al-Rafai, for Golden Marble, wrote a check for $22,000 to QLI. On the following day, Al-Rafai executed a check for $88,000 to QLI.[2]

31. Bank records reviewed by the FBI indicate that QLI did not cash or deposit the two September 1991 checks from Al-Rafai totaling $110,000 for six months, until March 11, 1992, when Zaki Hameed of QLI endorsed the checks over to a third party.[3] Within days after Zaki Hameed's endorsing of the checks, Mohammad Salah received the first in a series of three substantial overseas wire transfers into his First National Bank of Chicago account that is a subject of this seizure and forfeiture action totaling just under $110,000. Specifically, bank records for Mohammad Salah's First National Bank of Chicago account number 8060700 show that on March 16, 1992, within five days of Zaki Hameed's endorsing of the Golden Marble rent, Salah received an overseas wire transfer of $27,000 into his First Chicago account

---

[2] The balance of the $150,000 rent payment was paid on November 27, 1992, when Al-Rafai wrote QLI a check for $40,000.

[3] Tamer Al-Rafai has related that he was told by Zaki Hameed that the checks were not cashed during this period because QLI was waiting for the conferral of tax-exempt status from the IRS. In fact, the delayed endorsement of the checks on March 11, 1992, correlates with QLI's attaining status as a 26 U.S.C. § 501(c)(3) tax-exempt organization in March of 1992. Prior to that time, and including the summer of 1991, QLI did not have tax exempt status. It therefore should have reported the rental income from the Woodridge property as a non-tax exempt organization for the 1991 tax year. A review of tax records indicates that QLI did not report the rental income, or any other income, for the 1991 tax year as it was required to do.

from Faisal Financial of Geneva, Switzerland. That wire was followed by two additional wire transfers from Faisal Financial of Geneva of $30,000 on July 3, 1992[4], and $50,000 on October 7, 1992.

32. Also on July 23, 1991, Zaki Hameed and Amer Haleem of QLI brought Al-Rafai to the Midland Federal Bank, at which time Zaki had Al-Rafai execute a document transferring the Woodridge property to Midland Land Trust No. 1206-0, of which QLI was the only beneficiary.

33. A title search for the Woodridge property obtained by the FBI does not reflect Golden Marble having ever been recorded as owner or party in interest to the Woodridge property at the time of the land deal in July of 1991. The title search instead shows ownership of the property as being held by Midland Federal Land trust 1206-0. This chain of transactions, (which according to Al-Rafai was directed by Zaki, QLI's President), resulted in QLI gaining possession and ownership of the Woodridge property in a manner that obscured its connection to the overseas transfer of $820,000 from the Saudi entity Fadi International with which the deal was financed.

---

[4] On July 5, 1992, two days after the July 3, 1992, $30,000 wire transfer from Faisal Financial of Geneva Switzerland was received into his First Chicago account, Mohammad Salah signed a lease for Standard Bank & Trust Safe Deposit Box Number 4019. On July 9, 1992, Salah drew on the wired funds by withdrawing $10,000 from the First Chicago account. According to Standard Bank & Trust personnel, Azita Salah has paid the yearly rent for Box Number 4019 through to the present, including the 4 year ten month period during which Mohammad Salah was incarcerated in Israel.

34.  Indeed, QLI's relationship to the loan extended by Kadi
International for the July 1991 purchase of the Woodridge
property was not reflected in any notes or agreements until ·
December 1991, five and a half months after the wire transfer and
closing of the land deal.  Specifically, on December 17, 1991,
QLI, through Zaki, instructed Midland Federal, as Trustee of
Trust No. 1206-0, to execute a mortgage respecting the Woodridge
property in the amount of $820,000 in favor of Kadi
International, due and payable on December 31, 1993.  On December
31, 1991, Midland Savings did so by executing a note specifying
that $820,000 was due and payable on December 31, 1993, and
providing that "All payments are to be made to Kadi International
Corp., c/o BMI, Inc., One Harmon Plaza, Secaucus, New Jersey,
Attn:  Gamal Ahmed."  Richard Taylor, Vice President of Midland
Federal, who signed and notarized the document advised the FBI
that he understood the note as signifying that QLI was planning
to borrow $820,000 from Kadi International Corp. and use the Land
Trust #1206-0 as collateral for the loan.  The bank officer who
served as trustee related to the FBI that at the time he prepared
and executed the note, he was not aware that it was referencing
an unsecured loan that occurred five and one half months earlier.

35.  Notably, Kadi International and its related entity,
BMI, Inc., has disavowed any relationship with QLI.  A
representative of BMI, Inc.,(specified as payee in the QLI
"Note"), testified that Kadi International Corp. had no records
or any relation to QLI, its president, Zaki Hameed, or Midland

17

Trust No. 1206-0. The representative also testified that BMI was not aware of the note or mortgage executed in favor of Kadi International. Additionally, a review of title records for the property indicates that the note or mortgage was never record as a lien against the property, which had the effect of further concealing from public notice the relationship between QLI and the oversees transfer of funds from Kadi in Saudi Arabia.[5]

### MOHAMMAD SALAH'S TRIP TO ISRAEL IN JANUARY OF 1993

36. Mohammad Salah has related to Israeli authorities that in December of 1992, he was ordered by Mousa Mohammad Abu Marzook ("Abu Marzook") to travel to Israel's West Bank in January of 1993 to carry out five missions on behalf of HAMAS.

37. Abu Marzook is the leader of the political bureau of HAMAS. According to records of the United States Customs Service and the Immigration and Naturalization Service, Abu Marzook is a native of Rafia, Gaza, who moved to the United States in 1973, and eventually settled in the Washington, D.C./Northern Virginia area as a resident alien until 1993. Between 1993 and 1995, he resided principally in Jordan, which deported him in June of 1995 for his involvement and senior position in HAMAS. In July of 1995, after making trips to Iran and Syria, Abu Marzook attempted

---

[5] A review of tax records reveals that for the tax years 1991 through 1995, QLI never filed the annual IRS Form-990 required of tax exempt organizations. This failure acted to further conceal and obscure QLI's business dealings generally, its effective receipt of $820,000 internationally transferred into the United States by Kadi for the purchase of the Woodridge property, and the income QLI received in the form of rents from Golden Marble between 1991 and 1994.

to reenter the United States at which time he was arrested by Customs and INS officials at the request of the Israeli government which sought to prosecute Abu Marzook for numerous crimes in connection with his leadership of HAMAS.

In October of 1995, acting at the request of the Israeli government, the United States initiated extradition proceedings against Abu Marzook based on pending Israeli criminal charges that included, murder, attempted murder and conspiracy stemming from HAMAS sponsored terrorist acts on civilian targets in Israel and the Occupied Territories between July of 1990 and October of 1994. These terrorist acts resulted in the killing of over 30 Israeli citizens, the injuring or kidnaping variously of scores of other innocent civilians, including an American citizen, and the wounding of scores of Israeli soldiers.

In the resulting extradition proceedings in the spring of 1996, the United States District Court for the Southern District of New York found probable cause to believe that HAMAS was the perpetrator of numerous of the crimes for which the Israeli's sought to prosecute Abu Marzook, including the April 4, 1994, suicide bombing of a passenger bus in Afula, Israel, which killed eight civilian passengers and seriously wounded 44 civilians and two Israeli soldiers, and the April 13, 1994 bombing of another passenger bus between Afula and Tel Aviv, which killed six persons, including four civilians and one Israeli soldier, and wounded an additional 12 civilians and 18 Israeli soldiers. In the district court proceedings, Abu Marzook expressly

acknowledged his position as the leader of the political branch of HAMAS. The court found probable cause to believe that Abu Marzook, in his leadership capacity, had knowledge of these and other terrorist acts, that he had promoted and defended them publicly, and that he had directed underlying activities in support of HAMAS terrorist activities, including the activities of Salah in both the United States and Israel. The district court's decision is published in <u>In the Matter of the Extradition of Abu Marzook v. Christopher</u>, 924 F. Supp. 565 (S.D.N.Y. 1996).

38. Salah's relationship with Abu Marzook is independently corroborated by bank records showing more than $752,800 flowing from Abu Marzook (or accounts controlled by Abu Marzook) to Salah between 1989 and January 1993.[6]

39. According to Salah, he was first contacted by Abu Marzook about the proposed January 1993 missions through a series of telephone calls placed by Abu Marzook in December of 1992. According to Salah, Abu Marzook called him after a succession of calls by Abu Marzook to Syria, Lebanon and Sudan through which Abu Marzook received information from, and consulted with, HAMAS operatives regarding the mass deportations by the Israeli government of 415 HAMAS operatives in Israel and the Occupied Territories on December 17, 1992. In public statements, the

---

[6] Among the transfers, the largest of which are set forth in the following paragraphs, was a check executed by Abu Marzook for $5,000 and dated August 8, 1992, just two weeks prior to Salah's trip to Israel to provide weapons money to HAMAS operative Salah Al-Arouri. <u>See</u> ¶¶ 15-20. In the extradition proceedings, Abu Marzook acknowledged this transfer to Mohammad Salah.

Israeli government indicated that the mass deportation was a
direct response to the murder of a number of members of Israeli
military and police units in the previous weeks for which HAMAS
had claimed credit,[7] and the last of which was the December 15,
1992, dumping of the stabbed and mutilated body of a kidnaped
Israeli border police officer in the West Bank on the main road
between Jerusalem and Jericho.  The discovery of the body was the
precipitating event for Israel's immediate arrest and detention
of approximately 1200 Palestinians, followed on December 17, 1992
by the Israeli deportation of approximately 400 suspected HAMAS
members.

40.  According to Salah, Abu Marzook reported to him in the
immediate wake of these events that HAMAS' situation inside
Israel was serious because the mass deportations and arrests had
decimated the organization within the Occupied Territories.  Abu
Marzook characterized the situation as most serious in Ramallah
and Hebron because of the sudden removal of HAMAS leadership
structure in those areas.

41.  Salah further related that Abu Marzook instructed that
due to the mass deportation by the Israeli government, it was
necessary that Salah go to Israel to assist in reorganizing and
restaffing the military cells in Hebron, Ramallah, Nablus,
Bethlehem, Jericho and Jerusalem.  Salah also stated that Abu

---

[7] Among these precipitating incidents was the murder of
Israeli soldier Yuval Tutanji in which Musa Dudin assisted, and
which was undertaken by the Hebron military cell of HAMAS that
was supported with weapons and money provided by Al-Arouri with
funds he received from Salah in September of 1992.  See ¶ 18.

Marzook instructed him to distribute $790,000 to HAMAS cells in support of HAMAS-sponsored military (or terrorist) activities. According to Salah, Abu Marzook directed that Salah allocate the funds as follows: $100,000 to Ramallah; $130,000 to Nablus; $100,000 to Hebron; $300,000 to Gaza (specifically for military activity there); with the remainder to be distributed according to military and general requirements that would be determined following Salah's arrival and assessment of HAMAS organizational needs in Israel and the occupied territories.[8]

42. Salah told Israeli authorities that Abu Marzook also identified by name specific contacts and operatives with whom Salah was to meet to gather further information and make assessments regarding HAMAS' situation following the mass deportations and resulting leadership vacuum. Additionally, Abu Marzook provided Salah with the names of specific individuals who were to be placed into leadership positions in various mosques and units to replace those who had been deported.

43. In response to Abu Marzook's various directives, Salah made arrangements for air travel from the United States to sites in the Middle East for himself and other HAMAS operatives. The air travel was booked through Ghada Sharif. Sharif was Salah's regular travel agent for such purposes, having previously booked the airline reservations for Salah to fly to Israel to conduct HAMAS business in August and September of 1992, as well as those

---

[8] Salah indicated to Israeli authorities that the final designated distribution provided for the remaining $160,000 to be distributed to Nablus.

of HAMAS operatives Alwan Shareef and Razick Saleh Abdel Razick
to fly to Syria in September 1992 for HAMAS military training.

44.  Immediately following the organizational crisis
initiated by the December 17, 1992 deportations, and the
communications between Abu Marzook and Salah, Zaki Hameed and
Amer Haleem of QLI separately made contact with Golden Marble
President Tamar Al-Rafai to pressure him to liquidate the
Woodridge property because, they claimed, the Saudi funds tied up
in the property were needed immediately.  According to Al-Rafai,
beginning in mid-December of 1992, Zaki Hameed repeatedly
contacted him and pressured him (and Golden Marble) to tender the
money for the purchase of the Woodridge property from QLI.  In
these communications, Zaki Hameed repeatedly told Al-Rafai that
the money was needed immediately for "a mission above all else."
QLI Secretary and Trustee Amer Haleem also contacted Al-Rafai
during the same period and similarly told him to do whatever was
necessary to liquidate the Woodridge property and get the money
to QLI.  Al-Rafai could not do so because, at the time, Golden
Marble lacked the financial resources to take immediate action.
Additionally, according to Al-Rafai, the Lease and Sale agreement
with QLI did not contractually obligate Golden Marble to purchase
the property for another seven months.

45.  Bank records reviewed by the FBI reveal that shortly
after these events, close associates of Abu Marzook initiated a
series of wire transfers into Salah's La Salle Bank account
totaling $985,000.

46. According to Salah, he provided Abu Marzook with the account number to the LaSalle Talman Savings checking account he held with his wife so that Abu Marzook could wire him the funds to be distributed to HAMAS operatives in the Middle East.

47. Bank records reviewed by the FBI reflect that on December 29, 1992, Ismail Selim Elbarasse ("Elbarasse"), who, according to Salah is a HAMAS operative in the United States, wire transferred $300,000.00 to Salah's LaSalle Bank account. The Elbarasse wire originated from an account at the First American Bank of McLean, Virginia, which Elbarasse jointly held with Abu Marzook.[9]

48. In the days just prior to this wire transfer there was a substantial influx of money principally from international sources into the First American Bank of Virginia account jointly held by Elbarasse and Abu Marzook. On December 23, 1992, $99,985 was wire transferred into the account by an individual named Gazi Abu Camah from an as yet unspecified source. It was followed with a December 23, 1992 wire transfer of $200,000 from Faisal Finarcial of Geneva, Switzerland,[10] and a December 29, 1992 wire

---

[9] A review of bank records indicates that the account was the same one from which Abu Marzook had drawn from in executing a $5,000 check to Salah on August 8, 1992 that is discussed in footnote 2. It is also the same account from which Abu Marzook wrote a November 27, 1992 check to Salah in the amount of $2,110 (which Abu Marzook also acknowledged in his extradition proceedings).

[10] This is the same entity that transmitted a total of $107,000 directly into Salah's subject First Chicago account through a series of three substantial wire transfers from Geneva Switzerland between March and October of 1992. See ¶ 31.

transfer of $73,475.77 from Dubai, United Arab Emirates.

49. Bank records indicate that in early January of 1993, Salah withdrew a significant portion of the $300,000.00 placed into his account by Elbarasse. Specifically, bank records reviewed by the FBI show that on January 7, 1993, just days prior to flying to Jerusalem on January 13, 1993, Salah wrote a check for $3,000 to Amer Haleem of QLI [11] They also show that on January 12, 1993, the day before his departure, Salah withdrew an additional $2,000 in cash from his account. The largest withdrawal, of $200,000, was directed by Salah from Israel.

50. Salah has related to Israeli authorities that he arrived in Jerusalem on January 14, 1993 for the purpose of meeting other HAMAS operatives to coordinate, among other things, a terrorist attack against Israeli. Salah further related that on January 19, 1993, subsequent to his initial round of meetings with various HAMAS operatives, some of whom Salah met with pursuant to Abu Marzook's instructions, he placed an international call from Israel to his wife Azita in Chicago and instructed her to wire $200,000.00 from their joint LaSalle Bank account to First Chicago Bank of Ravenswood account number 678006002654-4 held in the name of Rihbe Abdel Rahman. According to Salah, Rahman was an unlicensed money changer. Bank records reviewed by the FBI indicate that Azita Salah carried out her

---

[11] Bank records reviewed by the FBI also reveal that on January 12, 1993, the day before Salah left Chicago for the Middle East Zaki Hameed of QLI executed check for $1,040 to Salah's travel agent, Ghada Sharif.

husband's instructions on the same day. According to Salah the $200,000.00 was then transferred from the Abdel Rahman account to the Middle East.

51. According to bank records reviewed by the FBI, the successful transfer of the $200,000.00 on January 20, 1993 was closely followed by a succession of large wire transfers from HAMAS-related sources into Mohammad and Azita's LaSalle Bank account. Records from the Salahs' LaSalle Bank account and the First American account of Elbarasse and Abu Marzook show that on January 20, 1993, Elbarasse wire transferred $135,000 into the Salahs' La Salle Bank account, and followed it with another wire transfer of $300,000 on January 25, 1993.

52. Bank records for the First American Bank of Virginia account held jointly by Abu Marzook and Elbarasse show a further influx of overseas money just prior to this second round of wire transfers to the Salahs' LaSalle Bank account. On January 4, 1993, a second $99,985 wire transfer was received into the First American account from an individual named Gazi Abu Samah. On January 22, 1993, the First American account was credited another $665,000 from a wire transfer from Faisal Financial of Geneva Switzerland.

53. FBI review of bank records also show that during the same period, Nasser Al-Khatib (Al-Khatib"), a United States-based supporter and financial backer of HAMAS and close associate of Abu Marzook, wire transferred additional funds into Salah-controlled accounts in Chicago. In an interview with the FBI in

26

March of 1994, Al-Khatib acknowledged being a supporter of HAMAS, and that he donated money to HAMAS causes. Al-Khatib further related that prior to leaving the United States in June of 1993, he was an employee of Abu Marzook, serving essentially as Abu Marzook's personal secretary. In that capacity, Al-Khatib, explained, he had access to and was a signatory to some of Abu Marzook's financial accounts, and that he had made financial transactions on Abu Marzook's behalf.[12]

54. A review of bank records reveals that on January 21, 1993, Al-Khatib wired $50,000 into Salah's La Salle Bank account. On the same day, he wired an additional $30,000 into Standard Bank & Trust account number 2393288006-2 held jointly by Salah and his wife. Standard Trust Bank records reflect that the wire from Al-Khatib was credited in Azita Salah's name. Al-Khatib followed with a $170,000 wire transfer on January 22, 1993 into the Salah's Standard Trust Bank account number 239328006-2.

55. On January 25, 1993, Salah was arrested by Israeli military authorities. At the time of his arrest, he was found in possession of $97,400. Salah also was in possession of extensive notes he had compiled from his meetings with over 40 HAMAS operatives and contacts in Israel and the occupied territories over the preceding 11 days.

---

[12]Al-Khatib had previously written a check to Salah on August 21, 1992, immediately prior to Salah's trip to Israel during which he gave money to Salah Al-Arouri for the purchase of arms for HAMAS military operations See ¶¶ 15-20. Bank records indicate that the check was deposited by Salah into the subject LaSalle Bank account that he jointly held with his wife, Azita.

## THE REMAINING MONEY TRAIL

56. Bank records show that on January 29, 1993 four days after Mohammad Salah's arrest by the Israelis, an unidentified individual attempted to cash a check for $299,950, made payable to Nasser Al-Khatib, purportedly executed by Salah and drawn from the LaSalle Talman account he held jointly with his wife. LaSalle Talman declined to clear the check when the unidentified individual attempted to cash it. A cursory examination of a copy of the check obtained from LaSalle Talman bank records indicates that it was executed in handwriting that substantially differed from Mohammad Salah's handwriting appearing in checks and drafts known to have been executed by Salah.

57. Bank records reviewed by the FBI further show that of the $985,000 wire transferred into Salah's account in Between December 29, 1992 and January 25, 1993, $723,541.18 was transferred out through the following transactions. On February 1, 1993, Azita Salah withdrew $723,541.18 from the Salahs' two accounts and deposited $717,041.18 into a new savings account, Standard Bank & Trust Account No. 56002850-0. Bank records for the account show that Azita Salah then began to draw substantial amounts of money

58. Standard Bank & Trust bank records for the account show the following withdrawal activity on April 2, 1993, $4,500.00 was withdrawn from the account. On April 2, 1993, Azita Salah signed a lease for Standard Bank & Trust safe deposit box No. 207. That is the only day of any logged transactions for the box.

59. Bank records further reflect that on April 6, 1993, Azita Salah transferred $97,067.93 from the account to pay the outstanding balance of the Salahs' mortgage on their 9229 S. Thomas, Bridgeview, Illinois residence.

60. In a subsequent interview with the FBI, Azita Salah, accompanied by counsel, stated that she believed the money placed into the joint LaSalle Bank and Standard Bank & Trust accounts she held with her husband was intended for distribution by her husband to charitable organizations overseas. However, Azita Salah stated that she decided to keep the money herself after her husband was arrested in Israel. Azita Salah further stated that she transferred the money into a new account because she feared the United States Government might attempt to take it.

61. On February 10, 1995, the Office of Foreign Asset Control, U.S. Department of Treasury, having reason to believe that Mohammad Salah acted on behalf of an organization (HAMAS) designated by U.S. President William J. Clinton, in Executive Order 12947, as a terrorist organization threatening to disrupt the Middle East Peace Process, ordered the freeze of all of Mohammad and Azita Salah's known bank accounts containing $372,572.39.

62. Among the accounts frozen by the order was Azita Salah's Standard Bank & Trust savings account number 56002850-0 which she had opened on February 1, 1993 with $717,041.18 in funds internationally wire transferred to Mohammad Salah for HAMAS purposes. Standard Bank & Trust personnel informed the FBI

29

that after the account was frozen, Standard Bank & Trust transferred the funds in the account into a new account, Standard Bank & Trust Account No. 560249500-3.  On March 31, 1995, those funds, totaling $233,973.00, were in turn, transferred to a Standard Bank & Trust certificate of deposit account, which has been periodically renewed every six months, the remainder of which presently is held in Standard Bank & Trust Account No. 5580349268.  Since the transfer to a certificate of deposit account, the Office of Foreign Asset Control has, on a monthly basis, licensed withdrawal of a living stipend from the certificate of deposit account to Azita Salah.  On a monthly basis Azita Salah has deposited the living stipend into Standard Bank & Trust Account No. 239328806 for subsequent use.

63.  Bank records show that on July 9, 1993, a certified check debited from Golden Marble's Account Number 60609146 (at the Midland Federal Savings & Loan Association) was drawn and made payable to the QLI in the amount of $169,000.[13]  On September 24, 1993, that check was deposited into the QLI Building Fund Account, #0010930021133, at the Midland Federal Savings & Loan Assoc.  As of December, 1997, the $169,000 plus interest of approximately $25,000 was in the account.  According to bank records, the $169,000 deposit is the only transaction to have taken place in this account.

64.  One June 30, 1994, the Woodridge property was sold, by

---

[13] According to Tamer Al-Rafai, the $169,000 check was payment for a one year lease extension on the Woodridge property negotiated between QLI and Golden Marble.

the QLI, for $1,050,000. The net proceeds of $988,500 were deposited directly into the QLI General Fund Account #12310153 at the First National Bank of Chicago. Since the deposit of the land sale proceeds, the account has been maintained with a balance at all times in excess of $820,000, the amount that was initially transmitted by Saudi corporation Kadi International in July of 1991 for the purchase of the Woodridge site. At present, the account, which is merely a simple interest bearing checking account, has a balance of approximately $876,300.54

65. A review of bank records reveals that since the deposit of the land sale proceeds into the QLI General Fund Account, QLI has only intermittently transacted business from the account.

66. One of the transactions made from the account was the execution of a check dated October 21, 1996, by QLI Treasure Abraham Abusharif, in the amount of $25,112.40 and made payable to Hawkinson Ford Co. 6100 West 95th Street, Oak Lawn, Illinois, for the purchase outright of a 1997 Ford Club Wagon XLT, VIN: 1FBJS31LXVHA40608. On May 22, 1997, QLI returned the vehicle to Hawkinson Ford due to mechanical problems covered under warranty, and was given a replacement vehicle, a grey 1997 Ford Van E35, VIN: 1FBJS31L3VHB70844, which QLI currently owns and possesses.

67. Shortly after Mohammad Salah's return to the Chicago area after having served his Israeli-imposed prison term for his involvement with HAMAS, QLI transferred money from the General Fund Account. Specifically, on February 2, 1998, $50,000 was withdrawn from the account and transferred into First National

Bank of Evergreen Park Account No. 1412446, held in the name of The Quranic Literacy Institute, which was opened by Zaki Hammed and Abusharif.

## CONCLUSION

68.  Based on the preceding information, there is sufficient probable cause to believe that the QLI funds in First National Bank of Chicago account number 12310153, QLI funds in First National Bank of Evergreen Park account number 1412446, and One 1997 E35 Ford Van, VIN: 1FBJS31L3VHB70844, are funds involved in financial transactions or property traceable to transactions in violation of the Money Laundering Statute, 18 U.S.C. § 1956. These assets were derived from an $820,000 wire transfer from Yassin Kadi in Saudi Arabia to Golden Marble, Inc., for the purchase of the Woodridge property, which was subsequently sold for $1,050,000 with the net proceeds of $988,500 deposited into the subject account.  The illegally transferred funds also were used to generate income (in the form of rent and sales profits) to facilitate the activities of Mohammad Salah and others in the HAMAS conspiracy involving past and continuing violent terrorist attacks, including the extortion, kidnaping and murder of and against the citizens and government of the State of Israel, in furtherance of HAMAS' publicly declared goals of undermining the Israeli-Palestinian peace process, and forcing the State and citizens of Israel to cede physical and political control and dominion over the lands comprising Israel and the occupied territories.

32

The foregoing defendant funds and vehicle also represent the proceeds of monetary transactions in excess of $10,000 with the illegally transferred funds, in violation of 18 U.S.C. § 1957, thereby rendering the defendant funds and vehicle forfeitable pursuant to 18 U.S.C. § 981.

69.  Based on the preceding information, there is probable cause to believe that the QLI-held funds in Midland Federal Savings & Loan account number 001093002113 are funds involved in or traceable to financial transactions in violation of the Money Laundering Statute, 18, U.S.C., § 1956(a)(2), and are therefore subject to civil forfeiture pursuant to Title 18, U.S.C. § 981(a)(1)(A). The subject funds are rents collected by QLI from Golden Marble pursuant to the terms of the Lease and Sales Agreement for the Woodridge property. As such these funds were derived from the $820,000 wire illegally transferred from Saudi Arabia by Yassin Kadi of Kadi International with the intent of generating income for the use of Mohammad Salah and others in the HAMAS conspiracy involving past and continuing violent terrorist attacks, including the extortion, kidnaping and murder of and against the citizens and government of the State of Israel, in furtherance of HAMAS' publicly declared goals of undermining the Israeli-Palestinian peace process and forcing the State and citizens of Israel to cede physical and political control and dominion over the lands comprising Israel and the occupied territories.

Additionally,  the foregoing defendant funds also represent

33

the proceeds of monetary transactions in excess of $10,000 with the illegally transferred funds, in violation of 18 U.S.C. § 1957, thereby rendering the defendant funds and vehicle forfeitable pursuant to 18 U.S.C. § 981.

70.  The funds in the Salahs' bank accounts--Standard Bank & Trust Account Number 5580349268 and Account Number 239328806; LaSalle Bank, F.S.B. Account Number 022034532; First National Bank of Chicago Account Number 8060700, (each of which is currently frozen pursuant to order of the Office of Foreign Asset Control, U.S. Department of Treasury, as authorized under Executive Order 12947 and based on reason to believe that Mohammad Salah acted on behalf of and in concert with the HAMAS terrorist organization); Standard Bank & Trust Safe Deposit Box Number 207; and Standard Bank & Trust Safe Deposit Box Number 4019, were involved in financial transactions in violation of the Money Laundering Statute, 18 U.S.C. § 1956(a)(2).  The subject funds are moneys transferred, or traceable to moneys transferred from outside the United States, into the United States, with the intent of supporting HAMAS in the commission of specified unlawful activity, involving extortion, kidnaping and murder of and against the citizens and government of the State of Israel, in furtherance of HAMAS' publicly declared goals of undermining the Israeli-Palestinian peace process and forcing the State and citizens of Israel to cede physical and political control and dominion over the lands comprising Israel and the occupied territories.  The subject funds are therefore subject to civil

forfeiture-pursuant to 18 U.S.C. § 981(a)(1)(A). The subject funds were deposited via wire transfers from Ismail Selim Elbarasse & Abu Marzook's joint bank account in McLean, Virginia, and from Nasser Al-Khatib, which, in turn, had been deposited via wire transfers from Geneva, Switzerland and Dubai, U.A.E. No other legitimate source of income has been determined to exist for either Mohammad or Azita Salah to account for their possession of these funds.

71. There is probable cause to believe that the real property commonly referred to as 9229 S. Thomas, Bridgeview, Illinois with the legal description:

> Lot 5 in Mosque Foundation and Center Area, Subdivision of part of the Southeast quarter of Section 1, Township 37 North, Range 12, East of the Third Principal Meridian, in Cook County, Illinois. PIN 23-01-404-012.

was acquired through, and constitutes the proceeds of bank fraud in violation of 18 U.S.C. § 1014, and therefore is forfeitable pursuant to 18, U.S.C. § 981(a)(1)(C). The subject property, (which is currently frozen pursuant to order of the Office of Foreign Asset Control, U.S. Department of Treasury, as authorized under Executive Order 12947 and based on reason to believe that Mohammad Salah acted on behalf of and in concert with the HAMAS terrorist organization), was acquired by the Salahs through a residential mortgage loan obtained from Standard Bank & Trust of Evergreen Park, Illinois based upon false information provided to the bank by Mohammad Salah in the form of false claims regarding his employment relationship with QLI and falsified federal tax

35

returns.

Additionally, the mortgage loan was paid with funds transferred into the United States from abroad with the intention that they be used to support HAMAS domestic and international terrorist activities, including the extortion, kidnaping and murder of and against the citizens and government of the State of Israel in furtherance of HAMAS' publicly declared goals of undermining the Israeli-Palestinian peace process, and forcing the State and citizens of Israel to cede physical and political control and dominion over the lands comprising Israel and the occupied territories, thus rendering the house property traceable to moneys transferred in violation of the money laundering statute, 18 U.S.C. § 1956(a)(2), and therefore forfeitable pursuant to 18 U.S.C. § 981. Additionally, the purchase of the property constitutes a monetary transaction valued in excess of $10,000 with proceeds of a violation of 18 U.S.C. § 1956(a)(2), in violation of 18 U.S.C. § 1957, thereby rendering the property

forfeitable pursuant to 18 U.S.C. § 981.

*Robert H. Wright*

Special Agent Robert Wright
Federal Bureau of Investigation

SUBSCRIBED and SWORN to before me
this 8th day of June 1998.

*Cynthia A. Meinke*

Notary Public

"OFFICIAL SEAL"
Cynthia A. Meinke
Notary Public, State of Illinois
My Commission Exp. 04/30/2000

37

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

# Civil Cover Sheet

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Northern District of Illinois.

**Defendant(s): Quranic Literacy Institute, Holy Land Foundation for Relief and Development, Islamic Association for Palestine (a/k/a/ American Muslim Society), American Middle Eastern League for Palestine, United Association for Studies and Research, Mohammed Abdul Hamid Khalil Salah (a/k/a Abu Ahmed), Mousa Mohammed Abu Marzook (a/k/a/ Abu Omar Musa), Amjad Hinawi, Estate of Khalil Tawfiq al-Sharif, and John Does 1-99**

**Plaintiff(s): Stanley Boim, Individually and as Administrator of the Estate of David Boim, deceased, and Joyce Boim**

County of Residence: Israel

County of Residence: Cook County, IL; Dallas County et al.

Plaintiff's Atty: Shelly B. Kulwin
Kulwin & Associates
161 North Clark Street, Suite 2500 Chicago, IL 60601
(312) 641-0300

Defendant's Atty:

**II. Basis of Jurisdiction:**     **3. Federal Question (U.S. not a party)**

**III. Citizenship of Principle Parties (Diversity Cases Only)**
        Plaintiff: - **N/A**
        Defendant: - **N/A**

JUDGE KENNELLY

DOCKETED
MAY 1 5 2000    MAGISTRATE JUDGE KEYS

**IV. Origin :**            **1. Original Proceeding**

**V. Nature of Suit:**       **890 Other Statutory Actions**

**VI.Cause of Action:**     **Claim for compensatory and punitive damages resulting from acts of international terrorism committed by the defendants, pursuant to the civil remedies provision of the Antiterrorism Act of 1990, as amended, 18 U.S.C. 2333.**

**VII. Requested in Complaint**
      Class Action: **No**
      Dollar Demand: **Compensatory damages of $100 million and punitive damages of $100 million, with trebling of damages, plus costs and attorneys fees. In addition, plaintiffs request special relief in the form of a lien on $1.4 million of the defendants' assets presently in the registry of the court.**
      Jury Demand: **Yes**



VIII. This case **Is NOT** a refiling of a previously dismissed case. (If yes case number __ by Judge __)

Signature:

Date:        5·1)·00

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, print this form, sign and date it and submit it with your new civil action. **Note: You may need to adjust the font size in your browser display to make the form print properly.**

**Revised: 04/27/99.**



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

In the Matter of    STANLEY BOIM, et al. v. QURANIC LITERACY INSTITUTE, et al.

**Case Number:**

**00C 2905**

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

*FILED-EDS*
*00 MAY 12  PM 1: 28*
*CLERK COURT*
*U.S. DISTRICT COURT*

Stanley Boim,  Joyce Boim

JUDGE KENNELLY

MAGISTRATE JUDGE KEYS

| (A) | (B) |
|---|---|
| SIGNATURE *Nchl L* | SIGNATURE |
| NAME Nathan Lewin | NAME |
| FIRM MILLER CASSIDY Larroca & Lewin, LLP | FIRM |
| STREET ADDRESS 2555 M. Street, N.W. | STREET ADDRESS |
| CITY/STATE/ZIP Washington D. C. 20037-1302 | CITY/STATE/ZIP |
| TELEPHONE NUMBER 202/293-6400 | TELEPHONE NUMBER |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR?   YES ☐   NO ☒ | MEMBER OF TRIAL BAR?   YES ☐   NO ☐ |
| TRIAL ATTORNEY?   YES ☒   NO ☐ | TRIAL ATTORNEY?   YES ☐   NO ☐ |
|  | DESIGNATED AS LOCAL COUNSEL?   YES ☐   NO ☐ |

| (C) | (D) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME Shelly B. Kulwin | NAME |
| FIRM KULWIN & ASSOCIATES | FIRM |
| STREET ADDRESS 161 N. Clark St., Ste. 2500 | STREET ADDRESS |
| CITY/STATE/ZIP Chicago, IL  60601 | CITY/STATE/ZIP |
| TELEPHONE NUMBER 312/641-0300 | TELEPHONE NUMBER |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 03125344 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR?   YES ☒   NO ☐ | MEMBER OF TRIAL BAR?   YES ☐   NO ☐ |
| TRIAL ATTORNEY?   YES ☐   NO ☒ | TRIAL ATTORNEY?   YES ☐   NO ☐ |
| DESIGNATED AS LOCAL COUNSEL?   YES ☒   NO ☐ | DESIGNATED AS LOCAL COUNSEL?   YES ☐   NO ☐ |

*DOCKETED*
*MAY 15 2000*

PLEASE COMPLETE IN ACCORDANCE WITH INSTRUCTIONS ON REVERSE.

# EXHIBIT
# H

# NewsRoom

5/15/00 Chi. Trib. 1
2000 WLNR 8318499

### CHICAGO TRIBUNE
Copyright © 2000 Chicago Tribune Company

May 15, 2000

Section: Metro Chicago

PARENTS OF BOY SLAIN IN ISRAEL FILE SUIT
BRIDGEVIEW MAN'S ALLEGED TERRORIST TIES CITED

Matt O'Connor, Tribune Staff Writer.

The parents of a 17-year-old boy who was killed in 1996 in Israel in an alleged attack by Hamas terrorists have filed a $201 million federal lawsuit in Chicago against what they label Hamas-front organizations in the United States that allegedly financed the attack.

Among the defendants is Mohammad Salah, a naturalized U.S. citizen who lives in suburban Bridgeview and is accused in a pending Justice Department lawsuit of financing terrorist activities by Hamas, the militant Islamic group.

Stanley and Joyce **Boim**, whose son David, a student in Israel, was gunned down as he stood at a bus stop in the West Bank, brought the unusual legal action under the federal Antiterrorism Act.

The parents were legal residents of New York at the time of the slaying and now live in Jerusalem.

The lawsuit, filed Friday in U.S. District Court here, seeks multimillion-dollar damages from Salah as well as the Quranic Literacy Institute, based in Oak Lawn, and several other Islamic and Muslim groups around the country.

The Quranic Literacy Institute was also named in the Justice Department suit, filed in 1998 in federal court in Chicago.

Lawyers for the institute have said in the past that it translates and publishes sacred Islamic texts and other scholarly research.

But the **Boims'** lawsuit as well as the Justice Department's alleges that the Quranic Literacy Institute raises and launders money for Hamas.

Salah was in prison in Israel at the time of **Boim's** slaying after pleading guilty to a charge of illegally channeling funds to the Hamas organization. He was freed in late 1997 and returned to the Chicago area after serving nearly five years.

In an interview in 1998, Salah denied ever supporting Hamas and said he was tortured into confessing to the charges in Israel.

Neither Salah nor the Quranic Literacy Institute has been criminally charged with wrongdoing, though it has been an open secret in courtroom discussions in the Justice Department lawsuit that a federal grand jury has been investigating whether they have financially supported Hamas terrorist activities.

Attorneys for Salah and the Quranic Literacy Institute could not be reached for comment on the allegations in the **Boims'** lawsuit.

The lawsuit alleges that Hamas seeks to undermine the Middle East peace process through violent attacks against civilians. The suit accuses Salah of organizing military fundraising in the U.S. for Hamas.

The FBI has alleged that Salah used the Quranic Literacy Institute to channel hundreds of thousands of dollars to Hamas operatives outside the United States between 1991 and 1993.

According to the **Boims'** lawsuit, Hamas operatives in the West Bank used money wired from the United States to buy weapons and carry out terrorist attacks, including the one on their son.

According to the suit, two known members of Hamas' military wing were arrested by Palestinian authorities for **Boim's** slaying. One was released and died in a 1997 suicide bombing that killed five civilians in Jerusalem, according to the suit. The other suspect was convicted of taking part in the slaying and was sentenced in 1998 to 10 years of hard labor in prison.

In addition to seeking $200 million in damages, the parents want to lay claim to $1.4 million in cash and property seized by federal authorities from Salah and the Quranic Literacy Institute in 1998.

Copyright © 2000 **Chicago Tribune** Company

---- Index References ----

News Subject: (Legal (1LE33); Judicial (1JU36); International Terrorism (1IN37))

Region: (Middle East (1MI23); USA (1US73); Americas (1AM92); Illinois (1IL01); Palestine (1PA37); North America (1NO39); Arab States (1AR46); Israel (1IS16); Mediterranean (1ME20))

Language: EN

Other Indexing: (FBI; FEDERAL ANTITERRORISM ACT; HAMAS; JUSTICE DEPARTMENT; QURANIC LITERACY INSTITUTE; US DISTRICT COURT; WEST BANK) (Boim; Boims; BOY SLAIN; Bridgeview; David; Mohammad Salah; Salah; Stanley and Joyce Boim)

Keywords: ISRAEL; TERRORISM; CHICAGO; SUBURB; LAWSUIT; DEATH; MURDER; FAMILY PARENT; GROUP

Edition: Chicago Sports Final

Word Count: 674

End of Document                          © 2017 Thomson Reuters. No claim to original U.S. Government Works.

# **News**Room

# **News**Room

5/13/00 Dallas Morning News 29A
2000 WLNR 9419606

Dallas Morning News
Copyright © 2000 2001 The Dallas Morning News

May 13, 2000

Section: NEWS

Suit accuses Islamic groups of aiding in terrorist attack: Area organizations have denied ties to Hamas

Steve McGonigleStaff Writer of The Dallas Morning News

Staff Writer of The Dallas Morning News

Two Richardson-based Islamic organizations were accused in a $200 million lawsuit filed Friday of helping the militant Hamas movement carry out a 1996 terrorist attack that killed an Israeli-American seminary student on the West Bank.

Holy Land Foundation for Relief and Development and the **Islamic Association for Palestine** are among six groups and four individuals that David **Boim's** parents seek to hold financially liable for his death. They allege that the organizations are Hamas front groups and that the individuals are Hamas leaders or activists.

"These organizations' purportedly humanitarian functions mask their core mission of raising and funneling money and other resources to Hamas operatives in support of their terrorist campaign," said the lawsuit, which was filed in federal district court in Chicago.

Holy Land Foundation is a charity that says it raises $5 million a year for needy people, mostly in Gaza and the West Bank. The **Islamic Association for Palestine** describes itself as an educational organization that holds conferences and publishes newspapers in English and Arabic.

The two groups have repeatedly denied ties to Hamas. John Bryant, an attorney for Holy Land Foundation, said his client had not been served with a copy of the lawsuit and was not aware of its allegations.

"I don't know anything about it, and it's hard to comment without knowing anything about it," said Mr. Bryant, a former U.S. representative from Dallas.

The federal lawsuit is the latest in a series of legal attempts by American citizens to recover damages from organizations accused of foreign terrorism or their reputed backers. Some suits have produced large judgments, but collecting has been difficult.

"These are people and organizations that, according to the United States, their investigation, and according to information we have, have been sending money over to Hamas to finance exactly the conduct that killed David **Boim**," said Nathan Lewin, a Washington, D.C., attorney for the **Boim** family. "For that reason, we think these organizations should be forced to pay for the death of David **Boim**."

Mr. **Boim**, a 17-year-old New York native who emigrated to Israel with his family in 1985, was mortally wounded in a drive-by shooting that occurred while he was waiting for a ride at the entrance to Beit El, a Jewish settlement near Ramallah where he was attending a religious high school.

The two young Palestinians accused of carrying out the attack were identified by Israeli authorities as members of Izzedine Al Qassam, the military wing of Hamas. One man pleaded guilty and was sent to a Palestinian Authority prison; the second man died in a 1997 suicide bombing in Jerusalem.

Joyce and Stanley **Boim**, parents of the slain teen, have conducted a lengthy campaign in Israel and the United States to force the Palestinian Authority to extradite the surviving attacker to stand trial in the United States.

The **Boims**, who live in a suburb of Jerusalem, could not be reached for comment Friday.

Their lawsuit stated that it was related to an unusual asset forfeiture case filed in 1998 by the U.S. attorney's office in Chicago against a suburban car broker and an Islamic religious institute.

In that case, prosecutors are seeking to confiscate more than $1 million in cash and property that they contend are the proceeds of an elaborate money-laundering scheme to benefit Hamas.

Two of the defendants in the U.S. attorney's lawsuit, Mohammed Salah and the Quranic Literacy Institute, also are accused by the **Boims** of being responsible for their son's death.

The **Boims'** suit also seeks any funds the government confiscates from Mr. Salah and the literacy institute.

Mr. Salah, a founding member of a mosque in Bridgeview, Ill., spent five years in an Israeli prison after admitting that he distributed money to Hamas military operatives in the West Bank. He also gave his interrogators detailed statements about Hamas operations in the United States.

Mr. Salah, who now works out of the Hamas political bureau in Damascus, Syria, has renounced his statements to Israeli investigators as the product of torture.

Last month, Holy Land Foundation filed suit against The Dallas Morning News, its parent company, Belo Corp., and four reporters, alleging a campaign of defamation. Belo's executive vice president and general counsel, Michael J. McCarthy, denied the charge.

CORRECTIONS, CLARIFICATIONS: On Page 29A of Saturday's Metropolitan section, the head of the Hamas political bureau in Damascus, Syria, was incorrectly identified as Mohammed Salah. The actual head of the office is Mousa Abu Marzook. (Ran: Tuesday, May 16, 2000)

Copyright © 2000 2001 The Dallas Morning News

---- Index References ----

Company: BELO CORP

News Subject: (Business Lawsuits & Settlements (1BU19); Business Litigation (1BU04); Legal (1LE33); International Terrorism (1IN37); Government Litigation (1GO18))

Suit accuses Islamic groups of aiding in terrorist attack: Area..., 2000 WLNR 9419606

Region: (Middle East (1MI23); USA (1US73); Americas (1AM92); Illinois (1IL01); Syria (1SY20); Palestine (1PA37); North America (1NO39); Arab States (1AR46); Israel (1IS16); Mediterranean (1ME20))

Language: EN

Other Indexing: (BELO; BELO CORP; CORRECTIONS; HAMAS; HOLY LAND FOUNDATION; ISLAMIC; ISLAMIC ASSOCIATION; **ISLAMIC ASSOCIATION FOR PALESTINE**; JEWISH; MOUSA ABU MARZOOK; PALESTINIAN AUTHORITY; QURANIC LITERACY INSTITUTE; WEST BANK) (Al Qassam; Beit El; Boim; Boims; Bryant; David Boim; John Bryant; Joyce and Stanley Boim; Michael J. McCarthy; Mohammed Salah; Nathan Lewin; Richardson; Salah)

Edition: THIRD

Word Count: 937

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

**News**Room

**News**Room

5/15/00 Seattle Times A2
2000 WLNR 1442861

Seattle Times (WA)
Copyright (c) 2000 Seattle Times Company, All Rights Reserved.

May 15, 2000

Section: NEWS

Slain American teen's parents sue Islamic charities as fronts

The Associated Press

CR:The Associated Press

WASHINGTON - The parents of an American teenager slain on the West Bank have filed suit in a federal court in Chicago against Islamic groups and charities, claiming they raised money in the United States for Hamas, a radical Islamic group that has carried out dozens of suicide bombings against Israelis.

In an apparently unprecedented move, Stanley and Joyce **Boim**, former New Yorkers who now live in Jerusalem, invoked the federal anti-terrorism law of 1990 against what their suit described as Hamas-front organizations and individuals who collected funds in the U.S. for relief and development on the West Bank and in Gaza.

The **Boims** asked for $600 million in damages against "a network of front organizations" who collected money allegedly channeled to terrorists.

The suit claims some was used to pay for the vehicle, machine guns and ammunition used to kill the **Boims'** son David, a 17-year-old yeshiva student who was gunned down in 1996 waiting with other students at a bus stop in Beit El, on the West Bank.

Among the groups named as defendants were Quranic Literacy Institute, Holy Land Foundation for Relief and Development, and **Islamic Association for Palestine**.

---- Index References ----

News Subject: (International Terrorism (1IN37))

Region: (Middle East (1MI23); USA (1US73); Americas (1AM92); Palestine (1PA37); North America (1NO39); Arab States (1AR46))

Language: EN

Other Indexing: (HOLY LAND FOUNDATION FOR RELIEF AND DEVELOPMENT; ISLAMIC; **ISLAMIC ASSOCIATION FOR PALESTINE**; QURANIC LITERACY INSTITUTE; WEST BANK) (Boims; Joyce Boim; Stanley)

Edition: Final

Word Count: 244

---

**End of Document**                                   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

**News**Room

# EXHIBIT

# I

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| STANLEY BOIM, Individually and as Administrator of the Estate of David Boim, deceased, and JOYCE BOIM, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civil No. 00-cv-2905 |
| QURANIC LITERACY INSTITUTE, HOLY LAND FOUNDATION FOR RELIEF AND DEVELOPMENT, ISLAMIC ASSOCIATION FOR PALESTINE, AMERICAN MUSLIM SOCIETY, AMERICAN MIDDLE EASTERN LEAGUE FOR PALESTINE, UNITED ASSOCIATION FOR STUDIES AND RESEARCH, MOHAMMED ABDUL HAMID KHALIL SALAH, MOUSA MOHAMMED ABU MARZOOK, AMJAD HINAWI, and THE ESTATE OF KHALIL TAWFIQ AL-SHARIF, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

## MEMORANDUM IN SUPPORT OF MOTION FOR JOINDER OF NON-PARTIES PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 25(c)

It is well established that Federal Rule of Civil Procedure 25(c) may be used in a supplementary, post-judgment proceedings to assert alter-ego or successor liability against a non-party to a judgment and, ultimately, to enforce the judgment against the non-party if alter ego or successor status is established. *See, e.g., Panther Pumps & Equip. Co. v. Hydrocraft, Inc.*, 566 F.2d 8, 23 (7th Cir. 1977); *Rodriguez-Miranda v. Benin*, 829 F.3d 29, 43 (1st Cir. 2016). A proceeding to effectuate a Rule 25(c) joinder or substitution is initiated by filing a motion to join or substitute and providing notice of hearing to the parties. Fed. R. Civ. P. 25(a)(3)(c). This motion seeks to initiate such a proceeding and ultimately to enforce the unpaid portion of the

judgment entered in the above-captioned matter against two entities and three individuals who are alter egos and successors of the judgment debtors.

These are not ordinary judgment debtors, and this is not an ordinary commercial case. The defendants in this action were held liable in this Court under the civil remedies provisions of the Anti-Terrorist Act ("ATA"), 18 U.S.C. §2333, for providing material support to a foreign terrorist group that murdered David Boim, an American teenager. As discussed below—and as will be demonstrated at the hearing on this motion—the judgment debtors here and their individual leaders have deliberately created and hidden behind new legal entities, to obscure their identity and avoid paying the judgment—thereby nullifying the critical purposes of the ATA.

The plaintiffs, Stanley and Joyce Boim, originally filed the above-captioned action (the "*Boim* Action") under Section 2333 of the ATA after their son, David, was murdered by two agents of the international terrorist organization, Hamas. In 2004, this Court entered judgment (the "*Boim* Judgment") in the amount of $156 million in favor of the plaintiffs against certain individuals and organizations (the "*Boim* Defendants") who provided material support to Hamas. However, when time came to pay the *Boim* Judgment, two of the principal *Boim* Defendants claimed to be out of business with few assets. A third had its assets seized by the government after it, together with its leaders, was convicted of terrorist activities. As a result the Boims have recovered only a small percentage of the total amount of the *Boim* Judgment.

Seemingly, the *Boim* Action brought an end to the defendant organizations. But that was not the case. Prominent *Boim* Defendants are in business today through their successors and alter egos: American Muslims for Palestine ("AMP") and The Americans for Justice in Palestine Educational Foundation ("AJP"). AMP and AJP were established by former leaders of several *Boim* Defendant entities—including Rafeeq Jaber, Abdelbasset Hamayel and Osama Abu

2

Irshaid (together, the "Individual Defendants")—to continue the same enterprise, while avoiding the burden and stigma of the *Boim* Judgment. AMP and AJP continue to be run today by former leaders of the *Boim* Defendant entities; they are headquartered in the same neighborhood; they continue the same enterprise, mission and activities; and they appear to have received assets and funds from those entities. The Individual Defendants exercised control of the *Boim* entities in 1998, and they continue to act as leaders of AMP and AJP today. As alter egos and successors of *Boim* Defendants, AMP, AJP and the Individual Defendants are liable for the unpaid portion of the *Boim* Judgment.

Plaintiffs have initiated this supplementary enforcement proceeding in the *Boim* Action pursuant to 735 ILCS 5/2-1402 (applicable here under Fed. R. Civ. P. 69(a)) by serving citations to discover assets to AMP, AJP and the Individual Defendants. Pursuant to Rule 25(a)(3)(c), this motion seeks to commence Rule 25(c) proceedings to effectuate the joinder of AMP, AJP and the three Individual Defendants because they are alter egos and/or successors of the *Boim* Defendants. Plaintiffs request that the Court: (i) permit appropriate discovery in connection with these Rule 25(c) proceedings; (ii) set a hearing to determine following appropriate discovery whether AMP, AJP and the Individual Defendants are liable as alter-egos and/or successors of one or more of the *Boim* Defendants (or permit submission of evidence through an appropriate motion in the event that there are no material disputed issues of fact); (iii) join AMP, AJP and the Individual Defendants as judgment debtors if the Court determines that they are alter–egos and/or successors; and (iv) order that the *Boim* Judgment is jointly and severally enforceable against AMP, AJP and the Individual Defendants.

## BACKGROUND

### The Initial *Boim* Action and *Boim* Defendants

In 1996, Stanley and Joyce Boim's seventeen-year old son David was murdered by a

Hamas gunman while standing with classmates on their way to Jerusalem to attend a review class for their matriculation exams. The Boims filed suit in 2000 in this Court under the civil remedies provision of the ATA. The *Boim* Defendants were individuals and organizations in the United States who provided material support to Hamas in violation of 18 U.S.C. § 2339A, including, *inter alia*, the Holy Land Foundation for Relief and Development ("HLF"), the American Muslim Society ("AMS"), AMS's alter egos operating under the name Islamic Association for Palestine ("IAP"), and the United Association for Studies and Research ("UASR"). On November 10, 2004, this Court entered summary judgment in favor of the Boims, *Boim v. Quranic Literacy Institute*, 340 F. Supp. 2d 885 (N.D. Ill. 2004), and on December 8, 2004, the jury awarded damages of $52 million, which were trebled to $156 million pursuant to the ATA.

In both the trial and appellate courts, IAP, AMS and HLF claimed to be charitable and educational institutions promoting the welfare of Palestinians and educating the American public. The Court of Appeals for the Seventh Circuit, sitting *en banc*, rejected that assertion in a landmark ruling governing civil liability under the ATA, holding that a defendant who provides material support to a terrorist organization such as Hamas—even to its social or charitable wing—with knowledge that the organization engages in terrorism is, as a matter of law, a cause of the organization's terrorist activity. *Boim v. Holy Land Found.*, 549 F.3d 685, 698-99 (7th Cir. 2008) (*en banc*).

Final judgements were ultimately entered against, *inter alia*, *Boim* Defendants HLF, IAP, AMP and UASR. But as noted above, IAP and AMS claimed to be defunct and without funds; HLF and its principals were convicted and their funds seized. As a result, the Boims have only collected a small percentage of their $156 million judgment

4

**AMP and AJP Are Established as Alter Egos and/or Successors
to Continue the Business of the *Boim* Defendants**

At the hearing on this motion, plaintiffs will establish that AMP and AJP are alter egos and successors of the *Boim* Defendants. AMP was established in Palos Hills, Illinois in 2005—shortly after the *Boim* Judgment—by activists involved in IAP and a successor entity to HLF, KindHearts. During an investigation of KindHearts, individuals affiliated with KindHearts and IAP opened the national office for AMP in 2008 in Palos Hills, just down the street from the former offices of AMS and IAP. These purportedly new entities were created by, among others, the Individual Defendants—who had previously managed and controlled AMS and IAP. In 2009, AMP leaders established AJP as a tax-exempt organization run by former leaders of IAP, which acts as the financial supporter of AMP and receives donations on its behalf.

The current management and donors of AMP and AJP are substantially the same as the management and donors of their predecessors, HLF, IAP and AMS. For example, the Mosque Foundation in Bridgeview, Illinois—the charitable arm of the Bridgeview Mosque—is a significant supporter and funder of AMP and AJP just as it was for the *Boim* Defendants. The Mosque Foundation has a history of donating and directing money to terrorist organizations including Hamas and al-Qaeda. The Mosque Foundation's leader, Sheikh Jamal Said, regularly spoke at IAP events and has been a frequent speaker at AMP conferences and fundraisers. Leaders of AMP and AJP hold prominent positions in the Mosque Foundation and its affiliates.

Numerous other individuals who played important leadership roles in *Boim* Defendant entities have gone on to play key roles in AMP and AJP. The Individual Defendants were especially prominent, both in the predecessor *Boim* Defendant entities, and in AMP and AJP:

- Rafeeq Jaber, former president of AMS, IAP (Chicago), and IAP National, was an

organizer of AJP and prepares its tax forms.  He is President of the Board of Directors of the Bridgeview Mosque.  His business, Jaber Financial Services, is an AMP donor, and he signed a petition in 2015 as an AMP representative.

- Abdelbasset Hamayel is identified by AMP as its Executive Director.  He is AJP's registered agent and head of the Mosque Foundation Community Center.  Hamayel was the Director and Secretary General of IAP and the former Wisconsin and Illinois representative for KindHearts.

- Osama Abu Irshaid is an AMP board member and National Political Coordinator.  Irshaid was the editor of IAP's newspaper, *Al-Zaytounah*, operating from Washington, D.C.  According to Jaber, Irshaid was "from IAP National which is … Chicago [and] in charge of everything from A to Z in the paper, what comes on the paper and what goes into the paper."  Irshaid's salary was paid by AMS.  Irshaid has published a similar newspaper, *Al-Meezan,* from Virginia.  Among the regular features in *Al-Meezan* is an advertisement for a blog written from prison by Shukri abu Baker, the former President of HLF.

AMS could not and did not operate independently from Jaber, Hamayel and Irshaid.  The Individual Defendants were the heart of AMS and they directed and controlled AMS.  AMS was created and operated to carry out their agenda in accordance with their directives.

AMP and AJP have continued the *Boim* Defendants' activities and purposes.  For example, IAP held major annual conferences featuring prominent speakers identified with Hamas, including leaders and fighters from Gaza and the West Bank.  After AMS and IAP purportedly went out of business, beginning in 2006, the IAP Annual Conference became the AMP Annual Conference.  The target audience, content, management, speakers, and message,

have remained the same.  Speakers have included Rafeeq Jaber, Kifah Mustapha, Abdelbaset Hamayel, and Osama Abu Irshaid, each of which had been featured at prior IAP events.

In short, IAP, AMS and HLF were replaced by AMP and AJP to permit the same ongoing enterprise to continue free and clear of the burden of the *Boim* Judgment and the stigma of liability for aiding and abetting the murder of an American teenager.  AMP's establishment in 2005 coincided almost exactly with the *Boim* Judgment.  AMP and AJP *are* IAP, AMS and HLF but just by different names, and the Individual Defendants are alter egos of IAP, AMS and HLF—which they controlled in 1998 and whose mission and purpose they have continued through AMP and AJP.   AMP, AJP and the Individual Defendants are therefore liable for the *Boim* Judgment.

### Plaintiffs' Enforcement Proceeding and Declaratory Judgment Action

Plaintiffs are initiating supplementary enforcement proceedings in this action by serving citations to discover assets pursuant to 735 ILCS 5/2-1402(a) and Ill. S. Ct. R. 277(b) on AMP, AJP and the Individual Defendants.  Plaintiffs are bringing this motion within those enforcement proceedings.   As judgment creditors, plaintiffs may "obtain discovery from any person— including the judgment debtor—as provided in [the Federal Rules of Civil Procedure] or by the procedure of [Illinois]."  Fed. R. Civ. P. 69(b).

Plaintiffs are concurrently filing in this Court a separate declaratory judgment action (the "Declaratory Action") under a new caption, seeking (among other things) a declaration that AMP, AJP and the Individual Defendants are successors and/or alter egos of the *Boim* Defendants and are therefore liable for the *Boim* Judgment.  A copy of Plaintiffs' Complaint for Declaratory and Monetary Judgment, and Preliminary and Permanent Injunctive Relief is attached hereto as Exhibit A.  Because the Declaratory Action is related to the above-captioned action, Plaintiffs are concurrently moving under LR 40.4(c) to reassign the Declaratory Action so

that the actions can be managed and resolved in a single proceeding.[1]

## ARGUMENT

I.    **Plaintiffs Will Demonstrate that AMP, AJP and the Individual Defendants Are Alter Egos and/or Successors of Certain of the *Boim* Defendants.**

Plaintiffs will demonstrate at the hearing on this motion (or in appropriate briefs if material issues of fact are not disputed) that AMP, AJP and the Individual Defendants are liable for the unpaid portion of the *Boim* Judgment as alter egos and/or successors of one or more of the *Boim* Defendants who are judgment debtors in this matter. Both the alter ego and the successor liability doctrines are applicable in the international terrorism and not-for-profit contexts and provide bases for joinder of AMP, AJP and the Individual Defendants here.

Federal courts have broadly applied the alter ego doctrine to individuals and organizations that engage in or support terrorism. Recognizing that terrorist organizations differ from owned, for-profit entities, these courts have eschewed typical "factors" applied to alter ego and veil piercing claims in the for-profit context in favor of an analysis focused on the "the broader equitable principle" recognized in *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 629-630 (1983) ("*BPECE*"), under which "the doctrine of corporate entity, recognized generally and for most purposes, will not be regarded when to do so would work fraud or injustice" or when it is "interposed to defeat legislative policies." *Id*. This analysis looks at *dominion and control*—often in the framework of agency law—and whether an entity's independence is in form only. *Id*. at 629.

For example, in its appeal of its criminal conviction, *Boim* Defendant HLF claimed that it was error to have been represented at trial by the same counsel as its president, Shukri Abu

---

[1] The judges originally assigned to this case, District Court Judge George W. Lindberg and Magistrate Judge Arlander Keys, are no longer on the bench.

Baker. The Fifth Circuit sent the question back to the trial court for an evidentiary hearing, and the trial court concluded there was no space between Holy Land and its principals:

> The evidence clearly established that HLF could not and did not operate independently from Baker, Elashi and El-Mezain. Baker, Elashi and El-Mezain were the heart of HLF and they directed and controlled HLF throughout its lifetime. HLF was created and operated to carry out their agenda in accordance with their directives. Any independence was in form only. In such a situation the court may disregard the legal fiction of the corporate entity. The law recognizes there is no practical distinction between the acts of the individuals and the acts of the corporation in cases like this. Courts may also disregard the corporate existence when the corporate entity is used as a 'cloak for fraud or illegality or to work an injustice.'

*United States v. Holy Land Foundation*, No. 3:04-CR-0240-P, Dkt # 1447, page 15 (N.D. Tex. May 24, 2010) (attached as <u>Exhibit B</u>).

Courts have employed the same approach in civil damages cases. In *In re 650 Fifth Ave. & Related Props.*, 881 F. Supp. 2d 533, 548-552 (S.D.N.Y. 2012), the victims of a terrorist bombing of Marine Corps barracks in Beirut sought to enforce money judgments through a turn-over order against a New York property owned by entities alleged to be alter egos of the Iranian government. In examining the claim under the Foreign Sovereign Immunities Act, the court held that the entities were alter egos of Iran. Rather than looking to state law, *650 Fifth Avenue* relied on *BPECE* and examined *control* and whether the entities were in effect "agents" of the Iranian government. After finding that the defendant foundation's charitable giving was driven by Iran, the management of the building was overseen by Iran, and seized documents showed that the defendants could not act without authorization from Tehran, the court found that the defendants were "at least agents" and therefore alter egos.

Similarly, in In *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414 (E.D.N.Y. 2013), the court examined whether certain charities were alter egos of Hamas for purposes of the

plaintiffs' §2333(a) claims. The court adopted the "alias" standard set forth by the current Chief Justice of the United States Roberts in *Nat'l Council of Resistance of Iran v. Dep't of State*, 373 F.3d 152, 157–58 (D.C. Cir. 2004), that when "one entity so dominates and controls another that they must be considered principal and agent, it is appropriate, under AEDPA, to look past their separate and juridical identities and to treat them as aliases." *Strauss*, 925 F. Supp. 2d at 435. The court considered traditional veil-piercing factors—i.e. "whether the organizations share leadership, whether they commingle finances, publications, offices, etc., and whether one operates as a division of the other"—but ultimately rejected defendant's assertion that the plaintiffs must also satisfy these factors, holding "[w]hile these factors may be similar to the factors [used in this case], the court questions whether legitimate corporations are sufficiently analogous to terrorist groups such that every corporate veil piercing factor applies here." *Id.* at 435 n.14. Courts in numerous other cases have adopted the same approach. *See, e.g., Nat'l Council of Resistance of Iran*, 373 F.3d at 157–58; *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 432 (E.D.N.Y. 2009); *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542, 555 (E.D.N.Y. 2012); *Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 334 (E.D.N.Y. 2015).[2]

Federal courts have also extended the dominion-and-control concept to hold that *non-contemporaneous* entities are alter egos when they are managed or controlled by the same people and are in reality one enterprise. For instance, in *Sanchez v. Global Parking Management, Inc.*, No. 14–cv–04611, 2015 WL 4429024, at *1 (N.D. Ill. July 20, 2015), this Court held that common management between two seemingly separate successive companies was "relevant to

---

[2] Illinois state courts have similarly treated alter ego and "veil piercing" as equitable doctrines that can appropriately be extended to the not-for-profit context, even where the traditional for-profit factors do not fit. *See, e.g., Macaluso v. Jenkins*, 95 Ill. App. 3d 461, 465 (2d Dist. 1981) (organization's "status as a not for profit corporation in and of itself should not bar a court from applying the equitable remedy of piercing the corporate veil"); *see also Fontana v. TLD Builders, Inc.*, 362 Ill. App. 3d 491, 501 (2d Dist. 2005); *Buckley v. Abuzir*, 2014 IL App (1st) 130469, ¶ 31.

determine whether two seemingly independent businesses are really one enterprise" for purposes of alter ego liability for Fair Labor Standards Act violations. *Id.* at *3. Likewise, courts have commonly found alter ego liability in the ERISA context for successive employers where there is "substantially identical management" and identical "business purpose." *See, e.g., Laborers' Pension Fund v. Green Demolition Contractors, Inc.*, 2016 WL 74682, at *2 (N.D. Ill. Jan. 7, 2016) (quoting *Int'l Union of Operating Eng'rs, Local 150, AFL-CIO v. Rabine*, 161 F.3d 427, 433 (7th Cir. 1998)).

Likewise, courts have readily extended the "successor" liability paradigm to not-for-profit entities, even where they do not fit the standards usually applied in the for-profit, corporate context. *See, e.g., Chao v. Int'l Bhd. of Indus. Workers Health & Welfare Fund*, 97 F. Supp. 3d 268, 274 (E.D.N.Y. 2015) ("The Court notes that the standard governing successor liability in the corporate context, although not a perfect fit, is more appropriate for determining successor liability between two non-profit employee benefit trusts"); *Hankinson v. King*, 117 F. Supp. 3d 1068, 1074 (D. Minn. 2015) (courts have gone so far as to either (i) reinterpret the 'continuity of shareholders' requirement as a 'continuity of ownership' requirement because non-profits have no shareholders, or (ii) simply ignore this prong as inapplicable or irrelevant when considering this exception for non-profits); *Ring v. The Elizabeth Foundation for the Arts*, Index No. 113849/2011, 2014 WL 5908429, at *5 (N.Y. Sup. Nov. 12, 2014) ("court recognized that, because both entities were not-for-profits, they had no owners or shareholders. Therefore, it looked to other indicia of control instead of considering ownership, per se").

Thus, there is ample authority for extending alter ego and successor liability to the terrorism and not-for-profit context, even where traditional factors might not otherwise apply. As outlined above, Plaintiffs will demonstrate that the Individual Defendants exercised dominion

and control over one or more of the *Boim* Defendant entities and have continued to carry on the same enterprise in the wake of efforts to enforce the *Boim* Judgment. Likewise, Plaintiffs will show that AMP and AJP are simply reincarnations of *Boim* Defendants, created at the time of the *Boim* Judgment to continue the *Boim* Defendants' work without the burden of paying the *Boim* Judgment and to portray a new public face. This proof will be sufficient to demonstrate that AMP, AJP and the Individual Defendants are (1) alter egos and successors of *Boim* Defendants IAP, AMS and HLF, and (2) the same entity or person as these *Boim* Defendants and are liable to Plaintiffs under 18 U.S.C. § 2333(a) for the unpaid portion of the *Boim* Judgement.

## II.     Rule 25(c) Is a Proper Procedural Mechanism to Join Alter Egos and Successors in a Supplementary Enforcement Proceeding.

Rule of Civil Procedure 25(c) permits substitution or joinder of a transferee where "an interest" has been transferred:

> If an interest is transferred, the action may be continued by or against the original party unless the court, on motion, orders the transferee to be substituted in the action or joined with the original party.

Fed. R. Civ. P. 25(c). A proceeding to effectuate a Rule 25(c) joinder or substitution is initiated, as Plaintiffs have done here, by filing a motion to substitute and providing notice of hearing to parties as provided in Rule 5 and nonparties as provided in Rule 4. Fed. R. Civ. P. 25(a)(3)(c).

Rule 25(c) may be used as a basis to assert alter ego and successor claims against non-parties in post-judgment supplementary enforcement proceedings. *See, e.g., Panther Pumps*, 566 F.2d at 23-24 (motion to add successor in interest as party in post-judgment contempt proceeding); *Chicago Dist. Council*, 1997 WL 12794, at *1 (Rule 25(c) used to assert ERISA successor liability claim); *Rodriguez-Miranda v. Benin*, 829 F.3d 29, 43 (1st Cir. 2016) (courts have "sanctioned the use of Rule 25(c) to join parties as alter egos and hold them liable for the full judgment"). In the leading Seventh Circuit case, *Panther Pumps*, the court held that the

"charge" in a motion to substitute is that the party to be substituted "is the successor in interest of the judgment debtor and, therefore, liable on the judgment." *Panther Pumps*, 566 F.2d at 24. The court evaluated the Rule 25(c) motion based on the standards for successor liability, finding that the successor in that case was a "mere continuation" of the judgment debtor and that the transfer was a "fraudulent effort to escape liability." *Id.* at 25-26; *see also Chicago Dist. Council of Carpenters Pension Fund v. Artistry Woodworking, Inc.*, No. 92 C 2069, 1997 WL 12794, at *1 (N.D. Ill. Jan. 10, 1997) (motion to substitute granted and judgment entered against successor based on meeting ERISA test for successor liability); *Select Creations, Inc. v. Paliafito Am., Inc.*, 852 F. Supp. 740 (E.D. Wisc. 1994) (Rule 25(c) motion based on transfer of toy business to successor, which was set up to avoid liability; alter ego of successor also substituted).

Rule 25(c) proceedings are not limited to recovery of transferred assets. In *Rodriguez-Miranda v. Benin*, 829 F.3d 29 (1st Cir. 2016), the First Circuit recently addressed the question of whether the scope of imposed liability based on a Rule 25(c) substitution would be limited to the amount of the transferred assets—i.e. "reaching the 'interest only'"—or whether the successor/alter ego would be liable for the whole judgment. 829 F.3d at 42. After noting that the courts in *Panther Pumps*, *Minnesota Min. & Mfg. Co.* and *Explosives Corp. of Am. v. Garlam Enters Corp.*, 817 F.2d 894 (1st Cir. 1987), all permitted liability for the full amount of the judgment, the First Circuit held that the district court properly joined two parties as successors in interest and alter egos and made them liable for the whole judgment:

> [W]hen we have never expressly limited Rule 25(c) joinder to the amount of the transferred assets, and other circuits, especially on such similar facts, have sanctioned the use of Rule 25(c) to join parties as alter egos and hold them liable for the full judgment, "any error cannot be plain or obvious."

*Id.* at 43. Under the First Circuit's reasoning—based on cases in this Circuit and elsewhere—this Rule 25(c) motion is a proper basis to impose liability for the entire unpaid amount of the

13

*Boim* Judgment on the *Boim* Defendants' successors and alter egos.

**III.    Following Discovery and an Appropriate Hearing, the Court Should Enforce the Unsatisfied Portion of the *Boim* Judgment against AMP, AJP and the Individual Defendants.**

Following appropriate discovery and a hearing (or briefing if there are no disputed issues of material fact) during which Plaintiffs will demonstrate that AMP, AJP and the Individual Defendants are alter egos and/or successors of one or more *Boim* Defendants, Plaintiffs request that this Court join AMP, AJP and the Individual Defendants as judgment debtors and enforce the *Boim* Judgment against them, jointly and severally.  This relief is both permitted under Rule 25(c) and equitable under the circumstances.

Indeed, there is a strong public interest in preventing organizations that have provided financial support to terrorist groups from escaping liability by merely dissolving legal entities and replacing them with new legal entities.  As explained above, the Anti-Terrorism Act provides a comprehensive scheme of criminal and civil liability aimed at eradicating support for international terrorism, including material support provisions described by the Supreme Court as a "preventive measure—it criminalizes not terrorist attacks themselves, but aid that makes the attacks more likely to occur."  *Holder v. Humanitarian Law Project*, 561 U.S. 1, 35 (2010). Noting that terrorism is *sui generis*,  Judge Posner, on behalf of the *en banc* panel in the appeal of the *Boim* Action, fashioned a remedy against even small donors to known terrorist organizations in order to sustain the underlying purpose of the ATA.  *See Boim v. Holy Land Foundation*, 549 F.3d 685, 698 (7th Cir. 2004) (*en banc*).

Allowing AMP, AJP, Jaber, Hamayel and Irshaid to escape liability based on the fiction of their separate legal existence would enable the *Boim* Defendants to shield and transfer their assets and continue with their same enterprise and mission—despite having been held to be material supporters of international terrorism.  The effective enforcement mechanisms of the

ATA will be thwarted if "fronts" for people and enterprises who support terrorism can avoid liability merely by morphing into new entities not subject to prior ATA judgments. Moreover, the injustice to the victims in this case, and to other victims of international terrorism financed by the *Boim* Defendants' support, demands that the *Boim* Defendants and Individual Defendants not be allowed to escape liability simply by creating two new legal entities that are in every way identical except for name, and shifting their ongoing mission, operations, activities and assets to those purported new entities.

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' motion and (i) permit appropriate discovery in connection with these Rule 25(c) proceedings; (ii) set a hearing to determine following appropriate discovery whether AMP, AJP and the Individual Defendants are liable as alter-egos and/or successors of one or more of the *Boim* Defendants (or permit submission of evidence through an appropriate motion in the event that there are no material disputed issues of fact); (iii) join AMP, AJP and the Individual Defendants as judgment debtors if the Court determines that they are alter–egos and/or successors; (iv) order that the *Boim* Judgment is jointly and severally enforceable against AMP, AJP and the Individual Defendants; and (v) grant such further relief as the Court deems just and appropriate.

Dated: May 12, 2017                    Respectfully submitted,


                                       /s/ Stephen J. Landes
                                       Stephen J. Landes
                                       Daniel I. Schlessinger
                                       W. Allen Woolley
                                       Michael B. Kind
                                       Joshua Fliegel
                                       LOCKE LORD LLP
                                       111 South Wacker Drive
                                       Chicago, IL 60606
                                       (312) 443-0700

                                       *Attorneys for Stanley Boim, Individually and as the
                                       Administrator of the Estate of David Boim,
                                       Deceased, and Joyce Boim*

Of Counsel
Nathan Lewin (*pro hac* application being filed)
Alyza D. Lewin (*pro hac* application being filed)
LEWIN & LEWIN LLP
888 17th Street NW, 4th Floor
Washington, DC 20006
(202) 828-1000

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that on May 12, 2017 he caused the foregoing

MEMORANDUM IN SUPPORT OF MOTION FOR JOINDER OF NON-PARTIES

PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 25 (c) to be served upon (i)

Islamic Association for Palestine ("IAP"); (ii) American Muslim Society ("AMS"); (iii)

American Muslims for Palestine ("AMP"); (iv) Americans for Justice in Palestine Educational

Foundation ("AJP"); (v) Rafeeq Jaber; (vi) Abdelbasset Hamayel; and (vii) Osama Abu Irshaid,

by (1) electronically filing with the Clerk of the Court for the Northern District of Illinois using

the CM/ECF system, and thereby serving by e-mail notification upon counsel for all parties of

record and (2) U.S. Mail, postage pre-paid, to the following persons at the following addresses:

| | |
|---|---|
| AMS | Rafeeq Jaber<br>Last Known Registered Agent for AMS<br>Jaber Financial Services<br>10661 S Roberts Rd, Ste 200<br>Palos Hills, IL 60465-1988<br><br>Rafeeq Jaber<br>9748 Meade Ave<br>Oak Lawn, IL 60453 |
| IAP | Mohammed Lafi<br>Last Known Registered Agent for IAP<br>401 S. Sherman #219<br>Richardson, TX 75081 |
| AMP | Abdelbasset Hamayel<br>Registered Agent for AMP<br>10101 S Roberts Rd<br>Palos Hills, IL 60465<br><br>American Muslims for Palestine<br>10063 S. 76th Ave<br>Bridgeview, IL 60455 |

| AJP | Abdelbasset Hamayel<br>Books and Record Keeper for AJP<br>10101 S Roberts Rd<br>Palos Hills, IL 60465<br><br>Americans for Justice in Palestine Educational Foundation<br>10063 S. 76th Ave<br>Bridgeview, IL 60455 |
|---|---|
| Rafeeq Jaber | Jaber Financial Services<br>10661 S Roberts Rd, Ste 200<br>Palos Hills,  IL  60465-1988<br><br>9748 Meade Ave<br>Oak Lawn, IL 60453 |
| Abdelbasset Hamayel | 9400 S. Oketo Ave.<br>Bridgeview, IL 60455<br><br>American Muslims for Palestine<br>10063 S. 76th Ave<br>Bridgeview, IL 60455 |
| Osama Abu Irshaid | 8145 Ridge Creek Way<br>Springfield, VA  22153<br><br>American Muslims for Palestine, DC Office<br>6404 Seven Corners Place<br>Suite 7<br>Falls Church, VA  22044 |

  /s/ Joshua Fliegel

# EXHIBIT

# J

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| STANLEY BOIM, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF DAVID BOIM, DECEASED, AND JOYCE BOIM, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | Civil No. |
| v. | ) ) | |
| AMERICAN MUSLIMS FOR PALESTINE; AMERICANS FOR JUSTICE IN PALESTINE EDUCATIONAL FOUNDATION; RAFEEQ JABER; ABDELBASSET HAMAYEL; AND OSAMA ABU IRSHAID, | ) ) ) ) ) ) ) | |
| Defendants. | | |

## COMPLAINT FOR DECLARATORY AND MONETARY JUDGMENT AND PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

Plaintiffs Stanley Boim, individually and as administrator of the estate of David Boim, deceased, and Joyce Boim (together, "Plaintiffs"), for their claim against defendants American Muslims for Palestine ("AMP"), Americans for Justice in Palestine Educational Foundation ("AJP"), Rafeeq Jaber, Abdelbasset Hamayel, and Osama Abu Irshaid (collectively, "Defendants"), allege and state as follows:

### INTRODUCTION

1.      In 1996, Stanley and Joyce Boim's son David was murdered by two agents of the international terrorist organization Hamas. The Boims initiated a lawsuit in this Court four years later, in 2000 (the "*Boim* Action"). In 2004, plaintiffs were awarded a $156 million judgment against individuals and organizations who financed the murder of their son (the "*Boim* Judgment"), and that judgment was affirmed in 2008. Among the defendants in the *Boim* Action

(the "*Boim* Defendants") were organizations that worked in tandem to support Hamas in the United States: the Holy Land Foundation for Relief and Development ("HLF"), the American Muslim Society ("AMS"), and AMS's alter egos operating under the name Islamic Association for Palestine ("IAP"). When time came to pay the *Boim* Judgment, AMS and IAP claimed to be out of business with few assets as a result of the burden of the *Boim* Judgment and associated litigation costs. HLF had ceased operations, and its assets had been seized by the United States. HLF and several of its leaders were subsequently convicted of terrorist activity. Seemingly, the *Boim* Action brought an end to these organizations. But that was not the case.

2.     In fact, these *Boim* Defendants are in business today in this District through their alter egos and successors, Defendants AMP and AJP. AMP and AJP were established by the former leaders of HLF, AMS and IAP—including Defendants Rafeeq Jaber, Abdelbasset Hamayel and Osama Abu Irshaid (together, the "Individual Defendants")—in order to continue the same enterprise and agenda, while avoiding the burden of the *Boim* Judgment and the ignominy of having been found liable for aiding and abetting the murder of an American teenager. AMP and AJP continue to be run by former leaders of HLF, AMS and IAP, including the Individual Defendants; until August 2016 they were headquartered on the same street, and they are now located nearby; and they continue the same enterprise, mission and activities. On information and belief, they have also received assets and funds from HLF, AMS, and IAP.

3.     AMP and AJP are alter egos and successors of HLF, AMS and IAP, and are therefore liable for the unpaid portion of the *Boim* Judgment. Likewise, the Individual Defendants are alter egos of HLF, AMS and IAP. They participated in the direction and control of those entities in 1996, and they continue to direct and control the successor entities, AMP and AJP, today. Having been unable to collect more than a small fraction of the *Boim* Judgment

from the named *Boim* Defendants, Plaintiffs should be permitted to recover from the *Boim* Defendants' alter egos and successors, i.e. the Defendants herein.

4.      The purpose of this action is to request that the Court (i) enter a declaratory judgment determining that AMP and AJP are the alter egos and/or successors of one or more of the *Boim* Defendants (including AMS, IAP and HLF); (ii) enter a declaratory judgment determining that the Individual Defendants are alter egos of one or more of the *Boim* Defendants (including AMS, IAP and HLF), and that they engaged in the conduct that gave rise to liability in the *Boim* Judgment; (iii) enter a declaratory judgment determining that each of Defendants is liable for the unsatisfied portion of the *Boim* Judgment; (iv) enter money judgments against each of the Defendants, jointly and severally, for this unpaid liability; and (v) issue a preliminary and permanent injunction preventing AMP, AJP and the Individual Defendants from dissipating funds in their possession or in the possession of unknown third parties that rightfully belong to the Boims.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 18 U.S.C. §§ 2333(a) and 2338 and 28 U.S.C. §§1331 because Plaintiffs seek to impose liability on AMP, AJP and the Individual Defendants arising from the civil liability provisions of the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(d)(2), as alter egos and/or successors of the *Boim* Defendants.  *See, e.g., Central States, Se. and Sw. Areas Pension Fund v. Central Transp., Inc.*, 85 F.3d 1282, 1286 (7th Cir. 1996) (recognizing federal subject matter jurisdiction for enforcement action based on alter ego liability).  This Court is authorized to grant declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§2201-2202, and to issue preliminary and permanent injunctive relief under Rule 65 of the Federal Rules of Civil Procedure.

3

6.      In addition, this Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367 in the event that any claims asserted herein are not subject to original jurisdiction, because such claims (if any) are so related to claims in this action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

7.      Venue is proper under 18 U.S.C. §2334(a) because one or more of the Defendants resides, will be served, and/or has an agent in this judicial district.  Venue is also proper under 28 U.S.C. §1391(b) because the acts alleged herein were performed within this judicial district.  The Defendants reside in this district, a substantial part of the events giving rise to the claim occurred in this district and, on information and belief, a substantial part of the property that is the subject of this action is situated in this district.

**THE PARTIES**

8.      Plaintiffs Stanley Boim and Joyce Boim are United States citizens who reside in Jerusalem, Israel.  Stanley Boim is the administrator of the estate of his son, David Boim, deceased.  The *Boim* Judgment was entered in favor of Stanley and Joyce Boim.

9.      AMP (American Muslims for Palestine) is an Illinois-registered, not-for-profit organization located at 10063 South 76th Avenue, Bridgeview, Illinois.

10.      AJP (Americans for Justice in Palestine Educational Foundation) is a 501(c)(3) tax-exempt organization located at 10063 South 76th Avenue, Bridgeview, Illinois.

11.      The Individual Defendants Rafeeq Jaber and Abdelbasset Hamayel are, on information and belief, residents of Illinois and this Judicial District.  Individual Defendant Osama Abu Irshaid is, on information and belief, a resident of Virginia and regularly conducts business in Illinois and this Judicial District. As alleged herein, the Individual Defendants currently manage and control the operations of Defendants AMP and AJP, previously managed

4

and controlled one or more of the *Boim* Defendants, and were directly involved in the conduct that gave rise to the *Boim* Judgment.

## GENERAL ALLEGATIONS

12.     Stanley and Joyce Boim's seventeen-year old son David was murdered by Hamas terrorists at a bus stop in Israel in 1996. He was standing with a group of classmates on their way to Jerusalem to attend a review class in preparation for their matriculation exams. A car drove up opposite the boys and a gunman shot at the group, hitting David in the head. David died the next day. The Boims filed suit in 2000 in this Court under the civil remedies provision of the federal Anti-Terrorism Act, 18 U.S.C. §2333. The defendants included individuals and organizations in the United States that provided material support to Hamas in violation of 18 U.S.C. §2339A. They included, inter alia, *Boim* Defendants HLF, AMS, IAP and the United Association for Studies and Research ("UASR").

13.      In the early 1980's the International Muslim Brotherhood created The Palestine Committee in the United States to raise money and conduct propaganda operations. The Palestine Committee established three entities to carry out this mission—IAP, UASR and the Occupied Land Fund (which subsequently renamed itself "the Holy Land Foundation").

14.     The Palestinian branch of the International Muslim Brotherhood became Hamas in 1987 during the Palestinian uprising against Israel known as the First Intifada. The Hamas charter called for annihilation of Israel through jihad (i.e. holy war) and sought to establish an Islamic state in place of Israel. Jihad includes violent activities. The International Muslim Brotherhood directed its Palestinian Committees throughout the world, including in the United States, to aid Hamas. *See* Order, *United States v. Holy Land Foundation*, No. 04-CR-00240 (N.D. Tex. May 24, 2010) [Dkt. 1447]. The Palestine Committee in the United States undertook

to comply with the International Muslim Brotherhood's mandate through its front organizations, including *Boim* Defendants HLF, IAP, UASR and (later) AMS.

15.     An entity or group of persons and entities operating under the name "Islamic Association for Palestine" (collectively, "IAP National") has operated continuously in the United States since the early 1980s.  The initial Islamic Association for Palestine ("IAP Illinois") was founded in 1981 by Aly Mishal at the direction of Khaled Mishal, then a senior member of the Muslim Brotherhood in Gaza and from 2004 until May 2017 the leader of Hamas.  In 1983, Mousa Abu Marzook, who is currently and has for many years been a senior leader of Hamas, was tasked by the Muslim Brotherhood to help found IAP.  Marzook transferred $150,000 to both IAP and HLF.  IAP National acted as an umbrella organization that encompassed various organizations throughout the country that called themselves "Islamic Association for Palestine," including:  IAP Illinois; the Islamic Association for Palestine formed in California in 1986 by Ghassan Elashi ("IAP California"); AMS (American Muslim Society) formed by Rafeeq Jaber in Illinois in 1993; American Middle East League for Palestine formed in Texas in 1990 by Yasser K. Saleh Bushnaq ("AMELP"); and IAP Texas formed by Basman Elashi in 1993.   Each of these organizations assumed a primary position in the IAP network depending on the location of the individual who was designated as the leader of IAP at that time.

16.     IAP National acted as the primary voice and propaganda arm for Hamas in the United States.  Among other activities, it issued Hamas press releases and communiqués and published the Hamas charter, which explicitly called for the destruction of Israel and the murder of Jews.  IAP National also organized annual conventions and meetings, which were regularly addressed by members of Hamas brought from the Middle East.  IAP National functioned as a major fund-raiser and financier for the network of front organizations supporting Hamas'

terrorist activities. IAP also published Arabic-language newspapers directed to the Palestinian population in the United States advocating Hamas doctrines.

17.    In all its efforts and activities, IAP had the distinct function of linking support for the Palestinian cause and members of the Palestinian diaspora to the Islamic wave that was sweeping the Muslim world. For example, in 1988 Abdullah Azzam, who founded al-Qaeda with Osama bin Laden, was the featured speaker at the annual IAP conference. Azzam made an impassioned plea at the conference to donate funds to Hamas and referred explicitly to Sheikh Ahmed Yassin, the terror group' spiritual leader in Gaza. In line with Hamas' political program, IAP has never supported a solution to the Palestinian problem that would include the continued existence of the State of Israel.

18.    *Boim* Defendant AMS was incorporated in Illinois in 1993. In 1994, AMS applied for the name of "Islamic Association for Palestine in Chicago." Prior to its incorporation, AMS's principals acted as the local chapter of IAP National. During the *Boim* litigation, AMS was both the Chicago branch and the national office of IAP National, and it was the primary voice for Hamas in the United States. AMS stated that its purpose was "to promote the cause of Palestine in America."

19.    *Boim* Defendant HLF, formerly the Occupied Land Fund, was founded in California in 1987 with funds supplied by Mousa abu Marzook. HLF acted as the direct financial conduit to Hamas institutions and was referred to by its leaders as "the Fund." HLF claimed to be the largest Islamic charity in North America and declared that it was dedicated to the cause of social welfare in Palestine. IAP National and HLF were intimately involved with each other since the latter's inception and shared key personnel.

7

20.    *Boim* Defendant UASR was created by Marzook in Illinois in 1989 as an affiliate of HLF, IAP and AMS.  UASR purported to be a think-tank conducting research on Mid-Eastern and Islamic topics.  It functioned as the political command center for Hamas in the United States.

21.    Marzook was expelled from the United States in 1997.  He is listed by the U.S. Department of the Treasury as a "Specially Designated Terrorist."  Marzook is now the deputy head of Hamas.

## THE *BOIM* DEFENDANTS ARE JUDGED LIABLE TO PLAINTIFFS

22.    On November 10, 2004, the United States District Court for the Northern District of Illinois entered summary judgment in favor of the Boims and against *Boim* Defendants IAP, AMS and HLF, reserving the issue of damages for a subsequent jury trial.  *Boim v. Quranic Literacy Institute*, 340 F. Supp. 2d 885 (N.D. Ill. 2004).  On December 8, 2004, a jury awarded damages of $52 million.  Pursuant to the Anti-Terrorism Act, the judgment was trebled and entered in the amount of $156 million.

23.    Throughout the suit, in both the trial and appellate courts, IAP, AMS and HLF claimed to be nothing more than charitable and educational institutions promoting the welfare of Palestinians and educating the American public about the Palestinian cause.  The United States Court of Appeals for the Seventh Circuit, sitting *en banc*, rejected that assertion in a landmark ruling governing civil liability under the Anti-Terrorism Act.  The Court held that a defendant that provides material support to a terrorist organization such as Hamas—even to its social or charitable wing—with knowledge that the organization engages in terrorism is, as a matter of law, a cause of the organization's terrorist activity and liable for damages under 18 U.S.C. § 2333.  *Boim v. Holy Land Found. for Relief and Dev.*, 549 F.3d 685, 698-99 (7th Cir. 2008) (*en banc*) ("Anyone who knowingly contributes to the nonviolent wing of an organization that he knows to engage in terrorism is knowingly contributing to the organization's terrorist activities").

8

24.      AMS and IAP were held to have acted as an instrument of Hamas, the terrorist organization found to have murdered David Boim.  The defense that the individual and organizational defendants were mere advocates and benign donors was rejected.

25.      The Court of Appeals for the Seventh Circuit affirmed the judgment against AMS and IAP in 2008.  It held that AMS and IAP funneled funds to Hamas using HLF as a conduit. 549 F.3d at 701.

26.      The Court of Appeals vacated the judgment against HLF and remanded for further proceedings on an issue that did not affect HLF's ultimate liability.  549 F.3d at 701.  On remand, the District Court found that HLF had funded Hamas and entered judgment against HLF for the same $156 million.  2012 U.S. Dist. LEXIS 126063 (Doc. # 883).  That judgment was not appealed and is now final.

27.      On February 25, 2005, a default judgment was entered against UASR.

28.      The Boims registered their judgments against these defendants in this Court. Those judgments remain valid and subject to enforcement.  The Boims are concurrently filing a petition to revive the *Boim* Judgment against AMS and IAP pursuant to 735 ILCS 5/2-1602.  The *Boim* Judgment against HLF was entered less than seven years ago and remains fully enforceable without revival.

### THE *BOIM* DEFENDANTS CLAIM THEY

### HAVE NO FUNDS TO PAY THE JUDGMENTS

29.      Plaintiffs have had very limited success in collecting on the judgments against IAP, AMS, HLF and the other *Boim* Defendants.  In a March 2005 deposition taken pursuant to a citation to discover assets, Rafeeq Jaber, then president of IAP National and an officer of AMS,

claimed that both of those organizations were essentially defunct as a result of the expense of the litigation and judgment in the *Boim* Action.

30.     In 2004 HLF and its principals were indicted.  In 2008 they were convicted of violating the anti-terrorism laws.  On information and belief, numerous HLF-affiliated individuals provided assistance to or material support of Hamas.  As demonstrated below, certain of these individuals have been directly involved in AMP and AJP's activities.

31.     In a comprehensive 96-page opinion, the United States Court of Appeals for the Fifth Circuit upheld the convictions.  *United States v. El-Mezain*, 664 F.3d 467 (5th Cir. 2011). By the time of the Fifth Circuit's decision, HLF claimed that it had ceased to function as a distinct organization.

## HLF CONTINUES UNDER A NEW NAME

32.     In January 2002, while HLF's leaders were being investigated by the government and after HLF's assets had been seized, HLF's leaders helped launch and were active in a new organization—the Ohio-based KindHearts for Charitable Relief and Development ("KindHearts").  KindHearts shared employees, donors, and fundraisers with HLF and IAP. KindHearts also shared an overseas bank account with HLF.  IAP engaged in fund raising for KindHearts.

33.     On February 19, 2006, the United States Treasury Department invoked a "Block Pending Investigation" and froze the assets of KindHearts, stating that the organization was the "progeny" of HLF, and that it provided "support for terrorism behind the façade of charitable giving."  KindHearts disbanded in 2011.

10

**AMP AND AJP ARE ESTABLISHED AS ALTER EGOS AND/OR SUCCESSORS
TO CONTINUE THE BUSINESS OF THE *BOIM* DEFENDANTS**

34.     Contrary to outward appearances and false assertions that they are currently defunct and have no assets, HLF, AMS, and IAP remain in business today through their successors and alter egos, AMP (American Muslims for Palestine) and AJP (Americans for Justice in Palestine Educational Foundation).  These purportedly new entities were created by individuals—including the Individual Defendants—who had previously managed and controlled *Boim* Defendants HLF, AMS, and IAP for the purpose of continuing the work that had been conducted by these organizations.

35.     AMP claims that it was established as a "voluntary organization" in Palos Hills, Illinois in 2005 by IAP and KindHearts activists, shortly after the *Boim* Judgment was entered against IAP, AMS and HLF.  While KindHearts was being investigated and after its funds were frozen, individuals affiliated with KindHearts and IAP opened the national office for AMP in 2008 at 10101 South Roberts Road, Palos Hills, Illinois.  AMP's offices are down the street from the former offices of AMS and IAP, which continue to be used as the business address of Individual Defendant Rafeeq Jaber.  AMP claims on its website that it is "all about educating people about Palestine," thus continuing the purported purposes of AMS, IAP and HLF.

36.     In 2009, AMP leaders established AJP as a tax-exempt, 501(c)(3) organization run by former leaders of IAP.  AJP acts as the financial supporter of AMP and receives donations on behalf of AMP.  The leadership of AMP and AJP are essentially identical.  Many of the most significant donors and fundraisers for AJP were donors to IAP, HLF and KindHearts.

37.     The current management and donors of AMP and AJP are substantially identical to the management and donors of their alter egos and predecessors, HLF, IAP and AMS.  This

11

overlap demonstrates that AMP and AJP are re-incarnations, alter egos and successors of HLF, IAP and AMS:

38.     The Mosque Foundation.  The Mosque Foundation in Bridgeview, Illinois, the charitable arm of the Bridgeview Mosque, together with its individual leaders, is a significant supporter and funder of AMP and AJP.  The Mosque Foundation has a history of donating and directing money to terrorist organizations.  It previously donated significant funds to HLF and KindHearts, which directed money to Hamas, and Benevolence International Foundation and Global Relief Foundation, each of which sent money to al-Qaeda.  The Mosque Foundation's leader, Sheikh Jamal Said, has been identified by the government as a member of the Palestine Committee and its affiliates.  Sheikh Said was also identified in 1993 as Treasurer and a member of the Board of Trustees of the Al-Aqsa Educational Fund, Inc., a funder of Hamas based in Oxford, Mississippi, which was designated by the U.S. Department of the Treasury as a Specially Designated Global Terrorist Entity.  Jamal Said regularly spoke at IAP events and has been a frequent speaker at AMP conferences.  Muhammad Salah, another *Boim* Defendant, who, in a separate case, was convicted and imprisoned for obstruction of justice in the *Boim* Action, stated that Jamal Said was instrumental in recruiting him into Hamas.  As demonstrated below, leaders of AMP and AJP hold prominent positions in the Mosque Foundation and its affiliates.

39.     Rafeeq Jaber.  Individual Defendant Jaber was an organizer of AJP and currently prepares its tax forms.  Jaber was the former president and principal spokesman for AMS and IAP in the Chicago area and was President of IAP National.  He is currently President of the Board of Directors of the Bridgeview Mosque.  His business, Jaber Financial Services, which is located in the former offices of AMS and IAP, is a donor to AMP.  In 2015, Jaber signed a

12

petition designating himself as a representative of AMP.  Jaber is the *eminence grise* of Chicago area organizations that support Hamas terrorism.

40.  <u>Abdelbasset Hamayel</u>.  AMP has identified Individual Defendant Hamayel as its Executive Director.  He is also AJP's registered agent and head of the Mosque Foundation Community Center.  Hamayel was the Director and Secretary General of IAP and the former Wisconsin and Illinois representative for KindHearts.  In a 2003 deposition, Rafeeq Jaber, then President of IAP, testified that Hamayel was responsible for producing AMS and IAP's "action letters … newsletters … (and) bulletins. …"  Jaber described Hamayel as "[t]he employee that works for us, the executive director, the secretary.  He is everything."

41.  <u>Osama Abu Irshaid</u>.  Individual Defendant Irshaid is an AMP board member and National Political Coordinator.  Irshaid was the editor of IAP's newspaper, *Al-Zaytounah*, operating from Washington, D.C.  According to Jaber, Irshaid was "from IAP National which is … Chicago [and] in charge of everything from A to Z in the paper, what comes on the paper and what goes into the paper."  Irshaid's salary was paid by AMS.  Irshaid currently publishes a similar newspaper, *Al-Meezan,* from a location in Virginia.  Among the regular features in *Al-Meezan* is an advertisement for a blog written from prison by Shukri abu Baker, the former President of HLF.  In August 2015, the United States Citizenship and Immigration Services ruled that Abu Irshaid is currently ineligible for naturalization because of his failure to disclose his connections with IAP.  In reaching that decision, USCIS made specific reference to the *Boim* Action and the role of IAP in funding international terrorism.  According to a document filed by AMS with the Illinois Attorney General, Jaber, Hamayel and Irshaid were its three highest paid persons in 2000 and 2001.  AMS could not and did not operate independently from Jaber, Hamayel and Irshaid.  Jaber, Hamayel and Irshaid were the heart of AMS and they directed and

controlled AMS.  AMS was created and operated to carry out their agenda in accordance with their directives.  Any independent existence was in form only.

43.  <u>Hatem Bazian</u>.  Bazian is the Chairman of AMP and AJP, which he helped found in 2005 and 2010, respectively.  He spoke at the 2001 IAP conference.  In 2004 he was a featured speaker at a fundraiser for KindHearts together with Mohammed el-Mezain, a leader of HLF who is now in prison for providing money to Hamas.  Bazian is a regular speaker at AMP conferences.  In 2014, Bazian spoke at a fundraiser in the United Kingdom for Interpal, an organization that was designated by the United States Treasury in 2003 as a Specially Designated Global Terrorist because of its affiliation with Hamas.

43.  <u>Salah Sarsour</u>.  Sarsour was a financial bundler for IAP.  He was imprisoned in Israel in 1995 for activities on behalf of Hamas. His furniture business in Wisconsin passed money to a known Hamas member.  Sarsour is currently a board member and important fundraiser for AMP.  He was chairman of the 2014 and 2015 AMP conference committees.  His business is a donor to AMP and AJP.

44.  <u>Hussein al-Khatib</u>.  Al-Khatib was a Regional Director for HLF and is now an AMP board member.  Al Khatib was identified by the government as part of the Hamas social infrastructure in Israel and the Palestinian Territories.

45.  <u>Kifah Mustapha</u>.  Until 2015, Mustapha was the co-Imam of the Bridgeview Mosque, and from 2002 to 2014, he was the associate director of the Mosque Foundation. Mustapha was the Illinois representative of HLF and was its registered agent in this State.  As its registered agent, Mustapha described his role as "soliciting money for the various programs HLF" held in Illinois and elsewhere, including internationally.  Mustapha spoke at the 2001 IAP convention and now regularly speaks at AMP conferences.  He has filmed promotional videos

14

for AMP. Mustapha was identified by the government as a member of the Palestine Committee or one of its related organizations. In 2010, he filed suit against the Illinois State Police claiming wrongful discharge after he was terminated as its first Muslim chaplain. *Mustapha v. Monken*, 1:10-cv-05473 (N.D. Ill.). Judge Guzman granted summary judgment to defendants in the lawsuit, finding that the discharge was lawful in view of Mustapha's close connection to HLF, a designated terrorist organization. *Mustapha v. Monken*, No. 10-cv-05473, 2013 WL 3224440, *10 (N.D. Ill. June 25, 2013).

46. <u>Sufian Nabhan</u>. Nabhan is an AMP board member. He was IAP's former Michigan representative.

47. Among the most significant activities of IAP and AMS was an annual conference most commonly held each November. The IAP conferences were a major gathering featuring prominent speakers who were known to be closely identified with Hamas. The speakers included actual leaders and fighters sent by Hamas from Gaza and the West Bank to address and motivate the audience. IAP invested significant time, effort and funds in preparing and conducting these conferences.

48. After AMS and IAP purportedly went out of business, the conferences continued under AMP's auspices. Beginning in 2006, the IAP Annual Conference became the AMP Annual Conference. The audience, content, management, speakers, and their message, remained the same under the AMP imprimatur as it had been under IAP. Speakers at the inaugural 2006 AMP Annual Conference included Rafeeq Jaber, Kifah Mustapha and Osama Abu Irshaid, as well as Raed Tayeh, a former member of IAP. Each of these speakers was formerly affiliated with UASR.

49.     A featured speaker at the 2007 AMP Conference was Sheikh Mohammad Al Hanooti, another member of the U.S.-based Hamas Palestine Committee.  Sheikh Hanooti was a former President of IAP.   A featured speaker at the 2014 AMP Annual Conference was Sabri Samirah, the former Chairman of IAP.   Certain former leaders of HLF who frequently spoke at IAP Conferences are now in prison, but members of their families have regularly appeared at AMP Annual Conferences.

50.     AMP and AJP claim not to send or receive money to or from overseas.  Mindful of past experiences of their purported predecessor entities and concerned over government scrutiny and legal risk, AMP invited participants at its 2014 conference to "come and navigate the fine line between legal activism and material support for terrorism."

51.     This lawsuit is not directed at the content of AMP or AJP's message, what is said on their websites, or at the individuals who attend its conferences.  Their message and the manner in which the message is delivered are, however, identical to the message of HLF, IAP and AMS.  This identity is evidence that AMP and AJP are the alter egos and successors to the material supporters of terrorism against whom the Boims have a valid outstanding judgment.

52.     From the very outset, HLF, IAP and AMS worked in tandem to support Hamas.  *See Boim v. Quranic Literacy Inst.*, 340 F. Supp. 2d at 909.  The interrelationship between the organizers and donors of *Boim* Defendants HLF, IAP and AMS, and the current beneficiaries of their largess and efforts—Defendants AMP and AJP—is no coincidence.  It is the continued implementation of a plan initiated over thirty-five years ago by Khalid Mishal and Mousa abu Marzook to support Hamas in the United States by whatever available means can be devised to skirt the laws of the United Sates and law enforcement.

**DEFENDANTS ARE LIABLE FOR THE *BOIM* JUDGMENT**

53.     Defendants AMP and AJP are the alter egos and successors of *Boim* Defendants IAP, AMS and HLF.  As set forth herein, Defendants are controlled and operated by the former leaders of these *Boim* Defendants.  AMP was headquartered on the same street as AMS and IAP and established by the officers and leaders of IAP, AMS and HLF; AMP and AJP continue the same enterprise, mission and activities as the *Boim* Defendants.  The assets and donors to the *Boim* Defendants were, on information and belief, directly transferred to or commingled with AMP and AJP's assets.

54.     IAP, AMS and HLF were abandoned and replaced by AMP and AJP in order to permit the same ongoing enterprise—formerly conducted through the *Boim* Defendants—to continue free and clear of the burden of paying the *Boim* Judgment. AMP was established in 2005 at almost exactly  the same time as summary judgment was entered in favor of the Boims in late 2004.  AMP and AJP *are* IAP, AMS and HLF but just by a different name.  These *Boim* Defendants were dissolved following the judgments obtained in this case.   They were reestablished by the same officers and leaders just as quickly and with the same stated goals but with new names.  As such, AMP and AJP—IAP, AMS and HLF's successor organizations and alter egos—have such a "unity of interest" and leadership with these *Boim* Defendants that their independence and separate existence is a legal fiction that should not be upheld by a court.  The continuity of the enterprise, management and control in the new entities make them legal successors and alter egos of *Boim* Defendants IAP, AMS and HLF.

55.     The Individual Defendants are also the alter egos of IAP, AMS and HLF.  The Individual Defendants controlled these entities and used them as a front to advance their personal objectives.  In the guise of acting on behalf of the entities, the Individual Defendants also directly participated in the conduct giving rise to the *Boim* Judgment.  Now they control the successors—

17

AMP and AJP—and use them as a front to continue the same types of personal objectives they previously sought to achieve through IAP, AMS and HLF. The Individual Defendants have such a unity of interest with, and exercised such dominion and control over, IAP, AMS and HLF (and their alter egos and successors) that the legal fiction of their independence and separate existence should not be upheld by the Court.

56. Allowing Defendants to escape liability based on the fiction of their separate legal existence would enable *Boim* Defendants IAP, AMS, and HLF, and the Individual Defendants to shield and transfer assets, and continue with their same enterprise and mission, after the *Boim* Defendants were held to be material supporters of international terrorism. The *Boim* Defendants and the Individual Defendants should not be allowed to escape liability simply by creating two new legal entities that are in every way identical to IAP, AMS and HLF except for their names, and thereby shift their ongoing mission, operations, activities and assets to those purported new entities.

57. The ATA provides a comprehensive scheme of criminal and civil liability aimed at eradiating support for international terrorism. The material support provisions of the ATA have been described by the Supreme Court as a "preventive measure – it criminalizes not terrorist attacks themselves, but aid that makes the attacks more likely to occur." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 35 (2010). Allowing the Boim Defendants—each of which has been found liable as a "material supporter[] of international terrorism"—and their leaders to walk down the street and continue to operate without paying their victims would send a message that this important statute, implicating a uniquely federal interest, can be ignored. The effective criminal and civil enforcement mechanisms of the ATA will be thwarted if "fronts" for

18

people and enterprises that support terrorism can avoid liability merely by morphing into new entities not subject to prior ATA judgments.

58.     As alter egos and/or successors of *Boim* Defendants IAP, AMS and HLF, AMP, AJP and the Individual Defendants are effectively the same entity or person as these *Boim* Defendants and are liable to Plaintiffs under 18 U.S.C. § 2333(a) for the unpaid portion of the *Boim* Judgment. This Court should direct AMP, AJP and the Individual Defendants to satisfy the *Boim* Judgments and thereby achieve the objectives and purposes of the ATA.

<u>**COUNT I**</u>
**DECLARATORY JUDGMENT AGAINST DEFENDANT**
**AMERICAN MUSLIMS FOR PALESTINE (AMP)**

59.     Plaintiffs repeat and reallege paragraphs 1-58 above as if fully set forth herein.

60.     Defendant AMP purports to be an organization apart and distinct from *Boim* Defendants Holy Land Foundation for Relief and Development (HLF), the Islamic Association for Palestine (IAP), and the American Muslim Society (AMS).  On information and belief, AMP will contend that it is not liable for any portion of the *Boim* Judgment.

61.     AMP is in fact and as a matter of law the alter ego and/or successor in interest of the aforementioned purportedly defunct organizations.

62.     There is a substantial and continuing controversy between Plaintiffs and AMP. A declaration of rights is both necessary and appropriate to establish that AMP is the alter ego and successor of HLF, IAP and AMS and that AMP is therefore liable to Plaintiffs for the unpaid amount of the *Boim* Judgment.

WHEREFORE Stanley Boim, individually and as administrator of the estate of David Boim, deceased, and Joyce Boim respectfully request the Court to enter judgment in favor of Plaintiffs and against Defendant American Muslims for Palestine on Count I herein as follows:

19

A. Declare that the *Boim* Judgment against Islamic Association for Palestine and American Muslim Society entered in 2004 and affirmed in 2008 is currently valid and enforceable;

B. Declare that the *Boim* Judgment against the Holy Land Foundation for Relief and Development entered in 2012 is currently valid and enforceable;

C. Declare that American Muslims for Palestine is the alter ego and successor of the Islamic Association for Palestine, American Muslim Society, and the Holy Land Foundation for Relief and Development;

D. Declare that American Muslims for Palestine is fully liable for any unpaid amount of the *Boim* Judgment; and

E. Award Plaintiffs such other relief as the Court deems just and proper under the circumstances.

**COUNT II**
**DECLARATORY RELIEF AGAINST DEFENDANT**
**AMERICANS FOR JUSTICE IN PALESTINE EDUCATIONAL FOUNDATION (AJP)**

63. Plaintiffs repeat and reallege paragraphs 1-58 above as if fully set forth herein.

64. Defendant AJP purports to be an organization apart and distinct from *Boim* Defendants Holy Land Foundation for Relief and Development (HLF), the Islamic Association for Palestine (IAP), and the American Muslim Society (AMS). On information and belief, AJP will contend that it is not liable for any portion of the *Boim* Judgment.

65. Defendant AJP is in fact and as a matter of law the alter ego and/or successor in interest of the aforementioned purportedly defunct organizations.

66. There is a substantial and continuing controversy between Plaintiffs and Defendant AJP. A declaration of rights is both necessary and appropriate to establish that AJP is

20

the alter ego and successor of HLF, IAP and AMS and that AJP is therefore liable to Plaintiffs for the unpaid amount of the *Boim* Judgment.

WHEREFORE Stanley Boim, individually and as administrator of the estate of David Boim, deceased, and Joyce Boim respectfully request the Court to enter judgment in favor of Plaintiffs and against Defendant Americans for Justice in Palestine Educational Foundation on Count II herein as follows:

A.      Declare that the *Boim* Judgment against Islamic Association for Palestine and American Muslim Society entered in 2004 and affirmed in 2008 is currently valid and enforceable;

B.      Declare that the *Boim* Judgment against the Holy Land Foundation for Relief and Development entered in 2012 is currently valid and enforceable;

C.      Declare that Americans for Justice in Palestine Educational Foundation is the alter ego and successor of the Islamic Association for Palestine, American Muslim Society, and the Holy Land Foundation for Relief and Development;

D.      Declare that Americans for Justice in Palestine Educational Foundation is fully liable for any unpaid amount of the *Boim* Judgment; and

E.      Award Plaintiffs such other relief as the Court deems just and proper under the circumstances.

## COUNT III
## DECLARATORY RELIEF AGAINST THE INDIVIDUAL DEFENDANTS

67.     Plaintiffs repeat and reallege paragraphs 1-58 as if fully set forth herein.

68.     The Individual Defendants Rafeeq Jaber, Abdelbasset Hamayel, and Osama Abu Irshaid purport to be individual persons apart and distinct from *Boim* Defendants Holy Land Foundation for Relief and Development (HLF), the Islamic Association for Palestine (IAP), and

21

the American Muslim Society (AMS). On information and belief, the Individual Defendants will contend that they are not liable for any portion of the *Boim* Judgment.

69.    The Individual Defendants are in fact and as a matter of law the alter egos of the aforementioned purportedly defunct organizations and participated directly in the conduct giving rise to the *Boim* Judgment.

70.    There is a substantial and continuing controversy between Plaintiffs and the Individual Defendants. A declaration of rights is both necessary and appropriate to establish that each Individual Defendant is the alter ego of HLF, IAP and AMS and participated directly in the conduct giving rise to the *Boim* Judgment, and that each Individual Defendant is therefore liable to Plaintiffs for the unpaid amount of the *Boim* Judgment.

WHEREFORE Stanley Boim, individually and as administrator of the estate of David Boim, deceased, and Joyce Boim respectfully request the Court to enter judgment in favor of Plaintiffs and against each of Individual Defendants Rafeeq Jaber, Abdelbasset Hamayel, and Osama Abu Irshaid on Count III herein as follows:

A.    Declare that the *Boim* Judgment against Islamic Association for Palestine and American Muslim Society entered in 2004 and affirmed in 2008 is currently valid and enforceable;

B.    Declare that the *Boim* Judgment against the Holy Land Foundation for Relief and Development entered in 2012 is currently valid and enforceable;

C.    Declare that each of Individual Defendants Rafeeq Jaber, Abdelbasset Hamayel, and Osama Abu Irshaid is the alter ego of the Islamic Association for Palestine, American Muslim Society, and the Holy Land Foundation for Relief and

22

Development and that each of these Individual Defendants directly participated in the conduct giving rise to the *Boim* Judgment;

D.     Declare that each of Individual Defendants Rafeeq Jaber, Abdelbasset Hamayel, and Osama Abu Irshaid is fully liable for any unpaid amount of the *Boim* Judgment; and

E.     Award Plaintiffs such other relief as the Court deems just and proper under the circumstances.

## COUNT IV
## ENTRY OF MONEY JUDGMENT

71.     Plaintiffs repeat and reallege paragraphs 1-58 as if fully set forth herein.

72.     The *Boim* Judgment is a final, non-appealable and currently fully enforceable judgment against Holy Land Foundation for Relief and Development (HLF), the Islamic Association for Palestine (IAP), and the American Muslim Society (AMS). To date, the *Boim* Judgment remains only partially satisfied.

73.     As alter egos and/or successors of *Boim* Defendants HLF, IAP and AMS, each of Defendants is jointly and severally liable for the full amount of the unsatisfied portion of the *Boim* Judgment.

74.     The Individual Defendants were also direct participants in the conduct giving rise to the *Boim* Judgment and each is therefore jointly and severally liable for the full amount of the unsatisfied portion of the Boim Judgment.

WHEREFORE Stanley Boim, individually and as administrator of the estate of David Boim, deceased, and Joyce Boim respectfully request the Court to enter judgment in favor of Plaintiffs and against each of the Defendants on Count IV herein as follows:

A.    Enter Judgment in the full amount of the *Boim* Judgment, to the extent not yet paid, against each of the Defendants, jointly and severally; and

B.    Award Plaintiffs such other relief as the Court deems just and proper under the circumstances.

## COUNT V
### PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

75.    Plaintiffs repeat and reallege paragraphs 1-58 above as if fully set forth herein.

76.    This Court has already entered judgment against the *Boim* Defendants and in favor of Plaintiffs.

77.    There is a strong likelihood that Plaintiffs will succeed on the merits of their claims that (i) Defendants are alter egos and/or successors of certain of the *Boim* Defendants and are therefore liable for the unsatisfied portion of the *Boim* Judgment; and (ii) the Individual Defendants were direct participants in the conduct giving rise to the *Boim* Judgment and are therefore liable for the unpaid portion of the *Boim* Judgment.

78.    After this Complaint has been filed, Defendants are likely to dissipate, transfer or otherwise move their assets beyond Plaintiffs' reach.  The original *Boim* Defendants did exactly that by forming new entities, continuing their operations through those entities, and claiming that the *Boim* Defendants were defunct and lacked assets to pay the *Boim* Judgment.

79.    Without injunctive relief to prevent improper dissipation or transfer of assets, there is a significant likelihood that Defendants will continue this practice and Plaintiffs will be unable to collect the *Boim* Judgment from Defendants.  For example, on information and belief, substantial assets held by AMP and AJP are cash donations and intra-company transfers.  If those cash assets are dissipated, Plaintiffs will be unable to recover their judgment from the alter egos

and successors of the *Boim* Defendants. Plaintiffs will thereby suffer irreparable harm for which there is no adequate remedy at law.

80.     The balance of the equities favors entry of appropriate injunctive relief to prevent Defendants from improperly dissipating or transferring their assets pending the resolution of Plaintiffs' claims. Defendants AMP and AJP were created to continue the enterprise and operations of the *Boim* Defendants, without the burden of having to pay the *Boim* Judgment. The Individual Defendants controlled certain of the *Boim* Defendants and used these entities to further their own personal objectives and shield them from liability. The Individual Defendants also directly participated in the conduct that gave rise to the *Boim* Judgment.

81.     Permitting Defendants to transfer or dissipate their assets would hinder Plaintiffs' efforts to collect the judgment and would create a significant burden for Plaintiffs. This burden outweighs any burden on Defendants that would result from an order preventing dissipation and transfer of assets.

82.     There is a strong public interest in preventing organizations that have provided financial support to terrorist groups from escaping liability for the consequences of terrorist acts carried out by those groups merely by dissolving legal entities and replacing them with new legal entities.

WHEREFORE Stanley Boim, individually and as administrator of the estate of David Boim, deceased, and Joyce Boim respectfully request the Court to enter judgment in favor of Plaintiffs and against Defendants on the Fifth Claim herein as follows:

A.      Grant preliminary and permanent injunctive relief preventing Defendants from dissipating or transferring assets in their possession, custody or control until such time as this Court resolves Defendants' liability for the *Boim* Judgment; and

B.      Award Plaintiffs such other relief as the Court deems just and proper under the

circumstances.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims and issues so triable.


Dated:  May 12, 2017                      Respectfully submitted,


 

_____

Stephen J. Landes
Daniel I. Schlessinger
W. Allen Woolley
Michael B. Kind
Joshua Fliegel
LOCKE LORD LLP
111 South Wacker Drive
Chicago, IL  60606
(312) 201-2772

*Attorneys for Stanley Boim, Individually and as the*
*Administrator of the Estate of David Boim,*
*Deceased, and Joyce Boim*


Of Counsel
Nathan Lewin (*pro hac* application being filed)
Alyza D. Lewin (*pro hac* application being filed)
LEWIN & LEWIN LLP
888 17th Street NW
4th Floor
Washington, DC 20006
(202) 828-1000


26

# EXHIBIT

# K

