UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

STANLEY BOIM, et al.,

                Plaintiffs

v.

AMERICAN MUSLIMS FOR PALESTINE,
et al,

           Defendants.

CASE NO. 1:17-CV-03591

Honorable Sharon Johnson Coleman

## MOTION TO DISMISS

Defendants American Muslims for Palestine ("AMP"), Americans for Justice in Palestine Educational Foundation ("AJP"), Rafeeq Jaber ("Jaber"), Abdelbaset Hamayel ("Hamayel"), and Osama Abuirshaid ("Abuirshaid") ("current Defendants") file this Motion to Dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), as set forth below.

## I.      Summary of the Argument

This Court does lacks subject matter jurisdiction over the claims alleged. Under both Supreme Court and Seventh Circuit authority, there is neither independent nor ancillary jurisdiction over the claims asserted. Plaintiffs claim that current Defendants are liable for a prior judgment to which Defendants were not parties; the facts on the alter ego and successor liability claims alleged do not support jurisdiction and are not so closely related to the original claims from the separate action to warrant ancillary, or supplemental, jurisdiction. Therefore, this Court is without jurisdiction under Fed. R. Civ. P. 12(b)(1) and must dismiss the case in its entirety.

## II.      Plaintiffs' Complaint

Plaintiffs obtained a judgment against Holy Land Foundation ("HLF"), the American Muslim Society ("AMS"), the United Association for Studies and Research ("UASR"), and

Islamic Association for Palestine ("IAP"), among others (collectively, the "judgment defendants"). (Dckt. 1.) Stanley Boim's parents (Plaintiffs) filed suit after their son was killed in Israel by members of Hamas ("the 2000 lawsuit"), alleging material support of terrorism which led to their son's 1996 death. They obtained a judgment of $156 million; this was affirmed in part.[1]

On May 12, 2017, Plaintiffs initiated the instant suit against current Defendants, seeking to enforce the 2000 judgment against these new defendants. No current Defendants were parties to the 2000 lawsuit. Plaintiffs argue that the current Defendants are liable as successor corporations and under the theory of alter ego,[2] for the 2000 judgment against the judgment defendants. Plaintiffs make the following allegations as to each current Defendant, in support of their claims:

## A.   **AMP and AJP**

Plaintiffs' Complaint describes AMP as established "in 2005 by IAP and KindHearts activists"[3] with its headquarters opened "in 2008 … down the street from the former offices of AMS and IAP." (Dckt. 1 at 11.) Plaintiffs also assert that AMP is "all about educating people about Palestine," which Plaintiffs characterize as "thus continuing the purported purposes of AMS, IAP and HLF." (*Id*.) Plaintiffs describe AJP as a tax exempt 501(c)(3) organization established in 2009 and "run by former leaders of IAP." (*Id*. at 11.) Plaintiffs allege that "[m]any of the most significant donors and fundraisers for AJP were donors to IAP, HLF and KindHearts." (*Id*.)

Plaintiffs allege "current management and donors of AMP and AJP are substantially identical to the management and donors of their alter egos and predecessors, HLF, IAP and AMS." (*Id*. at 11.) Plaintiffs assert "this overlap" "demonstrates that AMP and AJP are re-incarnations,

---

[1] *Boim v. Holy Land Found. for Relief & Dev*., 549 F.3d 685, 688 (7th Cir. 2008).
[2] Plaintiffs' Complaint is vague on the specific theories brought against each Defendant, but Plaintiffs assert successor liability for AMP and AJP, and alter ego against all Defendants. (Dckt. 1 at 17, 19, 20, 22.) While alter ego is traditionally asserted against individuals, Plaintiffs assert it against all Defendants in this matter, so it is addressed as to all Defendants.
[3] KindHearts is not a party to this or the 2000 lawsuit; nonetheless, Plaintiffs make the unsupported allegation that HLF "continued" as KindHearts after HLF ceased operating. (Dckt. 1 at 10.)

alter egos and successors of HLF, IAP and AMS." (*Id*. at 12.)[4] While claiming "[t]his lawsuit is not directed at the content of AMP or AJP's message, what is said on their websites, or at the individuals who attend its [sic] conferences", Plaintiffs assert "[t]heir message and the manner in which the message is delivered are, however, identical to the message of HLF, IAP and AMS" and that "[t]his identity is evidence." (*Id*. at 16.) Plaintiffs allege "Defendants AMP and AJP are the alter egos and successors of *Boim* Defendants IAP, AMS and HLF." (*Id*. at 16.) Plaintiffs claim "AMP was headquartered" "on the same street" as AMS and IAP, and AMP and AJP were "established by the officers and leaders of IAP, AMS and HLF" and "continue the same enterprise, mission and activities as the *Boim* Defendants." (*Id*. at 17.) Plaintiffs believe "[t]he assets and donors to the *Boim* Defendants were, on information and belief, directly transferred to or comingled with AMP and AJP's assets." (*Id*.) Plaintiffs identify no such transactions or transfers.

## B.  **Individual Defendants**

Plaintiffs allege the individual Defendants are "alter egos of IAP, AMS and HLF" who "controlled these entities and used them as a front to advance their personal objectives." (*Id*.) Plaintiffs further assert these Defendants "directly participated in the conduct giving rise to the *Boim* Judgment" but do not name it. (*Id*.) Plaintiffs claim "now they control the successors – AMP and AJP—and use them as a front to continue to same types of personal objectives they previously sought to achieve through IAP, AMS and HLF." (*Id*.) These "personal objectives" are undefined.

### 1.  Abdelbaset Hamayel

Defendant Hamayal is AMP's unpaid executive director. (Dckt. 1 at 13; Ex. A.) He was

---

[4] Plaintiffs attempt to bolster their allegations of AMP and AJP as successors of HLF, IAP and AMS by identifying individuals who were neither judgment defendants in 2000 nor are current Defendants in this matter. (Dckt. 1 at 12-16.) Specifically, Plaintiffs reference The Mosque Foundation, Hatem Bazian, Salah Sarsour, Hussein al-Khatib, Kifah Mustapha, Sufian Nabhan, Raed Tayeh, Sheikh Mohammad Al Hanooti, and Sabri Samirah. (*Id*.) In the interests of brevity and relevance, Defendants address only the allegations made pertaining to the current Defendants.

previously a paid employee of IAP. (*Id*.) Plaintiffs quote Defendant Jaber's 2003 testimony describing Defendant Hamayel as "the employee that works for us, the executive director, the secretary. He is everything." (Dckt. 1 at 13.) Plaintiffs make no more relevant claims as to him.[5]

2. Osama Abuirshaid

Without referencing a timeframe, Plaintiffs allege that Defendant Abuirshaid edited IAP's newspaper and was paid by AMS. (*Id*.) Plaintiffs allege that Defendant Abuirshaid is a current AMP Board member, and publishes a newspaper out of Virginia. (*Id*.) Without further explanation, Plaintiffs then state that "AMS could not and did not operate independently from" Defendant Abuirshaid. (*Id*.) Plaintiffs allege no other relevant facts as to Defendant Abuirshaid.[6]

3. Rafeeq Jaber

Plaintiffs allege Defendant Jaber "was an organizer of AJP and currently prepares its tax forms." (*Id*. at 12.) Plaintiffs describe Defendant Jaber as "the former president and spokesman for AMS and IAP" with his business office "located in the former offices of AMS and IAP."[7] (*Id*.) Plaintiffs allege Defendant Jaber "is a donor to AMP." (*Id*.) Plaintiffs deposed Defendant Jaber in both 2003 and 2005. (*Id*. at 9, 13).

### III.  Legal Theories Alleged

Although Plaintiffs do not specify the theories under the doctrines of successor or alter ego liability on which they rely, the facts pled in the Complaint limit the theories under which they

---

[5] Plaintiffs refer to Defendant Hamayel previously working for KindHearts, and currently working for the Mosque Foundation Community Center. However, as neither of these was a 2000 judgment defendant or is a current Defendant in this matter, this Motion does not address these connections.
[6] Plaintiffs make allegations about the content of the newspaper published by Defendant Abuirshaid as well as his personal immigration status. (Dckt. 1 at 13.) As neither of these is relevant to the claims asserted in this suit, Defendant does not include them here.
[7] As shown in his Declaration, Defendant Jaber actually obtained office space in the same building in which AMS and IAP were located, but not the same offices, several years after IAP and AMS ceased operating. (Ex. C.) The building contains over 50,000 square feet of office space with many other businesses operating out of it, which are not defendants in this action.

could proceed.   Applying the four factors for successor liability from *Travis v. Harris Corp.*[8] against the allegations made in Plaintiffs' Complaint, Plaintiffs make no allegation that AJP or AMP expressly or impliedly agreed to assume liability of any judgment defendants. Plaintiffs do not point to any transactions amounting to consolidations or mergers of any corporations. Plaintiffs allege no facts showing that Defendants AMP and AJP are "mere continuations" of judgment defendants, and identify no sale or transfer of assets.   That leaves the last *Travis* factor: "where the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts."  565 F.2d at 446.  Plaintiffs fail to identify any discrete acts, asserting only that "IAP, AMS and HLF were abandoned and replaced by AMP and AJP in order to permit the same ongoing enterprise—formerly conducted through the *Boim* Defendants—to continue free and clear of the burden of paying the *Boim* judgment."  (Dckt. 1 at 17.)

While claims of alter ego can be evaluated under many factors, the key element required under the Seventh Circuit is motive and intent to avoid liability.[9]  For a finding of alter ego, plaintiffs must show "the stockholder and corporation were in effect a single entity," established through broad practice, not a single transaction that is alleged as unfair.  *Esmark  Inc. v. N.L.R.B.,* 887 F.2d 739, 788-89 (7th Cir. 1989).  There must be evidence of intent or motive to act in a fraudulent or abusive manner, and sufficient unity between the two corporations to justify setting aside the separateness of the entities. *Favia,* 995 F.2d at 788–89.  Here, Plaintiffs make conclusory

---

[8] "(1) [W]here there is an express or implied agreement of assumption; (2) where the transaction amounts to a consolidation or merger of the two corporations; (3) where the purchasing corporation is a "mere continuation" of the seller; and (4) where the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts."  *Travis v. Harris Corp*., 565 F.2d 443, 446 (7th Cir. 1977).

[9] *Trustees of Pension, Welfare & Vacation Fringe Ben. Funds of IBEW Local 701 v. Favia Elec. Co., Inc.*, 995 F.2d 785 (7th Cir. 1993); *Int'l Union of Operating Engineers, Local 150, AFL-CIO v. Centor Contractors, Inc.,* 831 F.2d 1309, 1312 (7th Cir. 1987).

allegations without supporting facts,[10] and allege no facts giving rise to subject matter jurisdiction.

### IV. Authorities Support Dismissal for Lack of Subject Matter Jurisdiction

### A. Standard for Dismissal for Lack of Subject Matter Jurisdiction

Subject matter jurisdiction is a threshold question, "the first question in every case." *State of Ill. v. City of Chi.,* 137 F.3d 474, 478 (7th Cir. 1998). Without jurisdiction "the court cannot proceed at all." *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94 (1998). Federal courts have an obligation to examine jurisdiction. *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006); *Hukic v. Aurora Loan Servs.*, 588 F.3d 420, 427 (7th Cir. 2009). To survive a motion to dismiss for lack of subject matter jurisdiction, plaintiffs must show the existence of facts that could, with the complaint's allegations, establish standing. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992); *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton,* 422 F.3d 490, 495 (7th Cir. 2005). In considering a motion challenging the facts supporting jurisdiction, " '[t]he district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists.'" *Evers v. Astrue,* 536 F.3d 651, 656–57 (7th Cir. 2008).

### B. Controlling Supreme Court Authority Demonstrates Lack of Subject Matter Jurisdiction over the Facts in this Case.

Plaintiffs claim independent jurisdiction, or, in the alternative, ancillary jurisdiction, based on theories of successor liability and alter ego for damages obtained against the original judgment defendants, under the Anti-Terrorism Act ("ATA"). (Dckt. 1 at 3-4.) The ATA itself requires a showing of direct involvement for liability under it.[11] Therefore, if this Court has jurisdiction to

---

[10] If necessary, Defendants will file a Motion to Dismiss under Fed. R. Civ. P. 12(b)(6) for failure to properly state a claim in accordance with applicable scheduling deadlines, should this Court determine it has jurisdiction to proceed.

[11] *Holder v. Humanitarian Law Project*, 561 U.S. 1, 35-36 (2010); *Boim v. Holy Land Foundation, et al.*, 549 F.3d at 691 (holding there must be a connection between the acts at the time of the injury

enforce the debts from the 2000 action, this must come from the Court's general powers.

1.    There is No Independent Jurisdiction for Claims Attempting to Pierce the Corporate Veil.

The United States Supreme Court squarely addressed the question of whether third parties may be liable under theories of piercing the corporate veil and alter ego in *Peacock v. Thomas*. 516 U.S. 349, 354, 116 S.Ct. 862, 868, 133 L.Ed.2d 817 (1996).  In *Peacock*, plaintiff Jack Thomas sought to impose a judgment under ERISA, regarding administration of a pension plan, against Grant Peacock, an officer and shareholder of the corporation that was found liable who had not been named in the original suit.  *Id*. The alter ego claims were raised in a subsequent, separate action from the original suit on the merits, much like Plaintiffs attempt here. *Thomas v. Peacock*, 39 F.3d 493, n. 1 (4th Cir. 1994).[12]   The Supreme Court reversed lower court decisions permitting the action, finding no independent subject matter jurisdiction over the plaintiff's new claims after the plaintiff had been unable to collect his original judgment against the liable corporate defendant, and held that "[p]iercing the corporate veil is not itself an independent … cause of action, 'but rather is a means of imposing liability on an underlying cause of action.'"  516 U.S. at 354.  As such, Plaintiffs' claims of independent jurisdiction necessarily fail under Peacock.  Plaintiff are therefore left only with the option of showing ancillary jurisdiction.

2.    Claims to Pierce the Corporate Veil Do Not Warrant Ancillary Jurisdiction.

The Supreme Court in *Peacock* likewise rejected the plaintiff's claims of ancillary (or supplemental) jurisdiction over alter ego claims.  In so doing, the *Peacock* court explained the

---

and the defendant, in order for liability to exist; finding alter ego between IAP and AMS because they acted together at the time of the relevant acts in question).

[12] In *Peacock*, the plaintiff actually did make allegations of specific wrongdoing by the individual, of invalid transfers to avoid liability totaling $80,000.  The Supreme Court noted that even if an independent basis for jurisdiction had also been present, any liability would have been limited to that amount and not the full judgment. 516 U.S. at n.3.  No jurisdiction otherwise existed in the case before it even with these allegations, however, because the transfers complained of all occurred after the original judgment and not at the time of the acts giving rise to the judgment. 516 U.S. at 359.

proper limits of extending collection for prior judgments:

Ancillary enforcement jurisdiction is, at its core, a creature of necessity. When a party has obtained a valid federal judgment, only extraordinary circumstances, if any, can justify ancillary jurisdiction over a subsequent suit like this. To protect and aid the collection of a federal judgment, the Federal Rules of Civil Procedure provide fast and effective mechanisms for execution. In the event a stay is entered pending appeal, the Rules require the district court to ensure that the judgment creditor's position is secured, ordinarily by a supersedeas bond. *The Rules cannot guarantee payment of every federal judgment.* But as long as they protect a judgment creditor's ability to execute on a judgment, the district court's authority is adequately preserved, and ancillary jurisdiction is not justified over a new lawsuit to impose liability for a judgment on a third party.

*Peacock*, 516 U.S. at 359 (emphasis added). The Court viewed the assertion of ancillary jurisdiction as an improper attempt "to impose an obligation to pay an existing federal judgment on a person not already liable for that judgment." *Id.*, citing *H.C. Cook Co. v. Beecher*, 217 U.S. 497, 30 S. Ct. 601, 54 L. Ed. 855 (1910).

Under *Peacock*, this Court lacks subject matter jurisdiction over Plaintiffs' claims. The theories of liability alleged against current Defendants arises from the individual defendants' roles as officers and directors in one or more of the prior corporations, as well as the corporate defendants' alleged continuity and alleged (but unspecified) receipt of funds from donors and assets of the judgment defendants. As in *Peacock*, any alleged transfer and role of the defendants occurred years prior to the present action, without objection at the time by Plaintiffs and without explanation by Plaintiffs as to why they were unable to prevent any such transfers previously, in order to timely attempt to secure payment under the Federal Rules of Civil Procedure. These are facts which the Supreme Court found insufficient to establish jurisdiction: "[t]his is a new action based on theories of relief that did not exist, and could not have existed, at the time the court entered judgment in the [original] case." *Peacock*, 516 U.S. at 359. Plaintiffs here make the same improper attempt, without justification for ignoring Supreme Court precedent.

**C.      Controlling Seventh Circuit Authority Also Precludes Subject Matter Jurisdiction.**

Plaintiffs misrepresent the holdings of this Circuit: Plaintiffs' Complaint asserts

jurisdiction under *Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc.*, 85 F.3d 1282, 1284 (7th Cir. 1996). Contrary to Plaintiffs' assertions that *Central States*' holding "recogniz[es] federal subject matter jurisdiction for enforcement action based on alter ego liability" (Dckt. 1 at 3), the Seventh Circuit held exactly the opposite. Recognizing *Peacock*'s limitations, the Seventh Circuit found subject matter jurisdiction on the facts before it only because the plaintiff's claims were **not** claims of alter ego, and instead were claims that the new defendant was the "true employer" who committed the original violation giving rise to liability, with control of the relevant actions at the time the violation first occurred:

> Central States, however, has styled its theory of liability somewhat differently, alleging that Central Transport and Central Cartage so dominated and controlled the Rogers Group Companies that they were the "true employers" for purposes of ERISA liability. Under this theory, Central *States is not pursuing the defendant corporations merely to enforce a judgment.* Rather, Central States is claiming that Central Transport and Central Cartage played a part in the initial ERISA violation. This theory is different from Peacock's, where Thomas pursued Peacock solely in his capacity as an officer and shareholder of the liable corporation. Thomas' lawsuit attempted to "pierce the corporate veil." By contrast, Central States claims that the defendants exercised "common control."

*Central Transport*, 855 F.3d at 1284 (emphasis added). Plaintiffs here recognize this action is no more than an attempt to collect the prior judgment: "[h]aving been unable to collect more than a small fraction of the *Boim* judgment from the named *Boim* Defendants, Plaintiffs should be permitted to recover from the *Boim* Defendants' alter egos and successors, i.e. the Defendants herein." (Dckt. 1 at 2-3.) This is exactly what the Supreme Court and Seventh Circuit prohibit.[13] This Court has no subject matter jurisdiction over the current claims alleged by Plaintiffs.

---

[13] *See also Goulding v. Global Medical Products Holdings, Inc.*, 394 F.3d 466, 467-68 (7th Cir. 2005) (holding that "[d]isputes about settlement contracts must be resolved in state court, unless they independently satisfy the requirements of federal jurisdiction" and ancillary jurisdiction exists where a court has either entered as a judgment or reserved authority to enforce"); *Matos v. Richard A. Nellis, Inc.*, 101 F.3d 1193, 1195 (7th Cir. 1996) (noting "[w]e may assume that after *Peacock v. Thomas*, an effort to collect a judgment by 'piercing the corporate veil' to reach the judgment debtor's shareholders requires an independent ground of jurisdiction … which here is missing"); *Central States, et al. v. Art Pape Transfer, Inc.*, 79 F.3d 651, 653 (7th Cir. 1996) (observing that "[i]t hardly follows that 'alter ego' is a magical phrase that brings liability down on the head of a

**D.      The Facts Do Not Support Subject Matter Jurisdiction As To These Defendants.**

"The district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists.'" *Evers,* 536 F.3d at 656–57.  Considering all relevant information, then, the facts do not support jurisdiction here.   As noted in *Central Transport*, subject matter jurisdiction would exist in these circumstances only if the current Defendants played such a part in the initial bad acts in 1996, which led to liability, that they were the "true" liable defendants for those acts.  855 F.3d at 1284. For the reasons set forth below, this is not factually possible.

1.    Abdelbasset Hamayel

Defendant Hamayel first joined IAP as an employee, as office administrator for the Chicago office, in September 1997.  (Ex. A.)  In that position, he reported to the Board of Directors.  (*Id*.) He remained an employee until IAP ceased operating, in or around late 2003.  (*Id*.)  Defendant Hamayel did not hold any positions with AMS.  (*Id*.) Defendant Hamayel became a volunteer with AMP in December 2008, and is serving temporarily as an unpaid Executive Director until a replacement is found.  (*Id*.) He was not involved in the founding of AMP or AJP and is not on the Board of Directors for either AMP or AJP.  (*Id*.)

Since Defendant Hamayel did not even begin working for IAP until after the 1996 acts which led to the 2000 judgment, he cannot be considered the true actor for those events.  While he may have become "everything" to the organization years date, the relevant window here is May 1996.  His connections to the judgment defendant postdate the 1996 acts; for the same reasons the Seventh Circuit reversed judgment on the individual in the 2000 matter, Defendant Hamayel could

---

corporation; for that, one needs a concrete theory"; declining alter ego as a basis for jurisdiction, since "Illinois … keeps liability strictly within the corporate boundary unless a failure to respect corporate formalities has combined with a fraud or other wrongdoing to produce inequity").

not have been a true actor and this Court therefore has no jurisdiction over the claims against him.[14]

2.    Osama Abuirshaid

In September 1996, Defendant Abuirshaid came to the United States as a non-immigrant journalist from his residence in Morocco.  (Ex. B.)  He got married in 1999, to a United States citizen, and they remain married today.  (*Id*.)  Defendant Abuirshaid became a lawful permanent resident of the United States in 2002.[15] (*Id*.) Defendant Abuirshaid became an outreach coordinator for AMS in 2000, which was his first role with the organization.  (*Id*.)  He first became a member of IAP in 2002.  (*Id*.)  Defendant Abuirshaid is self-employed, through his consulting firm DAR Consulting, since on or around November 2004.  Through his firm, he became a consultant for AMP in 2010.  He later became a member of the Board of Directors for AJP.  (*Id*.)

As with Defendant Hamayel, Defendant Abuirshaid could not have been the "true" actor in 1996 for subject matter jurisdiction purposes in this action, since he did not join any judgment defendant organization prior to 2000, and did not even enter the country until late 1996, after the May 13, 1996 shooting of Stanley Boim.[16]  Despite Plaintiffs' claim that "AMS could not and did not operate independently from" Defendant Abuirshaid, it must have done so until at least 2000, when he first joined that organization.  (Dckt. 1 at 13; Ex. B.)  Plaintiffs' allegations against Defendant Abuirshaid therefore must be dismissed for lack of subject matter jurisdiction.

3.    Rafeeq Jaber

Defendant Jaber came to the United States in 1974 at the age of 24, and became a citizen

---

[14] *Boim*, 549 F.3d at 691.

[15] While not relevant to any allegations in this matter, Plaintiffs represent to this Court that Defendant Abuirshaid "is currently ineligible for naturalization because of his failure to disclose his connections with IAP" and that USCIS made specific reference to the 2000 *Boim* lawsuit "and the role of IAP in funding international terrorism."  (Dckt. 1 at 13.)  Actually, Defendant Abuirshaid has filed for de novo review of his naturalization application, which remains pending in the Eastern District of Virginia.  (Ex. B.)

[16] *Boim*, 511 F.3d at 713.

in 1980. (Ex. C.) He was a factory worker, working next for Met Life for twenty years, as an insurance agent, then sales manager, then branch manager. He retired from Met Life in or around 1996. (*Id.*) He served as the President of AMS in the early 1990s, and of IAP from approximately 1990 to 1996 without compensation. In each of those unpaid positions, he reported to the Board of Directors for each organization. (*Id.*) In 2003 and March 2005, Plaintiffs deposed Defendant Jaber. (Dckt. 1 at 9-10, 13.) As Plaintiffs state, he testified in 2005 that IAP and AMS were financially defunct. (*Id.*) He did not hold any positions with AMP or AJP until 2013. (Ex. C.)

Taking Plaintiffs' assertions as true, along with Defendant Jaber's Declaration, there is no support for subject matter jurisdiction over him. There are no facts alleged showing Defendant Jaber, while working as a branch manager for Met Life, to be the "true" actor for any judgment defendant. If any existed, they would have likely arisen during the first three trips to the Seventh Circuit on the 2000 lawsuit. Plaintiffs' conclusory allegations, without factual support, are insufficient;[17] Plaintiffs fail to plead a single act by Defendant Jaber that leads to subject matter jurisdiction. Simply being an officer of a corporation is not enough: holding individuals liable for corporate judgments, when their known roles did not give rise to liability in the underlying factual trial, opens the door to hold any corporate officer liable after the fact, without a trial on the merits.[18] The Supreme Court prohibits this explicitly. *Peacock*, 516 U.S. at 359. Furthermore, Plaintiffs deposed Defendant Jaber twelve (12) and fourteen (14) years ago (Dckt. 1 at 9, 13); if there was

---

[17] "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion" to dispose of the case prior to trial. *Scott v. Harris,* 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).

[18] Plaintiffs' counsel's firm has attempted, and lost, this argument before. *Veolia Es Special Services, Inc. v. Pilgrim Investments, LLC*, No. 13-C-63, 2013 WL 3937013, *3 (E.D. Wis. July 30, 2013) (holding that "[b]ecause state law claims alleging alter ego theories and the like are a different animal entirely, they should not bog down an otherwise simple" matter on a prior judgment, and noting that while "[i]t is tempting to conclude that a single court could be a 'one stop shop,'" state law claims like alter ego "have little factual or legal nexus at all,"; therefore, "the tail of supplemental jurisdiction should not wag the dog of original jurisdiction").

any action against him, Plaintiffs either knew or should have known long ago.[19] Plaintiffs cannot show a valid cause of action against Defendant Jaber based on misleading facts, like renting space in a building where IAP used to have offices. And while he may well currently donate to charities as alleged, that alone does not grant a basis for subject matter jurisdiction over him in this matter. Those facts do not connect him to the 1996 acts which led to liability in the earlier suit. At most, these facts imply that Defendant Jaber created new entities to continue the charitable work of IAP and AMS without their debts; even if true, this does not form a basis for subject matter jurisdiction.[20]

4.    American Muslims for Palestine and Americans for Justice in Palestine Educational Fund

In 1996, neither AMP nor AJP existed. AMP was incorporated in 2006. (Ex. D.) By then, judgment defendant HLF's assets were already seized. (Dckt. 1 at 10.) Plaintiffs allege that HLF "continue[d] under a new name", KindHearts for Charitable Relief and Development ("KindHearts"). (*Id*.) Plaintiffs next state that the United States Treasury ("the Treasury") froze the assets of KindHearts and called it "progeny" of HLF, providing terrorist support "behind the facade of charitable giving." (*Id*.) AJP was formed next, in 2009. (Ex. E.) Without further explanation, Plaintiffs state that KindHearts "disbanded in 2011." (Dckt. 1 at 10.) Plaintiffs imply, without identifying any facts, that assets of KindHearts and/or HLF made their way to AMP. (*Id*.)

Plaintiffs omit material facts, which are directly relevant to the allegations of jurisdiction in this matter. While Plaintiffs correctly state that KindHearts "disbanded in 2011," Plaintiffs omit

---

[19] The sole individual against whom Plaintiffs did originally obtain a judgment won reversal of that judgment on appeal, when the Seventh Circuit found he could not have played a direct role in the relevant 1996 events. *Boim*, 549 F.3d at 691.

[20] *Christiansen v. Mech. Contractors Bid Dep*., 404 F.2d 324, 325 (10th Cir. 1968) ("[t]he court can find no equitable or moral reason … why the new corporation could not be organized to conduct a modified and extended business or even a business similar to that conducted by the old corporation so long as no property of the old corporation was diverted to the new corporation").

that this was part of a settlement with the Treasury, after it was sued by KindHearts for improperly seizing its funds and assets. (Ex. F, Settlement.)[21] This settlement included a complete return and distribution of all KindHearts' assets and funds seized by the Treasury, which the Treasury and the Office of Foreign Asset Control ("OFAC") oversaw. (*Id.*) This settlement specifies that, in addition to not being found guilty of any wrongdoing, the officers and directors of KindHearts were free to engage "in any lawful activity, including forming a new organization to engage in charitable activity in the Middle East or elsewhere." (*Id.*) Furthermore, the disbandment of KindHearts involved approved dispersement of "grants for charitable purposes to charitable organizations set forth in" the settlement. (*Id.*) Not one of the current Defendants is listed as a recipient of any of the dispersed KindHearts funds. (*Id.*) The supposed fraudulent transfer of any assets, which Plaintiffs allege "on information and belief" occurred from HLF and/or KindHearts to AMP and/or AJP, was not factually possible on the face of Plaintiffs' Complaint: the 2011 dispersement of KindHearts' assets and funds (frozen prior to the inception of AJP) was overseen by the Treasury, and the prior freezing of HLF assets (predating the formation of both AMP and AJP) remain frozen; these present financial and factual dead ends precluding any successor or alter ego liability for AMP or AJP. These facts also preclude any possible finding that the relevant 1996 actions which form the basis of the 2000 judgment were in actuality performed by entities which did not exist until nine (AMP) and thirteen (AJP) years later. The Supreme Court found such allegations insufficient to support jurisdiction. *Peacock*, 516 U.S. at 359.

Plaintiffs further cannot demonstrate subject matter jurisdiction as to AMP and AJP through their derivative allegations relating to judgment defendants IAP and AMS.[22] Plaintiffs'

---

[21] Also located at https://www.aclu.org/files/assets/kindhearts_v__geithner_-_settlement.pdf.

[22] In the 2000 litigation, the Seventh Circuit upheld the finding that IAP and AMP were essentially overlapping entities for totally different reasons than Plaintiffs allege here. *Boim v. Holy Land Foundation*, 511 F.3d 707, 713 (7th Cir. 2007), citing the District Court opinion at 340 F. Supp.2d 885, 908 (N.D. Ill. 2004).

Complaint states that Plaintiffs deposed Defendant Jaber in 2003 and March 2005. (Dckt. 1 at 9, 13.) Per Plaintiffs' Complaint, this sworn testimony demonstrated "both of those organizations were essentially defunct as a result of the expense of the litigation and judgment in the *Boim* Action." (Dckt. 1 at 10.)[23] Again, this presents a financial and factual dead end precluding jurisdiction: neither AMP nor AJP existed as of the time of the 1996 actions, or the insolvency of judgment defendants IAP and AMS. Therefore, they could not have been the "true" actors in 1996 of the actions leading to liability. AMP and AJP also could not have been "alter egos" or "successors" by way of fraudulent transfers, from entities which had no assets left before AJP and AMP were even formed. Simply performing a similar charitable purpose is not enough.[24] The fact that AMP and AJP have offices in the same neighborhood where IAP and AMS used to office is likewise both irrelevant and unpersuasive. While their stated purposes may resemble those of IAP and AMS, those purposes are perfectly legal; the purposes did not form the basis of the 2000 judgment. (Exs. D and E.) Even if these allegations may be sufficient to create successor liability, they are insufficient to establish subject matter jurisdiction.

## IV.     Conclusion

In an effort to collect damages from new defendants on an old uncollected judgment, Plaintiffs take the legal approach of throwing mud against a wall to see what sticks. Legally, nothing sticks. Plaintiffs cannot create subject matter jurisdiction where it doesn't exist, no matter how sympathetic the Plaintiffs or how convoluted the presentation of theories. Therefore, Defendants respectfully request this Court dismiss Plaintiffs' claims in this matter in their entirety for lack of subject matter jurisdiction.

---

[23] Had there been contrary facts, Plaintiffs would have surely used them to collect the judgment.

[24] *Christiansen*, 404 F.2d at 325 ("[t]he court can find no equitable or moral reason … why the new corporation could not be organized to conduct a modified and extended business or even a business similar to that conducted by the old corporation so long as no property of the old corporation was diverted to the new corporation").

Dated this 12th day of June 2017.

/s/ Christina Jump
Chares D. Swift
Texas Bar No. 24091964
Christina A. Jump
Texas Bar No. 00795828
Constitutional Law Center for
Muslims in America
833 E. Arapaho Rd, Suite 102
Richardson, TX 75081
Phone: (972) 914-2507
Fax: (972) 692-7454
*Pro Hac Attorney for Defendants*

## CERTIFICATE OF SERVICE

On June 12, 2017, I electronically filed the forgoing with the clerk of the court by using

the CM/ECF system, which will send a notice of electronic filing to all attorneys of record.

.

/s/ Christina Jump
Christina A. Jump

# EXHIBIT

# A

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

-------------------------------------------X

STANLEY BOIM, et al.

            *Plaintiffs,*              Case No: 1:17-cv-03591

        v.

AMERICAN MUSLIMS FOR
PALESTINE, et al.

            *Defendants.*

-------------------------------------------X

## DECLARATION OF ABDELBASET HAMAYEL

I, Abdelbaset Hamayel, hereby declare under penalty of perjury as follows:

1.     I, Abdelbaset Hamayel, submit this declaration based on my own personal knowledge.

2.     I am over the age of 18 and competent to testify to the facts recited below.

3.     I began working for the Islamic Association for Palestine ("IAP") as Chicago office administrator in or around September 1997.

4.     In that position I reported to the Board of Directors of IAP and the President.

5.     My employment with IAP ended when it ceased operating, in or around the end of 2003.

6.     I did not hold any positions with the American Muslim Society ("AMS").

7.     I became a volunteer for American Muslims for Palestine ("AMP") in or around December 2008.

8.     On March 2009, I became a volunteer Executive Director for AMP, in an unpaid position until the board finds a replacement.

9.   I was not involved in founding AMP or Americans for Justice in Palestine
     Educational Foundation ("AJP"), and I am not on the Board of Directors for either
     organization.

Abdelbaset Hamayel, Declarant

# EXHIBIT

# B

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

-----------------------------------------------X

STANLEY BOIM, et al.

           *Plaintiffs,*           Case No: 1:17-cv-03591

      v.

AMERICAN MUSLIMS FOR
PALESTINE, et al.

           *Defendants.*

-----------------------------------------------X

## DECLARATION OF OSAMA ABUIRSHAID

I, Osama Abuirshaid, hereby declare under penalty of perjury as follows:

I, Osama Abuirshaid, submit this declaration based on my own personal knowledge.

I am over the age of 18 and competent to testify to the facts recited below.

I first came to the United States at age 23, in September 1996, as a nonimmigrant journalist. I previously resided in the countries of Morocco and Jordan, and was a citizen of Jordan.

When I arrived in the United States, I worked as a journalist for a publication out of Jordan.

I got married in 1999. My wife is a United States citizen. We are still married.

I became an outreach coordinator for the American Muslim Society ("AMS") in 2000. Prior to that I had no role with the organization.

I became a lawful permanent resident of the United States in 2002.

I became a member of Islamic Association of Palestine ("IAP") in July 2002. Prior to that I did not have a role with that organization, other than to the extent there was overlap with AMS.

I filed an application to become a naturalized citizen in 2006. In December 2016, the United States Citizenship and Immigration Services issued its final administrative decision denying my application. I have filed a petition for *de novo* review of the agency's decision in the United States District Court for the Eastern District of Virginia. That cause of action is still pending.

To the best of my knowledge, both IAP and AMS were financially defunct by 2004. IAP did not have any paid employees after 2004.

I am self-employed through my consulting business, DAR Consulting. I began that business in or around November 2004.

I became a consultant, through DAR Consulting, for American Muslims for Palestine ("AMP") in 2010. I joined the Board of Directors for AMP in or around 2010 or 2011.

I became a member of the Board of Directors for Americans for Justice in Palestine Educational Foundation ("AJP") in November 2016.

I was not involved in the founding of either AMP or AJP.

Osama Abuirshaid, Declarant

# EXHIBIT

# C

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

----------------------------------------------------X

STANLEY BOIM, et al.

          *Plaintiffs,*                  Case No: 1:17-cv-03591

        v.

AMERICAN MUSLIMS FOR
PALESTINE, et al.

          *Defendants.*

----------------------------------------------------X

## DECLARATION OF RAFEEQ JABER

I, Rafeeq Jaber, hereby declare under penalty of perjury as follows:

1.     I, Rafeeq Jaber, submit this declaration based on my own personal knowledge.

2.     I am over the age of 18 and competent to testify to the facts recited below.

3.     I came to the United States in 1974, and became a U.S. citizen in 1980.

4.     When I first came to the United States, I worked in a factory for Dearborn Glass Company.

5.     When Dearborn Glass Company went out of business, I began working for Metropolitan Life ("Met Life"), first as an insurance agent. I later became a sales manager and then a branch manager. I worked for Met Life from 1975 until approximately 1996.

6.     Since retiring from Met Life, I have done freelance work as a insurance agent, financial planner and tax preparer. I began my own business, Jaber Financial Services, in or around 2000.

7. I was the President of Islamic Association for Palestine from in or around 1991 to its closing in around 2004

8. In that position I reported to the Board of Directors of IAP.

9. IAP ceased operating in or around 2004.

10. I was also the President for American Muslim Society ("AMS") in the early 1990s.

11. I was deposed in or around March 2005, and testified that both IAP and AMS were financially defunct by that time.

12. I did not serve in any official capacity with Americans for Justice in Palestine Educational Fund ("AJP") or American Muslims for Palestine ("AMP"), till I was invited to serve on the Board of Directors for AMP on 2013, or 2014 to represent it to the IRS and States tax entities to solve some problems of tax matters. I never attended any of its board meetings.

13. In or around 2012, I moved the office of my financial consulting business to the same building where AMS and IAP had been several years-beforehand, when larger office space became available in that building. However, I am not in the same office space that was formerly occupied by IAP and AMS. I did not take over the office space formerly occupied by IAP or AMS.

Rafeeq Jaber, Declarant

# EXHIBIT

# D

# STATE of CALIFORNIA
## ARTICLES of INCORPORATION

AUG -2 2006

I

The name of this corporation is: **American Muslims for Palestine Inc.**

II

This corporation is a nonprofit **PUBLIC BENEFIT CORPORATION** and is not organized for the private gain of any person. It is organized under the Nonprofit Public Benefit Corporation Law for:

( ) **Public** purposes.
Or ( ) **Charitable** purposes.
Or ( X ) **Public and charitable** purposes.

The specific purpose of this corporation is to educate the general public on Palestine culture and history. Conduct seminars at high schools and colleges.

III

The name in the State of California of this corporation's initial agent for service of process is:

**Hatem Albazian**
**2425 Channing Way, Suite 335**
**Berkeley, CA 94704**

IV

This corporation is organized and operated exclusively for **Public and Charitable** purposes within the meaning of Section 501 (c) (3), Internal Revenue Code. No substantial part of the activities of this corporation shall consist of carrying on propaganda, or otherwise attempting to influence legislation, and the corporation shall not participate or intervene in any political campaign (including the publishing or distribution of statements) on behalf of any candidate for public office.

V

The property of this corporation is irrevocably dedicated to **Public and Charitable** purposes and no part of the net income or assets of this corporation shall ever inure to the benefit of any director, officer or member thereof or to the benefit of any private person. Upon the dissolution or winding up of the corporation, its assets remaining after payment, or provision for payment, of all debts and liabilities of this corporation shall be distributed to a nonprofit fund, foundation or corporation which is organized and operated exclusively for Public purposes and which has established its tax exempt status under Section 501 (c) (3), Internal Revenue Code.

Date: July 28, 2006

# EXHIBIT

# E

3237554

FILED
IN THE OFFICE OF THE
SECRETARY OF STATE
OF THE STATE OF CALIFORNIA

NOV 16 2009

### STATE of CALIFORNIA
### ARTICLES of INCORPORATION

I

The name of this corporation is: AJP Educational Foundation

II

A.  This corporation is a nonprofit PUBLIC BENEFIT CORPORATION and is not organized for the private gain of any person. It is organized under the Nonprofit Public Benefit Corporation Law for Charitable purposes.

B.  The specific purpose of this corporation is:

* To provide seed funding for publishing books, specialized journals and fostering research focusing on international relations and global human rights conditions. Also, will provide funds for conferences, seminars and media projects intended to reach widest possible audience.

III

The name in the State of California of this corporation's initial agent for service of process is:

Hatem Al-Bazian
2801 Telegraph Ave
Berkeley, CA 94705

IV

A.  This corporation is organized and operated exclusively for Charitable purposes, including, for such purposes, the making of distributions to organizations that qualify as exempt organizations under Section 501 (c)(3) of the Internal Revenue Code, or corresponding section of any future federal code.

B.  No substantial part of the activities of this corporation shall consist of carrying on propaganda, or otherwise attempting to influence legislation, and the corporation shall not participate or intervene in any political campaign (including the publishing or distribution of statements) on behalf of any candidate for public office.

V

The property of this corporation is irrevocably dedicated to Charitable purposes and no part of the net income or assets of this corporation shall ever inure to the benefit of any director, officer or member thereof or to the benefit of any private person. Upon the dissolution or winding up of the corporation, its assets remaining after payment, or provision for payment, of all debts and liabilities of this corporation shall be distributed to a nonprofit fund, foundation or corporation which is organized and operated exclusively for Charitable purposes and which has established its tax exempt status under Section 501 (c) (3), Internal Revenue Code.

Date: November 13th, 2009

Nida

# EXHIBIT

# F

## SETTLEMENT AGREEMENT

This Settlement Agreement is entered into by Plaintiff KindHearts for Charitable Humanitarian Development, Inc. ("KindHearts") and Defendants Timothy F. Geithner, in his official capacity as the Secretary of the Treasury, Adam Szubin, in his official capacity as Director of the Office of Foreign Assets Control, and Eric Holder, in his official capacity as Attorney General of the United States ("Defendants"), (hereinafter, collectively, "the Parties"). Whereas the Parties now mutually desire to resolve all of the claims asserted by Plaintiff in this action without the need for further litigation, and without any admission of liability or wrongdoing by either Party; whereas KindHearts believes that it acted lawfully and has independently determined to close down because further charitable work would be best pursued under other auspices; and whereas the government believes that it acted lawfully and correctly, the Parties hereby accordingly agree to compromise, settle and resolve all of the claims asserted by Plaintiff in this action on the following terms and conditions:

1. All funds and assets owned by KindHearts will be expended, pursuant to licenses by the Office of Foreign Assets Control (OFAC), to cover KindHearts' outstanding financial obligations and as grants for charitable purposes to charitable organizations set forth in Appendix A. Nothing in this Agreement is or should be construed as Defendants' endorsement or approval of, or agreement with, any of the organizations or individuals listed in the Appendix. KindHearts shall complete the process of identifying financial obligations within 90 days of the signing of this agreement. Once KindHearts has identified all such obligations to OFAC and certified to OFAC that the obligations are valid and represent a complete accounting of KindHearts' outstanding financial obligations, and OFAC has found that such licenses are appropriate, OFAC will issue, within 30 days, licenses authorizing: (1) the payment of those obligations; and (2) the apportionment of all remaining funds between the entities listed in Appendix A, pursuant to the agreement of KindHearts and OFAC. Upon completion of the process contemplated in this paragraph, the remainder of this agreement will become operative. In the event that the parties cannot reach agreement as to the payment or licensing of particular debts, either party may terminate this agreement prior to disposition of KindHearts' assets.

2. Once its assets and funds have been fully allocated, KindHearts agrees to dissolve, cease operations and close down. Assuming all requirements are met, OFAC will license such dissolution. Nothing in this Agreement is or should be construed as a determination that KindHearts was engaged in any wrongdoing. KindHearts is responsible for complying with its legal obligations, including those related to dissolution.

3. Within 60 days after disposition of all KindHearts assets and dissolution of KindHearts, OFAC will remove KindHearts from the list of entities whose assets are blocked, and lift any and all blocking orders against KindHearts. As long as the terms of the Agreement are fulfilled and KindHearts is not a functioning entity, OFAC will not designate KindHearts. At the conclusion of this process, OFAC will notify all other federal agencies to which it normally communicates such actions that KindHearts has been removed from the list of specially designated nationals and blocked persons, and OFAC has lifted the blocking pending investigation of its assets.

4. Nothing in this agreement prevents KindHearts' former board members, officers, and employees from engaging in any lawful activity, including forming a new organization to engage in charitable activity in the Middle East or elsewhere that conforms with all legal requirements. In this agreement, OFAC takes no position on such future charitable activities. Nothing in this agreement affects the laws and regulations applicable to KindHearts' former officers and employees; nor does this agreement restrict the authority or discretion of the Defendants to take enforcement action or seek designation with respect to any person or entity, consistent with Executive Order 13224 or any other authority.

5. Within 180 days of execution of this agreement – or if KindHearts has not dissolved within 180 days, then within 60 days of the dissolution of KindHearts – Defendants will pay $ 330,000 as reasonable attorneys' fees and expenses directly to KindHearts' counsel on KindHearts' behalf, without remittance to KindHearts or its officers. OFAC will license this transaction.

6. Upon satisfactory completion of the terms of Paragraphs 1, 2, 3 and 5, the Parties will jointly move for lifting of the existing preliminary injunction, and dismissal of this case with prejudice.

7. Plaintiff, for itself and its administrators, heirs, representatives, successors, or assigns, acting in their formal capacity as such, hereby waives, releases and forever discharges Defendants, all of its agencies, components, offices or establishments, and any officers, employees, agents, or successors, of any such department, agency, component, office or establishment, either in their official or individual capacities, from any and all claims, demands and causes of action of every kind, nature or description, which were known to Plaintiff or should have been known, which have been or could have been asserted in this action, or any other administrative or judicial proceeding against Defendant, arising out of or in connection with any event occurring prior to the date of this Agreement including, without limitation, the blocking pending investigation of Plaintiff, the provisional determination that Plaintiff could be designated, and any and all licensing requests to OFAC for disbursement of Plaintiff's funds. This agreement does not constitute waiver of claims by Plaintiff's administrators or representatives in their personal capacities.

8. This Agreement is not and shall not be construed as an admission by Defendants of the truth of any allegation or the validity of any claim asserted in this action, or the Defendants' liability therein. Nor is it an admission by Plaintiff of the truth of any allegations or accusations made by Defendants about it. Nor is it a concession or an admission of any fault or omission in any act or failure to act. Nor shall any of the terms hereof be offered or received in evidence or in any way referred to in any civil, criminal, or administrative action, or construed for any purpose whatsoever as an admission or presumption of wrongdoing on the part of either Defendants or Plaintiff.

9.      The terms of the Agreement, and the attachment thereto, constitute the entire agreement of the Parties entered into in good faith, and no statement, remark, agreement or understanding, oral or written, which is not contained therein, shall be recognized or enforced; nor does the Agreement reflect any agreed-upon purpose other than the desire of the Parties to reach a full and final conclusion of this action and to resolve the matter without the time and expense of further litigation.

10.     This Agreement cannot be modified or amended except by an instrument in writing signed by the party to be charged therewith; nor shall any provision hereof be waived other than by a writing setting forth such waiver and signed by the party to be charged with such waiver.

11.     This Agreement shall be binding upon and inure to the benefit of the Plaintiff and the Defendants and their respective successors, assigns, and representatives acting in their official capacities, including any persons, entities, departments or agencies succeeding to the interests or obligations of the Parties. This agreement shall not be binding upon Plaintiff's administrators or representatives in their personal capacities.

12.     Each person signing this Agreement, whether signed individually or on behalf of any person or entity, warrants and represents that he or she has full authority to so execute the Agreement on behalf of the party on whose behalf he or she so signs.

13.     This Agreement, which may be signed in counterparts, shall take effect upon execution by all signatories below. This Agreement may be executed on copies send by electronic mail with the same force and effect as an executed original of the same.


Amy Powell
For Defendants

11/22/11
Dated


Hatem ElHady
For Plaintiff

11/29/11
Dated


Jihad Smaili
For Plaintiff

11/28/11
Dated

## APPENDIX A

1. United Nations World Food Programme
    *See* http://www.wfp.org
2. United Nations Children's Fund
    *See* http://www.unicef.org
3. United Nations Relief and Works Agency for Palestinian Refugees
    *See* http://www.unrwa.org
4. Mercy Corps
    *See* http://mercycorps.org
5. Masjid Saad (receiving KindHearts' physical assets only)